1                    UNITED STATES DISTRICT COURT FOR
                          THE DISTRICT OF MARYLAND
2

3  --------------------------x
   IN RE: KBR, INC. BURN PIT  :
4  LITIGATION                 :
                              :
5                             :Civil Action: RWT-09-2083
                              :
6                             :
   --------------------------x
7

8                              Friday, June 4, 2010
                               Greenbelt, Maryland
9

10

        The above-entitled action came on for a Motions
11 Hearing Proceeding before the HONORABLE ROGER W. TITUS,
   United States District Judge, in courtroom 2C, commencing
12 at 10:32 a.m.

13
            **APPEARANCES**:
14
            **On behalf of the Plaintiffs**:
15 JOSEPH RICE, Esquire
   SUSAN BURKE, Esquire
16 SUSSAN SAJADI, Esquire
   JOE MELUGIN, Esquire
17 VINCENT PARRETT, Esquire

18          **On behalf of the Defendant**:
   ROBERT MATTHEWS, Esquire
19 BIKRAM BANDY, Esquire
   RAYMOND BIAGINI, Esquire
20 LORA BRZEZYNSKI, Esquire
   SHARON STAGGY, Esquire
21 TIMOTHY HALLORAN, Esquire
   SHANNON KONN, Esquire
22

23

24
   Tracy Rae Dunlap, RPR, CRR              (301) 344-3912
25 Official Court Reporter

1                         I N D E X

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                                        <u>Page</u>

25 Reporter's Certificate                         136

1          THE CLERK:  The matter now pending before this
2  court is RWT-09-MDL-2083; In RE: KBR, Inc. Burn Pit
3  Litigation.  We are here for the purpose of a motions
4  hearing.
5          Counsel, please identify yourselves for the
6  record.
7          MR. RICE:  Your Honor, Joe Rice for the
8  plaintiffs.
9          MS. BURKE:  Good morning.  Susan Burke for the
10 plaintiffs.
11         MS. SAJADI:  Sussan Sajadi for the plaintiffs.
12         MR. MELUGIN:  Joe Melugin for the Johnson
13 plaintiff and plaintiffs.
14         MR. PARRETT:  Good morning, Your Honor.  Vincent
15 Parrett of Motley Rice for the plaintiffs.
16         MR. MATTHEWS:  Robert Matthews for the KBR
17 defendants.
18         MS. KONN:  Shannon Konn for the KBR defendants.
19         MR. BANDY:  Bikram Bandy for the defendants.
20         MR. BIAGINI:  Ray Biagini for the defendants.
21         MS. BRZEZYNSKI:  Lara Brzezynski for the
22 defendants.
23         THE COURT:  We are here on a series of motions --
24 we've got some more to go, excuse me.
25         MS. STAGGY:  Sharon Staggy for the defendants.

1      MR. HALLORAN:  And Timothy Halloran for the KBR

2 defendants.

3      THE COURT:  We have a number of motions here

4 today, but what I'd like to have you do is to make your

5 argument on the motions to dismiss; and you can include

6 in that your Motion to Strike, and let's hear them both

7 at the same time.  You may proceed.

8      Before you begin, I just wanted to tell you that I

9 noted that a Cert petition was pending in the Carmichael

10 case, and I'm curious.  I looked at the Supreme Court

11 docket and noted that the Solicitor General filed a brief

12 as *amicus curiae* in that case last Friday.  So, I have a

13 copy of that in front of me.  If some of you don't know

14 what that's all about, let me know and I can make sure

15 you all have copies.  But I did read that.

16      MR. MATTHEWS:  Thank you, Your Honor.  May it

17 please the Court.  Your Honor, Bob Matthews for the

18 defendants.  We've already done the introductions.  If I

19 may proceed.  Just a point of clarification.  Did I hear

20 you say you wanted argument on the Motion to Strike as

21 well?

22      THE COURT:  Yes.

23      MR. MATTHEWS:  If it please the Court, Mr. Bandy

24 will address those issues when I'm at the right point,

25 either at the end of my presentation or later on as the

1 Court prefers.

2         THE COURT:  That's fine.

3         MR. MATTHEWS:  Your Honor, there are some

4 significant issues before this court.  We've fully

5 briefed our Motion to Dismiss.  We've raised the

6 Political Question Doctrine.  We've raised Derivative

7 Sovereign Immunity and the combatant exceptions to the

8 Federal Tort Claims Act.  But before getting into the

9 merits of those issues, what I would like to do is

10 address the Court on some of what has been placed before

11 the Court by the plaintiffs.

12        As the Court has no doubt noted, plaintiffs have

13 put a number of issues which I would call clutter and

14 distractions before the Court trying to veer this court

15 off the path towards considering the merits of our

16 motions, and some of that has been quite sensational, to

17 say the least, Your Honor.  Maybe we'll hear some more

18 of that this morning.

19        What I'd just like to spend a minute or two on,

20 Your Honor, is to be clear about what this case is and is

21 not about.  Today, for example, Your Honor, this case is

22 not about the merits of plaintiffs' claims.  And an

23 equally important point, try as they may -- try as

24 plaintiffs may, this case is not about full merits

25 discovery.  Not yet.  Not today.  That's not the issue

1 before this court.

2        In that regard, Your Honor, another thing that
3 this case is not about is the Burn Pit MDL.  This is not
4 the convoy case.  There have been substantial efforts by
5 a number of plaintiffs' counsel to import -- inject into
6 this case issues, documents, arguments, pleadings that
7 have arisen in another court, in another jurisdiction
8 involving different facts at a very different procedural
9 stage, and we invite the Court to decline that invitation
10 to consider those issues.

11       Also raised but in our judgment, Your Honor, not
12 relevant in these proceedings or any other time are the
13 plaintiffs' efforts to impugn the character of KBR.  That
14 is an issue that is not before this court today, nor
15 should it ever be.

16       Now, there is also a number of *ad hoc* allegations
17 of isolated incidents of noncompliance.  What I'd like
18 the Court to fully grasp here is that incidents of
19 contract noncompliance are not central to these defenses.
20 They're not an element of these defenses.  There's this
21 odd notion in the pleadings of plaintiffs' that because
22 they're alleging noncompliance, that itself means that
23 we're not eligible for immunity and dismissal.  Oddest of
24 notions.

25       The whole premise of the Federal Tort Claims Act

1 is that somebody is alleging that a tort has occurred and

2 the government, in its wisdom, has decided that under

3 certain circumstances government employees may or may not

4 be sued, but the underlying premise is allegations of

5 tort.  That same premise is found in all of the cases in

6 which those same immunities have been extended to

7 government contractors.  The premise is somebody saying

8 there's a tort and the dismissals in those cases

9 routinely granted never get to the merits of whether

10 that's right or wrong.  So the notion that they've

11 alleged noncompliance, therefore don't dismiss, simply is

12 a non sequitur.

13        On a very related point, Your Honor, plaintiffs

14 have tried to convince us and this court that what we

15 really meant to say was we're arguing the government

16 contractor defense.  Well, the fact is we're not.  We

17 haven't pled it.  It's a very different defense.  It's

18 not before the Court today.  I would say, Your Honor,

19 there may come a time when that defense would be one we

20 would want to raise with the Court, and the Court would

21 have to consider then, well, what are the evidentiary

22 facts necessary to support that defense.  Not happening

23 today.

24        Finally, Your Honor, on my list, I'd like to point

25 out that this is not an exclusive remedies case.  That is

1  to say that in dismissing the claims of plaintiffs, Your

2  Honor would not be precluding claimants with injuries

3  from seeking redress.  The servicemen and women can seek

4  some kind of -- some form of redress through the Veterans

5  Benefits Act.  And the contract employees, KBR and others

6  who have served in the war theaters, can seek recourse

7  through the Defense Base Act.

8        All right.  Now, having said what's not in this

9  case, Your Honor, let me turn to what is.  Clearly, the

10 issues are whether in fact this court has jurisdiction to

11 hear plaintiffs' claims; and the related second point is,

12 does the Court now have before it a sufficient

13 evidentiary record to reach a conclusion one way or the

14 other on the merits of those defenses.

15       Your Honor knows that these defenses are largely

16 predicated on profound federal interest, unique federal

17 interest, and it is in the protection of those interests

18 that the case law has developed around immunizing

19 government contractors, and it is inconsistent with that

20 interest to impose state tort law liabilities not from

21 one state, not from five but, in this case, I think the

22 count is -- I could be wrong, but I think the count is 43

23 states.  That is inconsistent with the need to protect

24 those federal interests.

25       All right.  Well, it's clear that before this or

1 any other court can get to the merits of plaintiffs'
2 claims, courts must first make judgments on whether or
3 not it has jurisdiction.  And we thought, Your Honor, the
4 best way to sort of grapple with -- understand what the
5 jurisdictional issues really are is to align what
6 plaintiffs are alleging are the acts of negligence with
7 what KBR is asserting what is its defense and, in that
8 regard, what the military has said about its role in
9 those alleged instances of negligence.
10       As we know, Your Honor, the plaintiffs have
11 basically made three points.  One, that KBR chose burn
12 pits when they should not have chosen burn pits; they
13 should have chosen incinerators, recycling, or landfills.
14       2.  KBR improperly located burn pits at forward
15 operating bases.  That is to say, instead of placing the
16 burn pit downwind from the living and working facilities
17 so that the smoke would blow away, KBR chose locations on
18 forward operating bases upwind so that those living and
19 working facilities were downwind from the smoke.  That's
20 the second allegation.
21       And then third, plaintiffs allege that KBR
22 improperly burned substances that they should not have
23 burned, and they should have known not to burn them.
24       So, in essence, Your Honor, on this alignment
25 point plaintiffs have alleged that KBR had a duty to

1  potential claimants; they breached that duty, and they

2  did so through these three key decisions.  KBR, as Your

3  Honor is aware, has asserted in response in fact as to

4  each of those critical decisions it was in fact the Army

5  that made them.

6         So, what we found, Your Honor, to be instructive

7  is that alignment, and we've actually prepared a

8  demonstrative.  We have a series of demonstratives, Your

9  Honor, and I'd like to pass those forward to the Court if

10 I may approach.

11        THE COURT:  You may.

12        MR. MATTHEWS:  Your Honor, I've provided three

13 copies to the clerk for the Court, your law clerk, and

14 for the court reporter, and a copy for the plaintiffs as

15 well.

16        THE COURT:  Okay.

17        MR. MATTHEWS:  All right, Your Honor.  So, here is

18 the alignment.  We have the main allegations that I've

19 just recited that we chose the burn pits over other

20 alternatives; we improperly located and we burned unsafe

21 materials.

22        The reality that's reflected in our defense papers

23 and in the exhibits including but not limited to the

24 declarations is in fact that the military chose the burn

25 pits as the method.  They chose the location of the burn

1 pits and the living and working facilities, and they

2 decided which items could or could not be disposed on.

3 Now, let me just take a minute to break each of those

4 down.

5        So, on the first allegation that plaintiffs allege

6 that KBR chose:  They knew or should have known that

7 burning waste in burn pits would create hazardous

8 conditions, and we should have chose a safer alternative.

9        Look at what the declarations tell us, however,

10 Your Honor.  As a matter of policy, says Dr. Craig

11 Postlewaite of DOD, it's the military that made those

12 choices.

13        And Major Tara Hall said pretty much the same

14 thing:  It's up to the Army to make those decisions.

15        Your Honor, I would like to highlight now on the

16 third bullet on the right side of the page.  This is not

17 simply a declaration.  Let me digress a little bit

18 further.

19        Let me remind the Court that each of the

20 declarations that we provided in our moving papers went

21 through the former Touhy process, a process that we

22 briefed in our papers.  That means that they were vetted

23 through the Department of Defense, including the

24 Department of Army and the Department of Justice, and I

25 think that that says something about their reliability

1 and credibility.

2        So, Dr. Postlewaite says as a matter of policy,
3 no, it's us.  So, too, does Tara Hall.  But in addition
4 to these declarations, we now have, and we've also had in
5 the record a number of documents which support those
6 declarations.  So, our evidence is not limited to
7 declarations.

8        In this case, we have this very recent document
9 which we which filed as a supplement, docket number 87-1
10 if I can read the small print, is this report to
11 Congress.  Congress directed, through the National
12 Defense Authorization Act of 2010 that DOD filed a series
13 of reports -- this is the first one -- and it's clear
14 that DOD is saying this is a matter of operational
15 control.

16        DOD, in fact, has said a number of things about
17 burn pits, Your Honor.  And it's not what they've said
18 necessarily in 2003 and 2004 that's instructive, although
19 it is.  But, look here on this slide how recently they
20 have continuously reaffirmed that they made this choice
21 and they're going to continue to make this choice, so
22 says General Petraeus in 2008.

23        This DOD report has what we consider to be, you
24 know, a very informative quote in it.  It says, "during
25 military operations open-air burning will be the safest

1 (from a total threat standpoint), most effective and

2 expedient manner of solid waste reduction."  And what

3 that quote says, Your Honor, that quote in particular, is

4 that the United States made this decision balancing the

5 risks that it perceived on the battlefield, and it was

6 their judgment that this is the safest, most expedient,

7 and provides the most effective means from a total threat

8 standpoint.  And, again, that same report goes on to say

9 that this is going to continue to be a need as the wars

10 and years go on.

11      The second issue is location.  Again, plaintiffs

12 allege we were responsible and we put them in the wrong

13 places.  Okay.  We have three excerpts from the

14 declarations.  Perhaps Your Honor has already read these.

15 Let me just say this.  The declarations tell us something

16 that is so intuitive, it defies logic that it's been

17 suggested otherwise.  That is, that in the midst of a

18 contingency operation in a war at a forward operating

19 base which is under hostile attack, the decision as to

20 how to deploy the land on that base, it's not made by the

21 contractor, it's made by the Army.  I don't think more

22 needs to be said about that point.

23      But here is kind of a capture, Your Honor, in this

24 last slide of the effects of those first two decisions,

25 this kind of use and location decisions creating,

1 essentially, exposure.  Dr. Craig Postlewaite said, okay.
2 Burn pits, we'll try to put them in the right places, but
3 sometimes we can't.  In any circumstance, Your Honor,
4 burn pit smoke may, through wind rows, consideration if
5 it's placed in the right place, generally blow away from
6 living and working quarters.  Even in those instances,
7 sometimes it will come at, you know, the soldiers and the
8 employees because the wind does shift from time-to-time.
9 But Dr. Postlewaite says, sometimes we even put it in the
10 wrong place because we have to.
11        And as to the items in the burn pit.  Again, I
12 think Your Honor has seen much of this already.  I want
13 to focus on two things:  The medical waste allegation
14 that they say, well, that was your choice and it was
15 wrong.  We have the Army's health arm, CHPPM, saying, you
16 know what?  When an incinerator is not available, and
17 until very recently, Your Honor, there were very few
18 incinerators available in Iraq and Afghanistan, not only
19 is burning medical waste permissible, it's preferred.
20        And then of course, in addition to medical waste,
21 much as been made about the plastic water bottles.
22 Again, we see here through these declarations that not
23 only was it permitted, but the Army understood and
24 essentially directed KBR because the alternative was not
25 available.  There were so many plastic water bottles in

1 theater, but they had no choice.  They didn't want to

2 recycle.  I shouldn't say that.  There was no built in

3 recycling program in Iraq.  They didn't want to go

4 outside of the wire to the landfill for obvious reasons,

5 and inside the wire there simply was not enough room.

6 This is the choice they made.

7        All right.  Your Honor, that section of our -- of

8 the demonstratives.

9        Now, Your Honor, at this point I will proceed to

10 address the merits of our jurisdictional defenses.  And I

11 also want to address in that context the discovery

12 questions that are before this court, and I will do that

13 in whatever order the Court wishes.  Otherwise, I will

14 proceed.

15        THE COURT:  You can proceed.

16        MR. MATTHEWS:  Thank you, Your Honor.  Let me

17 start with the activities exception to the Federal Tort

18 Claims Act.  I don't know if you're asking this question,

19 but I'll answer it.  Why?  Why start there?  Because in

20 many respects, Your Honor, it is the simplest of them

21 all.  It asks only one question, and that is whether the

22 activities at issue are both necessary to and in direct

23 connection with actual hostilities.  That's a pretty

24 simple and straightforward question.

25        This standard -- that question was first

1 articulated back in 1948 in the Johnson decision in the

2 Ninth Circuit.  Again, in 1992, in the Koohi decision,

3 again in the Ninth Circuit; and most recently in the

4 Taylor decision in the Eastern District of Virginia,

5 approved by Judge Dumar.

6        Plaintiffs views on this combatant activities

7 issue are self-serving.  They're somewhat myopic.  And

8 more than anything else Your Honor, they fail to take

9 into account the modern realities of force protection on

10 the battlefield.  That is why these courts have said,

11 particularly of late, it is within the federal interest

12 to protect contractors on the battlefield.  I'll come

13 back to that in a minute.  Let me get rid of some of the

14 other issues they've raised.  They're sort of just

15 one-offs.

16        They first say, well, that doesn't apply to

17 contractors.  Well, that's a -- that's an uphill battle

18 for plaintiffs, I would think, Your Honor.  There is a

19 weight of evidence of cases from Saleh to Koohi to Taylor

20 to Benson, all the cases we've cited.  This is not simply

21 an overwhelming series of precedents, it is a fully

22 emerged consensus on that issue.  And, again, in reading

23 those cases, what emerges?  Protection of the federal

24 interests.  Protection of the military's ability to fight

25 an efficient battle on the modern battlefields.

1          Another issue they raise is no, no, you can't
2 raise this defense unless plaintiffs are enemy
3 combatants.  Once again, we're ignoring precedence here.
4 Most recently, Taylor -- plaintiff was a U. S.
5 servicemen.  The Benson case, I believe the plaintiff was
6 a marine.  Again, precedence says otherwise.
7          And then a third argument is, well, it doesn't
8 apply to what they call the "what, now how" contracts.
9 That's an interesting argument, but it ignores or it
10 tries to infuse an issue into this jurisdictional defense
11 that simply doesn't exist.  Why?  Because the only
12 question that that defense asks the Court to answer is
13 whether the alleged activities were undertaken in direct
14 connection to hostile activities were necessary to and in
15 direct connection with hostile activities.
16          So, let's come back around to the main order of
17 business on this combatant activities issue and that is,
18 are these combatant activities for which the immunity
19 should be extended to these contractors.  Plaintiffs
20 would like to rely on Al Shimari, which was an Abu Ghraib
21 Prison case.  It is narrow.  We can, you know, speculate
22 on why the judge wanted to find a way, because of the
23 horrible publicity about the atrocities at Abu Ghraib.
24          Instructively, Your Honor, it is a narrow
25 definition of what is combat activities.  And I think it

1 has to be said that subsequently we have an appellate

2 decision out of the D. C. Circuit in the Saleh case which

3 rejects Al Shimari, and then we have Taylor coming behind

4 Saleh within this circuit rejecting Al Shimari and saying

5 no, no, we need to accommodate the federal interest.  It

6 can't be that narrow, and so they adopted of course a

7 much broader test.

8        I will, Your Honor, just quickly recite two

9 passages out of Taylor, simply because I can't improve on

10 this capture of combatant activities and that is --

11        THE COURT:  What was the case again?

12        MR. MATTHEWS:  Taylor.

13        THE COURT:  Taylor?

14        MR. MATTHEWS:  Yep.  The Taylor court said there

15 is no question that the activities of private contractors

16 acting under the supervision of the military in a war

17 zone fall within an area of uniquely federal interest.

18 It went on to say, the application of state tort law to

19 the combatant activities of, insert KBR, would produce a

20 significant conflict with federal interests and policies.

21 So, to accommodate that federal interest, once again the

22 Court adopted the standard that goes back to Johnson,

23 back to Koohi and was adopted also by Saleh.

24        Finally on this point Your Honor, in the Taylor

25 case the activities at question were maintenance and

1 power generation.  The Court said clearly these are

2 activities necessary to and in connection to.  It's no

3 less true for waste management and water services.

4        Not only does KBR make that assertion, but let's

5 take a look through the next demonstrative at what the

6 United States military has said.  As to waste management,

7 the quote from our Exhibit 1 in the Motion to Dismiss is

8 that waste management is truly an area of force

9 protection.

10        The next bullet speaks to how important it is to

11 provide safe and potable water on the battlefields, so

12 that service is also an area of force protection.

13        And the other quotes, again, Army technical

14 bulletins:  "Critical to protect the health of soldiers,"

15 talking about waste.

16        John Resta, from CHPPM, says these are an

17 operational necessity.

18        Let's see.  Your Honor, there was one quote out of

19 plaintiffs' opposition, I believe it's on the very last

20 page right before the conclusion where they said that no

21 combat interest of the United States would be served by

22 immunizing KBR from accountability for its misconduct

23 merely because it provided logistical support in Iraq and

24 Afghanistan.

25        I would contrast that statement Your Honor from

1 plaintiffs with an exhibit they themselves attached to
2 their opposition.   This is this Army regulation 7-137.
3 In defining "logistics," what did they say?   Merely
4 because they provided logistical support.   In defining
5 "logistics," the Army says those are activities that
6 support the movement and sustenance of a combat force.
7 The five functional elements include supply, maintenance,
8 transportation, services, and facilities.   Is there any
9 question that the services that KBR was providing are
10 combat-related to combat activities that arose in direct
11 connection with combat activities?   They were necessary
12 to support our troops, and I think this case should be
13 dismissed on that basis alone.
14       As to discovery on this issue.   I would simply
15 say, Your Honor, that I don't see any facts that are
16 going to change the legal question that's before this
17 court on that issue.   So, I don't think discovery becomes
18 an issue on this.
19       All right.   Turning to Derivative Sovereign
20 Immunity.   Derivative Sovereign Immunity itself asks a
21 fairly straightforward question, whether the activities
22 at issue fall within the government function of the kind
23 for which a government itself would be immune.
24 Plaintiffs' arguments first appear to be that KBR is not
25 the sovereign.   That's not disputed.

1      Second, that a federal interest is not served if

2 KBR is immunized.  Well, not so.  Not even close to being

3 so.  Clearly there is a federal interest.

4      And third, they say that KBR doesn't meet the

5 boiler criteria for government contractor defense.  We've

6 already said that's not relevant.

7      The only other thing that's striking about

8 plaintiffs' arguments here is they completely ignore the

9 controlling precedence in this circuit, particularly

10 Mangold.  To use the lexicon of sort of computer and

11 software, it's as if they want to "gray out" the Mangold

12 and Servco decisions as matters of inconvenience.  Your

13 Honor, we've fully briefed these cases.  I don't want to

14 go through, you know, all of that, but I would like to

15 maybe capture a couple of the elements that emerge.

16      Essentially, the cases tell us there are

17 essentially two paths the Court can go down to grant

18 Derivative Sovereign Immunity or Sovereign Immunity.  The

19 first path, the Fourth Circuit path, let's call it the

20 Mangold path, the Court need only consider the following.

21 First, Mangold first asked whether the activity at issue,

22 the services provided, are a function of the government.

23 That one is pretty straightforward.  Providing, you know,

24 water and waste management services on the battlefield to

25 soldiers is historically and quintessentially a

1  government function.

2          And Servco says, in addition to saying the law of

3  absolute immunity doesn't require specific authorization,

4  Servco goes on to say that the immunity is defined by the

5  scope of the contractor immunity by the nature of the

6  function being performed.  Let me try that again.  The

7  scope of contractor immunity is defined by the nature of

8  the function being performed.  So, that's the first prong

9  of the Mangold path.

10          And then Mangold asks importantly, Your Honor,

11  whether it's in the public interest to confer immunity.

12  Here, there could be no greater significant public

13  interest.  The whole premise of the LOGCAP program

14  adopted back in the '80s is that the United States

15  military needs -- it absolutely relies on its contractors

16  to go onto the battlefield with it.  That is the reality

17  of modern warfare.  And if we, through the application of

18  state tort law, create disincentives for contractors to

19  proceed, or put obstacles in their way, that clearly is

20  in conflict with the federal interest and interests of

21  the military and national defense.

22          So, clearly, federal interests means we need to

23  protect the military which means we need to protect the

24  contractors.  Let me just turn that around one more time.

25  What we don't want is contractors hesitating to step

1 forward and accept these assignments for fear that the

2 responsibilities and liabilities born of tortious

3 allegations will outweigh any benefit to them, so they

4 will hesitate to step forward or worse yet Your Honor, on

5 the battlefield do we really want our contractors pausing

6 and saying, hmm, I wonder if I should do this.  I wonder

7 if I do this I'm going to be held liable for tort.

8 Clearly, federal interests are implicated by even

9 suggesting the contractors --

10      THE COURT:  Would your arguments be different if

11 we were dealing with a military base in, say, Maryland,

12 like Fort Meade, and your client was under contract to

13 provide water services and to provide refuse services,

14 and one day one of their trash trucks is driving down the

15 street and runs over a civilian?

16      MR. MATTHEWS:  Your Honor, let me answer it this

17 way.  The analysis of the public interest issue in that

18 case would be different.  Can a defendant in that

19 situation under the facts of that case identify a federal

20 interest?  Possibly.  I'm not sure I'm capable of doing

21 that as we sit here, Your Honor.  But at the case at bar,

22 we have federal interests defined by the fact that LOGCAP

23 says the soldiers, the Army, the military needs

24 contractor support on the battlefield and we don't want

25 to disincentivise that activity.

1          So, the second path to extending immunity to KBR

2  was this alternate line of cases under the rubric of

3  Derivative Sovereign Immunity.  It's the Yearsley and

4  Ackerson line of cases.  Here, the question is whether in

5  the performance of a government function.  All right?

6  The question that's asked is not whether have they

7  complied with the activities they've been designated but

8  rather instead whether the activities that were taken

9  were within the scope of that function.

10          And Ackerson case said, well, immunity is going to

11  be conferred where the actions are "taken pursuant to

12  contract," and that's a pretty simple standard here, Your

13  Honor.  The fact that there are allegations of

14  noncompliance is not the issue.  Every allegation of

15  noncompliance in this case has to do with whether we did

16  the right or wrong things in performing waste management

17  services and, in particular, burn pit services.  That is

18  within the scope of the contract, within the meaning of

19  the Yearsley and Ackerson cases.

20          Again, Your Honor, on the discovery issue we would

21  submit that this is really not much that's needed here.

22  There is no more needed than is already before the Court

23  to apply these legal concepts.

24          THE COURT:  Well, I assume that you're very

25  pleased with the Saleh decision of the D. C. Circuit, but

1  in that case there was limited discovery.

2          MR. MATTHEWS:  Say again, Your Honor.

3          THE COURT:  In is Saleh decision in the D. C.

4  Circuit, there was limited discovery.  And how would I,

5  consistent with the approach taken by the Saleh court,

6  address the discovery issue in this case if I were to

7  permit it?

8          MR. MATTHEWS:  Your Honor, I think one of the

9  distinguishing features of this case versus -- and I've

10 called it "Sa-LAY;" I'll defer to "Sa-La."  I'm sorry.

11         THE COURT:  I don't know how to pronounce it.

12         MR. MATTHEWS:  I'm going to have to work on that

13 one.

14         THE COURT:  I will defer to your pronouncement.

15         MR. MATTHEWS:  Not only Saleh, but a number of

16 other cases KBR came to these motions, attached to its

17 motions and to its reply brief, and as a supplement, the

18 DOD report, a substantial body of information that is

19 itself a sufficient level of threshold jurisdictional

20 discovery facts and discovery.  I mean, I think that we

21 have to be clear about this, Your Honor.  It isn't that

22 facts are never needed.  It's that in this case, and

23 we're going to talk about the discriminating inquiry here

24 in a minute under the PQD.  But in this case, it's clear

25 that Your Honor already has the information that it --

1 that this court will require in order to make an

2 assessment about whether this is a government function,

3 whether there is a public interest in immunizing

4 contractors under these circumstances.

5        I don't mean to suggest -- KBR does not mean to

6 suggest that you never need a lick of discovery; that no

7 facts are relevant Your Honor, and I actually appreciate

8 the opportunity to clarify that.  You will see in my

9 prepared remarks that I get there eventually, but this is

10 a better time to make clear that it isn't that we're

11 saying no, no discovery is ever needed.  It's that it's

12 already been accomplished.

13        THE COURT:  I'm sure your adversary is going to

14 say it hasn't been accomplished and we're 180 degrees

15 apart in conflict with them.  How do I resolve that

16 question?

17        MR. MATTHEWS:  Again, Your Honor, one of the

18 reasons that the alignment was instructive to us is, I

19 think -- you have to look at it in context.  What are the

20 allegations of negligence, and how is KBR defending

21 itself?  What are the issues in either combatant

22 activities or derivative sovereign immunities?  What are

23 the facts that the Court would need in order to, you

24 know, adopt those defenses and rule on those bases?  I

25 mean, plaintiffs are going to disagree.  There is not

1 much I can do about that, Your Honor, but I would invite

2 this court to focus again on the alignment of the

3 specific allegations.

4        That's why it was important to us to get rid of

5 the ground clutter and say all right, what's this case

6 really about?  Three basic allegations of negligence.

7 And we need to focus on those allegations, KBR's defenses

8 and, indeed, the military's role.  And when we do that, I

9 think we can judge whether or what the evidence --

10 evidentiary requirements are to assess those issues and

11 whether, in fact, that amount of evidence, the quality

12 and depth of evidence, is already in this record.

13        THE COURT:  Well, we have the report to Congress

14 from April of this year.  It would appear from this

15 report, if I give it a generous reading in your favor,

16 that the decision to use burn pits was made by the

17 military, and that the decision to, at least in general

18 terms to locate them was made by the military.

19        Indeed, they suggested that trying to locate them,

20 like, outside the base or remote areas would be a

21 security risk and that they, therefore, had to locate

22 them closer.  So, it appears that this document, if read

23 in your favor, would support your position that the use

24 of burn pits and the location of burn pits was a military

25 decision.

1       MR. MATTHEWS:  Your Honor, I couldn't say it

2 better.  That is our position.  It confirms -- again, I

3 think it's pretty intuitively obvious but, yes, it does

4 just that.

5       THE COURT:  It's obvious they've gotten some

6 criticism of the use of burn pits and they've committed

7 to, if I read it correctly, close them in Iraq, at least

8 by the end of this year.  Of course, the conditions in

9 Iraq are very different than they were in years past.

10      What about the question of putting wrong things in

11 burn pits?

12      MR. MATTHEWS:  Well, Your Honor, if I may.  Can we

13 go back to the use and exposure slide?  Use and location

14 slide.  I mean, here's ultimately what's going on in this

15 case.  Once you decide to use burn pits and once you

16 locate them, there will be exposures.  We're trying to

17 dance on the head of a pin saying well, wait a minute

18 now.  If you put the wrong stuff in there, different

19 things would happen.  But the fact is, there is going to

20 be emissions; there is going to bo exposures.

21      And, again, if you look at what they say was

22 wrong, the most specific instances of prohibited

23 substances that they say is wrong are medical waste and

24 plastic water bottles.  And in that respect, Your Honor,

25 we've put on the record evidence that the Army knew and,

1 indeed, directed that we dispose of them through the burn
2 pits.

3        On top of that, we have both, in declarations and
4 in one of the exhibits, which I can point to in a minute
5 here Your Honor if you would like to look at it, you
6 know, the Army's prohibited items list.  And in that
7 regard, the declarants say we decided what could and
8 couldn't be burned.  There is an Army document showing
9 the prohibited item list.  So, I don't think there is
10 much merit to the claim that, a) we wouldn't have been
11 injured but for you disposing of medical waste and
12 plastics, because you would have to take account of all
13 the other exposures from burn pits, from other sources,
14 from the sand and dust, all of those issues that are in
15 the CHPPM report.

16        But on top of all that, the substantial evidence
17 in the record says that too was an Army decision.  It may
18 not be reflected in the most recent report.  That may not
19 be an issue that DOD chose to address in their report to
20 Congress but, nevertheless, I believe the evidence in
21 this court and in this case supports only that
22 conclusion.

23        Your Honor, I'm prepared to move on to the
24 Political Question Doctrine, or would you like --
25        THE COURT:  You may proceed.

1       MR. MATTHEWS:  Thank you.  The Political Question

2  Doctrine is somewhat, but I would urge that it's only

3  somewhat more involved.  Here, there must be a

4  discriminating inquiry into essentially two issues:

5  Whether in fact the Army exercised pervasive control over

6  the activities at issue, and whether in fact -- secondly,

7  whether the activities undertaken by KBR that have been

8  put, you know, into this litigation, claims of

9  negligence, were within the envelope of that control such

10  that they cannot be isolated from the accent decisions of

11  the military.  Again, we fully briefed all of that.

12       Just a couple of quick points, Your Honor.  First,

13  on the Discriminating Inquiry point.  While plaintiffs

14  have given lip service to that notion, I would suggest

15  that's the best you can say about it.  They simply assert

16  that you can peel away the decisions of the military from

17  the decisions of KBR.

18       There's a disconnect to that proposition.  It is

19  axiomatic that the party that has control over the

20  activities at issue is the only party that can have a

21  duty to potential claimants, and that if there is a

22  breach of that duty, the only party who could have

23  breached that duty is the party that had that control.

24  So at the most fundamental level, you can peel away our

25  activities but what's left are the decisions made by the

1 party that led to the exposures.

2        But beyond that, Your Honor, KBR has established

3 through credible, comprehensive and compelling evidence

4 that the military in fact did control each of these

5 decisions.  The seven declarations speak to that directly

6 and conclusively.  There's a little bit of an effort to

7 diminish the quality and reliability of these military

8 declarants, maybe even suggest bias.  That is a little

9 unfortunate, Your Honor.  I don't think there is really

10 any basis for recognizing these are independent military

11 personnel with no ax to grind, unlike plaintiffs'

12 declarants who themselves are plaintiffs or fired KBR

13 employees.

14        You might suggest that there is a bias but, be

15 that as it may, let me focus instead of that problem,

16 another problem created by plaintiffs's efforts to say

17 well you've got your declarants and we've got ours.  Some

18 of those declarants are military personnel, and I first

19 observed, Your Honor, they didn't go through the formal

20 Touhy process.  They weren't vetted.  So, there is a

21 credibility issue.

22        But on top of that, it creates the classic problem

23 under PQD and that is we now have not simply the prospect

24 but the absolute reality that we will be hailing into

25 court military personnel who will testify against each

1  other.  We've created a demonstrative on this point.

2       Plaintiffs allege through Mr. Lamberth that KBR

3  avoided using incinerators.  This goes back to the notion

4  somehow that we chose A instead of B.  Again, just

5  picking one of the many declarations that make the point

6  that no, no, we chose the option.  And Major Hall goes on

7  to say incinerators were not a viable option.  So you

8  have two military personnel directly in conflict.

9       And Mr. Lamberth again goes on to say we picked

10  the locations.  Again, Dr. Postlewaite tells us this is

11  simply not the case.  So, this notion of -- yes, indeed,

12  I forgot we have another slide on this point, Your Honor.

13  This is the Balad point.  Not to put the merits of the

14  Balad dispute on the table, but for PQD purposes it is

15  instructive that we now see that the plaintiffs put

16  forward military personnel who said yes they did, in

17  response to KBR's military personnel saying no they

18  didn't.  That is a classic PQD problem that the line of

19  cases suggest should be avoided at all costs.

20       All right.  Another PQD issue --

21       THE COURT:  Did KBR ever supply personnel to the

22  military when the military was operating a burn pit?  The

23  reason I'm asking that is, could that explain the stark

24  difference between these people?  I mean, if you've

25  consistently told me that KBR did not operate that burn

1 pit and what I'm trying to ask myself is well, how did

2 they see people wandering around in uniforms that said

3 "KBR" on them?  Did KBR provide some labor services in

4 various forms in these countries?

5          MR. MATTHEWS:  The simple answer is yes.  The more

6 complex answer is I don't know whether that's true at

7 Balad.  But, here is what I do know that would explain at

8 least the Balad situation, although this is sort of

9 rambling facts coming from counsel here.

10          What I do know is that KBR was a tenant at Balad.

11 It provides, for example, water services at Balad.  In

12 that respect -- I believe it also may have the dining

13 facility service contract at Balad.  So, KBR generated

14 waste like all the other tenants at the Balad base and,

15 as many other tenants did, they took waste to the burn

16 pit.

17          The question is -- and we saw in the complaints,

18 we're starting to see a little softness around the edges

19 of their allegation.  I think their last -- the last

20 formulation was that KBR was "involved."  And so maybe

21 plaintiffs are recognizing that they're going to have to

22 pull away from the notion that we "operated" or were the

23 direct service providers.  Yes we were at that base, as

24 were all other tenants.

25          This case is about who made the decisions to put

1 that burn pit there; to burn all that waste there; to

2 allow the living and working quarters at Balad to

3 encroach, if you will.  They "came to the hazard."  You

4 know that phrase from some of the waste cases.  That,

5 apparently, occurred at Balad.  But the fact that we were

6 there is a very different issue than whether we were the

7 party that made the critical decisions leading to the

8 exposure, Your Honor.

9       I think we tried to say this when we were here in

10 February, Your Honor.  While we hope and expect, if I may

11 say so, that this case will be dismissed.  If there came

12 a time when you wanted an evidentiary hearing on that

13 issue, I could do this -- well, give me a couple of days

14 anyway.  We've looked as hard as we can at this issue.

15 We will do that at such time as is necessary.  But the

16 point of this slide, Your Honor, is simply to reflect

17 that we will be hailing into court military personnel who

18 will be testifying against each other, and that is one of

19 the concerns that is -- that underlies the body of cases

20 that says that gets to be a Political Question.  We want

21 to avoid that at all costs.

22       Another issue that arises under the PQD is really

23 a critical one in this case and that is, you know, you

24 have to -- I believe Your Honor, if I may say

25 respectfully, is required to look not only at the state

1  of play today, the legal issues today, but look

2  downstream.  How will this case be tried?  How will

3  plaintiffs prosecute their claims?  How will KBR defend

4  their interests?  There is no question that we will say

5  it was reasonable for KBR to rely on the military

6  judgments and decisions, and we will interject that as

7  our defense.

8        KBR will go a step further than that.  KBR will

9  say if there's fault, the only duty that was owed was the

10  duty owed by the party in control.  The only breach of

11  that duty can be by that party, and that party was the

12  United States military.  So, we will be again, whether

13  it's military versus military or just on our side, we

14  will be bringing into court military personnel to go at

15  all of those facts.

16        In that regard, Your Honor, we had one more

17  demonstrative, just to reflect on the fact that the

18  issues before this court and the multiple trial courts in

19  the future, if this case were to go to trial court, would

20  clearly involve defenses built around military decisions.

21        Just a couple of excerpts from a report you've

22  apparently read, so you've probably seen all of this.

23  Operational level of command; alternatives not always

24  available and not safe.  Here is an interesting point.

25  The majority of the burn pits themselves are operated by

1 the military.  The report concludes more than 50 percent

2 of the burn pits are operated by the military itself.

3 So, again, we would act --

4        THE COURT:  That's why I asked the question is how

5 could somebody in the military see somebody with a "KBR"

6 badge at a burn pit not operated by KBR.  And I assume

7 the answer you're giving is that KBR had other contracts

8 to do other things, and some of those persons would be

9 coming and dumping trash in a burn pit operated by the

10 military.

11       MR. MATTHEWS:  That would be correct, Your Honor.

12 And many of the bases where the military is operating the

13 burn pit, like Balad, but a number of others, KBR in some

14 instances, not all, would still be at that base for other

15 services.  We did not have the contract to do all the

16 burn pits.  That's evident.  But the point I'm trying to

17 get at is the United States made that decision and relied

18 on it.  The United States continues to this day to say it

19 was a right decision.  If they're wrong -- if they're in

20 a trial on the merits looking at causation issues, if the

21 United States was wrong, we will be saying we relied on

22 it.

23       And if they're wrong, the finger of blame will

24 point at the United States military.  That is immutable.

25 It's true today, it will be true tomorrow, and it will be

1 true in every one of those 46 cases, I think, if they're

2 ever sent back to the state courts or the federal

3 district courts across the states.

4          Finally on this point, Your Honor, on the PQD.

5 The argument that you can separate, you know, one from

6 the other, KBR actions from the Army's.  You know,

7 there's -- the plaintiffs' arguments here, as they were

8 in Taylor, are abstractions.  Again, the best

9 articulation of why that's simply not so is taken from

10 the first Taylor case which says that, you know, the

11 argument that you can isolate defendants' actions and

12 treat the military's decisions as external constraints

13 which need not be questioned.  That's what's urged by the

14 plaintiffs.

15          But the Taylor court went on to say that taken to

16 its logical extreme, this argument would completely

17 eliminate the Political Question Doctrine in contractor

18 suits.  It's always possible to strip a case down to a

19 question of a particular actor's negligence.  So that

20 abstract notion of stripping away, the Taylor court

21 rejected.  The Carmichael court said, you know what?

22 That's a play on words.  It's a play on words of control

23 and responsibility to suggest a truck driver in the

24 Carmichael case had control over his decisions.  He was

25 acting within the envelope of military control.

1          Carmichael said "at all times under orders and

2 determinations made by the military."

3          THE COURT:  Well, the Solicitor General's brief is

4 *amicus curiae*.  It was somewhat critical of that

5 decision, was it not?

6          MR. MATTHEWS:  Yes, it was Your Honor.

7          THE COURT:  All right.

8          MR. MATTHEWS:  The Solicitor General's opinion we,

9 of course, have read it.  We understand it in some places

10 and not in others.  I mean, the fundamental point about

11 that decision -- you can almost say some of that is

12 dicta.  They said in particular, Your Honor, these issues

13 are not fully developed enough at the lower courts.  We

14 need some percolation, I think they used that form of

15 that word several times.  Your Honor, I think they're

16 looking to perhaps this court and others.

17          THE COURT:  I feel like I'm in the middle of a

18 percolator path.

19          MR. MATTHEWS:  Doing a lot of percolating here,

20 Your Honor.  And I think that that's what's instructive

21 for that case.  They denied -- they're recommending that

22 Cert not be granted.  That's foundational.  And they're

23 suggesting that these issues need to be further

24 developed.

25          Frankly, Your Honor, we have a lot of confidence

1 in this court to further develop these principles.  And I
2 think, therefore, at some later date, if it gets up to
3 the Supreme Court, that decision at the higher court
4 level would be informed by, among others, this court's
5 analysis.
6          All right.  So, there is only one other point I
7 wanted to make about the PQD, and that is this.  This is
8 fundamentally a separation of powers issue.  This court
9 should not be second guessing the military.  Beyond that
10 base point, I want to point out that the Army health
11 branch, CHPPM, that we've referred to once or twice
12 before, has already undertaken to study the health
13 effects of burn pits.  They've issued one report.  It's
14 been criticized, but it concluded that there are no
15 long-term health effects expected from exposure to burn
16 pits.  That study was done at Balad, described as the
17 worst case ever, and that was their conclusion.  Some
18 have said you need to look a second time, and CHPPM is
19 doing just that.
20          Congress has gotten in on the act.  I mentioned
21 earlier the National Defense Authorization Act of 2010
22 directing a report to Congress -- several, I think.  The
23 first has already been submitted.  And they've also asked
24 GAO to take a look at all of this.  So this is another
25 example, Your Honor, of how, out of respect for the

1 coordinate branches of government, this court should

2 conclude that these matters are beyond its jurisdiction.

3       All right.  I wanted to say just a few more words

4 on discovery, if I may Your Honor.  You know, when we

5 were here last, it was pretty clear that in the February

6 -- the transcript is clear what this court wanted.  This

7 court wanted the parties to respond to the merits and

8 then directed the plaintiffs to say if you want -- if

9 there is something else you think you need, let me know.

10 But I think the transcript is clear that this is not a

11 time for full merits discovery.  Right on Page 1,

12 plaintiffs say the controlling law in this circuit

13 requires plaintiffs to be given an opportunity to conduct

14 full merits discovery.  It's wrong as a matter of law.

15 Until the Court resolves jurisdictional questions, it's

16 inappropriate.

17       We've talked about hailing the military in.  I

18 don't want to repeat all of that.

19       What I do want to say is this.  They do eventually

20 get to an alternative.  They say, okay.  If we can't have

21 full merits discovery, here are the five things we want.

22 We want all of the LOGCAP contract documents, statement

23 of work, past orders, Letters of Technical Direction.  We

24 want all communications between KBR and the government.

25 We want all documents related to compliance or non-

1 compliance.  We want the deposition of the declarants,

2 and we want depositions of knowledgeable KBR employees.

3          Your Honor, I think the sum of the parts equals

4 the whole.  That is full merits discovery.  So, I don't

5 think they've really backed off their position.

6          There is -- I've made this point, Your Honor, and

7 this is the point I was going to make.  Let me just

8 underscore it without repeating it all.  There is no need

9 for jurisdictional discovery for the sake of

10 jurisdictional discovery.  This record is sufficient.

11 The declarations.  The contract documents that are in

12 this record, some that KBR put in, some that plaintiffs

13 put in.  There is other relevant military documents that

14 are found throughout our motion and in our reply, and now

15 we have the Department of Defense report to the -- to

16 Congress.

17          The quality and depth of that record speaks

18 directory to the quality and depths of the military

19 footprint that is all over the decision-making in this

20 case.  And on that basis, Your Honor, we don't think that

21 more is needed.  If this court concludes that more is

22 needed, it doesn't swing the door wide open for full

23 merits discovery.  If this court concludes that more is

24 needed, we would be comfortable with the Court fashioning

25 limited, targeted jurisdictional discovery.

 1          THE COURT:  One of the devilish questions that I
 2   think you've addressed already is defining what limited
 3   discovery would be in this case.  We're talking at the
 4   highest level about the three factors you indicated of
 5   who decided to use burn pits, who decided to locate them,
 6   where they were located, and who decided what stuff to
 7   dump in them.  And it would certainly seem to me that at
 8   this point the -- in absence of something very specific
 9   to the contrary that the decision to use them has been
10   conceded by the Department of Defense in its report in
11   April that we decided to use burn pits and we decided
12   where to locate them, at least in the sense of -- I mean,
13   necessarily having to locate them closer to civilian
14   populations than would be the case in a peaceful and
15   tranquil area, as opposed to a war zone where you have to
16   have much tighter control of facilities.
17          The question of who decided what to dump in the
18   burn pits is a little more murky.  But if the plaintiffs'
19   theory is that we're going to pursue this matter on the
20   basis of breaches of duties by KBR under its contracts,
21   that does make discovery a bit messy because of, you
22   know, dealing with all the communications back and forth.
23          It also makes causation more difficult.  Because
24   if the plaintiffs can only recover based upon a breach,
25   like throwing plastic bottles in when they shouldn't

1 have, that may be a very precise matter in terms of

2 temporal element and so forth that may make it much more

3 difficult on causation as opposed to you shouldn't have

4 been using burn pits at all anywhere, and therefore we

5 recover.  Then the causation issue becomes more

6 attenuated and easier for the plaintiffs to prevail.

7        So, it's a damned if you do and damned if you

8 don't situation on discovery.

9        MR. MATTHEWS:  Let me say one more thing on this

10 point, Your Honor.  It does seem to us that the record is

11 sufficient on this issue of -- we don't think compliance

12 is relevant, by the way.  It's just the case law doesn't

13 support the notion that we look at the compliance factor.

14 Not true for combatant activities; not true for sovereign

15 immunity; and really not true for PQD.  The

16 discriminating inquiry doesn't say, well, did they comply

17 or not.  That's really not an element here.

18        Secondly, I think the record is sufficient to

19 establish that the plastic water bottles were, you know,

20 not only understood by the government but directed by the

21 government.  So, too, was the medical waste.  Your

22 Honor's points about how would you sort that out --

23        THE COURT:  Let me ask you this.  I was fascinated

24 by the Solicitor General's analysis of this.  The

25 Political Question Doctrine -- let me attempt to reduce

1 this wonderful document to simple terms -- is very messy

2 to apply and went through the difficult questions that

3 one would have to resolve in order to decide the

4 applicability of the Political Question Doctrine.

5          And then the Solicitor General says for reasons

6 such as these, all the messy problems with using that

7 doctrine, the D. C. Circuit's decision in Titan, and

8 going on with Saleh, he was more focusing on the

9 Combatant Activities Exception as being an easier way to

10 look at this.  What's your view on that?

11          MR. MATTHEWS:  Well, I guess as to the Solicitor

12 General's opinion, I guess when we read it we found, you

13 know, the pluses and the minuses.  There is something in

14 there for everybody.

15          THE COURT:  There is something for everyone.  I

16 knew that.

17          MR. MATTHEWS:  Without -- we had this discussion

18 about whether it was "political" in the White House

19 sense, and our view was it was not "political" in the

20 White House sense but it has an element of politics to

21 it.

22          It may be in the view of the Solicitor General's

23 office that because it's messy, they're kind of pushing,

24 huh?  They're saying well maybe if you can go to the

25 Combatant Activities Exception route, maybe that's the

1  way that you should go.  In that "political" sense, Your

2  Honor, it is just an opinion at this point.  It carries

3  no weight of law.  There is something in there for

4  everybody and just --

5          THE COURT:  That's one of the reasons why I was

6  asking the question about KBR having a contract to

7  deliver fuel at Fort Meade and KBR having a contract to

8  deliver fuel in the middle of a war zone, that it would

9  be hard to get the Political Question Doctrine a lot of

10 juice when one of their trucks drives off the road and

11 hits a pedestrian at Fort Meade, when all they're

12 contracted to do is to provide fuel to a military base in

13 peacetime as opposed to having to drive it 60 miles an

14 hour on S-turns in Iraq in a fuel convoy with military

15 people escorting you and somehow you didn't make a turn.

16 Combatant activity exceptions seem to be far more

17 comfortably applied there than in a clearly non-combat

18 zone at Fort Meade.

19         MR. MATTHEWS:  Even the lower court in that other

20 convoy case that they keep trying to import in here said,

21 you know, Political Question -- I forget the exact

22 phrase.  Something like "looms large," you know, in those

23 kinds of considerations.  There is no question that

24 that's true, Your Honor.

25         And again, I can only encourage this court not to

1   read the Solicitor General's opinion as a direction.

2   It's more, to me, keeping a lot of balls in the air at

3   this point in time and I think, therefore, it doesn't

4   push us in one direction or the other.

5          THE COURT:  Their office is put in a very awkward

6   position when they're asked to do an amicus brief where

7   Cert hasn't been granted and they've got to give their

8   friendly views to the court.  So, they may not be acting

9   as an advocate so much as normal.

10         MR. MATTHEWS:  One part of the PQD that -- you can

11  call it messy, but our phrase is it's immutable.  No

12  matter what happens, we will rightfully -- as the courts

13  have said, KBR would be within its rights in similar

14  circumstances to point to the United States the decisions

15  that it made on the question of causation that is going

16  to be in this case.  There is no way around it.  It's

17  immutable.  I think it's impermeable for that matter.

18  And that is going to be an element of this case that

19  simply is never going to go away.

20         So when you strip away some of the other policy

21  considerations and close calls, Your Honor, which I still

22  think weigh in favor of dismissal under PQD anyway,

23  particularly because of the compelling, profound federal

24  interest.  At the end of the day, there's a simple trial

25  court truth, and that is that causation will center on

1  the acts of the military.

2         The military will be right center stage in all of

3  these litigations and trials, and that itself is a reason

4  why this court should decline to allow this case to go

5  forward.  Otherwise, this and other courts will be second

6  guessing the decisions of the military.

7         THE COURT:  All right.

8         MR. MATTHEWS:  Thank you, Your Honor.

9         THE COURT:  Let me hear the Motion to Strike.

10         MR. BANDY:  Your Honor, I'll try to be brief

11  because I know you've heard a lot, and I'm sure they have

12  quite a bit to say in response to Mr. Matthews'

13  presentation.

14         The Motion to Strike to consolidate the complaint,

15  there are really two main issues that I want to highlight

16  from our brief.  The first one is, we think it should be

17  stricken because they didn't do what you asked them to

18  do.  When we were here on February 23rd, you had asked

19  them to file a consolidated complaint which basically

20  would compile the 40-some odd complaints that were

21  pending at this time into one document so you wouldn't

22  have to read 40-some odd complaints, which was a very

23  reasonable request.

24         And your direction to them after we said well, we

25  don't want to have to change or file another response was

1 that the consolidated complaint was not to deviate in any

2 significant way from the allegations in the existing

3 complaint.  The consolidated complaint that they filed

4 deviates in many significant ways.  There are lots of new

5 allegations that are nowhere to be found in the previous

6 existing complaints.  So, in some sense the motion is

7 they didn't do what you asked them to do.

8       There is another basis for why the complaint

9 should be stricken.  In this -- in December, you issued

10 an order setting a deadline for filing of all amendments

11 on December 21st 2009.  This was a deadline that the

12 plaintiffs agreed to themselves.  And in fact, on

13 December 21st, the plaintiffs did amend a lot of their

14 complaints.  The purpose of this was to set up a schedule

15 where they would get all of their allegations out on the

16 table so we could respond to them at one time.

17       Now, they filed their amendments on the 21st of

18 December.  We filed our Motion to Dismiss, based on those

19 complaints as amended, on January 29th.  Then on March

20 9th, they file another complaint that has new

21 allegations.  In other words, they amend their complaint.

22 Now, they make an argument that under Rule 15, leave

23 should be granted -- freely granted, even though, of

24 course, here they never actually asked for leave.  But

25 Rule 15 doesn't apply under Rule 16, because there was a

1  scheduling order setting a deadline for filing

2  amendments.  That is the analysis.

3        Under Rule 16, they can only file that amendment

4  if there's good cause.  And the case law has indicated

5  that good cause only exists when a party is trying to

6  amend with information that they did not have prior to

7  the amendment deadline.  Now, there are many things in

8  the complaint that they cannot credibly claim they did

9  not have before the December 21st deadline.  They have

10 new citations to reports that were written in 2006, in

11 reports written in 2008.  They have testimony from their

12 own clients that was given before December 21st that they

13 added to the consolidated complaint.  Surely they can't

14 claim that they didn't have knowledge of that prior to

15 December 21st.

16       So, the fact of the matter is that these

17 amendments -- there are no good cause for them, and

18 they're in violation of Rule 16, and so they should be

19 stricken.

20       Now, the plaintiffs have argued that Rule 15

21 applies and that their amendment should be allowed under

22 Rule 15.  It shouldn't.  Under Rule 15, they only have --

23 they can only amend their complaint if they get

24 defendants' written consent or if they get leave of

25 court.  They got neither here, so their amendments don't

1 fly under Rule 15.

2        Finally, in their opposition, they say well, the

3 new allegations, they don't materially differ from what

4 we said in the previous complaints.  We're just adding

5 additional detail.  In our view, that's essentially

6 arguing it doesn't matter whether we have those

7 allegations or not because they're already encaptured in

8 the original complaints.

9        So, what they're essentially saying is if you

10 strike the consolidated complaint, they're not going to

11 be prejudiced.  Because in their view, they've already

12 made those allegations.  In our view, the main reasons

13 we're looking to strike this complaint is because of the

14 pretrial publicity.  If those allegations do stand, then

15 it does give the plaintiffs' lawyers an ability to repeat

16 those allegations to the press, and we've dealt with that

17 issue before.

18        In some sense, it's expanding the universe of the

19 kinds of things lawyers can say to the press.  And so

20 we're not doing this to make a procedural point.  There

21 is a purpose behind it.  And if the complaint is allowed

22 to stand, then we are considering filing a Rule 12(F)

23 Motion to Strike some of the allegations that we think

24 are completely immaterial and salacious in nature, and

25 there are many which I won't go into here.

1    For those reasons, we think that the complaint

2 should be stricken and this the Court should order them

3 to go back and do what the Court asked them to do, which

4 is to file a consolidated complaint that does not deviate

5 from what was on record on December 21st 2009.  Thank

6 you.

7    THE COURT:  All right.  I'm going the take a ten

8 minute recess, then we'll hear from the plaintiffs.

9    (Off the record at 11:35 a.m.)

10    (On the record at 11:52 a.m.)

11    THE COURT:  You may proceed.

12    MS. BURKE:  May it please the Court.  My name is

13 Susan Burke and I'll be presenting argument on behalf of

14 all the plaintiffs we represent, as well as the Bishop

15 and Matson plaintiffs.

16    Mr.  Melugin, afterward, will present additional

17 argument on behalf of his client, Mr. Johnson.

18    Your Honor, counsel for KBR has conceded that

19 discovery is needed but is telling the Court that they've

20 already done it for the Court.

21    THE COURT:  I'm not sure he's conceding it's

22 needed.  I think he's conceded that in some circumstances

23 it may be appropriate, and he doesn't think this is one.

24 But if it's going to be this case, then it ought to be

25 very limited.

1          MS. BURKE:  I understand that.  But the real

2    troubling thing about what Mr. Matthews was saying is

3    that this court should not look at all behind the

4    materials that they have put into the record.  And I

5    would simply point out for Your Honor that Mr. Matthews

6    tried to distinguish the Saleh case by saying well, you

7    know, in that case they didn't have this type of record,

8    with military declarations and military reports and so

9    forth.  The reality is that the Saleh case did in fact

10   have that.  They attempted the same type of one-sided

11   approach where we'll get the military declarations, we'll

12   put in military reports, and urged the Court to rule on

13   that basis.  So I just want, at the outset of my remarks,

14   wanted to point that out to the Court, because we think

15   this really comes down to a critical question for Your

16   Honor.

17          As you mentioned, you are sitting in an area of

18   law that is not well developed; it has to percolate.  You

19   are sitting and presiding over 43 different cases.  And

20   so what you decide to do in this matter is obviously

21   going to have great import on the area of law.

22          They're urging you to dismiss this outright,

23   without even limited discovery, and that would clearly be

24   a mistake.  I'm going to walk through, first, why that

25   would be a mistake under the Political Question Doctrine,

1 and then I'm going to turn to the combatant activity and

2 the derivative sovereign immunity under Yearsley, unless

3 Your Honor would prefer me to flip-flop that order.

4        THE COURT:  No.  You can proceed any way you want.

5 That's fine.

6        MS. BURKE:  Okay.  What KBR is seeking is a very

7 novel expansion of the Political Question Doctrine.  As

8 you know, the Political Question Doctrine, it's a

9 separation of powers.  It's whether or not this court, an

10 Article III court, has the power to adjudicate.  KBR is

11 not a branch of the government.  They're a private

12 corporation.  Any recovery here is going to come from a

13 private company, not from the public fisk.  So the mere

14 fact that the United States is not a party makes it far

15 less likely that exercising jurisdiction would intrude on

16 the province of the executive.

17        THE COURT:  Wait a minute.  Let's take a base that

18 has a burn pit operated exclusively by the Army.  There's

19 not a sign of KBR anywhere.  And then let's take another

20 base that has KBR operating the burn pit.  If one gets

21 into the questions about operation of the burn pit in the

22 latter case, don't you get into some questions about how

23 the government has decided to carry out its -- through

24 the Executive and Legislative Branch its conduct of a

25 war.

 1          MS. BURKE:  No, Your Honor, you don't.  And it's

 2 important to distinguish between those two situations,

 3 because KBR has essentially tried to treat this as a

 4 single topic:  Burn pits.  What we know from the DOD

 5 report is that the military made a conscious decision.

 6 Their first choice -- their preferred means for disposing

 7 of solid waste was to hire somebody, was to hire someone

 8 to do it.  So that is one set of decisions that led to

 9 KBR operating some set of bases where they were

10 responsible for the solid waste.

11          THE COURT:  They also made a decision to use burn

12 pits, didn't they?

13          MS. BURKE:  They made a decision -- they did, but

14 let me get to that, Your Honor.  There is two paths they

15 went down.  One path was they used KBR.  The other path

16 was they used -- they operated it themselves and they

17 used burp pits.  If you look at the path they walked down

18 in using KBR, they also there, by contract, made quite

19 clear that burn pits could be used.  And so there,

20 though, what you have to do is look at the contract,

21 which is remarkably absent from the discussion by KBR's

22 counsel.

23          The contracts actually spell out a mechanism that

24 leads to KBR being given written permission to use

25 surface burning.  It imposes conditions on how that

1 surface burning is done.  So, for example, in a KBR-
2 operated burn pit, they are required by contract to
3 minimize smoke.  And we know from the declarations that
4 we put in that, in fact, sometimes when they did it, they
5 did in fact minimize smoke.  They gave an award to Mr.
6 Robbins for minimizing smoke by 60 percent.
7         So what we're talking about, and the basis of our
8 claims, is that subset of military bases over there that
9 have KBR operations.  And then within the realm of KBR
10 operations where they failed to follow the contract
11 terms, and by their own negligence they just didn't do
12 what they were supposed to do.  That task of looking at
13 -- of measuring an American corporation's performance
14 against what the military told it to do is a
15 straightforward adjudicatory task.
16         THE COURT:  But don't you, in making this argument
17 on applicability of the defenses that they're raising,
18 create a nightmare for yourself on causation?
19         MS. BURKE:  No.
20         THE COURT:  I mean, if the government is out there
21 cheerfully operating ordinary burn pits and throwing
22 plastic bottles in it at one base and at the other base
23 KBR is doing it; or, it may change from time to time, and
24 one month KBR is operating it and another month it's not.
25 Don't you create a nightmare for causation?

1          MS. BURKE:  Your Honor, we're not saying it's
2  going to be easy to litigate hundreds of people who have
3  been harmed at many, many different locations, but I
4  think the way that they are framing up the causation is a
5  bit of a mistake, and it's trying to put Your Honor as
6  predicting what is going to happen.  And if I could, I'll
7  just walk through a couple of different reasons why you
8  don't have to look at causation at this point.
9          The language of Baker v Carr is what we use when
10  we put that quote in our brief.  It doesn't include going
11  the next step and trying to sus out in advance all the
12  various different defenses that the defendants may use.
13  But even assuming that you look to that next step, there
14  is no -- there is no evidence on the record that the
15  standard that the "but for" causation standard is going
16  to apply.
17          If I may, I'll put up -- the Restatement (Second),
18  for example, has a different formulation that the actor's
19  negligent conduct is a legal cause of harm to another if
20  his conduct is a substantial factor in bringing about the
21  harm and there is no rule of law relieving the actor from
22  liability.
23          Essentially, what KBR is saying is we're going to
24  attack the government and we're going to say the
25  government didn't set -- didn't operate the war in a

1  manner that protected the health of soldiers, and the

2  government's decision to operate the burn pits is what

3  caused the problem.  That's essentially equivalent to

4  defending yourself in a traffic accident where you're

5  going 20 miles over the limit and it's a 55 miles an hour

6  limit.  You say well, gee, if the government had set the

7  limit down at 35 and I was going 20 over, I'd only be

8  going 55.  So it's really the government's fault for

9  setting the limit too low.

10        Our view is that, yes, the military made a set of

11 decisions that arose from the fact that these were

12 contingency operations.  One of those decisions was that

13 in some bases and at some locations surface burning was

14 going to be permitted.  The fact that surface burning was

15 given the green light does not mean that the military

16 gave the green light for KBR to ignore its contract; to

17 fail to make any effort to abide by the contract terms

18 requiring the minimization of smoke; made no effort to

19 abide by the contract terms that regulated what they

20 could put in, what had to be separated out as hazardous

21 material, what had to be separated out as medical waste.

22        If you mix all of that together -- if you just

23 throw everything together and burn it all together, that

24 creates a serious toxicity.  That is not the same as a

25 well-run surface burning.  So, they're trying to simplify

1   it and make it as if it's just simply a matter that the

2   harms necessarily would have occurred but for the

3   decision of the military.  That's just not factually

4   accurate.

5         And I think that what we can see about that is

6   that there's been a military history of using burn pits

7   without these type of problems.  So we believe, although

8   it's going to be -- it's obviously going to require a lot

9   of detailed analysis, we believe that we'll be able to

10  show that it was their negligent conduct, the fact that

11  they didn't abide by the contract, that actually caused

12  the harm to our plaintiffs.

13        THE COURT:  Let me ask you this.  The D. C.

14  Circuit's decision in the Saleh or Saleh case or however

15  you pronounce it.

16        MS. BURKE:  Saleh, Your Honor.

17        THE COURT:  The court in that case said some

18  things that sound a little bit in disagreement with what

19  you're saying when you're talking about all the breaches

20  of the contract they were supposed to do this and

21  supposed to do that.

22        The D. C. Circuit says we think the district judge

23  properly focused on the chain of command and the degree

24  of integration that in fact existed between the military

25  and both the contractors and employees, rather than the

1 contract terms.  And so the discovery, as I understand it
2 in that case, and I wasn't there -- you may know more
3 about it than I do -- but was dealing with the question
4 of command -- command and control, perhaps, is another
5 term; degree of integration.  And that's a different
6 question than whether you were throwing the wrong type of
7 bottle in or bottles at all or medical waste.  It has to
8 do with who was controlling it and how were you
9 integrated; correct?
10         MS. BURKE:  Your Honor, and let me give a bit of
11 background on how it got to that point.  In that case,
12 you had a situation in which CACI, one of the companies,
13 invited interrogators; and the other company, Titan,
14 provided translators.  They were working side-by-side
15 directly with military, under the direct command of
16 military officers -- of intelligence officers.
17         We had initially argued on behalf of the
18 plaintiffs that, well, listen, you know, it is prohibited
19 for a military commander -- by the terms of the contract,
20 the military commander is not supposed to give direct
21 orders.  And what the Court said is, you know, listen.
22 That may be true by the letter of the contract, but let's
23 look at the reality of what happened on the ground.  And
24 what they did is -- we conducted discovery and looked at
25 what actually happened over there.

1        And what actually happened was that military
2   essentially violated their regulations and gave direct
3   orders.  They treated a CACI interrogator as a
4   substitute, a side-by-side substitute for a military
5   soldier, and so they would use them interchangeably.  The
6   reports that they prepared -- the reports that the
7   corporate guys prepared went directly to the military.
8   They didn't go to the corporation and.  The translators
9   were working directly in cells, working directly
10  translating for a military official.  So the problem in
11  that case factually was you couldn't pull it apart.  You
12  couldn't say, here is corporate activity and here is
13  military activity.
14       If you apply the test of Saleh to this case, you
15  get -- you reach a different conclusion.  Here, it's very
16  clear.  There is absolutely no evidence on the record at
17  all that KBR employees were integrated into the military
18  chain of command.  Certainly there's high level policy
19  decisions being made by the military, but nobody is
20  directing KBR employees on a day-to-day basis about how
21  to spread the waste, when to burn, what to put in and
22  that type of thing.  There is -- instead, it's the
23  diametrically opposite situation to Saleh.
24       Here, you have a whole corporate structure,
25  including leading up to a corporate environmental manager

1 and health and safety people, and the military has

2 basically just outsourced the thing entirely.  It's waste

3 disposal, it's not interrogation, so they're comfortable

4 doing that.  They outsource it entirely to KBR.  They say

5 you go run these.  You go run waste disposal.  Take care

6 of all this waste.  Take care of all this water treatment

7 for us at these places.

8         Now, they actually didn't even -- our

9 understanding, but we're going to need discovery to

10 confirm this.  Our understanding is that the military,

11 they preferred that solution, but they could only use

12 that solution at the bigger, more static bases.  So, here

13 you have situations in which the military is the one with

14 the smaller kind of front line bases.  KBR is running it

15 back at the bigger, static bases, the bases that have,

16 you know, the Subway franchises and Pizza Huts and so

17 forth.  And so, you know, it's a far different case than

18 Saleh.

19         In fact, if you look at the language of the Saleh

20 decision itself, it excludes this type of case.  It says

21 that we recognize that a service contractor might be

22 supplying services in such a discrete manner, perhaps

23 even in a battlefield contact, that these services could

24 be judged separate and apart from combat activities of

25 the U. S. military.

1          In addition, I think, Your Honor, one of the key

2 points to think about in the Political Question and this

3 issue of integration is, well, what does the military

4 itself think?  Has the military itself come out saying

5 that it's dangerous to their ability to conduct a war to

6 have private companies be at risk for tort liability from

7 third parties that they hurt?  And on that, the

8 Department of Defense has spoken.  The *Federal Register*

9 that we submitted as Exhibit 30 -- and if I may, Your

10 Honor, approach the bench and hand some documents up?

11          THE COURT:  You may.

12          MS. BURKE:  So, the Department of Defense was

13 actually asked by KBR and others in the industry to redo

14 the -- to redo the procurement regs to eliminate the risk

15 that these companies take on when they operate overseas

16 in these contingency operations.  The DOD did not do

17 that.  It made an affirmative decision that the

18 liability, the risk of tort liability, was going to

19 remain with the contractors.  It said the contractors are

20 in the best position to decide how to keep third parties

21 safe.

22          It went on and said that the current rule of law

23 that holds contractors accountable for the negligent or

24 willful actions of their employee, officers or

25 subcontractors should remain and is incorporated by

1  reference into the DEFARs which, of course, are then

2  incorporated by reference into the LOGCAP.  They

3  specifically took on this notion of the public policy.

4  So it's not -- it's not a clear case in which there's

5  only one public policy at play here, Your Honor.  There

6  is a public policy in making sure that government

7  contractors don't receive billions of dollars and then

8  not do the bidding of the United States.  It doesn't

9  serve the federal interest.

10        So, here, the Department of Defense has walked

11  through the fact that these service contracts, the type

12  that we have at play here in the LOGCAP, that when you're

13  dealing with the services contract, the government didn't

14  exercise this kind of day-to-day control.  And the Saleh

15  decision, as well, excluded this particular category of

16  contracts.  These are different types of service

17  contracts than what was at play in that case.

18        THE COURT:  Well, I would agree with you without

19  any question that that would apply to the person running

20  the Burger King at one of these big bases where the

21  government doesn't come in and say how to make the

22  Whoppers or whatever they're making at the Burger King.

23  But isn't it clear that the government, in fact, has had

24  a significant role in the decision-making on at least two

25  out of the three things that are at the heart of your

1 complaint?

2      MS. BURKE:  Actually Your Honor, that's really far
3 from clear.  What KBR is trying to do is push it together
4 as if there's a monolithic set of activities overseas in
5 Iraq and Afghanistan at over 130 different locations.
6 The reality is we don't know yet.  What we do know is
7 that at some sites KBR wasn't there at all.  So there may
8 be some locations where they -- they were not the
9 contractor and they're not even in play.  At other sites
10 they may have provided personnel and then you may get
11 into a situation where there's integration, but there is
12 no evidence on the record of that whatsoever.

13      The evidence on the record that we've been able to
14 come up with without discovery, just by searching the
15 Internet, is that clearly at some sites they were -- they
16 were contracted to handle the whole thing, soup to nuts.
17 They were contracted to come up with plans for waste
18 disposal and make recommendations.  They were contracted
19 to get permission from the military on their
20 recommendations, and then they were contracted to
21 implement.

22      There may well be a situation, Your Honor, in
23 which KBR was not given permission to use surface burning
24 but did it anyway.  We just don't know yet because we
25 haven't had discovery.

1          All of the military's decisions here are in black

2 and white.  They are decisions by the contract officers

3 and -- the contract themselves, and then all of the

4 subsidiary contract documents.

5          The declarations that they obtained are from

6 people who are peripheral to the supervision of KBR.

7 Now, the declarants may be knowledgeable about the

8 military's operation of military waste disposal, I'm not

9 questioning that.  But when you look at what they're

10 saying about KBR, they clearly lack knowledge.

11          For example, Lieutenant Colonel Kackey put in a

12 declaration, and she said oh, you know, boy.  At times,

13 KBR went above and beyond and even complied with the

14 OEGBC even though they didn't have to.  Well, actually,

15 if he she was familiar with the contract and had read the

16 contract, they did have to.

17          So the military put a different set of standards

18 on KBR than they did on their own people, and for obvious

19 reasons:  They paid $5 billion for it.  So the military

20 very logically expects a level of service and a level of

21 operations from KBR that it's not necessarily going to

22 hold itself to when it's using soldiers deployed right on

23 the front lines.  And so this is one of the many reasons

24 why discovery is necessary in order to really flesh out

25 the parameters of what we're dealing with here, Your

1  Honor.

2         The fact that the contracts themselves aren't even

3  on record is very important.  You cannot make a decision

4  on whether or not a federal contractor is within the zone

5  of their power to act for the government without even

6  knowing what they were supposed to do.  We've put in what

7  we found, but we obviously did not find all of them.

8         I would just flesh one last piece of language from

9  the *Federal Register* for you, Your Honor.  And I think

10 the reason that all of this is very important is that if

11 we're going to look at sovereign intent here and we're

12 going to look at whether we're intruding on the executive

13 prerogative for the Political Question Doctrine, we

14 should be looking at what the sovereign itself has said.

15 And so here what you find -- and I think you need to

16 weigh the official comments of the Department of Defense

17 in the *Federal Register* versus a few of the -- against

18 some declarations of people, some of whom weren't even

19 deployed, that they have managed to --

20        THE COURT:  Well, focusing on the very clause

21 you've got up in front of me now.  The first sentence

22 indicates that contractors are -- will still be able to

23 defend themselves when injuries to third parties are

24 caused by actions or decisions of the government.

25        Now, in this case your complaints have very

1  eloquently stated that using burn pits was a bad thing;

2  that locating them close to civilian populations was a

3  bad thing; and throwing bad stuff into it is a bad thing.

4  Now, at least two of those three appear to have been from

5  neutral documents deposited with the United States

6  Congress by the Defense Department appear to have been

7  made, at least in significant part, by the government.

8      MS. BURKE:  Well, Your Honor, I don't actually

9  think that's accurate.  And the reason is that there's an

10  inherent ambiguity in the DOD report, as well as in the

11  declarations.  But what are they talking about?  The DOD

12  report says okay, our first choice is to use contractors

13  like KBR.  That's our number one choice.  And then if

14  we're not able to use -- if we're not able to do that,

15  then we go through A) get landfills; B) get incinerators;

16  C) transport; and finally D) burn pits.  So, what's

17  interesting is they don't really speak to, well, when we

18  use a commercial contracting service, what does that say

19  about burn pits?

20      So you cannot assume that there's been -- on the

21  KBR-controlled places, Your Honor.  Setting aside the

22  military ones.  Looking just at the KBR-controlled

23  places.  There is not actually a factual record that the

24  military made these decisions, but it exists in writing

25  in black and white on paper.  Because as the KBR's former

1  corporate environmental manager Lee Lassiter said, we,

2  under the contract, had to and in fact did put in

3  requests to use surface burning.

4          So KBR has a file in their possession of

5  permission to do surface burning.  Not a mandate that

6  they had to but, rather, an initiated request by KBR

7  where they recommend surface burning, and then they had

8  to get the approval.  So, you know, at the outset, those

9  documents are going to shed light on whether some of the

10  surface burning was wholly unauthorized or not.

11          THE COURT:  What about where it was authorized?

12          MS. BURKE:  Where it was authorized there were

13  conditions put on KBR.  So, for example, one -- in some

14  of the contracts that we've been able to obtain off the

15  internet, one of the conditions was that they minimize

16  smoke.  So you can have an example of a burn pit where a

17  KBR employee such as Mr. Robbins arrives on the location,

18  finds out that his predecessor was doing nothing in that

19  regard, absolutely nothing, and the smoke was awful.  He

20  comes in and within a few days cleans it up and minimizes

21  the smoke by 60 percent and gets a KBR award for doing

22  so.

23          Now that first set, where his predecessor was

24  operating it, that time frame, you're going to have

25  damage coming to the plaintiffs from that lack of

1  controls.  It's not a simple yes, surface burning/no,

2  surface burning.  It's when you do it, how you spread the

3  waste, where you load it up.  There's a lot to it.  It's

4  not just lighting a match and saying okay, you know, it's

5  going to burn.

6          So, even in those instances when KBR got a letter

7  from the CO or a letter from the ACL saying yes, you can

8  use surface burning, were they time limited?  Were they

9  allowed to use it for a year and yet they kept using it

10 for another year without going back in for additional

11 permission?  That would be a case in which they shouldn't

12 have been surface burning at all.

13         Similarly to your second factor -- the second

14 factor:  Location.  We have at least one instance that

15 we've been told about and we put it in a declaration by

16 Mr. Perkinson that he unilaterally -- that the KBR

17 project manager was upset that the smoke was in his

18 hooch, and he had the burn pit moved.  He personally had

19 the burn pit moved.  Now, if this is a KBR-controlled

20 operation, there is no day-to-day oversight by the

21 military.

22         THE COURT:  Do you think he was able to move that

23 burn pit without getting permission from the military?

24         MS. BURKE:  Well, yes.  And if you think about it,

25 it's logical.  On the bases where KBR has been contracted

1  out, it's like one less thing that the commander has to
2  worry about.  Okay?  So if I'm a commander at a big base,
3  I've got a lot to do, the one thing I don't have to worry
4  about is waste disposal, because we're paying through the
5  nose to get a company to do that.  I don't have to use my
6  men and women.  I've got other people to do that.  That's
7  not my problem.  It's the role of the procurement
8  officers to make sure they do what's needed.  So you're
9  not going to be in a situation where the military is
10 wasting their own scarce resource of time to be
11 day-to-day supervising the contractor.
12         Now, at times, I'm sure it came to their
13 attention, and they may have brought issues forward but,
14 you know, it's not the kind of day-to-day operation --
15 supervision and control that would lead the military to
16 be in charge of policing negligence by KBR, and we know
17 that from the declarations that we've put in.
18         We also know that there's been occasions when KBR
19 went -- there would be a military official who was
20 concerned about their performance failures and who would
21 check up on them.  In some instances they basically took
22 steps to deceive the military about what they were
23 actually doing.  So they would segregate the waste out.
24 They'd put the plastic bottles to the side, so when the
25 military official showed up it looked like they were

1 recycling.  But as soon as he's gone, okay, just burn all

2 of it.  So you don't have the type of day-to-day control

3 exercise by the military.

4        The military -- the decisions that were made were

5 policy decisions, and we're not challenging those.  Those

6 are outside the scope of this lawsuit.  They are what

7 they are.  We'd like to know what they are and --

8        THE COURT:  Was there a military policy decision

9 to utilize burn pits?

10        MS. BURKE:  Pardon?

11        THE COURT:  Wasn't there a military policy

12 decision made to use burn pits?

13        MS. BURKE:  Not uniform decisions throughout the

14 theaters, Your Honor.

15        THE COURT:  In fact, they're using burn pits at a

16 majority of the bases that they themselves developed.

17        MS. BURKE:  It's more likely they used them at the

18 bases they themselves did because those are the ones

19 closer to combat and those are the ones closer to the

20 front line.  It's far less likely they used it year in

21 and year out at these static bases where the soldiers are

22 wearing soft caps.  They're not even -- they're not under

23 any kind of attack; they're not in hostile zones.  So the

24 fact that the military often used the burn pits doesn't

25 really say anything about what the military authorized

1 KBR to do.

2        KBR is back in the back of the front line and
3 they're doing the big bases.  We know for example --

4        THE COURT:  It doesn't appear that they were doing
5 the biggest base, does it?

6        MS. BURKE:  Your Honor, we don't really know the
7 answer to that.  It may be that a different contractor
8 was doing that.  We don't know the answer, and it's just
9 one of many things that we need discovery on, because
10 there is conflicting and contradictory factual
11 information on the record.

12        THE COURT:  We have extant military officials
13 providing declarations that say they didn't operate the
14 biggest base.

15        MS. BURKE:  Well, you know, Your Honor, if you
16 parse through the declarations themselves, first off, you
17 know, as I'm sure Your Honor knows, Touhy is not a
18 vetting process.  Touhy is just a way you get information
19 from the government.  When we were litigating the Saleh
20 case --

21        THE COURT:  You don't seriously think the
22 government lets those sort of declarations go out without
23 looking at them, do you?

24        MS. BURKE:  Yeah, they do look at them.  Just as
25 when we got declarations on both sides in the Saleh case.

1 Of course the government looks at them, but they're not a

2 statement of government permission.  They don't vet the

3 declarant.  They don't figure out whether the declarant

4 has knowledge of what they're being asked.  And they

5 don't opine as to whether or not that's the best person

6 to put forward.

7          So it's not equivalent to a Rule 30(b)6 on the

8 government, give us your person most knowledgeable about

9 use of burn pits.  And you can tell that because, for

10 example, you know, they don't appear to know that KBR had

11 a contract that required them to do certain things.  So I

12 actually think there's very serious questions as to

13 whether these particular declarants have knowledge, have

14 knowledge about the military's operation of KBR burn

15 pits.

16         The more appropriate declarants obviously would be

17 the contracting officers, the ones who are responsible

18 for LOGCAP.  They didn't get declarations from those

19 people, yet those are the people that would know, gee,

20 what did the military decide in terms of giving KBR

21 permission to use surface burning.  So on this record --

22         THE COURT:  Why would a contracting officer know

23 more than a general out in the field?

24         MS. BURKE:  Because the way the military operates,

25 it tries to eliminate burdens from its commanders, its

1  field commanders.  And so on things that are deemed

2  nonessential to combat, things like the waste disposal,

3  the water treatment.  It basically is like you,

4  commander, you don't have to worry about that.  We're

5  going to hire somebody to do it.  It's a logical way to

6  free up military personnel for more military matters and

7  take away some of this logistical support burden.

8        So, the commander -- the commander is free to ask

9  for more help.  The commander is free to complain about

10  the contractor.  But the way that the United States

11  military has chosen -- has voluntarily chosen to operate

12  is to have the procurement personnel be the ones

13  responsible.  And this is all laid out in the military

14  regulations and the way that they govern themselves.  And

15  certainly, you know, it's -- we're not questioning that.

16  They have the -- they have the ability to do it that way

17  if they want.

18        What that does, though, is it basically puts KBR's

19  operations to the side of military operations.  They're

20  not integrated and they're not run by military personnel.

21  So, the declarants that are on record are simply in the

22  same party as any other third party observer.  They're

23  not right in the mix of controlling KBR.

24        THE COURT:  Well, let me ask you this.  There's

25  obviously a concern that any court should have, including

1 this one, about unleashing hordes of lawyers on the

2 Defense Department and God knows where else they'd have

3 to go to get proper persons.  How would you propose that

4 the discovery you want to do would significantly differ

5 from full blown merits discovery?

6         MS. BURKE:  Your Honor, I think the hordes of

7 lawyers we need to worry about going after the government

8 is obviously the KBR lawyers and not us, because they're

9 the ones that are trying to turn this into an attack on

10 the military, we're not.

11        THE COURT:  Well, the people that are going to

12 know the answers to the questions in this case are

13 uniquely going to be military, aren't they?

14        MS. BURKE:  Well, Your Honor, no.  At the very

15 first pass through, they're KBR people.  I mean, for

16 example, the question as to whether or not KBR complied

17 with its contract, it's very telling.  There is no

18 declaration from KBR personnel on their side saying in

19 fact they did.

20        So, at the outset, what I would suggest is that we

21 limit either side's approach to the military and instead

22 focus -- as we put out in our plan, we focus on the

23 documents that are in their hands, which they have the

24 complete -- they have all this paper, just as the

25 military does.  So we get the paper from them and we

1 depose their people.

2          THE COURT:  What paper is it you want?

3          MS. BURKE:  We want the contracts.  We want the --

4 all of the subsidiary contract documents, any

5 modifications, the Letters of Technical Direction, the

6 administrative contract officers, all the correspondence

7 back and forth.  And then we want their own performance

8 documents, the documents they had to do their own reviews

9 on whether or not they were performing and complying.  We

10 would like those documents.  And then we'd like to depose

11 knowledgeable people within the company about their

12 performance.  And the only -- the only burden we are

13 asking at this point to put on the military is to depose

14 these people that voluntarily cooperated with KBR and

15 signed declarations that likely were drafted by KBR

16 lawyers.  So, we only are asking to depose those

17 particular military personnel.

18          After we get that amount of discovery done, Your

19 Honor, we don't -- we do not think they will be able to

20 continue to maintain this defense that they think they're

21 going to have, because we think that those documents and

22 those depositions will show that what we're really

23 dealing with here is not a situation in which a

24 contractor is acting to further the U. S. interest but

25 where they were sloppy and negligent, and where they

1 harmed American soldiers.  All of that is in our response

2 to the -- in the supplemental memo.  We laid that out and

3 we think, you know, it would not take too long to do

4 that.

5        I would give you -- just as a comparison, Your

6 Honor.  In the Saleh case, the judge limited the

7 discovery to issues of command and control, and it took

8 approximately nine to ten months to get that done, and

9 then there was motions made and it was revisited.

10       THE COURT:  Would command and control discovery be

11 appropriate in this case?

12       MS. BURKE:  They haven't made a threshold showing

13 that there's been any integration.  So, you know, there

14 -- I mean, here, the declarants -- for example, the

15 declarants here, they don't claim the military --

16       THE COURT:  Is the proper term -- I know the term

17 "integration" has been used, but isn't the more important

18 term "control?"  In other words, in a sense that if the

19 government hires Burger King to provide a fast food place

20 in some big place, they -- all they know is they signed a

21 contract, and you sell your burgers.  We don't control

22 you.  We don't tell you what kind of burgers, the cheese,

23 the ketchup, nothing.  We have nothing to do with it.

24 That's one circumstance.

25       The other is we're hiring you to operate burn pits

1 and provide water, and we're going to come in and tell
2 you things to do that we want you to do.  I don't care
3 what the contract says.  I'm the general, and I'm smoking
4 a cigar, and I walk in and I said I want this stuff to be
5 burned.  KBR is going to say where, general?  I'll burn
6 it right now.  Isn't that a bit different than the Burger
7 King?

8          MS. BURKE:  Your Honor, that's actually not
9 factually accurate, because the commanders don't have the
10 power to do that.  There is no record that they did that,
11 and KBR has gone on record saying that they would not
12 respond to that.  I mean, that is not -- that notion that
13 they could -- that the commander could just walk in and
14 make an *ad hoc* decision on what to be done, there is no
15 suggestion of that here.  In fact, what I will show Your
16 Honor is the way KBR itself described the LOGCAP and
17 described the way the LOGCAP operated, and this is
18 outside the context of litigation.
19          THE COURT:  Well, I mean, in the report to
20 Congress, they say the decision to use burn pits in
21 deployed operations is retained at operational command
22 level.
23          MS. BURKE:  But they're talking about --
24          THE COURT:  Who is that?
25          MS. BURKE:  They're talking about the military's

1 operation of burn pits, and they're contrasting that.  If

2 you look at Section 1 of the DOD report --

3        THE COURT:  Right.

4        MS. BURKE:  It has, at the very beginning, that

5 the preferred means to handle solid waste in military

6 operations worldwide is through commercial contracting

7 for logistics service, either directly with a local

8 national or host nation service provider, or through the

9 use of standing contracting instruments available to

10 military commanders locally.  Once that decision has been

11 made to use this contracting vehicle, then it takes it

12 outside the zone of the day-to-day control of the

13 military commander.  So that threshold decision of trying

14 to -- of using a contractor, outsourcing it, you know,

15 that threshold decision, yes, is something that the

16 commanders weigh in on.  But once they go that path, then

17 the rest of the report basically talks about what the

18 military does when it operates.

19        And so, you know, for example, it talks about the

20 standard of procedure and how the commander has to

21 specifically authorize the surface burning.  In a

22 situation when it's military men performing waste

23 disposal, yeah, the commander essentially becomes the

24 equivalent of, you know, the KBR, and he's got to run the

25 day-to-day waste disposal.

1          In those situations in which we're paying billions

2   of dollars for somebody else to do it, that task is off

3   his shoulders.  And there's been no -- there's been no

4   evidence that I've seen of any commanders being the ones

5   making the decisions on the KBR locations.  It's been

6   made at a high level, and they get the permission, and

7   this is certainly what Lee Lassiter  told us, who is not

8   a client but he is a former KBR employee who worked in

9   this field.  In fact, he was the environmental manager at

10  corporate level.

11         And what he explained, and what we put in the

12  declaration, is that KBR was supposed to plan.  That's

13  what they were paid for.  They're supposed to plan the

14  waste disposal from soup to nuts, and they had to get

15  permission when they went for surface burning.  So, you

16  know, we don't know whether they did in all instances.

17  We're sure that in some instances they likely did get

18  permission.  We know, though, from the contracts, that

19  conditions were imposed on it.

20         And so, Your Honor, the way the LOGCAP works is

21  really best explained by KBR itself, and that's what I

22  have up here.  This is KBR's e-mail to the LOGCAP officer

23  explaining their view of how LOGCAP works.  The contract

24  allows KBR the latitude to determine how to meet the

25  objectives.  Instead of prescriptive methods, the

1 contract allows KBR to deliver the required services by

2 following its own best practices.

3        And then they go on to say, since the primary

4 focus is on the end result, KBR is authorized by the

5 contract to adjust its processes as it seems appropriate

6 through the life of the contract, provided that the

7 delivered services, the outcome, remain in accordance

8 with the contract.

9        The arrangement maximizes opportunity for

10 competitive alternatives and greater innovation through

11 use of KBR's own best practices -- practices and

12 processes, in lieu of government-directed solutions.

13 That's LOGCAP.  They're supposed to bring the

14 intellectual activity of planning for the waste disposal

15 to the task.

16        So, you know, what we need to see -- what we need

17 discovery to see is what did they do?  Did they get

18 permission for surface burning?  Why did they recommend

19 it?  And did they keep using it when they could have been

20 using incinerators.  We do have the one declarant who

21 said there was an operational incinerator and they were

22 just too lazy to use it.  Clearly, that's a different

23 situation than when there aren't incinerators in country.

24        THE COURT:  That's sort of a conclusion that they

25 were too lazy to use it, isn't it?  What knowledge does

1  the declarant have as to why it wasn't being used, other

2  than his conclusion they were lazy and that's whey they

3  weren't using it?

4          MS. BURKE:  Statements of the KBR employees at the

5  site.  He's relying on what the KBR people told him.

6  Your Honor, you know, this is exactly the type of

7  situation -- this is the type of factual dispute that we

8  need discovery for.  Obviously, they're entitled to come

9  up with reasons why they did it that way, but we are

10  certainly entitled to make our case that the manner in

11  which they failed to perform hurt the plaintiffs.

12          So, if we walk through the Political Question, we

13  know the sovereign is comfortable having tort liability

14  to be borne by companies.  It has continued to keep the

15  DEFARs in the same fashion it has, and it continues to

16  contract with companies.  So, there's no -- there's no

17  evidence on the record that the United States -- "United

18  States" is going to have a problem with tort liability

19  for a noncompliant contractor.

20          We have walked through how the LOGCAP contract

21  worked; and I've already made the point about the Touhy

22  declarations, but I would again just point out that KBR

23  itself admits in its briefs, at Pages 25 and 42, that the

24  standards by which they are supposed to perform are set

25  out in writing.  So, this is a straightforward,

1 quintessential adjudicatory task well within Your Honor's

2 power.  Did the actions, the day-to-day actions of this

3 company comply with those written standards?

4        There's clear issues with the declarant's

5 knowledge.  For example, two of the declarants that it

6 relies on, Major Tara Hall and Major Sue Ann Ramsay, as

7 well as Sergeant Major Swann, they all say well, you

8 know, we're pretty sure there were no problems with the

9 water, because it would have been brought to our

10 attention if there had been.  But, yet, there's a DOD

11 report that finds that KBR had failed to comply with the

12 water treatment provisions.

13        So, we definitely -- you know, we are not

14 interested in burdening the military.  And as we said, we

15 think discovery is primarily going to be from KBR.  And

16 we do believe the discrepancies and the manner in which

17 -- that these declarations are drafted raise serious

18 questions that we do need depositions for those people.

19        THE COURT:  If you're furnishing water in a war

20 zone, isn't it a bit different than furnishing water in

21 Montgomery County or Prince George's County?

22        MS. BURKE:  You know, Your Honor, that's a

23 decision that I'm not equipped to make, and that's a

24 decision you're not equipped to make.  That's a decision

25 the military makes, and those military decisions --

1 you're not being asked to second guess those.

2         THE COURT:  Isn't it understandable, though, that
3 you might not have water of such pristine quality as we
4 have here, in a war zone?

5         MS. BURKE:  Your Honor, the military said we want
6 water for our troops at TB MED 577.  Clearly, the
7 military thinks it's a possibility in a war zone.  And
8 since they're the ones that fight wars, they know what's
9 possible and what's not possible.

10         KBR signed on to the contract promising they would
11 provide water in contingency operations.  It's not
12 actually war zones, it's contingency operations.  But KBR
13 knowingly signed on to these contracts promising they
14 would provide water at TB MED 577 in contingency
15 operations.  Presumably, KBR also thought they could
16 provide it at that level.

17         If they want to come in after the fact and, you
18 know, make a plea to the jury of oh, my goodness, it was
19 so hard to do; we were in a war zone.  You know, I
20 suppose that's their right but.  You know, they got paid
21 for it.  They signed on and promised they had the
22 capability to do it.  And the military decision that it
23 should be done that way is not before you, and that's why
24 these aren't -- these cases aren't Political Questions.
25 You're not being asked to second guess those military

1 decisions.

2        The law is clear that the Political Question

3 Doctrine should be invoked very sparingly, and I think

4 there's a -- there is kind of an intuitive appeal to this

5 notion that, okay, because it's in contingency operations

6 maybe we should just walk away from that entire topic.

7 But, you know, the Supreme Court has weighed in many

8 times about military issues and things that are occurring

9 in contingency operations.  There is -- you know, they've

10 adjudicated whether the military acted legally in

11 detaining enemy combatants.  They've adjudicated whether

12 the President himself violated the rights of enemy

13 combatants.

14        So, the fact that all of this arises from

15 contingency operations doesn't give it some kind of

16 veneer  that entitles it to the Political Question.  And

17 I would just point out as an example.  The Agent Orange

18 litigation all proceeded at times up to the high court;

19 that was never dismissed on Political Question.  The

20 majority of the federal courts that have looked at these

21 kind of contractor cases have not ruled that they raise a

22 Political Question.

23        Saleh rejected it outright:  Not a Political

24 Question.  And there, the conduct was far more -- was far

25 more integrated with the military and far closer to

1 actual combat than the type of, you know, background

2 waste disposal and water treatment that we're dealing

3 with here.

4        The Lane case, the Koohi case out of the Ninth

5 Circuit:  Not a Political Question.  The McMahon case:

6 Not a Political Question.  So you have four federal

7 appellate courts finding not a Political Question, and

8 the only case holding the other way is Carmichael which

9 as Your Honor knows, the United States had some comments

10 on in their most recently filed paper.  I'd also address

11 Taylor, simply because KBR has raised that case.

12        THE COURT:  Saleh, or however you pronounce it,

13 did not end its inquiry with that question of Political

14 Question.

15        MS. BURKE:  No, Your Honor, and I am going to turn

16 to the government -- to the government contractor

17 defense, but I just want to finish up on the Political

18 Question --

19        THE COURT:  Okay.

20        MS. BURKE:  -- if that's okay.

21        THE COURT:  You may.

22        MS. BURKE:  Okay.  KBR tries to argue that because

23 Taylor is in this district that somehow the Court should

24 defer to that.  In fact, there is two cases by district

25 courts here, by Judge Ellis in V Services, 665 F. Sup,

1 569, as well as the Al Shimari case that was cited
2 previously by Judge Lee.  Both found the kinds of claims
3 raised were not Political Questions.  So even within this
4 district, your fellow colleagues, the majority, have gone
5 against finding that there is a Political Question.
6          Your Honor, we believe that unlike the government
7 contractor defense, which I'll turn to now, we believe
8 that Your Honor should rule now denying the Political
9 Question motion.  There is no need to keep that alive.
10 It's not a Political Question, and it's clear there is
11 not a separation of powers issue at play here.  So we
12 would ask Your Honor to deny the motion on the Political
13 Questions grounds.
14          And then turning to the government contractor
15 defense, we would ask that Your Honor permit the
16 discovery to proceed.  Now, KBR has made much of the fact
17 that well, you know, they're not really alleging the
18 government contractor defense; they never used that term.
19 Instead, they're relying on Yearsley and Mangold.
20          I would just point out for Your Honor that the
21 Fourth Circuit views the Yearsley case as the government
22 contractor defense.  In the Tozier case, which is cited
23 in our papers, the Fourth Circuit walks through the
24 government contractor defense and said that it shielded a
25 contractor from liability when acting under the direction

1  and authority of the United States and cited Yearsley.
2  So, the first argument they've made that they can somehow
3  avoid the government contractor defense is just wrong as
4  a matter of law.

5        The two types of defenses they're raising,
6  derivative sovereign immunity under Yearsley, as well as
7  Combatant Activities, they both fall within that judicial
8  doctrine that is governed by the Supreme Court.  And the
9  Supreme Court jurisprudence on the doctrine includes
10 Yearsley, and it includes Boyle.  So that is the test,
11 the Boyle test.

12       The reason that it is important to find out
13 whether or not KBR complied with its contract is because
14 only by complying with the contract do they fall within
15 the zone of persons that may be entitled to immunity.
16 And if you look at the Yearsley and Ackerman decision,
17 it's very clear that you've got to make that
18 determination at the threshold.

19       Your Honor, you can, in a sense, think of it as
20 the equivalent of the Westfall determination on a
21 government employee.  If a government employee is sued,
22 there is not immunity necessarily.  Instead, the United
23 States makes an assessment as to whether they were acting
24 within the scope of their employment and whether they
25 were furthering the United States' interests.  The

1 corollary here is these are not government employees.

2 They're government contractors.

3         So, textually, they have absolutely no

4 entitlement.  The Federal Tort Claims Act expressly

5 excludes them from the immunities.  So what you're doing,

6 as a judge, is trying to find that very narrow area when

7 you can ignore the text of a congressional statute and

8 find that there is such an overwhelming federal interest

9 that there's a reason to extend an immunity to a private

10 corporation.

11         Yearsley -- they cannot go -- they cannot get

12 derivative sovereign immunity under Yearsley and under

13 Boyle until they have established -- and they bear the

14 burden of both proof and production on this issue --

15 until they have established compliance with the contract.

16         Now, the Combatant Activities Exception, Your

17 Honor, is another iteration of Boyle.  It is taking a

18 different Federal Tort Claims Act exception and saying

19 that the federal interest -- it's not a question as to

20 what the definition of that is, although what we would

21 suggest is that the better test to define that exception

22 is the test adopted in Al Shimari and Skeols.

23         The actual engaging in the exercise of physical

24 force.  We think that effectuates the intent of Congress

25 in adopting that provision.  But what's clear is

1 regardless of the texts of that particular provision,

2 they have to do more than just prove that they fit within

3 that text, because there is no textual entitlement under

4 the Federal Tort Claims Act.  So they, instead, have to

5 meet the test set forth in Boyle of showing that there's

6 a direct and significant conflict here of why holding

7 them responsible for complying with their contract,

8 measuring their standard of care against the military's

9 conduct, why engaging in that exercise would create some

10 type of direct conflict with the federal interest, and

11 they haven't even argued that.

12        They haven't even laid out -- they haven't even

13 laid out, you know, which state law they believe would

14 create that kind of direct conflict.  Instead, they

15 essentially create -- they're arguing almost a zone

16 notion.  Well, any operations of contractors over in the

17 contingency operations involve military decisions and

18 therefore should be outside the zone.  That type of loose

19 argument is not what's needed in order to establish

20 entitlement to the government contractor defense.  They

21 have to prove up each of those elements and they haven't

22 done so.

23        I would simply direct Your Honor to Plaintiff's

24 Exhibit 28 in which the United States filed its own

25 lawsuit against KBR.  And the way they described what KBR

1 was doing is important, I think. It talks about the

2 LOGCAP performing noncombat services in support of

3 military operations around the world.  So, at least the

4 indicia that we have on the public record from the

5 sovereign is that they view KBR as providing noncombat

6 services.

7        And they go on to -- they go on to talk about the

8 fact that American soldiers are responsible for force

9 protection for KBR contractors.  So it is clear that they

10 don't -- they don't, as a threshold matter, fit within

11 the zone of combat activities.  But even if they did, you

12 have to go beyond that because of this lack of textual

13 entitlement.

14        THE COURT:  The term in the Federal Tort Claims

15 Act is not combatant activities; it's arising out of

16 combatant activities.

17        MS. BURKE:  Yes, Your Honor, it is.  And the --

18 the combatant -- it's interesting that they use the word

19 "combatant" rather than "combat," because a combatant

20 activity is that actual person engaged in the hostility.

21 It's the soldier fighting.  And so here they've made no

22 showing that any of their conduct was arising out of that

23 actual fighting on the field.

24        In fact, if you look at what was done in Taylor, a

25 case that they heavily relied upon.  In Taylor, the Court

1  sent the matter out for discovery.  And one of the issues

2  on which there was discovery and which there was a record

3  built was whether or not the services were in combat.

4  And so the Court took -- the Court looked at the time

5  frame and looked at the location and made a finding that

6  in the year -- and I'm sorry Your Honor, I'm blanking on

7  the year.  I think it was 2006, in Fallujah.  That

8  particular tank company was in combat.  And therefore,

9  because those tanks were being used at that time in

10 ongoing combat, the maintenance service for the tanks was

11 connected to combat.  So it was a very, very direct

12 connection between the combat.

13        Now, my understanding from what we've learned so

14 far is that the combat -- the combat going on tended to

15 be the sites that the military handled themselves.  So

16 when you're up at the front lines and you are the

17 soldiers going out every day with their weapons, the

18 waste disposal there was more likely handled by the

19 military than by KBR.  That's our understanding.  But

20 again, Your Honor, this is exactly why we need discovery,

21 to build a factual record on when and where these things

22 took place.

23        Your Honor, the reason -- one of the reasons that

24 we believe that they supported the larger bases is their

25 own exhibit -- their own Exhibit 5, which speaks to that.

1        The last point I'll make, Your Honor, before I sit

2   down is the public policy argument that they've made.

3   They essentially have claimed that Your Honor should

4   refrain from exercising jurisdiction because permitting

5   these corporations to be subject to tort liability would

6   mean that corporations wouldn't be willing to stand up

7   and go do this work.   That is actually demonstrably

8   false.

9        We know, for example, that a competing company,

10  DynCorp, bid on and obtained the waste disposal contract

11  under LOGCAP IV during the pendency of this litigation.

12  So, these companies that are bidding and competing for

13  service contracts are not at all dissuaded by the

14  prospect of tort liability.   In fact, they know from the

15  DEFARs, and they know from the *Federal Register* that they

16  need to price their contracts to cover that.   They need

17  to carry insurance to cover it, and they need to account

18  for that in their business planning.   So, there's no

19  public policy argument that holds water when subjected to

20  scrutiny.

21       The reason that there's this notion of this public

22  policy argument arises from the genesis of the government

23  contractor defense.   It comes out of weapons manufacture.

24  There you had the United States really wanting the

25  significant investment in R&D by these government

1  contractors, and there was a concern that applying strict

2  product liability laws on design defects and

3  manufacturing defects would lead to a diminution in

4  private sector R&D.

5          That public policy articulation that you see in

6  some of the case law does not have a corollary in the

7  services context.  And so Your Honor, again, this is an

8  area of discovery that we need to do, but we think that

9  what's on the public record already shows that these --

10  the military is not -- as long as the military is willing

11  to pay $5 billion per year to get these services done,

12  there is no shortage of American corporations willing to

13  assume those risks.

14          Your Honor, we would ask that you deny the

15  Political Question motion and that you order discovery to

16  commence on the government contractor defense.

17          THE COURT:  All right.

18          MS. BURKE:  Oh.  And I would just speak briefly to

19  the Motion to Strike, Your Honor, before I sit down.

20          THE COURT:  You may.

21          MS. BURKE:  Your Honor, on that score.  Obviously,

22  we've also filed another complaint on behalf of

23  Mr. Jobes that is the new complaint.  When we filed the

24  amended -- the consolidated complaint, by that time we

25  were already working on the opposition to the Motion to

1 Dismiss.  I, in good faith, actually thought that if we

2 failed to alert them to the evidence that Your Honor had

3 already told us we could put on the record for this

4 exercise that we would be accused of sandbagging them.

5 All of the information we added to the consolidated

6 complaint is essentially illustrative of the major

7 premises that we put them on notice of at the outset.

8         Thank you, Your Honor.

9         THE COURT:  All right.

10        MR. MELUGIN:  May it please the Court.  Good

11 afternoon, Your Honor.  I am Joe Melugin.  I'm here on

12 behalf of plaintiff Albert Johnson, Jr., as well as the

13 plaintiffs represented by Ms. Burke.  I think what's best

14 in this regard is to understand this -- the motions that

15 are being presented here through the context of what has

16 happened in other cases.  And so to that end, I'm going

17 to address three things that I heard from the other side

18 earlier this morning.

19        Number one is this concept of plenary control.

20 Now, they didn't use that term in particular but we'll

21 get there, Your Honor.  And the second thing would be

22 this idea, this concept of a swearing contest between

23 military witnesses.  Again, we will get there.  And the

24 third is this idea of injecting convoy cases and the

25 plaintiffs wanting to inject these convoy cases.  And as

1  I address these three concepts, I'll show you that each

2  of these has no basis in the motions here today, and

3  we're not trying to do -- not trying to inject the convoy

4  cases or get military witnesses to engage in a swearing

5  contest.  It's just not going to happen in this case.

6        But to the first point, which is plenary control.

7  Your Honor has discussed control in this regard, and the

8  defendants, in their reply brief, have conceded that

9  through discovery we'd be able the chip away at plenary

10 control.  Well, that in and of itself is a little bit

11 contradictory.  As Your Honor can see, the idea of

12 plenary control is either you have it or you don't.  It's

13 absolute or it's not.

14        And through our replies -- our responses, we've

15 been able to show that they -- that the military did not

16 have plenary control.  And to that end, I'll discuss

17 Lane.  Again, I'm here as counsel for the Johnson

18 plaintiff and an officer of the court, but I'm also an

19 attorney who represented the plaintiffs in Lane.  To that

20 end, this idea of plenary control is actually an

21 injection of Carmichael and Lane by the defendants into

22 this case.

23        They've relied on this concept of plenary control

24 in all of their briefing, and it's the same claim that

25 they made in both Lane and in Carmichael.  In fact, it's

1  a mantra that has come up in every case that these

2  defendants have had to defend in these types of cases,

3  whether it's convoy or burn pits.  No matter what the

4  case, they go to plenary control.  And they did it in

5  Lane from 20- -- from when the case began in 2005 to when

6  it was dismissed in 2006.  And then when it went up to

7  the Fifth Circuit, they made the same claim.  And I

8  direct Your Honor to the Fifth Circuit decision,

9  actually, 529 Federal 3d 561, note 5.  And if you will

10 forgive me Your Honor, I want to get the quote exactly

11 right.

12        Counsel for the defendants -- these same lawyers

13 that are here before you today.  "At oral argument,

14 counsel for KBR suggested that only if KBR could

15 determine that the military had breached the LOGCAP

16 contract could it then refuse to direct its civilian

17 employees to participate in a convoy.  The only example

18 of a demonstrable breach that counsel could provide was

19 the military's failure to show -- failure to show up at

20 the gate at the appointed departure time.  That is a

21 failure to provide any force protection at all."  And

22 that's from the Fifth Circuit's opinion.  They made that

23 representation to the Fifth Circuit and it was simply a

24 false representation.

25        Now they've made the same general defense in this

1 case that they're subject to the plenary control of the

2 military, and it's simply not the case here either.  They

3 eventually came around in Lane.

4         THE COURT:  Why are not they not subject to the

5 plenary control of the military?

6         MR. MELUGIN:  Because the LOGCAP contract in and

7 of itself -- the discretion to use the means to complete

8 the task that is requested by the military in LOGCAP is

9 always the discretion of the contractor.  They're never

10 subject to the control of the military.  It's in the

11 contract itself at Statement of Work 1.11.

12         THE COURT:  Well, the D. C. Circuit focused more

13 on the, you know, actual control, not what the contract

14 says.

15         MR. MELUGIN:  Again, that's a different --

16         THE COURT:  In the real world of Afghanistan and

17 Iraq, if the commanding general of the base wants

18 something done, isn't it going to get done by KBR?

19         MR. MELUGIN:  Your Honor, there's two points that

20 -- when it comes to Saleh, that's a different contract in

21 a different context.  That's not the LOGCAP contract.

22 That's the first point.

23         The second point is that in Saleh, the focus is

24 actually on -- the test is that the Combatant Activities

25 Exception might apply to those plaintiffs to preclude

1 parties who -- against whom force is directed, and that's

2 not the case here.  So, that's the first thing.

3          And to go more to Your Honor's point about

4 control.  The Saleh court specifically excluded these

5 types of performance contracts, that is LOGCAP, from the

6 Combatant Activities Exception.  It's expressly in the

7 opinion.

8          Now, they clung to this plenary control idea even

9 on remand.  But eventually they did come around, because

10 the evidentiary record in our case became such that they

11 could no longer deny that they were subject to the

12 military's plenary control.  I'll direct Your Honor's

13 attention to Exhibit 32 of docket 73, I believe.  That's

14 the --  there in open court, after remand, after they've

15 made this claim to the Fifth Circuit, they still claim

16 the Army exercised plenary control other the convoys.

17          Now we're beginning -- at this point, in February

18 of 2009, we're taking discovery, we're deposing

19 witnesses, and that claim is going away slowly but sure

20 surely.

21          In April of 2009, the Chief Executive Officer for

22 KBR claims, in a published article -- published interview

23 that "the Army determines where, when and the route, and

24 we don't have the ability to say no."  Again, that's

25 simply a repackaging of this same plenary control claim

1 that they're making here, and that's also in our record

2 at Exhibit 33.

3          Now, all during this time, again, we're chipping

4 away as they've conceded that we be able to do in

5 discovery in this case.  We're chipping away at this case

6 of plenary control, but they maintain it.

7          In July and August of 2009 they filed dispositive

8 motions on the same subjects that are on the same grounds

9 that they're now bringing before this court and use the

10 same language.  It's their attempt to inject the Lane

11 and the Carmichael cases into these cases.  But this is

12 back in July of 2009 and August of 2009 where they claim,

13 again, they are subject to the government's plenary

14 control.

15          Now, that claim mysteriously goes away in November

16 of 2009, which is only 23 months after they made the same

17 claim in front of the Fifth Circuit.  And there we've got

18 Exhibit 34 from our brief, docket 73, where they finally

19 concede that yes, KBR had the authority to say no.  Now,

20 at this point, the evidentiary record in Lane has been

21 proven to such an extent that they can no longer credibly

22 claim that they're subject to the military's plenary

23 control.

24          Now, two months later, in -- at Exhibit 44, at

25 Page 71, KBR's CEO makes -- this brings us back to the

1  KBR CEO's statement of plenary control, and now they have

2  totally distanced themselves from those claims.  And

3  their lawyers stand up in open court, again, Exhibit 44

4  at Page 71, and they say that -- I don't know whether or

5  not he was misquoted or whether he's just wrong, but

6  that's not the position of the defendants.  That's this

7  idea of "we don't have the ability to say no."

8        So now they've gone from this concept of plenary

9  control, another concept they've injected into this case,

10 and completely obliterated it.  They've said that that's

11 not the case and that's not the position of these

12 defendants.

13       Now, going forward, the Court in our case, in

14 Lane, that's at Exhibit 37, denied the Political Question

15 Doctrine motion and the government contractor motion, and

16 at Page 8 says the defendants argue they were under the

17 plenary control of the Army, that they did not have the

18 authority to refuse to send a convoy.  However, this

19 argument finds support in neither the terms of the LOGCAP

20 contract, which is the same contract we're here on today,

21 nor of the practice of the parties at the time.

22       Now, this clearly demonstrates a need for

23 discovery.  And in support of those motions, they

24 provided the same sorts of declarations they now rely

25 upon.  They didn't use the words "plenary control" today,

1 but they tried to inject the idea by going back to these

2 same declarations.

3          Now, at this point we've not even -- the Lane

4 plaintiffs have still not deposed any of the military

5 declarants.  That they tried to proffer for support of

6 their motions to dismiss, but we did take those

7 declarations eventually and they rebutted their own

8 testimony in those cases or, rather, they rebutted KBR's

9 reading of that -- of those declarations.

10          Now, in our case, they had the declarations of

11 four Army officers to support those dispositive motions.

12 Their depositions were taken only after KBR lost their

13 Political Question and government contractor motions, and

14 they were taken pursuant to KBR's notice as they were

15 needed for trial, and we cross-noticed those depositions.

16          I want to point out the danger in relying upon

17 those declarations by going to Carmichael.  At

18 Carmichael, 52 Fed 3d, at 1282, the Eleventh Circuit

19 cites to one of these declarations, cites to a Carmichael

20 declaration, and it's by Lieutenant Colonel named Betty

21 Holmes.  And it's for this concept of plenary control,

22 this idea that appears in Carmichael and appears in Lane

23 and appears in this case.  They cite to her declaration,

24 and they do it to support this notion of plenary control.

25          But when we take Betty Holmes' -- they use another

1 declaration of Betty Holmes in Lane.  But when her

2 declaration is finally taken and we cross notice and ask

3 her to bring the drafts of declarations that she's

4 submitted on behalf of KBR in this case, in Lane, she

5 brings one document and it's the declaration that she

6 submitted in support of Carmichael's Motion to Dismiss.

7 She didn't even understand that these were different

8 cases and that she was submitting affidavits in two

9 different cases.  She goes on to rebut KBR's reading of

10 her declaration.

11        Now, one month after Lieutenant Colonel Holmes'

12 declaration, the defendants move to dismiss in this case,

13 and incorporated their February 2010 motion.  I don't

14 want to say -- and they have said that the declarations

15 were done through Touhy and that they complied with the

16 Touhy regulations.  But here is the thing about Touhy.

17 Even when they don't comply with Touhy, they still seek

18 to get these types of declarations and this type of

19 testimony.

20        In February of 2010 they sought for the second

21 time to use General -- Lieutenant General Ricardo Sanchez

22 for their expert in Lane, and for the second time they

23 were denied.  And I point Your Honor to Exhibit 40 of our

24 document 73 which is actually the second time they've

25 asked the Army to use Lieutenant General Sanchez.  The

1  Army denied them a second time, and they noticed his

2  deposition anyway.  And they forced the United States to

3  then file a Motion to Quash.  And the United States lost

4  that Motion to Quash.

5         The lieutenant general went on to testify, and now

6  they want to prevent Your Honor from even reviewing that

7  testimony.  That's their own expert and they won't agree

8  to release that deposition for Your Honor to review.  And

9  he talks about LOGCAP.  He talks about the nature of

10  LOGCAP.  He talks about all sorts of things within the

11  nature of LOGCAP, but they don't want you to see what he

12  said, because it shows that they actually did retain the

13  discretion to do whatever it was they were asked to do.

14  To get to the ends, but never mind the means.

15         Which brings us back to this case.  They don't

16  want you to see that deposition.  They don't want you to

17  see any deposition or any evidence that's been

18  accumulated in Lane, and that's a way that we can avoid

19  burdening the military or burdening any party other than

20  KBR -- well, not even burdening KBR.  If they just agreed

21  to release the documents, we could then see what LOGCAP

22  says -- what other experts have testified to as to what

23  LOGCAP says and go forward from there.  But they have

24  said nothing to our most recent request.

25         And instead, they sent another letter to the Fifth

1 Circuit asking to stay the Lane proceedings.  And sure
2 enough, the Fifth Circuit has stayed those proceedings.
3 So, we're kind of at an impasse at that point.  But the
4 point is, there is plenty of evidence that is readily
5 available but they don't want Your Honor to see it at
6 this time.

7        And the risk is that you dismiss based on these
8 declarations, but you have a record that is really absent
9 of any -- of any testimony that's been proven up -- of
10 any testimony that's been cross-examined against.  And
11 that's the risk.  It's a risk that was first -- that
12 happened in Lane.  And then because the case was
13 dismissed, only ultimately to be remanded and then the
14 claim to disappear, and that's what we're seeking to
15 avoid.  We don't want to relitigate Lane.  We don't want
16 to relitigate Carmichael.  The defendants have been the
17 ones to inject this idea into this case by asserting this
18 idea of plenary control, and it's just simply not the
19 case here.

20        THE COURT:  Do you align yourself with Ms. Burke
21 on the proposition that insofar as military officials are
22 concerned, you don't want to take any depositions above
23 and beyond the declarants who have provided their
24 declarations to the papers filed by the defense?

25        MR. MELUGIN:  Certainly, Your Honor.  And just for

1 background purposes.  In Lane there were no military

2 declarations taken until, like as in this case, they

3 inserted the military by providing these declarations.

4 We conducted no discovery in regard to what the military

5 was doing.

6        THE COURT:  And do you also align yourself with

7 the supplemental memorandum filed by the plaintiffs in

8 which they describe the discovery they want to have?

9        MR. MELUGIN:  Yes, Your Honor.  I think that's a

10 fair starting point.

11       THE COURT:  Well, a starting point for what, the

12 merits or the issues?

13       MR. MELUGIN:  No.  For jurisdictional issues, Your

14 Honor.

15       THE COURT:  All right.  Well, the hesitancy that

16 any judge is going to have in ordering discovery is

17 disruption of the military and also the chilling effect

18 on contractors for the government.  Do you really believe

19 you need to have all statements of work task orders and

20 Letters of Technical Direction?

21       MR. MELUGIN:  Yes, Your Honor, we do.  And I don't

22 know that it's a chilling effect on the contractor in as

23 much as that they already have the documents.  The

24 documents have been provided in other cases.

25       THE COURT:  Well, I mean, one of the requests is

1  to have documents related to Halliburton's -- KBR's

2  communications with the United States.  That is

3  breathtaking in scope, isn't it?  All communications?

4        MR. MELUGIN:  No, Your Honor, not in regard to

5  what we're asking for and what's relevant here in this

6  case.  This is --

7        THE COURT:  Well, how can you narrow it if you

8  really want discovery?  I mean, to have all

9  communications?

10        MR. MELUGIN:  I'll defer to Mr. Rice.  I believe

11  he's --

12        MR. RICE:  Your Honor, if you want to talk about

13  our discovery request, may I?

14        THE COURT:  Certainly.

15        MR. RICE:  Your Honor, we have tailored and

16  narrowed this down to very simple practical areas that we

17  know are in the absolute control of KBR and Halliburton,

18  and this is for the following reason.  The contract is an

19  overall contract.  It operates that they receive a task

20  order to do a job.  So they have those task orders.  And

21  then they receive Letters of Technical Direction.  They

22  have to get that to know what to do.  So they have those

23  in a logical fashion.

24        The defendants have said to this court that the

25  Army determined what, where and how waste was to be

1   managed and disposed of.  Well if they say the Army did

2   that, it has to be in writing, so they should have the

3   writings they rely upon to say that.  We're just asking

4   them for the documents they rely upon to establish that

5   the Army told them what to do.

6           KBR's corporate environmental manager has

7   testified by an affidavit to Your Honor that they sought

8   by writings to be relieved from obligations.  Those are

9   writings in their possession that they generated, that

10  they sent to the government.  We're asking for those

11  writings.

12          KBR admits in their motion that specific

13  instructions regarding what could be burned were

14  memorialized in writing from the Administrative Contract

15  Officer and the Defense Contract Management Agency.  We

16  want those writings that they rely upon.  They say they

17  have them in writing.

18          They talk about the ACL change letters at Page 7

19  of our brief.  It talks about at the bottom how it works.

20  And then they have -- they rely upon the compliance and

21  audit reports which they receive.  They generate and they

22  receive compliance reports and audit reports.  Those are

23  in existence.  They're not out in Iran, Iraq,

24  Afghanistan.  They have them.

25          The last thing we ask for is the documents that

1 have already been produced, because Ms. Burke and I are

2 somewhat hamstrung here.  We have the responsibility as

3 lead counsel in this MDL to present the case to the Court

4 on behalf of all of the MDL representatives.  Counsel

5 that was involved in the Lane case has knowledge that's

6 covered under a confidentiality agreement in the Lane

7 court for documents that have been produced, depositions

8 that have been taken.  So he knows certain things but

9 cannot make them available to his client in this case,

10 much less to the MDL clients, because they're hiding

11 behind the confidentiality order.

12        Ms. Burke and I agreed to be bound by that

13 confidentiality order solely for those documents, but

14 that was not accepted by KBR to allow us to look at

15 those.  So, we're hamstrung.  We don't know what those

16 documents and what those depos say.  What we do know is

17 that after the Court reviewed those documents and allowed

18 discovery to go forward and read those depositions, that

19 district judge reversed his own finding and found there

20 was no Political Question involved whatsoever.  So,

21 something happened.  Something relevant is contained in

22 those documents.

23        THE COURT:  You mean the district judge read all

24 these depositions?

25        MR. RICE:  Well, I think it was his clerk but I'm

1 not sure.

2        THE COURT:  My enthusiasm is contagious.

3        MR. RICE:  Excerpts from the depositions.  But the

4 point being, those documents have already been produced.

5 Those depos have already been taken.  There is absolutely

6 zero burden on producing those documents here.  And to

7 the extent they are concerned about the confidentiality

8 order that was entered in Lane, we would be willing for

9 those documents to be bound by the exact same

10 confidentiality order.

11        So, that's the discovery we believe that is

12 relevant for the jurisdictional motions that are before

13 the Court now.  And I find somewhat offensive the comment

14 that Mr. Matthews -- I respect he's a fantastic lawyer,

15 but he made the comment, when the Court asked a while ago

16 about the Saleh case and did the Court allowed limited

17 discovery.  And Mr. Matthews' response was KBR came

18 forward with discovery itself that makes their issues

19 clear, and the Court has what it needs to make the

20 decision.  It's already been accomplished.  Well, I

21 respectfully believe that the discovery we might ask is a

22 little different than what he asked.  So, for the Court

23 to rely upon the discovery that they have made available

24 to the Court, that they believe has already been

25 accomplished, I don't believe it complies with giving our

1 clients due process to present their case.

2        So we would ask to be able to do the discovery and

3 the limited discovery that we have asked for, in order to

4 give the Court a complete record.

5        THE COURT:  Okay.

6        MR. RICE:  And I want to make one comment on the

7 Motion to Strike.  Your Honor, at the time that the

8 consolidated complaint was filed, we did add the

9 additional facts that we had.  Since that time, there

10 have been three or four other law firms that have filed

11 cases that Your Honor has now consolidated as "tagalong

12 cases," and then we filed another original action in this

13 court that the Court has original jurisdiction of.

14        THE COURT:  That's the one I can't send home.

15        MR. RICE:  I understand.  We may have to try that

16 one here, Judge.  We're looking forward to it.

17        The point being is the allegations that are in our

18 amended -- our consolidated complaint are almost in some

19 of the cases verbatim repeated in the new complaints.

20        THE COURT:  Mr. Rice, it wasn't what I envisioned

21 when I asked for a consolidated complaint that simply

22 put all the stuff from 40-some complaints into one

23 complaint for ease of reading, and there is a substantial

24 change that you've made.  You've rewritten a complaint

25 from top to bottom to tailor make it to respond to the

1   Motion to Dismiss that's pending.

2       MR. RICE:  I agree we updated the complaint in

3   this MDL process that is an ongoing process.  And Your

4   Honor, I know that the Court assigned this case to you,

5   you didn't ask for it necessarily, but you are going to

6   get more complaints.

7       THE COURT:  I did not volunteer.

8       MR. RICE:  I understand that.  You are going to

9   get more complaints and the new complaints will probably

10  have new allegations because new information is coming

11  out.  The DOD has reported in April -- I personally am

12  aware that there has been two Senate requests for a GAO

13  report, and GAO has a massive report coming out for the

14  entire Senate that we've been made aware of that deals

15  with a lot of these issues.  So, more information is

16  going to be forthcoming that report is due out in

17  September or October.

18       This is not going to be a stagnant case because

19  people are getting diagnosed.  People are returning.

20  People are realizing they need to come forward.  And

21  we're getting more and more information.  We get a lot of

22  contacts on a daily -- a weekly basis, I'll say, and more

23  information is coming out.  But the key is the existing

24  documents in their possession and that's what we're

25  asking under due process to present to the Court.

1          THE COURT:  All right.

2          MR. MELUGIN:  I have nothing further, Your Honor.

3          THE COURT:  Let's take another ten-minute recess,

4 and I'll be right back.

5                    (Off the record at 1:13 p.m.)

6                    (On the record at 1:25 p.m.)

7          THE COURT:  You may proceed.

8          MR. MATTHEWS:  Thank you, Your Honor.  Your Honor,

9 let me make a couple of general comments and then I would

10 just like to quickly respond to the few specific items

11 that have been raised here.  Not by all means all of them

12 but, I don't know, I'm a little tempted.  I've got

13 nothing else to do this afternoon.  But just a few, Your

14 Honor.

15          First, I want to go back to the notion that the

16 Combatant Activities Exception itself could form the

17 basis of dismissal in this case, and I think that that is

18 something that we would urge this court to focus on.

19 Why?  Because, as I said at the outset, its rules are

20 simple.  It asks a very simple and direct question.

21 There is no need to reach into -- what was the Court's

22 term?  The messiness of the PQD.  And on top of that and,

23 indeed, in that instance there is to be no question there

24 would be no further discovery that is needed.

25          Another general point I'd like to make --

1        THE COURT:  Why would no further discovery need to
2  be needed if I went that route?

3        MR. MATTHEWS:  Say that again, Your Honor.

4        THE COURT:  Discovery is going to be needed if we
5  proceeded on the path of analyzing status under the
6  Combatant Activity Exception.

7        MR. MATTHEWS:  Well I guess my premise, Your
8  Honor, is the evidence in the record fully supports the
9  conclusion or the response to the question that the Court
10 must answer, and that is whether the activities at
11 question are necessary to and in direct connection with
12 actual hostilities.  I think the declarations told us
13 that's true.  I think the award fee language that we
14 looked at told us that's true.  And there is other
15 passages in the award fee Your Honor that speak at length
16 to --

17        THE COURT:  Is simply being in Iraq or Afghanistan
18 enough?

19        MR. MATTHEWS:  Well, I think Your Honor used the
20 Burger King example.

21        THE COURT:  Right.

22        MR. MATTHEWS:  I don't think we're saying if we
23 operated a Burger King that was necessary or in direct
24 connection to actual hostilities.  I think providing
25 services that the Army itself has characterized as

1  necessary for force protection meets the standard set

2  forth in Johnson, Koohi, Taylor and so on.  So, the short

3  answer no.  The slightly longer answer is, but in context

4  these services clearly qualify under that standard.

5        All right.  Now, moving on to make one general

6  comment.  I have to say that I felt like all along in

7  listening to Ms. Burke, in particular, that she was

8  basically wanting this court to accept a lot of facts

9  that she's throwing out there.  I'm trying to find

10  another word besides "facts," but there were a lot of

11  statements made that would support discovery if there was

12  any basis for them.  I don't think a decision on

13  discovery should be based on unsupported statements from

14  counsel.

15        But let me be more specific.  Comment was made

16  that, well, when the Army operates these burn pits

17  historically or in -- currently, there is no problem.

18  Well, no.  The real answer is, Your Honor, when the Army

19  operates the burn pits they're immune.  There is no

20  litigation against the Army for the inevitable exposures

21  arising from burn pits because simply they're immune.

22  They can't be sued.  KBR, absent these threshold

23  jurisdictional defenses, can be sued, and that's why we

24  are here.

25        There was some discussion about, you know, a

1  decision in which it was decided that the decisions by

2  the government that are controlled by the government and

3  the activities by KBR could not -- at least the defendant

4  in that case could not be pulled apart -- or, strike

5  that, could be pulled apart.

6          I'll just point out, Your Honor, that in the

7  Taylor case, in which the functions at issue were power

8  generation and maintenance, the Court reached the correct

9  conclusion the in fact you could not separate the

10 direction and control of the military with the directions

11 taken by KBR.

12         Now, this notion somehow that at a base camp of

13 whatever size -- again, this notion that, well, the

14 military did the small ones out there and KBR did the big

15 ones.  There is no evidence that's true.  I don't think

16 it is true.  These are not facts before this court.  But

17 in any event, here is also what is not a fact.  This

18 notion that, you know, when the military was doing the

19 burn pits that guidance supplied to them when KBR was

20 doing the burn pits, they were just told to do waste

21 management and you're off on your own and we have no

22 further direction.  That's simply not true.  It was in

23 fact the base commander or sometimes called the mayor

24 cell that directed KBR.

25         The declarations confirm -- the declaration of

1 Gerald Vincent.  "U. S. military" -- this is in Paragraph

2 9 of his declaration -- "took responsibility for siting

3 burn pits.  The garrison commander or mayor cell is in

4 charge of siting burn pits and incinerators, as well as

5 living quarters, dining facilities, etcetera.  During my

6 time in Iraq, my office set guidelines for the military

7 to follow when siting the burn pits downwind" and so on.

8        So, the structure in the field is there's a

9 contracting officer, yes, but the bases are run by the

10 garrison commander, sometimes referred to as the mayor

11 cell.  KBR's performance of functions in Iraq is directed

12 on the ground by the mayor cell.  They are not free to do

13 it any way they will.

14        The defense contracting management agency, DCMA,

15 does supervise KBR's performance.  They're not -- I think

16 there was something said about, you know, well, they

17 would just choose a burn pit and maybe the military

18 wouldn't know about it.  Really?  Really?  Nobody

19 noticed?  The garrison commander didn't notice?  DCMA

20 didn't notice that KBR put up a burn pit where they

21 didn't "have permission?"  They were directed to put up

22 burn pits Your Honor.  And clearly, if they were not

23 supposed to do so, DCMA and the mayor would have

24 something to say about it.

25        Also, there is evidence in this record of this

1  type of direction in Exhibit 18 which provided two

2  examples of those contract documents referred to as

3  Letters of Technical Direction, or LOTDs, one directing

4  that KBR burn dried woven fiber filters -- and I think

5  that means, Your Honor, that those things don't burn

6  readily or easily, but they could find no other solution

7  so they said burn them.  And in that same exhibit we

8  included an LOTD directing KBR to burn animal carcasses.

9  Nobody's first choice of how to deal with an animal

10 carcass.  Nevertheless, KBR was so directed.

11        Reference has been made to the OEC's environmental

12 baseline guidance document, the OEBGD, and how that is

13 controlling in these circumstances.  It's not, Your

14 Honor.  It is self-deleting.  By its own terms it says

15 "not applicable in a contingency environment."  Further,

16 what it actually says is don't use burn pits.  So if it's

17 actually applied, the military is violating its own

18 OEBGD guidelines.  Nowhere in there is there one single

19 criteria for how a burn pit should be operated.  The only

20 thing it says is we shouldn't be using burn pits, but it

21 doesn't apply in contingency operations.  That's the kind

22 of fact that's just being made up as we're going along

23 here.

24        The notion that KBR was only in static

25 environments and not in hostile zones.  Your Honor, KBR

1 went to war with the United States.  They answered the

2 call.  They have suffered grievously.  KBR employees

3 have died as a direct result of hostilities.  The number

4 is in the sixties, I believe, Your Honor.  And the number

5 is close to 500 the number of KBR employees -- the

6 community of KBR employees who have been injured by

7 hostilities.  Not by accidents, not tripping and falling;

8 by mortar, IED and so on.

9          KBR went to war.  They aren't sitting in static

10 Burger King safe behind the wire operations.  To this day

11 their lives are at risk.  And it is a disservice to the

12 tens of thousands of KBR's employees who have served for

13 there to be such statements made as oh, they're just safe

14 and tucked away in their Burger Kings.

15          I heard mention that in the Saleh case the

16 declarants were vetted through the Touhy process.  It's

17 interesting that they were not so vetted here.

18          I would come back to Your Honor's point about

19 control.  This is what the Carmichael court was saying

20 and in essence the Sayler court.  Don't get hung up on

21 semantics, on words.  The key issue before this court on

22 the pervasive plenary direct control exercised by the

23 military is not found in words, it's found in the

24 jurisdictional evidence that we've placed before the

25 Court.  It's found in those declarations.  It's found in

1 a number of exhibits that we have provided this court,

2 which are historic and current military documents.  It's

3 found in the DOD report to Congress that the Army was in

4 control of each of these functions.

5         As to the DOD report.  Your Honor, I believe

6 you've probably already concluded this but let me just

7 say that the notion that somehow that doesn't -- that

8 report doesn't cover any of the bases where KBR was asked

9 to service the burn pits is so unsupported on its face,

10 it has no weight.  It clearly is directed as much to the

11 burn pits where KBR was operating.  The political climate

12 -- let's be honest.  The political climate in which that

13 report was ordered by Congress was what's going on in

14 this court in large measure.  There is no mistaking that

15 this has everything to do with KBR and the burn pits that

16 it's operating.

17         Mention was made of the IG report regarding water.

18 Actually, in that IG report, what the IG found was you

19 know what?  Neither the United States, where it's

20 providing water services, nor KBR or other contractors

21 where they're providing water services have yet got it

22 right.  I believe the facts underlying that report were

23 circa 2005, maybe into '06.  The report also says by 2006

24 or '07, a year later, KBR had it right; it was up and

25 running.  It was fine and the government wasn't.

1          One point I'd like to clarify yet again, however,

2  with regard to water.  KBR provided potable and

3  non-potable.  While "potable" is defined as drinking

4  water worthy, in Iraq and Afghanistan the soldiers don't

5  drink potable water.  They drink bottled water.  Drinking

6  water equals bottled water in both of those theaters.

7  KBR did not provide the drinking water.

8          THE COURT:  That's why they had so many bottles to

9  burn.

10         MR. MATTHEWS:  That would be correct, Your Honor.

11 If somebody got sick from drinking water, it is not the

12 water provided by KBR.

13         I guess I have to say another word about Boyle,

14 Your Honor.  I said this before.  Try as they may, they

15 can't force us to assert that defense.  We don't.  Boyle

16 does establish principles on which that decision rests,

17 and those principles have to do with a pervasive federal

18 government interest.  That's -- we do rely on that.  It

19 is sort of the source, if you will.

20         The government -- that is to say, the Supreme

21 Court's recognition of there being a significant federal

22 interest that needs to be reviewed and protected in these

23 cases --

24         THE COURT:  By preempting state tort actions.

25         MR. MATTHEWS:  That would be correct, Your Honor,

1 in a specific case that had to do with a product.  But in

2 the principle that's applied is the one that we support.

3 It's just the specific defense that came out of that is

4 not the one that is before the Court.  And try as Susan

5 Burke, you know, may, she can't make us do it.

6          THE COURT:  It is quite similar though to some of

7 the analysis you're required to make under the Political

8 Question --

9          MR. MATTHEWS:  There are some.

10          THE COURT:  -- question you're raising; right?

11          MR. MATTHEWS:  Your Honor, to a point, but only to

12 a point.  There are some similar issues.  But very

13 specifically under the government contractor defense, you

14 have to say you are acting according to very detailed

15 specifications and that you complied with each one of

16 those specifications and that you provided the

17 information to government that they were not aware of

18 where there was any risks that you identified.

19          That is not what we are -- what we are asserting

20 here.  We are not saying that we complied with each and

21 every one of those specifications.  And in point of fact,

22 Your Honor, what we are saying is this whole compliance

23 issue is not relevant to the defenses that we have

24 raised.  So while there is some overlap, there are some

25 significant distinctions.

1       On the derivative sovereign immunity, I can only

2  say at this hearing what we said in our pleadings.

3  Somehow plaintiffs don't want to address Mangold.  It was

4  missing in their pleadings in any meaningful way; it was

5  never mentioned by Ms. Burke.  Controlling Fourth Circuit

6  precedent, it seems to me, has to be considered in any

7  consideration of derivative sovereign immunity.

8       You know, I don't know what to say about all of

9  the convoy case discussion.  It doesn't belong here.

10 Whether -- and I -- personally, Your Honor, I know it's

11 the same firm, but personally I'm not expert on all of

12 the facts and circumstances in convoy, but I don't think

13 it's necessary for either me or this court to wonder

14 whether the facts are the same or if the law, as applied,

15 would come out the same.  Because what this court is

16 being asked to do is make a discriminating inquiry on the

17 facts that are before this court about burn pits, about

18 the provision of water services, not about what happened

19 on a convoy, an ill-fated and unfortunate convoy accident

20 that is being played out in the courts in Texas and in

21 the Fifth Circuit.  One has got absolutely nothing to do

22 with the other.

23      Again, I'll repeat:  Why do I think that the

24 record is sufficient in declarations, documents, and the

25 federal government's -- that is to say the Department of

1 Defense report.

2        I'm having trouble reading my own writing here.

3        THE COURT:  It's a common disease.

4        MR. MATTHEWS:  There was something that was said

5 -- I know what I want to say, I can't remember what the

6 trigger was.  But let me just go with what I want to say.

7 There was something about, you know, evidence should not

8 be foreclosed or something to that effect.  The fact is

9 there is a legal standard here.  We've raised defenses

10 under Federal Rules of Civil Procedure 12(b)1.  We are

11 entitled to a resolution of our jurisdictional defenses

12 before being subject to merits discovery.  Now, that

13 doesn't answer the question of where it draws the line,

14 but it does say it's not enough to say you should give us

15 all this discovery because that's what we want before you

16 decide --

17        THE COURT:  -- clearly one motion doesn't give you

18 the right to merit discovery, but it may give you some

19 right to some discovery to resolve the jurisdictional

20 facts to resolve your defense; right?

21        MR. MATTHEWS:  Your Honor, you get no argument

22 from KBR on this point.  We may part company slightly,

23 Your Honor, as to whether you already have that

24 information.  Clearly, there is a substantial body of

25 information.  If this court were to resolve that

1 additional -- if it would like to have additional facts,

2 I presume, Your Honor, that would mean in order for you

3 to resolve the jurisdictional questions -- and I'm

4 certainly prepared to discuss with this court what those

5 might be.  But at this point, you know, our position

6 would be that we think it's sufficient, but we're willing

7 to listen.

8       THE COURT:  Let's assume for the moment that I

9 conclude that in order to resolve the defenses that

10 you've raised in this case, some limited discovery is

11 appropriate just as it was in some of the cases that

12 we've been talking about today, including the Saleh and

13 other cases, Carmichael, but not the one with the

14 airplane crash.  What would you propose those limits be?

15 Assume, obviously, more limited than the plaintiff wants

16 -- plaintiffs want.

17       MR. MATTHEWS:  Yes, Your Honor, a very safe

18 assumption.  Broken record here.  I will start with the

19 premise, but then I will respond that there is what there

20 is before.  So it's only a question of what's needed to

21 supplement then.  This court, back in February,

22 instinctively said maybe what I need here, because those

23 declarations do speak directly and conclusively on the

24 key issues, the ones that we showed the alignment on

25 earlier.  Maybe what needs to be done here is to get

1 affirmation from the government that in fact the

2 declarants have captured, you know, the facts as the

3 government believes them to be with regard to who

4 decided, who located, and who was in charge of deciding

5 what could and could not be burned.

6         Your Honor, I would say -- I think we said at the

7 time, if that's -- if Your Honor believes that that would

8 be necessary for the Court to have a sense that yes, I

9 feel I now have a sufficient basis to proceed to reach

10 the merits of the jurisdictional defenses, we have

11 absolutely no problem and, indeed, would support that

12 approach Your Honor.

13         THE COURT:  What does that mean?

14         MR. MATTHEWS:  That means that the Court could

15 either, as it began to do, direct discrete questions

16 through the local U. S. attorney to the United States

17 focusing on the declarations and seeking an after

18 affirmation, or it could mean depose those declarants.

19 It could mean that.  I don't personally believe that

20 that's necessary --

21         THE COURT:  What about the full text of the LOGCAP

22 contract and the directives given pursuant to that and

23 that have been requested by the plaintiffs?

24         MR. MATTHEWS:  Well, two points Your Honor.

25 Again, because compliance is not the issue.  In a strict

1 sense, we still don't see the point.  Three points.

2 That's one.  Two, there are contract documents in the

3 record, I think they're probably sufficient.  Three, at a

4 minimum, and I think you were there earlier.  I think I

5 heard you getting to this point.  The request so far is

6 essentially every contract document, not narrow, not

7 limited, not targeted, not really related to

8 jurisdictional discovery.  It looks like full merits

9 discovery.

10       Now, if the base contract -- you know, I think

11 there was a comment made it's not burdensome to produce

12 that.  I'm not going to argue with that, it's not

13 burdensome.  We would maintain the right question is

14 whether it's relevant or not to these jurisdictional

15 defenses.  But that base contract I don't think is going

16 to move the needle very far in terms of relevant facts,

17 but I don't think that would be ultimately a problem.

18       THE COURT:  Well, if they want more than the base

19 contract --

20       MR. MATTHEWS:  They want lots more than the base

21 contract.

22       THE COURT:  Well, let me look back in front me.

23 Their memo -- they have asked for statements of work,

24 task orders and letters of technical direction.  How

25 burdensome would it be to produce that?

1      MR. MATTHEWS:  I believe that the current record

2 includes three -- two or three of the four task orders.

3 I mean, on relevant points the statements of work within

4 the task orders, they're pretty much parallel.  I think

5 they included the one that originally had the EPA

6 reference, and either they or we produced the one later

7 on that deleted the EPA reference.  So, that's not -- I

8 mean that can be done.

9      Again, whether it's relevant or not or whether

10 it's going to move the needle, I don't know; but not a

11 huge burden if we're talking about the task orders.

12      THE COURT:  Then they can ask for "documents

13 relating to Halliburton-KBR's communications with the

14 United States."  That's breathtaking.

15      MR. MATTHEWS:  Your Honor, did you use the phrase

16 -- it's off the charts.  You cannot begin to imagine --

17 maybe you can.  I think you sensed what an incredible

18 burden that would be.  And the question again becomes not

19 only burden but relevance.  It's a fishing expedition.

20 This is exactly the kind of thing that the cases that

21 have looked at these 12(b)1 defenses and what should be

22 permitted and what should not.  This is exactly the kind

23 of point that the courts have made.  Don't turn this into

24 a fishing expedition.  That puts the defendants, who have

25 raised these defenses, at a distinct disadvantage because

1 they're not having their defenses reviewed before merits

2 discovery.

3          THE COURT:  That's the title, and perhaps that's

4 the home run wish list of what the plaintiffs want.  But

5 when you read farther into their memorandum at Page B in

6 -- Page 7, excuse me, under their heading paragraph B,

7 one of the things they asked for was the -- and these are

8 all governmental terms that I'm not sure what they are.

9 ACL letters.  They've indicated you've given them one ACL

10 change letter.  They would like to see all ACL change

11 letters.

12          MR. MATTHEWS:  Right.  And there the problem is,

13 Your Honor, again I think you were trying to get at it

14 earlier.  They're not saying let's get the ones that

15 might be relevant, the waste management issues.  They're

16 saying all.  Why would we give them ACLs about, you know,

17 all of the other services, laundry services, morale,

18 welfare and recreation services?

19          THE COURT:  One thing I don't understand because I

20 have not perused from top to bottom the LOGCAP contract,

21 and I'm not looking forward to it.  But I assume what

22 you're saying is that the LOGCAP contract you have

23 encompasses more than waste disposal and water services.

24          MR. MATTHEWS:  Yes, Your Honor.  There must be 20

25 categories of services, or more.

1        THE COURT:  What ACL change letters are pertinent

2   to waste disposal and water?  Is that going to be

3   burdensome?

4        MR. MATTHEWS:  I think it will not be easy to

5   pull all of those, Your Honor.  But, yes, that would be

6   something that we could consider.  We don't want to

7   suggest, Your Honor, that there is not a burden.  And,

8   again, it's a question of where you draw the line; how

9   relevant this will be.  Will it move the needle in terms

10  of what the Court needs.  Not what plaintiffs want but

11  what the Court needs to resolve these jurisdictional

12  issues.

13        And again, maybe for the last time Your Honor,

14  I'll say for combatant activities none of this is

15  relevant or necessary.  And if the Court were to resolve

16  these motions on the basis of granting dismissal on the

17  Combatant Activities Exception, really, none of this is

18  necessary.

19        THE COURT:  Well, if these documents demonstrated

20  pervasive control over you, would that not be of

21  assistance to you in the Combatant --

22        MR. MATTHEWS:  It would, Your Honor.  I'm not sure

23  if that the blank verse of the contract is going to say

24  that the LOTDS and ACLs -- again, Your Honor, I would

25  remind the Court we have put some of those in there as

1  examples.

2       THE COURT:  In the same memorandum, at Page 7, it

3  says you have admitted in your motion that specific

4  instructions regarding what could be burned were

5  memorialized in writing.  Is that a document that can be

6  produced?

7       MR. MATTHEWS:  We did.  That's what I was trying

8  to refer to as Exhibit 18.  It shows -- it said "burn

9  animal carcasses."  It answers the mail, Your Honor, on

10 the allegations that we did things that we weren't

11 directed to do.  Animal carcasses.  Plastic bottles.

12 Woven fibers.  What we've tried to do is respond directly

13 to the kind of -- to the specific allegations they've

14 made, not some generalized, vague -- I think they

15 literally say they burned everything under the sun, or

16 everything imaginable.  The fact is, we have a government

17 document, it's in our exhibit, that says here is the

18 prohibited items list.  We have declarations that say we,

19 the government, decided what could or could not be

20 burned.  And we have no evidence that KBR acted contrary

21 to that.  Not that that's relevant for these

22 jurisdictional defenses.

23       Your Honor, let me just come back to your question

24 how -- you know, would that be burdensome?  There is

25 going to be some burden here.  And now KBR, in order to

1 have its jurisdictional defenses resolved, is going to
2 have to bear costs.  And I'm just wondering -- if this is
3 where the Court is going, then I think those costs should
4 be a burden shared.  There is no reason for KBR to be put
5 to this, because at this point in time they're really not
6 critical to the task in our judgment.
7         THE COURT:  All right.  The plaintiffs also ask in
8 paragraph C, on Page 8, for, essentially, documents
9 relating to whether you're complying with your agreement.
10 I don't know how these contracts work and I don't know
11 what happened in fact, but is there not a process whereby
12 KBR is notified by the government that the government is
13 not happy about something and there's a response?
14         MR. MATTHEWS:  The government conducts its own
15 audits.  It doesn't favor us with our own copies of
16 audits.  We occasionally get award fees and other
17 accolades that reflect our performance.  If there's a
18 problem through the mayor's cell and so on, they will
19 notify us.  From time-to-time that may have occurred, but
20 we're looking for needles in haystacks here, Your Honor.
21 That's not the way they operated.
22         THE COURT:  They're asking about compliance and
23 audit reports, incident reports, and corrective action
24 reports.  Do those exist?
25         MR. MATTHEWS:  There is, with respect to burn

1  pits, I think, one such corrective action report.  One,

2  in the history of our time in theater.  We can produce

3  that.  Again, I'm not sure how it moves the needle.  And

4  the problem, Your Honor, again, as I said earlier, is at

5  some point we're starting to add up things that look an

6  awful lot like merits discovery and carry the burdens of

7  merits discovery.  I would just respectfully urge the

8  Court to make certain that in kind of adding these pieces

9  together that they're all directed to the issues that

10 this court needs to consider now for jurisdictional

11 purposes and not broader merits issues.  I apologize.  I

12 know Your Honor knows these things, but it is the concern

13 we have.

14         THE COURT:  I have no stomach for having

15 open-ended merits discovery now, not at this stage, and

16 I'm not going to permit it.  But if I'm going to permit

17 discovery, I need to have some understanding of the

18 nature of the things that the plaintiffs want, and

19 they've given me that.  I just wanted to get your

20 reaction to what it would take to give them the things

21 they want and how burdensome it would be.

22         MR. MATTHEWS:  Right.  And you're asking me about

23 burden, and I'm trying to give you as much information as

24 I have about burden.  But without necessarily conceding

25 the point that some of those things at least would be

1 relevant, but we can -- some of those things can be

2 produced in a timely fashion Your Honor, if that's where

3 the Court would like to go.

4        I would -- we would urge the Court to be a little

5 narrower in that consideration.  That is, focusing on the

6 critical question of what the government says it did;

7 what the government says was in fact its control over

8 these fundamental decisions; remembering that at the end

9 of the day they're alleging acts of negligence that the

10 government says they were in control of.  That seems to

11 me to be where the jurisdictional discovery should be

12 directed.

13        THE COURT:  All right.  Anything further?

14        MR. MATTHEWS:  I'm just being reminded that ACLs

15 and LOTDs are base specific.  These are the contract

16 documents that direct.  There are thousands of them.  So,

17 any notion of producing those documents must -- let me

18 respectfully suggest, Your Honor, should be limited to,

19 you know, questions about the performance of burn pit and

20 water services operations.

21        THE COURT:  Oh, I don't think the plaintiffs -- I

22 mean, their language was broader than that, but I don't

23 think that's what they seriously are asking for.

24        MR. MATTHEWS:  Even as to that, there still may be

25 -- there is a burden.  This is not five documents.  This

1 is potentially hundreds, if not thousands, of documents

2 that will be responsive and that will take time, if we

3 add all the ACLs and LOTDs.  Mind you, Your Honor, any

4 time there's a change, you know, if they say okay, let's

5 take a base like Taji where there is cells of burn pits,

6 they're all in the same area.  We're going to now close

7 Cell 1 and open Cell 2.  That's a document from the

8 government.  We don't make that decision.  That's their

9 document.

10       And I think -- don't quote me on this, I think

11 Taji is the one where there is as many as five or six

12 cells, or KBR was operating, you know, from seven in the

13 morning until five in the afternoon.  And they say no, do

14 it from eight in the morning until six in the afternoon.

15 That's a document.

16       There is so many of these types of ACLs and LOTDs.

17 ACLs, by the way, Your Honor, it's where there is money

18 implications and LOTDs is essentially where there is not.

19 But we get directed in both instances to make whatever

20 changes the mayor cell decides or the contracting officer

21 decides are necessary.  In many cases they're trivial; in

22 many cases they're more substantial, like moving to the

23 second cell.

24       I just don't want the Court to believe that this

25 is a small pot of documents that we can easily and

1 quickly put our hands on.  This will take time.  It is a

2 burden.  And I'm not sure at the end of the day that it's

3 going to move the needle very much on the issues before

4 the Court.

5        THE COURT:  I've made no decision which way I'm

6 going to go.  I just wanted to get some idea of what the

7 actual burdens would be.

8        All right.  You've given me a lot to think about,

9 and I will get a ruling to you just as soon as I can.

10       MR. MATTHEWS:  Thank you, Your Honor.

11       MR. RICE:  Thank you, Your Honor.

12       THE COURT:  Thank you.

13            (Off the record at 1:56 p.m.)

14                      **CERTIFICATE**

15       I, Tracy Rae Dunlap, RPR, CRR, an Official Court
   Reporter for the United States District Court of
16 Maryland, do hereby certify that I reported, by machine
   shorthand, the proceedings had in the case of IN RE: KBR
17 BURN PIT LITIGATION, Civil Action Number mdl-RWT-09-2083
   on June 4, 2010.
18
       In witness whereof, I have hereto subscribed my
19 name, this 15th day of June 2010.


20            _____/S/_____
             TRACY RAE DUNLAP, RPR, CRR
21           OFFICIAL COURT REPORTER

22

23

24

25