**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                              |     |                                  |
|------------------------------|-----|----------------------------------|
|                              | *   |                                  |
|                              | *   |                                  |
| **IN RE: KBR, INC.,**        | *   |                                  |
| **BURN PIT LITIGATION**      | *   | Master Case No.: RWT 09md2083    |
|                              | *   |                                  |
|                              | *** |                                  |

<u>**MEMORANDUM OPINION**</u>

Lieutenant Milo Minderbender, a fictional war profiteer during World War II, expressed the following capitalist sentiment in Joseph Heller's novel <u>Catch-22</u>: "Frankly, I'd like to see the government get out of war altogether and leave the whole field to private individuals." Joseph Heller, <u>Catch-22</u> 259 (1961). While not to the extent advocated by Lieutenant Minderbender, the role of government contractors in combat zones has grown to an unprecedented degree in recent years with the wars waged by the United States in Iraq and Afghanistan.

To support the logistics of its missions in these two war theaters, the U.S. military has relied on private civilian contractors awarded contracts under the auspices of a program known as the Logistics Civil Augmentation Program ("LOGCAP"). The Army awarded its third LOGCAP contract ("LOGCAP III") to a division of Kellogg Brown & Root, Inc. ("KBR, Inc.").[1] Under LOGCAP III, KBR, Inc. agreed to treat water and to manage and dispose of waste at military bases in Iraq and Afghanistan. One method of waste disposal used by KBR, Inc. involves burning items in open pits commonly referred to as "burn pits."

American soldiers, veterans, and former contractor employees (collectively, "Plaintiffs") allege that, while stationed on military bases in Iraq and Afghanistan, they suffered injuries

---

[1] The LOGCAP III contract was modified effective December 14, 2003 to substitute Defendant Kellogg Brown & Root Services, Inc. as the contracting party. <u>See</u> Joint Position Paper ¶ 6 n.3; <u>see also</u> <u>Martin v. Halliburton</u>, 601 F.3d 381, 385 (5th Cir. 2010) ("[T]here was a novation of the LOGCAP III Contract in 2003 that transferred contractual duties from Kellogg Brown & Root to Kellogg Brown & Root Services.").

resulting from exposure to contaminated water and to toxic emissions from burn pits.  Seeking to recover for their injuries, Plaintiffs have filed forty-three complaints in forty-two states across the country, asserting a multitude of state tort law claims against KBR, Inc., Kellogg Brown & Root Services, Inc., Kellogg Brown & Root LLC, and Halliburton Company (collectively, "Defendants").  The Judicial Panel on Multi-District Litigation ("MDL") transferred these cases to this Court for coordinated and consolidated pretrial proceedings.

Subjecting government contractors who provide services to the U.S. military in war zones to private civil suits under state tort law necessarily requires caution by the judiciary.  Courts must be careful not to pass judgment on matters outside their realm of competence, and especially in national security matters entrusted to other branches of government.  In time of war, courts are reluctant to burden the military and its personnel with onerous and intrusive discovery requests.  Failure to exercise such caution may threaten the success of military missions abroad.

Out of these concerns emerge various defenses that may be asserted by contractors facing tort suits arising from their actions.  Defendants assert three of those defenses in their motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[2] They contend:  first, that Plaintiffs' claims are nonjusticiable under the political question

_____

[2] Another defense potentially available to contractors is the Defense Base Act, 42 U.S.C. § 1651–54 (2006), which precludes contractor employees from pursuing a negligence claim against their employer for injuries incurred while performing a government contract outside the United States.  See 42 U.S.C. § 1651(c).  In addition, defense contractors may draw on legal protections traditionally afforded to the Government and its employees by asserting a defense based on the Federal Employees Liability Reform and Tort Compensation (Westfall) Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563 (codified in scattered sections of 28 U.S.C.), or the Feres doctrine, see Feres v. United States, 340 U.S. 135 (1950).  But see Boyle v. United Techs. Corp., 487 U.S. 500, 510 (1988) (declining to adopt the Feres doctrine as a basis for preemption of state-law tort liability against a government contractor).  The Westfall Act substitutes the United States for government employees in a common law tort suit arising out of the scope of their employment.  See 28 U.S.C. § 2679(d)(1).  The Feres doctrine precludes recovery in tort for service members against the United States for injuries incurred "incident to service."  Feres, 340 U.S. at 146.

doctrine; second, they are entitled to "derivative sovereign immunity" based on the "discretionary function" exception to the federal government's waiver of immunity in the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 2680(a) (2006); and, third, Plaintiffs' claims are preempted by the "combatant activities" exception in the FTCA, id. § 2680(j).

In tension with the exercise of caution supported by these legal defenses is the legitimate concern that the judiciary may prematurely close courtroom doors to soldiers and civilians injured from wartime logistical activities performed by hired hands allegedly acting contrary to military-defined strictures. Courts must be prepared to adjudicate cases that ultimately expose defense contractors to appropriate liability where it is demonstrated that they acted outside the parameters established by the military and, as a result, failed to exercise proper care in minimizing risk to service members and civilians.

These rival considerations drive Plaintiffs' opposition to Defendants' motion. Plaintiffs emphasize the preliminary nature of this lawsuit and the narrow tailoring of their tort claims to wartime logistical activities negligently performed by Defendants in breach of their duties under LOGCAP III. They argue that discovery relating to their claims is necessary and can be limited so as to avoid separation of powers and competency concerns and to minimize any potential interference with, and detraction from, the war efforts.

For the reasons provided below, the Court agrees with Plaintiffs that their claims, based on their as yet unproven factual allegations, may be justiciable at this time. An initial phase of carefully limited discovery is therefore appropriate in order to frame the issue with sufficient facts so that the Court may make an informed decision.

**I.      Defendants' Motions To Dismiss for Lack of Subject Matter Jurisdiction**

In multidistrict litigation, the law of the transferee circuit governs questions of federal law.  See In re Gen. Am. Life Ins. Co. Sales Practices Litig., 391 F.3d 907, 911 (8th Cir. 2004); Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993); In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1176 (D.C. Cir. 1987); cf. Bradley v. United States, 161 F.3d 777, 782 n.4 (4th Cir. 1998) (applying Fourth Circuit law to questions of federal law in a case transferred from the Fifth Circuit).  Accordingly, where necessary, the Court will apply Fourth Circuit law to determine the scope of its subject matter jurisdiction.

A defendant may challenge subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) by contending "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based."  Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). Once a defendant makes a facial challenge to subject matter jurisdiction, "the burden of proving subject matter jurisdiction is on the plaintiff."  Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).  A plaintiff receives the same procedural protection as would be received under a Rule 12(b)(6) consideration:  "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction."  Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009).  When deciding a Rule 12(b)(1) motion to dismiss, "the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  Velasco v. Gov't of Indon., 370 F.3d 392, 398 (4th Cir. 2004).

## A. The Political Question Doctrine

The political question doctrine recognizes both the constitutional separation of powers among the branches of the federal government, as well as the inherent limitations on the judiciary. Baker v. Carr, 369 U.S. 186, 210 (1962). "[D]esigned to restrain the Judiciary from inappropriate interference in the business of the other branches of Government," United States v. Munoz-Flores, 495 U.S. 385, 394 (1990), the doctrine excludes from judicial review cases or controversies in which courts "have no rightful power and no compass," Smith v. Reagan, 844 F.2d 195, 202 (4th Cir. 1988).

In Baker v. Carr, the Supreme Court set forth six independent guidelines to aid a court in identifying a political question:

1. A textually demonstrable constitutional commitment of the issue to a coordinate political department; or

2. A lack of judicially discoverable and manageable standards for resolving it; or

3. The impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

4. The impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

5. An unusual need for unquestioning adherence to a political decision already made; or

6. The potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217. In applying these guidelines, a court must engage in a "discriminating inquiry into the precise facts and posture of the particular case," while understanding "the impossibility

of resolution by any semantic cataloguing." Id. "[It] is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." Id. at 211.

The body of case law applying the political question doctrine to cases brought against private contractors for their work in war zones is in its infancy. While numerous district courts have grappled with lawsuits where defense contractors raise the political question doctrine as a subject matter bar to tort claims arising out of support services provided in Iraq and Afghanistan, only three of those decisions have undergone appellate scrutiny.

The Eleventh Circuit in McMahon v. Presidential Airways, Inc., 502 F.3d 1331 (2007), and the Fifth Circuit in Lane v. Halliburton, 529 F.3d 548 (2008), both held that the political question doctrine did not preclude all tort claims against defense contractors. McMahon involved tort claims brought by service members arising out of a crash of a contractor-operated plane carrying troops in Afghanistan, 502 F.3d at 1358, while Lane involved claims brought by contractor employees injured or killed when insurgents attacked their fuel convoy in Iraq, 529 F.3d at 555. Both Circuits agreed that the political question doctrine may bar state law tort suits against private contractors if adjudication would require a reexamination of sensitive military policies or judgments. See McMahon, 502 F.3d at 1358; Lane, 529 F.3d at 560. Both Circuits also concluded that determining whether adjudication would require such a reexamination will often necessitate a developed factual record. See McMahon, 502 F.3d at 1365; Lane, 529 F.3d at 568.

In contrast to McMahon and Lane, the Eleventh Circuit in Carmichael v. Kellogg, Brown & Root Services, Inc., 572 F.3d 1271 (2009), cert. denied, 78 U.S.L.W. 3368, 3755, 3762 (June 28, 2010) (No. 09-683), held that the political question doctrine did preclude certain tort claims against defense contractors. The tort claims in Carmichael arose out of a crash of a contractor-

operated truck that was part of a fuel supply convoy in Iraq.  See id. at 1278.  The Eleventh

Circuit agreed with the district court's conclusion that the suit would require reexamination of

sensitive judgments and decisions entrusted to the military in a time of war, including nearly all

aspects of the convoy's travel on the day of the accident.  See id. at 1281.  Unlike the district

court decisions being reviewed in McMahon and Lane, the district court decision being reviewed

in Carmichael was based on a complete factual record.  See id. at 1291.

Bearing these decisions in mind, the Court will now apply the Baker factors to the precise

facts of this case.

### 1.  The First Baker Factor

The first Baker factor "excludes from judicial review those controversies which revolve

around policy choices and value determinations constitutionally committed for resolution to the

halls of Congress or the confines of the Executive Branch."  Japan Whaling Ass'n v. Am.

Cetacean Soc'y, 478 U.S. 221, 230 (1986).  Article II, Section 2 of the U.S. Constitution grants

to the President authority over the conduct of foreign affairs and over the armed forces to protect

the national security of the United States.  See U.S. Const. art. II, § 2, cl.1 ("The President shall

be Commander in Chief of the Army and Navy . . . , and of the Militia . . . when called into the

actual Service of the United States . . . .").[3]  Because the text of the U.S. Constitution commits

controversies revolving around foreign affairs and the armed forces to the President, the political

question doctrine may preclude from judicial review cases involving military strategy, tactical

decision-making, or calculated operations.

---

[3]  Article I, Section 8 of the U.S. Constitution grants to Congress authority to raise and
support Armies, to provide and maintain a Navy, and to make rules for the government and
regulation of the land and Naval forces.  See U.S. Const. art. I, § 8, cl. 12–14.

Defendants argue that this case implicates the first <u>Baker</u> factor because its adjudication will require reexamination of sensitive military policies or judgments. <u>See</u> Defs.' Mem. Supp. Dismiss 30, ECF No. 21. Regarding Plaintiffs' burn pit allegations, Defendants argue that this Court would need to pass judgment on the military's decisions to use burn pits, where to locate them, where to locate living quarters for military and contractor personnel, and which wastes could or could not be placed in the burn pits. <u>See</u> <u>id.</u> Regarding Plaintiffs' water allegations, Defendants argue that this Court would be required to second-guess fundamental aspects of the military's water operations: the production, testing, and distribution of potable and nonpotable water; the proper uses of potable and nonpotable water; the thoroughness of the military's training regarding the production, testing, and distribution of water; and the adequacy of the military's oversight, inspections, and testing of water produced in the war theaters. <u>See</u> <u>id.</u> at 30 n.9. Defendants also contend that any analysis of causation will necessarily implicate insulated policies and judgments of the U.S. military. <u>See</u> Defs.' Reply 9, ECF No. 82.

Plaintiffs contend that this case does not require the Court to evaluate any decisions by the military because their claims only challenge the Defendants' performance of their duties to treat water and dispose of waste in an unauthorized manner. <u>See</u> Pls.' Opp'n 21–22, ECF No. 64. According to Plaintiffs, Defendants must abide by the terms of LOGCAP III, and Defendants' alleged failures to treat water and dispose of waste in the manner required by LOGCAP III may serve as the bases for their claims. <u>See</u> <u>id.</u> Regarding waste disposal, Plaintiffs allege that Defendants were prohibited from using burn pits, burning certain items, and locating burn pits in certain areas unless they obtained advance approval. <u>See</u> <u>id.</u> at 6–8, ¶¶ 13–16. Without the requisite authorization, Defendants allegedly used burn pits, burned items on the "do not burn" lists, and located burn pits in prohibited areas. <u>See</u> <u>id.</u> at 8, ¶ 16. Regarding water

treatment, Plaintiffs allege that Defendants were required, but failed, to monitor and maintain the quality of water to meet established standards.  See id. at 12, ¶ 25.

The Court agrees with Plaintiffs that, at this early stage of the litigation, the first Baker factor does not preclude state tort law claims challenging the water treatment and waste disposal services provided by Defendants in a manner not endorsed by the military.  While the first Baker factor may preclude a plaintiff from suing for injuries in a war zone where the alleged wrongs stemmed from the military's strategic and tactical decisions, it does not necessarily preclude a plaintiff from suing for injuries stemming from defense contractors' decisions to the extent they conflict with military directives.  Here, Plaintiffs only challenge Defendants' unauthorized decisions to use burn pits and to treat water in the manners alleged.  Limited discovery is therefore necessary to determine whether Defendants actually operated the burn pits and treated water in ways prohibited or unauthorized by the military.  If and when Plaintiffs show that Defendants committed such unauthorized acts, the Court will then address the complex issue of causation, which will require knowledge, but not necessarily second-guessing, of military actions that also may have contributed to Plaintiffs' injuries.

Plaintiffs incorrectly suggest, however, that any breach of LOGCAP III is justiciable. See, e.g., Pls.' Opp'n 21.  The political question doctrine, and not LOGCAP III, defines the boundaries of this Court's jurisdiction.  As a result, the Court is without jurisdiction to entertain a claim arising out of an alleged breach of LOGCAP III by Defendants if its review involves second-guessing a military decision, even if that decision is handed down by officials not contemplated by the contract.  Plaintiffs imply that they can challenge actions performed in violation of LOGCAP III, but specifically condoned by military commanders, because military commanders do not have the authority to modify LOGCAP III or its task orders.  See id. at 3–5,

¶¶ 5–9.  They are mistaken.  If, for instance, a military commander, rather than a contracting officer, authorized or directed Defendants to use burn pits because of wartime military exigencies, then any claim arising out of Defendants' use of burn pits pursuant to the military commander's authorization would be barred by the political question doctrine because the Court is without jurisdiction to evaluate such military decisions.  For the claims to survive the first Baker factor, they must arise out of either breaches of LOGCAP III committed without the requisite military permission or other violations of military directives.

Additionally, Defendants challenge the ability of Plaintiffs to demonstrate that Defendants made unauthorized decisions regarding the burn pits and water treatment.  See Defs.' Reply 7–8.  To demonstrate the pervasive "military footprint" over Defendants' waste disposal and water treatment services, they have provided the Court with voluminous regulatory and doctrinal evidence by the U.S. military and seven sworn declarations provided by current high ranking officers and civilians in the Department of Defense ("DoD") and the U.S. military who held critical leadership positions related to wartime health and safety.  See Defs.' Mem. Supp. Dismiss 8, Exs. 1–23; Defs.' Reply Exs. 1–3; Defs.' Supp. Auth. Ex. A, ECF No. 87.  Whether Plaintiffs can meet their burden of proof, however, is not now the subject of Defendants' motion. The key inquiry posed by the first Baker factor of the political question doctrine is whether the Court can adjudicate this case without second-guessing the reasonableness of the military's operations and decisions.  Based on Plaintiffs' narrowly tailored claims, the Court believes it can, albeit with significant restrictions on the scope of the inquiry.

### 2.  The Second Baker Factor

The second Baker factor requires courts to refrain from adjudicating cases that cannot be resolved based on judicially discoverable and manageable standards.  Baker, 369 U.S. at 217.

That is because "judicial action must be governed by <u>standard</u>, by <u>rule</u>," and "law pronounced by the courts must be principled, rational, and based upon reasoned distinctions." <u>Vieth v. Jubelirer</u>, 541 U.S. 267, 278 (2004). Courts lack the necessary standards to review military judgments involving "complex[,] subtle, and professional decisions as to the composition, training, equipping, and control of a military force." <u>Gilligan v. Morgan</u>, 413 U.S. 1, 10 (1973).

Defendants argue that this case asks the Court to pass judgments in the realm of military affairs without having knowledge or expertise. <u>See</u> Defs.' Mem. Supp. Dismiss 33. According to Defendants, the Court lacks standards to review the military's choices for water treatment and waste management and disposal in the war theater because they "involve military policies, strategies, and on-the-ground considerations as to security threats, the existing waste disposal infrastructure (if any) in theater, and resource limitations." <u>Id.</u> at 32–33. Defendants also argue that Plaintiffs' claims cannot be resolved by reference to traditional tort law standards. <u>See id.</u> at 33. In their view, the question of what a reasonable corporation in a war zone, subject to military regulations and control, would do "necessarily implicates the wisdom of the military's strategic tactical decisions," which the Court is without standards to evaluate. <u>Id.</u> at 33–34 (quotation marks omitted).

Plaintiffs contend that their lawsuit only asks the Court to adjudicate traditional tort and contract claims and not novel issues that lack discoverable and manageable standards. <u>See</u> Pls.' Opp'n 26. They emphasize that unlike combat or training operations, waste disposal and water treatment are not peculiarly "military" in nature, and that the Court may apply traditional legal principles to resolve their claims. <u>Id.</u> at 27–28.

On this limited record, the Court is not prepared to say that it lacks discoverable and manageable standards necessary to adjudicate this case. At their most basic level, Plaintiffs'

claims ask the Court to determine whether the actions of the Defendants, and not of the military, were negligent or otherwise improper.  Just because those actions concern war does not, in and of itself, necessarily mean the Court lacks standards to evaluate them.  See Gilligan, 413 U.S. at 11–12 ("[W]e neither hold nor imply . . . that there may not be accountability in a judicial forum for violations of law for specific unlawful conduct by military personnel . . . .").  The negligence standard is very flexible and depends heavily on the circumstances in each case.  As of now, the Court does not know the precise nature of Defendants' allegedly negligent actions nor their attendant circumstances.  Only after discovery develops the facts surrounding any unauthorized acts by Defendants can the Court evaluate whether workable standards exist.  Accordingly, the second Baker factor does not exclude this lawsuit from judicial review at this time.

### 3.   The Third Baker Factor

The third Baker factor prevents a court from making a policy determination of a kind clearly for nonjudicial discretion.  Baker, 369 U.S. at 217.  This factor does not persuade the Court to dismiss this case for the same reason that the first Baker factor failed to do so:  Plaintiffs allege that their claims against Defendants involve decisions separate from and contrary to the military decisions of the United States government.  Assuming that their claims can be so limited, this case simply does not involve formulating any military policies clearly committed to another political branch's discretion.

### 4.   The Fourth and Sixth Baker Factors

The fourth and closely related sixth Baker factors ask whether a court can adjudicate the claims without disrespecting or embarrassing coordinate branches of government.  Baker, 369 U.S. at 217.  At this early stage, the Court believes it can, subject to certain limitations, including inviting the United States to participate as amicus curiae.  The Court also recognizes that both

political branches continue to review the <u>military</u>'s waste management policies and practices in foreign theaters. <u>See</u> Defs.' Mem. Supp. Dismiss 35–36 (noting the Army's evaluation of potential illnesses from exposures to burn pits); Pls.' Opp'n 31 (highlighting the National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111–84, 123 Stat. 2190, which prohibits any use of burn pits when other alternatives are available). Again, because Plaintiffs' allegations pertain only to Defendants' allegedly <u>unauthorized</u> performance of waste disposal and water treatment services, it is doubtful that the exercise of jurisdiction by this Court will somehow disrespect or embarrass the executive or legislative branches.

In fact, subjecting defense contractors to potential tort liability for actions not approved by the military arguably expresses respect for the executive branch. In a rulemaking to implement policy regarding contractor personnel authorized to accompany U.S. Armed Forces deployed outside the United States, the Department of Defense ("DoD") explicitly advised military contractors that they could be subjected "to prosecution or civil liability under the laws of the United States and the host nation" for the "inappropriate use of force." Defense Federal Acquisition Regulation Supplement; Contractor Personnel Authorized to Accompany U.S. Armed Forces, 73 Fed. Reg. 16,764, 16,767 (Mar. 31, 2008). When contractors expressed concern about their defenses in tort litigation, DoD made clear that it thought the rule "adequately allocates risks, allows for equitable adjustments, and permits contractors to defend against potential third-party claims." <u>Id.</u> at 16,768. The DoD explained:

> [T]he clause retains the current rule of law, holding contractors accountable for the negligent or willful actions of their employees, officers, and subcontractors. . . . Contractors will still be able to defend themselves when injuries to third parties are caused by the actions or decisions of the Government. However, to the extent contractors are currently seeking to avoid accountability to third parties for their own actions by raising defenses based on the sovereignty of the United States, this rule should not send a signal that would invite courts to shift the risk of loss to innocent third parties.

Id.  Consistent with the DoD's position, the Court will not, at this early stage, allow contractors "to avoid accountability to third parties for their _own_ actions" based on the political question doctrine, or as discussed below, based on the sovereignty of the United States.  Id. (emphasis added).

### 5.  The Fifth **Baker** Factor

Defendants do not argue that the fifth Baker factor—"an unusual need for unquestioning adherence to a political decision already made," Baker, 369 U.S. at 217—renders this case ineligible for judicial review, and the Court is unaware of any political decision it would need to question, or not adhere to, in this matter.  Indeed, adjudication of Plaintiffs' claims, at most, would subject Defendants to liability only for disobeying military decisions that likely require unquestioning adherence.  Accordingly, none of the Baker factors precludes judicial review of this case at this time.

### B.  Derivative Sovereign Immunity

As a general matter, the United States as a sovereign is immune from suit except under those limited circumstances in which it has waived that immunity.  See United States v. Mitchell, 445 U.S. 535, 538 (1980).  With the passage of the Federal Torts Claims Act ("FTCA"), ch. 753, 60 Stat. 842 (1946) (codified as amended in scattered sections of 28 U.S.C.), the United States waived its immunity to tort suits under certain conditions and subject to the exceptions set forth in the FTCA.  See 28 U.S.C. § 2674 ("The United States shall be liable [for] tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ."); see id. § 2680 (setting forth exceptions).  One of the FTCA exceptions, the "discretionary function exception," involves any claim "based upon the exercise or performance or the failure to exercise

or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Id. § 2680(a).

The FTCA explicitly excludes independent contractors from its scope. The definitions of the terms "federal agency" and "employee of the Government," both of which appear in the discretionary function exception, do not include government contractors. See id. § 2671 ("[T]he term 'Federal agency' includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States." (emphasis added)); id. ("'Employee of the government' includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard . . . , and persons acting on behalf of a federal agency in an official capacity . . . , and (2) any officer or employee of the Federal public defender organization . . . ."). In addition, the FTCA limits the court's exclusive jurisdiction to "civil actions on claims against the United States, for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." Id. § 1346(b)(1) (emphases added).

Notwithstanding the exclusion of independent contractors from the FTCA's scope, Defendants argue that they are entitled to "derivative sovereign immunity" preserved by the sovereign in the discretionary function exception and retained by federal officials acting within the scope of their employment while exercising their discretion. Defs.' Mem. Supp. Dismiss 36–46. To support their entitlement to "derivative sovereign immunity" preserved by the sovereign in the discretionary function exception, they rely primarily on Yearsley v. W.A. Ross Constr.

Co., 309 U.S. 18 (1940), and its progeny. In support of their entitlement to "derivative sovereign immunity" retained by federal officials acting within the scope of their employment while exercising their discretion, they cite a Supreme Court case, Westfall v. Erwin, 484 U.S. 292 (1988), superseded in part by statute, 28 U.S.C. § 2679(d) (applying only to federal employees), as recognized in Gutierrez de Martinez v. Drug Enforcement Admin., 111 F.3d 1148, 1152 (4th Cir. 1997); a Fourth Circuit case, Mangold v. Analytic Servs., Inc., 77 F.3d 1442 (1996), and their progeny.

Plaintiffs contend that a third Supreme Court case, Boyle v. United Techs. Corp., 487 U.S. 500 (1988), controls Defendants' assertion of derivative sovereign immunity and does not insulate them from liability. Pls.' Opp'n 35–38. In the alternative, Plaintiffs contend that Yearsley, Westfall, Mangold, and their progeny do not entitle Defendants to the immunity preserved by the sovereign in the FTCA's discretionary function exception or retained by federal officials acting within the scope of their employment while exercising their discretion. See id. at 38–50.

The Court concludes that Boyle does not control, but nevertheless is instructive as to, Defendants' theories of derivative sovereign immunity and that Defendants are not entitled to derivative sovereign immunity under Yearsley, Westfall, Mangold, and their progeny, at least at this early stage of the proceedings.

### 1. Boyle v. United Technologies Corp.

The Plaintiff in Boyle was the father of a U.S. Marine helicopter copilot who was killed when his helicopter crashed during a training exercise. 487 U.S. at 502. Although the son survived the impact of the crash, he was unable to escape from the helicopter and drowned. Id. Plaintiff sued the Sikorsky Division of the United Technologies Corporation ("Sikorsky"), which

built the helicopter for the United States.  Id.  Plaintiff contended that Sikorsky was liable under state tort law for a defective design of the escape-hatch handle, which did not allow his son to escape from the helicopter once submerged in water.  Id. at 503.

In deciding "when a contractor providing military equipment to the Federal Government can be held liable under state tort law for injury caused by a design defect," 487 U.S. at 502, the Supreme Court considered whether the plaintiff's state law tort claims were preempted, despite the absence of federal legislation specifically immunizing government contractors.  Drawing on federal common law, the Court noted that in a few cases involving "uniquely federal interests," a state law is preempted and replaced, where necessary, by federal law if a "significant conflict" exists between an identifiable federal policy or interest and the operation of state law, or if the application of state law would frustrate specific objectives of federal legislation.  Id. at 504.

Applying this two-step process to determine whether the plaintiff's state law claims were preempted, the Supreme Court identified the area of uniquely federal interest as "the civil liabilities arising out of the performance of federal procurement contract" and cited approvingly to Yearsley.  Id. at 506.  The Court then found that the state law-imposed duty of care (the duty to equip helicopters with the sort of escape-hatch mechanism that the plaintiff claimed was appropriate) conflicted with the duty imposed by the Government contract (the duty to manufacture and deliver helicopters according to the specifications of the government).  Id. at 509.

Next, the Court had to determine whether conflict between the state tort law and the area of uniquely federal interests was "significant."  Id. at 508.  The Court expressed concern that, absent some limiting principle, conflicts between state tort law and areas of uniquely federal interests would too often be deemed "significant," resulting in unwarranted preemption of state

17

law.  Id.  The Court found a limiting principle in the discretionary function exception to the FTCA, id. at 511,  which exempts the Government from civil liability on any claim based upon the Government's exercise or performance, or the failure to exercise or perform, a discretionary function, see 28 U.S.C. § 2680(a).  The Court stated that the selection of the appropriate design of military equipment used by the Armed Forces is a discretionary function since it involves "not merely engineering analysis but judgment as to the balance of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness."  487 U.S. at 511.  Based on this analysis, the Court held that state tort law that imposes liability for design defects in military equipment is preempted where (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.  Id. at 512.

To determine whether the preemption defense for government contractors set forth in Boyle controls Defendants' theory of derivative sovereign immunity, the Court need only examine the first footnote of Boyle.  In it, the Supreme Court specifically noted that the government contractor defense recognized in that case results in the preemption of certain state law causes of action, not a grant of immunity to contractors.  See Boyle, 487 U.S. at 505 n.1 ("Justice Brennan's dissent misreads our discussion here to intimate that the immunity of federal officials might extend to nongovernment employees, such as a Government contractor.  But we do not address this issue, as it is not before us." (quotation marks, citations, and alterations omitted)).  Clearly, the Supreme Court viewed the concept of derivative sovereign immunity, at least as it derives from the immunity of federal officials, as separate and distinct from the preemption-based government contractor defense recognized in Boyle.  Likewise, the Fourth

Circuit has clearly embraced the terminology of derivative sovereign immunity, as explained herein.  See infra Parts I.B.2–3.

Even so, Boyle provides additional guidance on how to evaluate Defendants' defense of derivative sovereign immunity.  First, because the Supreme Court relied, at least in part, on Yearsley in crafting the preemption-based government contractor defense, this Court, as does the Fourth Circuit, see infra Part I.B.2, views Yearsley as a potential foundation for a separate defense of derivative sovereign immunity.  Second, since the Supreme Court looked to the principles behind the FTCA's discretionary function exception to justify excluding a government contractor from liability, id. at 51, this Court also thinks it appropriate to use those same principles as a potential basis for derivative sovereign immunity, even though the FTCA excludes independent contractors from its scope.[4]  However, because Defendants have not yet asserted the government contractor defense based on the FTCA's discretionary function exception as recognized in Boyle, see, e.g., Defs.' Reply 21, the Court will refrain from any further analysis of Boyle in relation to their claim of possible entitlement to derivative sovereign immunity.

### 2.  **Yearsley v. W.A. Ross Construction Co.**

In Yearsley, the Supreme Court considered whether a contractor that built dikes in the Missouri River pursuant to a contract with the federal government could be held liable for damages caused by the construction of the dikes.  309 U.S. at 19–20.  The contract was part of a federal project authorized by an act of Congress, and it was undisputed that the federal government authorized and directed the project.  Id.  The Supreme Court concluded that the

---

[4]  By the same token, the Court thinks it appropriate to use the principles embodied in the combatant activities exception as a potential basis for preemption, notwithstanding the FTCA's exclusion of government contractors from its scope.  See infra Part II.C.

contractor could not be held liable for the taking of private property, reasoning that when "authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." Id. at 20–21. The Supreme Court observed, however, "[w]here an agent or office of the Government purporting to act on its behalf has been held to be liable for his conduct causing injury to another, the ground of liability has been found to be either that he exceeded his authority or that it was not validly conferred." Id. at 21.

The Supreme Court's decision in Yearsley is somewhat enigmatic in that it does not mention sovereign immunity or otherwise address a court's power to hear the case. Instead, the Supreme Court emphasized the "complete remedy" provided by the Government, id. at 21–22, and narrowly held "in the case of a taking by the Government of private property for public use such as petitioners allege here, it cannot be doubted that the remedy to obtain compensation from the Government is as comprehensive as the requirement of the Constitution, and hence it excludes liability of the Government's representatives lawfully acting on its behalf in relation to the taking," id. at 22. This narrow holding led Justice Brennan to write in dissent in Boyle that it is "unlikely that the Court intended Yearsley to extend anywhere beyond the takings context." 487 U.S. at 525.

Nevertheless, the Fourth Circuit and several other courts of appeals have viewed Yearsley as "immunizing" government contractors from suit when their acts amount to acts of

the government.[5]  In Butters v. Vance International, Inc., 225 F.3d 462 (4th Cir. 2000), the

Fourth Circuit characterized Yearsley as holding "that sovereign immunity derivatively extended

to a private contractor who, pursuant to a contract with the United States Government,

constructed dikes that caused the erosion of the plaintiff's land," id. at 466, and cited Yearsley as

exemplifying "well-settled law that contractors and common law agents acting within the scope

of their employment for the United States have derivative sovereign immunity."[6]  In line with its

interpretation of Yearsley, the Fourth Circuit in Butters extended derivative sovereign immunity

under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602–1611 (1994), to a

---

[5]  See Ackerson v. Bean Dredging LLC, 589 F.3d 196, 204 (5th Cir. 2009) (dismissing claims against a contractor for dredging activities conducted near the Mississippi River Gulf Outlet that caused an amplification of a storm surge in the New Orleans region); McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1343–46, 1351 (11th Cir. 2007) (acknowledging that some form of derivative sovereign immunity may be appropriate for private contractor agents); Butters v. Vance Int'l, Inc., 225 F.3d 462, 466 (4th Cir. 2000) (extending derivative sovereign immunity to a private contractor for following commands of a foreign sovereign). But see Koohi v. United States, 976 F.2d 1328, 1336 (9th Cir. 1992) ("The plaintiffs' action against the [defense contractors] is not barred by sovereign immunity.  Private parties are not entitled to such a defense."); Foster v. Day & Zimmerman, Inc., 502 F.2d 867, 874 (8th Cir. 1974) ("The doctrine of sovereign immunity may not be extended to cover the fault of a private corporation, no matter how intimate its connection with the government.").

[6]  Unlike the Fourth Circuit, the Eleventh Circuit requires a contractor to prove that it was a "common law agent of the government at the time of the conduct underlying the lawsuit" in order to qualify for derivative sovereign immunity.  McMahon, 502 F.3d at 1343.

private contractor for following commands of a foreign sovereign, Saudi Arabia.[7] Butters, 255 F.3d at 466.

A key premise of the Supreme Court's decision in Yearsley was the finding that the contractor was following the sovereign's directives. See 309 U.S. at 20–21. While Yearsley established that a private corporation performing governmental functions pursuant to contractually delegated authority will not be liable in tort to third parties, it also acknowledged that an agent or officer of the Government purporting to act on its behalf, but in actuality exceeding his authority, shall be liable for his conduct causing injury to another. See id. at 21.[8] Thus, the Yearsley opinion makes clear that a contractor will qualify for an exclusion of liability

---

[7] While the Fourth Circuit in Butters clearly embraced use of the phrase "derivative sovereign immunity," this Court views "derivative sovereign immunity" as the practical result of preempting claims that are inconsistent with an important governmental interest rather than as a true immunity, in law, belonging to government contractors. From this Court's perspective, the rationale of the Fourth Circuit's decision in Butters is virtually indistinguishable from the logic underpinning the preemption-based government contractor defense embraced in Boyle. For example, the Fourth Circuit in Butters noted that "[i]mposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work," 225 F.3d at 466, while Boyle mentioned the "same interest in getting the Government's work done [by an independent contractor]," 487 U.S. at 505. Whether viewed as "derivative sovereign immunity" or federal preemption, the result is protection from liability for a government contractor faithfully doing the government's bidding. The semantic distinction between the two may be significant, however, in that immunity, but not necessarily conflict preemption, defeats the Court's jurisdiction. See infra Part I.C. In any event, the Court finds the Defendants' position unavailing, at least at this early juncture.

[8] See also Shaw v. Grumman Aerospace Corp., 778 F.2d 736, 740 (11th Cir. 1985), abrogated on other grounds by Boyle, 487 U.S. at 513 ("To evaluate a Yearsley claim in the military contractor context, a court would appear to be obliged to take three steps. First it would apply the [immunity] doctrine to determine whether the government itself could be sued in that situation. If not, the court would then invoke a second body of doctrine, the law of principal and agent, to inquire whether the contractor actually acted as an agent of the government. . . . Finally, if the contractor proved agency status, the court would require the agent acted within the course and scope of its duties."); Myers v. United States, 323 F.2d 580, 583 (9th Cir. 1963) ("To the extent that the work performed by [the contractor defendant] was done . . . in conformity with the terms of said contract, no liability can be imposed upon it for any damages claimed to have been suffered by the appellants.").

only if it executed the will of the Government and did not exceed its authority.  Consistent with Yearsley, the Fourth Circuit in Butters immunized the contractor because it was carrying out the decision of the foreign sovereign.  See Butters, 225 F.3d at 466 (explaining that the contractor was entitled to derivative immunity under the FSIA because it was following Saudi Arabia's orders not to promote an agent).

Yearsley does not insulate Defendants from liability in this case because this essential condition—acting within the confines of the authority bestowed by the sovereign—has not yet been established.  Plaintiffs ground their claims on actions allegedly taken in violation of the terms of LOGCAP III without the requisite permission of the military or otherwise unauthorized by the Government.  See Defs.' Reply 19.  To the extent that Defendants executed their own will in contravention of the will of the military, Yearsley instructs the Court not to insulate them from liability. Thus, Yearsley does not entitle Defendants to "derivative sovereign immunity" at this point in time.

Of course, Defendants sharply dispute that they treated water or disposed of waste in breach of LOGCAP III or without authorization.  The Court cannot resolve this fundamental factual dispute because the record does not contain the entire contract, evidence establishing performance in compliance with its terms, or evidence that the military, when necessary, permitted or directed Defendants to deviate from the contract's terms.  Consequently, carefully limited discovery will be geared towards identifying any unauthorized actions performed by Defendants.

Even if Defendants could satisfy the conditions of Yearsley at this juncture, however, their derivative claim of entitlement to the sovereign's immunity preserved in the discretionary function exception fails for a separate reason:  Plaintiffs are not challenging discretionary

functions. In order to determine whether conduct falls within the discretionary function exception, a court applies a two-part test established in Berkovitz v. United States, 486 U.S. 531 (1988). See United States v. Gaubert, 499 U.S. 315, 322–23 (1991). First, a court asks whether the conduct at issue involved "an element of judgment or choice." Berkovitz, 486 U.S. at 536. This requirement is not satisfied if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." Id. Once the element of judgment is established, a court asks, second, "whether that judgment is of the kind that the discretionary function exception was designed to shield," id., in that it involves considerations of "social, economic, and political policy," id. at 537 (quotation marks omitted). In sum, the action challenged must involve "the permissible exercise of policy judgment." Id. at 537.

The challenged conduct alleged in this case is not discretionary in nature because it does not involve "an element of judgment or choice." Plaintiffs have alleged that LOGCAP III incorporates mandatory laws and regulations that specify the manner in which Defendants are to dispose of waste and treat water and that Defendants failed, when applicable, to obtain permission to deviate from those requirements. Pls.' Opp'n 42. If the laws and regulations incorporated by LOGCAP III are indeed mandatory and not otherwise superseded by military directive, then actions taken by Defendants in violation of those laws and regulations hardly can be said to be discretionary. In other words, the conduct at issue here involves Defendants' alleged failure to abide by a military-prescribed course of action, not judgment or choice.

For clarity's sake, however, the Court notes Plaintiffs' apparent misconceptions about what constitutes a discretionary function. Plaintiffs point to Task Order 139 and Standard Operation Procedures presumably as bases for arguing that Defendants failed to comply with mandatory contractual conditions on burning. See Pls.' Opp'n 7–8, ¶ 15. Task Order 139

requires Defendants to "minimize any type of smoke exposures to the camp population," <u>see</u> <u>id.</u> Ex. 12, and Standard Operation Procedure ("SOP") 5(c) requires Defendants to "take all possible and reasonable actions to protect human health and preserve the environment," <u>see</u> <u>id.</u> Ex. 17. Unless Plaintiffs can point to mandatory procedures set forth by the military on <u>how</u> to "minimize any type of smoke exposures to the camp population" or to "take all possible and reasonable actions to protect human health and preserve the environment," the standards set forth in Task Order 139 and SOP 5(c) appear to involve judgment and choice and therefore may pertain to discretionary functions. Claims arising out of the authorized performance of discretionary functions delegated to the Defendants by the military likely would be barred by derivative sovereign immunity (or perhaps more appropriately by federal preemption) based on the discretionary function exception. The claims that survive the derivative sovereign immunity doctrine based on the discretionary function exception must arise out of violations of military directives, not the Defendants' exercise of their discretion validly conferred by LOGCAP III or otherwise by the military.

### 3. <u>Westfall v. Erwin</u>

In <u>Westfall</u>, a civilian warehouse employee of the Federal Government stationed in an army depot in Alabama suffered chemical burns to his eyes and throat when he inhaled soda ash dust that had spilled from its bag. 484 U.S. at 293–94. The employee and his wife sued his supervisors at the depot in tort. <u>Id.</u> at 293. The trial court held that the supervisors were absolutely immune from suit and granted summary judgment in their favor. <u>Id.</u> at 294. The Eleventh Circuit reversed, reasoning that a federal employee enjoys immunity "only if the challenged conduct is discretionary act <u>and</u> is within the outer perimeter of the actor's line of duty." <u>Id.</u> (quotation marks omitted). The Supreme Court granted <u>certiorari</u> to address "whether

conduct by federal officials must be discretionary in nature, as well as being within the scope of their employment, before the conduct is absolutely immune from state-law tort liability." Id. at 295.

Affirming the Eleventh Circuit's decision, the Supreme Court in Westfall recognized an absolute immunity from state-law tort liability for federal officials exercising discretion while acting within the scope of their employment. Id. Relying on Barr v. Mateo, 360 U.S. 564 (1959) (plurality opinion), the Supreme Court explained that the "purpose of [absolute] official immunity is not to protect an erring official, but to insulate the decisionmaking process from the harassment of prospective legislation." Id. Because of the costs associated with protecting federal officers from tort liability, including refusing victims compensation, the Supreme Court limited a federal officer's immunity only insofar as it is necessary to protect the officer's performance of a governmental function. See id. at 295 ("[A]bsolute immunity for federal officers is justified only when 'the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to individual citizens.'" (quoting Doe v. McMillan, 412 U.S. 306, 320 (1973)); see also McMahon, 502 F.3d at 1344 ("[U]nlike the immunity possessed by the government, [a federal officer's] immunity must be affirmatively justified, and does not flow automatically from the government's retained sovereign immunity.").

At the end of the Westfall decision, the Supreme Court specifically invited Congress to establish "[l]egislative standards governing the immunity of federal employees involved in state-law tort actions." See 484 U.S. at 300. Congress responded with the Federal Employees Liability Reform and Tort Compensation (Westfall) Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563 (codified in scattered sections of 28 U.S.C.), which substitutes the United States as the sole

defendant in any state law tort action against a federal employee for acts committed within the scope of the employee's office or employment, regardless of whether the acts involved the employee's discretion.  See 28 U.S.C. § 2679(d)(1).  Although the test for official immunity has been replaced by the Westfall Act, this common-law approach remains the standard when considering whether contractors may enjoy derivative official immunity.  See Mangold, 77 F.3d at 1447 n.4 ("At federal common law, absolute official immunity remains limited to discretionary functions."); see also Beebe v. Wash. Metro. Area Transit Auth., 129 F.3d 1283, 1289 (D.C. Cir. 1997) (noting that Westfall remains the common law rule for official immunity).

On its face, Westfall applies only to federal officials, and the Supreme Court has never extended federal official immunity to nongovernment employees, such as government contractors.  See Boyle, 487 U.S. at 505 n.1.  A Supreme Court case that might bridge the analytical gap between federal official and government contractor immunity is Yearsley, but, as mentioned above, Defendants have not shown pre-discovery that their engagement in the challenged conduct was an exertion of the government's will and within the authority conferred by the government.  Thus, at this early stage, Defendants are not entitled to derivative federal official immunity recognized in Westfall for the same reason they are not entitled under Yearsley to the sovereign's immunity preserved by the FTCA's discretionary function exception.

Assuming, however, that a government contractor may claim entitlement to federal official immunity without looking through the lens of Yearsley, Defendants' defense still fails. If government contractors are going to qualify for federal official immunity, they must, at the very least, satisfy the conditions that federal officials would have to satisfy under Westfall. Those conditions include (1) the conduct in question being within the scope of the official's duties and (2) the official having discretion to engage in the conduct.  Westfall, 484 U.S. at 297–

98.  The first condition appears to be met because waste disposal and water treatment were generally within the scope of the government contractor's duties as set forth in LOGCAP III. The second condition, however, is lacking for the same reason that the discretionary function exception does not apply:  the conduct at issue in this case is not discretionary in nature because it allegedly violated mandatory directives.

Furthermore, the Court is not prepared to say at this stage in the litigation that the "contributions of immunity to effective government . . . outweigh the perhaps recurring harm to individual citizens."  Westfall, 484 U.S. at 295–96 (quoting Doe, 412 U.S. at 320).  Although preferably performed by Congress, the careful balancing of immunity and harm is especially important when contemplating government contractor immunity.  See id. at 300 ("Congress is in the best position to provide guidance for the complex and often highly empirical inquiry into whether absolute immunity is warranted in a particular context.").  In contrast to public officers who in theory act in the public interest and seek to maximize social welfare, government contractors earn profits from their association with the government and are in a position to engage in cost-benefit optimizing behavior.  See Mangold, 77 F.3d at 1447 ("[P]rivate persons under contract with the government act only partly in the public sphere . . . .").  A government contractor's ability to adjust its behavior is especially pronounced in the performance of service contracts "because the Government does not, in fact, exercise specific control over the actions and decisions of the contractor or its employees or subcontractors [made pursuant to service contracts]."  73 Fed. Reg. at 16,768.

The contributions of immunity to effective government are not trivial.  Permitting the Plaintiffs' lawsuit to proceed could subject military personnel and contractors to lengthy and distracting court or deposition proceedings and cause government contractors to refuse to bid on

government contracts or raise the amount of their bids.  <u>See</u> Defs.' Reply 19.  Yet, the benefits of conferring immunity on Defendants are tempered by Plaintiffs' narrowly tailored claims that Defendants decided to treat water and dispose of waste in a manner unauthorized by the military. Holding a government contractor accountable for injuries resulting from its defiance of military orders would seem to contribute to, rather than detract from, effective government, although the U.S. government is arguably "in the best position to monitor wrongful activity by contractors, either by terminating their contracts or through criminal prosecution."  <u>Bentzlin v. Hughes Aircraft Co.</u>, 833 F. Supp. 1486, 1493 (C.D. Cal. 1993).  In any event, concerns surrounding mass contractor withdrawal from the military services market and the threat of injury to the federal treasury associated with higher rates are not imminent or particularly worrisome when a contractor's exposure to liability is limited to its own allegedly unauthorized actions.

The costs, however, of blanketing government contractors with the sovereign's cloak of immunity at this early stage of the litigation are significant.  In this case, Plaintiffs seek compensation for injuries resulting from exposure to burn pit emissions and contaminated water, which they allegedly would not have suffered absent what they claim were the Defendants' decisions to breach LOGCAP III without the necessary military permission and to otherwise disobey military directives.  Assuming the truth of these allegations, refusing such victims compensation and allowing Defendants' allegedly unauthorized conduct to go unredressed would be contrary to the most fundamental tenets of our legal system.  <u>See</u> <u>Westfall</u>, 484 U.S. at 295. In addition to shifting the risk of loss onto innocent plaintiffs, inappropriately extending official immunity to defendants would discourage them from properly assessing the risks involved in their actions and taking proper precautions.  <u>See</u> 73 Fed. Reg. at 16,768 ("However, to the extent contractors are currently seeking to avoid accountability to third parties for their own actions by

raising defenses based on the sovereignty of the United States, this rule should not send a signal that would invite courts to shift the risk of loss to innocent third parties. The language in the clause is intended to encourage contractors to properly assess the risks involved and take proper precautions."). Thus, the costs of immunity to the hundreds of named Plaintiffs and to future government–defense contractor relationships are obviously considerable.

Based on this preliminary balancing of interests, it cannot be said at this juncture that the public interest demands that the <u>Westfall</u> absolute immunity protect Defendants to the same extent it protects federal officials. Plaintiffs contend, and the Court agrees, that this case can proceed while "insulat[ing] the decisionmaking process from the harassment of prospective litigation." <u>See</u> <u>Westfall</u>, 484 U.S. at 295. So long as the military's decisionmaking process remains insulated and the government is freed from the "costs of vexatious and often frivolous damages suits," <u>id.</u>, the benefits to government efficiency are outweighed by the interests of the Plaintiffs in securing compensation for injuries resulting from Defendants' allegedly unauthorized acts and of the public in holding Defendants accountable for any such wrongful conduct that may be proven.

### 4. **Mangold v. Analytic Services, Inc.**

The Fourth Circuit in <u>Mangold</u> extended the absolute immunity for federal officials recognized in <u>Westfall</u> and <u>Barr</u>, in conjunction with a common law immunity protecting witnesses in an official investigation, to a government contractor and its employees. 77 F.3d at 1449. In <u>Mangold</u>, a government contractor and its employees made statements and provided information about an Air Force colonel's conduct in response to queries made in the course of an Air Force investigation. <u>Id.</u> at 1444. When the colonel sued the contractor under common law for injury to the colonel's reputation and position, the contractor asserted absolute immunity. <u>Id.</u>

The district court rejected the contractor's claim of immunity, but the Fourth Circuit reversed, holding that the government contractor and its employees were absolutely immune from state tort liability based on any statements made and information given in response to queries made in the course of the Air Force's investigation. Id. at 1450.

The Fourth Circuit first identified the government's decision to investigate suspected fraud, waste, and mismanagement in the administration of government contracts as a discretionary function protected under Westfall and Barr. Id. at 1447. Because such investigations would be effective only if investigators were able to obtain the cooperation of witnesses, the Fourth Circuit reasoned that cooperating government employees should also be protected. Id. The Fourth Circuit continued: "Extending such immunity to the private sector, in the narrow circumstances where the public interest in efficient government outweighs the costs of granting such immunity, comports with the principles underlying the immunity recognized in Barr and Westfall, since the scope of that immunity is defined by the nature of the function being performed and not by the office or the position of the particular employee involved." Id. The Fourth Circuit opinion also stated that "the reasoning in Westfall provides only a partial foundation for protecting witnesses cooperating in an official investigation," id. at 1448, and, to provide the remaining foundation for immunity, it relied on the "common law privilege to testify with absolute immunity in courts of law, before grand juries, and before government investigators," id. at 1449.

Defendants urge the Court to follow what they perceive to be the analytical framework outlined by the Fourth Circuit in Mangold. See Defs.' Reply 15. They contend that Mangold applied a two-part test to determine whether a government contractor could benefit from federal official immunity. See id. According to Defendants, the Fourth Circuit determined, first, that

government employees would be immune from suit for engaging in the same conduct as the contractor, and, second, that extending that same immunity to the private contractor defendant was in the public interest because "to allow such tort liability, whether against government employees or private contractors, would tend to make government less efficient." Id. (quoting Mangold, 77 F.3d at 1447). Applying their Mangold-derived test to this case, Defendants argue that they are entitled to federal official immunity because government employees would be immune from suit for disposing of waste and treating water in war zones and extending that same immunity to Defendants would be in the public interest. Id. at 16–19.

Plaintiffs contend that the test Defendants have formulated based on Mangold overreaches. See Pls.' Opp'n 41. Such a test, in Plaintiffs' view, would confer automatic immunity on contractors merely by entering into service contracts under which corporate employees perform functions otherwise handled by government employees. See id. Instead, they propose that the Court follow Westfall and view Mangold as being primarily applicable to contractors facilitating government investigations. See id.

While Mangold purports to extend the federal official immunity recognized in Westfall and Barr to government contractors, the record in the case does not show that the contractor and its employees deserved the federal official immunity recognized in Westfall. Instead, the opinion emphasizes the immunity which protects witnesses in government-sponsored investigations and adjudications. In order for the government contractor and its employees to have qualified for federal official immunity under Westfall, the Fourth Circuit would have had to have found, at the very least, that the contractors were acting within the scope of their contract

and performing a discretionary function.[9]  The Fourth Circuit made no such finding, and it is doubtful that merely answering questions and providing information in response to Air Force queries would constitute discretionary acts within the scope of their employment.  See Berkovitz, 486 U.S. at 536 ("[C]onduct cannot be discretionary unless it involves an element of judgment or choice."); see also id. at 537 ("The [discretionary function] exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy.").  Recognizing that the Westfall federal official immunity covered the government's decision to investigate, but not the cooperation of the contractor with the investigation, the Fourth Circuit drew "on principles of that immunity which protects witnesses in government-sponsored investigations and adjudications" for its "full justification" of the immunity.  Mangold, 77 F.3d at 1448.

Because the Fourth Circuit relied on a combination of two immunities, one of which is inapplicable to this case, the Court declines to parse Mangold into two distinct holdings in order to create a theory of immunity deriving from federal official immunity that requires less of government contractors than Westfall would require of federal officials.  Mangold is a unique case best limited to its facts.  See Andrew Finkelman, Suing the Hired Guns:  An Analysis of Two Federal Defenses To Tort Lawsuits Against Military Contractors, 34 Brook. J. Int'l L. 395, 419 n.148 ("Research discloses no case that has so extended the principle announced in Mangold outside of the government investigation or financial intermediary context.").  But see Servco Solutions v. CACI Int'l, Inc., No. 1:07cv908 (JCC), 2007 WL 3376661 (E.D. Va. Nov. 9, 2007)

---

[9]  See Murray v. Northrop Grumman Info. Tech., Inc., 444 F.3d 169, 174–176 (2d Cir. 2006) (extending official immunity to government contractors and their employees for the allegedly tortious effects of sharing information with the government agency charged with their oversight because (1) they were acting within the scope of their employment, (2) the action was discretionary, and (3) the contributions of immunity to effective government outweighed the harm to individuals).

(relying on Mangold to find government contractors immune from state-law contract and tort liability outside the government investigation context).

In the alternative, even if Mangold had created the Defendants' proposed two-pronged test, the second prong relating to the public interest is not satisfied. As discussed above, see supra Part II.B.3, the Court is not ready to hold, without the benefit of any discovery, that the public interest in efficient government outweighs the costs of granting Defendants' absolute immunity.

## C. Combatant Activities Exception

Finally, Defendants seek dismissal under the FTCA's combatant activities exception, which preserves the sovereign's immunity against "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). The statute leaves the terms "arising out of" and "combatant activities" undefined, so courts have been left to clarify their meanings. Only a handful of courts have done so, and they seemingly disagree about the necessity of physical force. Compare Johnson v. United States, 170 F.2d 767, 770 (9th Cir. 1948) ("[N]ot only physical violence, but activities both necessary to and in direct connection with actual hostilities."), with Skeels v. United States, 72 F. Supp. 372, 374 (W.D. La. 1947) ("[T]he actual engaging in the exercise of physical force."); see also Taylor v. Kellogg Brown & Root Services, Inc., Civil No. 2:09cv341, 2010 WL 1707530, at *10 (E.D. Va. Apr. 19, 2010), appeal docketed, No. 10-1543 (4th Cir. 2010) (adopting Johnson definition); Al Shimari v. CACI Premier Tech., Inc., 657 F. Supp. 2d 700, 721 (E.D. Va. 2009), appeal docketed, No. 09-1335 (4th Cir. 2010) (adopting Skeels definition). Regardless of the exact definition, "[t]he rational test would seem to lie in the degree of connectivity" between the conduct at issue and the actual combat. Johnson, 170 F.2d at 770.

Two courts of appeals, relying on Boyle, have held that the federal interests embodied in the combatant activities exceptions conflict with and therefore preempt tort suits against government contractors arising out of combatant activities. The first was Koohi v. United States, 976 F.2d 1328, 1336 (9th Cir. 1992). In that case, the Ninth Circuit was confronted with a claim arising out of an accidental shooting of a civilian aircraft by a United States warship. Id. at 1329–30. Heirs of deceased passengers and crew sued several private companies involved in the construction of the Aegis Air Defense System allegedly responsible for misidentifying the plane. Id. The Ninth Circuit held that plaintiffs' action against the Aegis manufacturers was preempted by the combatant activities exception. Id. at 1336. The court explained that "one purpose of the combatant activities exception is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." Id. at 1337. The imposition of tort liability on the Aegis manufacturers for claims arising out of the direction of force against the aircraft by the United States would conflict with this purpose of the combatant activities exception, the Ninth Circuit concluded, because it "would create a duty of care where the combatant activities exception is intended to ensure that none exists." See id.

The second case was Saleh v. Titan Corp., 580 F.3d 1 (D.C. Cir. 2009), which reviewed the district court decision in Ibrahim v. Titan Corp., 556 F. Supp. 2d 1 (D.D.C. 2007). As described in Saleh, Iraqi nationals brought suits alleging abuse against two private military contractors, CACI International, Inc. ("CACI") and Titan Corp. ("Titan"), which provided interrogation and interpretation services to the U.S. government at the Abu Ghraib military prison during the war in Iraq. 580 F.3d at 1. In their defense, the contractors asserted that the claims against them were preempted as claims against civilian contractors providing services to

the military in a combat context. Id. at 4. In the face of insufficient factual support to sustain the application of the preemption defense, the district court judge ordered limited discovery regarding the military's supervision of the contractor employees as well as the degree to which such employees were integrated into the military chain of command. Id. at 4. Following discovery, the contractors filed for summary judgment on the same preemption grounds. Id. Absent controlling authority, the court fashioned a test of first impression, finding preemption only where the contract employees are "under the direct command and exclusive operational control of the military chain of command." Id. (quotation marks omitted). Finding that the Titan employees were "fully integrated into their military units" and "essentially functioning as soldiers in all but name," but that the CACI employees were subject to a "dual chain of command," the court dismissed as preempted the tort claims against Titan, but not as to CACI. Id. (quotation marks omitted).

The D.C. Circuit decided that the district court judge "properly focused on the chain of command and the degree of integration that, in fact, existed between the military and both contractors' employees rather than the contract terms," but eliminated the exclusive control component of the district court's legal test. Id. at 6. The D.C. Circuit's test provides: "During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." Id. at 9. This "battle-field preemption" test is appropriate in the D.C. Circuit's view because the "imposition per se" of the state tort law conflicts with the policy behind the combatant activities exception of "eliminating tort concepts from the battlefield." Id. at 7. At the same time, the D.C. Circuit "recognize[d] that a service contractor might be supplying services in such a discrete manner—perhaps even in a battlefield context—

that those services could be judged separate and apart from combat activities of the U.S. military." Id. at 9.

Despite being presented with facts very similar to those in Saleh, Judge Peter J. Messitte of this Court recently declined to use the combatant activities exception as a basis for the government contractor defense in Al-Quraishi v. Nakhla, No. PJM 08-1696, 2010 WL 3001986, at *25 (July 29, 2010), appeal docketed No. 10-1891 (4th Cir. 2010). Judge Messitte in Al-Quraishi interpreted Boyle as creating a government contractor preemption defense based on the discretionary function exception, but not necessarily based on broader immunities, such as the combatant activities exception. See id. at *26–27. The Court expressed concern that unlike the discretionary function exception, the combatant activities exception does not take into account whether the Government exercised any discretion or played any role in the contractor's alleged tortious acts, as required by the three-part test ultimately articulated in Boyle. See id. at *27. Accordingly, he concluded that "using the combatant activities test as a basis for government contractor immunity goes against the teaching of Boyle and the principles of preemption." Id.

Relying primarily on Saleh, Defendants argue that Plaintiffs' claims are preempted by the federal interests embodied in the combatant activities exception. See Defs.' Mem. Supp. Dismiss 42–46. They contend that they were "integrated and performing a common mission with the military under military command," id. at 45 (quotation marks omitted), and that "imposition of state tort law duties from 42 different states would necessarily conflict with the FTCA's policy of eliminating tort concepts from the battlefield," id.

Emphasizing the absence of facts in the record demonstrating direct command control of the military, Plaintiffs distinguish Saleh based on the procedural posture of that case. See Pls.' Opp'n at 48–49. Putting Saleh aside, Plaintiffs primarily argue that Defendants do not qualify

for the combatant activities exception because their conduct does not fit within its scope.  See id. at 45.  In Plaintiffs' view, their claims arise from Defendants' provision of waste disposal and water treatment services, not from military conduct during combat.  See id.

Notwithstanding their disavowal of the government contractor defense and Boyle at this stage of the litigation, Defendants nevertheless rely on cases involving application of the Boyle-styled preemption defense to support their argument that Plaintiffs' claims are preempted based on the principles embodied in the combatant activities exception.  See Defs.' Mem. Supp. Dismiss 43–45 (relying on Saleh and Koohi to demonstrate that Plaintiffs' claims are preempted).  Apparently puzzled by Defendants' position, Plaintiffs interpret their combatant activities argument as a derivative sovereign immunity argument, not a preemption defense.  See Pls.' Opp'n 44–45.  The Court will assume for purposes of this motion that Defendants are raising a Boyle-styled, conflict preemption defense based on the combatant activities exception as opposed to a separate basis for the assertion of derivative sovereign immunity.[10]

Defendants' preemption defense is premature.  Although raised as a challenge to this Court's subject matter jurisdiction under Rule 12(b)(1), preemption does not normally concern the subject-matter jurisdiction of a court to hear a claim.  "Rather, the doctrine generally concerns the merits of the claim itself, namely, whether it is viable and which sovereign's law will govern its resolution."  Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 608 (6th Cir. 2004).  In particular, the Boyle-based conflict preemption defense raised by Defendants is an affirmative defense, and the burden is on them to show that they meet the requirements for preemption.  See McMahon, 502 F.3d at 1354 (stating that the Boyle court created an "affirmative defense").

---

[10]  Even if Defendants were arguing entitlement to derivative sovereign immunity based on the combatant activities exception, this Court would still require that Defendants meet the conditions set forth in Yearsley, which Defendants have not done.  See supra Part I.B.2.

Moreover, "[w]hether the facts establish the conditions for the defense is a question for the jury." Boyle, 487 U.S. at 514. Considering the affirmative nature of the defense, this Court concludes that Defendants have not produced sufficient factual support at this early stage of the record's development to justify its application.

First, whether Plaintiffs' claims "aris[e] out of the combatant activities" in Iraq and Afghanistan within the meaning of the combatant activities exception is not clear at this stage. 28 U.S.C. § 2680(j). Just because Plaintiffs' claims arise out of services provided in support of a war effort does not mean that they necessarily arise out of "combatant activities." Determining whether waste disposal and water treatment are sufficiently related to the "exercise of physical force," Al Shimari, 657 F. Supp. 2d at 721, or "actual hostilities," Taylor, Civil No. 2:09cv341, 2010 WL 1707530, at *10, so as to come under the umbrella of the combatant activities exception requires facts. Neither the Ninth Circuit in Koohi nor the D.C. Circuit in Saleh decided the question of preemption based on the combatant activities exception in a factual vacuum. The connections between combat and the interrogating and translating interrogations of detainees, see Saleh, 580 F.3d at 5, and the manufacturing of missile defense systems, see Koohi, 976 F.2d at 1337, are more pronounced than the nexus between combat and supplying waste

disposal and water treatment services.[11]   Discovery is therefore necessary to flesh out the relationship between waste disposal and water treatment and the exercise of physical force or actual hostilities.

Second, the Court questions whether a "significant conflict" exists between the federal interest embodied in the combatant activities exception and the operation of state law in this case.   See Boyle, 487 U.S. at 509.   Saleh identified the federal interest as "eliminating  tort concepts from the battlefield," 580 F.3d at 7 (emphasis added), and Koohi identified the federal interest as eliminating the "duty of reasonable care owed to those against whom force is directed as a result of authorized military action," 976 F.2d at 1337 (emphases added).   At first blush, imposing state-law tort liability onto government contractors for negligently disposing of waste and treating water without military authorization would not seem inconsistent with either of these identified federal policies.   See Al-Quraishi, No. PJM 08-1696, 2010 WL 3001986, at *26 (noting the possible absence of tension between state tort law and the federal interest embodied in the combatant activities exception).   Plaintiffs' narrowly defined claims suggest that

---

[11]   District courts have disagreed about whether maintaining electrical systems is within the scope of the combatant activities exception.   Compare Taylor, Civil No. 2:09cv341, 2010 WL 1707530, at *10, (maintaining electrical systems inside scope), with Harris v. Kellogg, Brown & Root Services, Inc., 618 F. Supp. 2d 400, 434 (W.D. Pa. 2009), appeal dismissed by Harris v. Kellogg Brown & Root Servs., Inc., No. 09-2325, 2010 WL 3222089 (3d Cir. Aug. 17, 2010) (maintaining electrical systems outside scope).   At least two district courts have agreed, however, that performing various roles in convoy operations is outside the scope of the combatant activities exception.   See Carmichael v. Kellogg, Brown & Root Services, Inc., 450 F. Supp. 2d 1373, 1380–81 (N.D. Ga. 2006), aff'd 572 F.3d 1271 (2009), cert. denied 78 U.S.L.W. 3368, 3755, 3762 (June 28, 2010) (No. 09-683) (driving vehicle in a war zone outside scope); Lessin v. Kellogg Brown & Root, No. CIVA. H-05-01853, 2006 WL 3940556, at *4–5 (S.D. Tex. June 12, 2006) (repairing of a vehicle during a military-controlled convoy operation outside scope).   Another district court recently found that storing and working with sodium dichromate did not constitute a combatant activity.   See Bixby v. KBR, Inc., No. CV 09-632, 2010 WL 3418340, at *17 (D. Or. Aug. 30, 2010).

Defendants' services can "be judged separate and apart from combat activities of the U.S. military," Saleh, 580 F.3d at 9, and the limited factual record does not demonstrate otherwise.

Lastly, assuming without deciding that the Saleh degree of integration test appropriately defines the scope of displacement necessary to secure the federal interests concerned,[12] the Court cannot assess on this minimal record the extent to which the government contractors were integrated into the military chain of command. In Saleh, the D.C. Circuit approved of the district judge's focus "on the chain of command and the degree of integration that, in fact, existed between the military and both contractors' employees rather than the contract terms." 580 F.3d at 4. In this case, the Court does not have the benefit of either the entire contract or of facts demonstrating the Defendants' degree of integration.[13] Taking as true Plaintiffs' allegations that Defendants breached LOGCAP III without required military permission and otherwise disobeyed mandatory directives, it appears unlikely that Defendants were so integrated into the military chain of command as to justify preemption. Like the political question doctrine and derivative sovereign immunity arguments, Defendants' combatant activities argument rises and falls with

---

[12] This Court has concerns similar to those described by Judge Messitte in Al-Quraishi about allowing the combatant activities exception to serve as a basis for the government contractor defense set forth in Boyle. See Al-Quraishi, No. PJM 08-1696, 2010 WL 3001986, at *25–27; cf. McMahon v. Presidential Airways, Inc., 460 F. Supp. 2d 1315, 1330 (M.D. Fla. 2006), aff'd on other grounds by McMahon, 402 F.3d 1331 ("There is no express authority for judicially intermixing the government contractor defense and the combatant activities exception . . . ."). The combatant activities exception is much broader in scope than the discretionary function exception, and the Saleh degree of integration test may not appropriately limit the scope of the combatant activities exception as applied to government contractors.

[13] The excerpts of LOGCAP III in the record do not support a finding of integration. See Pls.' Opp'n Ex. 2 at 3-2(d)(8) ("Contractors will not be used to perform inherently governmental functions."); id. at (d)(5) ("Contractors can be used only in selected combat support and combat service support activities. They may not be used in any role that would jeopardize their role as noncombatants."); id. at (d)(2) ("Contract employees will not be under the direct supervision or evaluation of military or the Department of the Army civilians except as provided [in regulations]. The contractor will provide the supervisory and management personnel for each contract as well as on-site liaison with functional U.S. organizations.").

the ability of Plaintiffs to demonstrate through discovery that Defendants committed unauthorized, negligent acts. Accordingly, the Court will refrain from further evaluation of the merits of Defendants' combatant activities-based preemption defense until the record is more fully developed.

## II.    The First Consolidated MDL Complaint

Lastly, the Court must address Plaintiffs' consolidated MDL complaint. At the February 23, 2010 initial case management conference in this action, the Court ordered Plaintiffs to file a consolidated complaint in this action that would consolidate all of the allegations made in their forty-three individual complaints into one document so that the Court would not need to refer to forty-three separate complaints. See Hr'g Tr. 22:3–11, Feb. 23, 2010. The Court made clear that the consolidated complaint should not "deviate in any significant degree from the existing complaints that are the subject of [Defendants'] Motion To Dismiss." Hr'g Tr. 22:5–7. Contrary to these clear instructions, Plaintiffs filed a consolidated complaint on March 9, 2010 that contained new allegations and new plaintiffs nowhere to be found in the original forty-three original complaints Plaintiffs filed in this action. Compare, e.g., Compl., ECF No. 1 in Civil Action No. RWT-09-2748, with Pls.' First Consol. MDL Compl., ECF No. 49. Accordingly, the Court will grant Defendants' Motion To Strike Plaintiffs' First Consolidated MDL Complaint. See Defs.' Mot. To Strike, ECF No. 52. Striking the Plaintiffs' First Consolidated MDL Complaint is of little consequence, however, because the Court has consolidated into this multidistrict litigation the complaint in Jobes v. KBR, Inc., et al., which is nearly identical to Plaintiffs' First Consolidated MDL Complaint. See Compl., ECF No. 1 in Civil Action No. RWT-10-00836.

### III.    Conclusion

At the outset of this Opinion, the Court noted that subjecting government contractors operating in war zones to private civil suits under state tort law requires the exercise of caution by the judiciary.  While the Court will deny the motions of the Defendants to dismiss for lack of subject matter jurisdiction,[14] the full fury of unlimited discovery will not be unleashed at this time.  Rather, the Court will require that the parties to the litigation meet and confer and develop, hopefully jointly, a proposed plan for carefully limited discovery consistent with the views expressed in this Opinion.  Recognizing the importance of not overly burdening the military and its personnel with onerous and intrusive discovery requests, the Court will also invite the participation of the United States, as <u>amicus curiae</u>, in formulating the discovery plan.  The Court will direct the submission of a joint discovery plan, noting any portions to which objection is made, on or before October 29, 2010.[15]   The Court will then review that proposal and enter a further order authorizing specific discovery.


Date:   September 8, 2010                                 _____/s/_____
                                                                         ROGER W. TITUS
                                                                         UNITED STATES DISTRICT JUDGE

---

[14]  The denial of the motions will be without prejudice to the filing of new motions once the limited discovery is concluded.

[15]  The Court also notes that the United States Court of Appeals for the Fourth Circuit has scheduled oral argument on October 26, 2010 before a single panel in three cases that address many of the arguments that have been presented by the parties in this case.  <u>See</u> <u>Al Shimari v. CACI Premier Tech., Inc.</u>, 657 F. Supp. 2d 700, 721 (E.D. Va. 2009), <u>appeal docketed</u>, No. 09-1335 (4th Cir. 2010); <u>Taylor v. Kellogg Brown & Root Services, Inc.</u>, Civil No. 2:09cv341, 2010 WL 1707530, at *10 (E.D. Va. Apr. 19, 2010), <u>appeal docketed</u>, No. 10-1543 (4th Cir. 2010); <u>Al-Quraishi v. Nakhla</u>, No. PJM 08-1696, 2010 WL 3001986, at *25 (July 29, 2010), <u>appeal docketed</u> No. 10-1891 (4th Cir. 2010).  The Fourth Circuit may (and, of course, may not) benefit from the additional analysis provided by this Opinion, and this Court will certainly benefit from an up-to-date analysis by the Fourth Circuit of some of the principal legal issues that have been raised in this case.