**IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF MARYLAND**

| | |
|---|---|
| In Re: KBR, Inc., Burn Pit Litigation | Master Case No.:  8:09-MD-02083-RWT |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' RENEWED
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

Raymond B. Biagini
Robert A. Matthews
Daniel L. Russell Jr.
Shannon G. Konn
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, DC  20006
(202) 496-7500
Fax: (202) 496-7756

*Counsel for Defendants KBR, Inc.,
Kellogg Brown & Root LLC,
Kellogg Brown & Root Services, Inc.
and Halliburton Company*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 4

I.    SIGNIFICANT LEGAL DEVELOPMENTS ................................................ 4

    A.    *Taylor* ................................................................................................. 4

    B.    *Filarsky* .............................................................................................. 5

    C.    *Al Shimari* ......................................................................................... 5

    D.    Significant District Court Cases .......................................................... 7

    E.    Briefs Submitted by the United States Clarifying the
           Broad Scope of Combatant Activities Preemption ............................. 8

II.    STATEMENT OF FACTS ........................................................................... 10

    A.    Waste Management in War Theaters is a Quintessential
           Military Responsibility Important to the Success of Military Operations ...................... 10

    B.    The U.S. Military Determined Which Method of Waste
           Disposal to Use at All Military Bases Across Iraq and Afghanistan ............................. 11

    C.    The U.S. Military Determined the Location of Burn Pits and the
           Items that Could be Disposed of in Burn Pits ................................... 14

    D.    The U.S. Military Exercises Exclusive Responsibility Over
           Environmental, Health, and Safety Practices in Iraq and Afghanistan .......................... 16

    E.    The U.S. Military Controls Water Operations in War Theaters ..................................... 18

    F.    The U.S. Military Directed KBR to Implement the Military's Waste Management
           and Water Decisions at Certain Bases in Iraq and Afghanistan ..................................... 20

STANDARD OF REVIEW ................................................................................... 22

ARGUMENT .......................................................................................................... 24

I.    THESE SUITS ARE BARRED BY THE POLITICAL QUESTION DOCTRINE ................... 24

    A.    *Taylor* Confirms that Dismissal is Required Where a Contractor's
           Liability Defenses Would Raise Political Questions ....................................... 25

    B.    These Cases Must be Dismissed Under *Taylor* .............................. 26

          1.    The Court Could Not Resolve KBR's Liability Defenses
               Without Encountering Non-Justiciable Political Questions ............... 26

          2.    Under *Taylor*, Plaintiffs Cannot Circumvent Political Questions
               Through Allegations of Negligence or Noncompliance ..................... 29

II.    PLAINTIFFS' TORT CLAIMS ARE PREEMPTED .............................................. 32

    A.    The Court Should Adopt the United States' Test for
           Combatant Activities Preemption ...................................................... 33

**TABLE OF CONTENTS**
(continued)

**Page**

B.     The United States' Preemption Test Compels Dismissal of Plaintiffs' Claims .............. 36

C.     Dismissal Under Combatant Activities Preemption Is Also
Supported By Recent Jurisprudence ................................................................................ 38

III.     KBR IS ENTITLED TO DERIVATIVE SOVEREIGN IMMUNITY ...................................... 41

IV.     JURISDICTIONAL DISCOVERY IS NOT NECESSARY ....................................................... 44

CONCLUSION .......................................................................................................................................... 46

## TABLE OF AUTHORITIES

Page(s)

Cases

*Aiello v. Kellogg, Brown & Root Servs., Inc.,*
  751 F. Supp. 2d 698 (S.D.N.Y. 2011)............................................................. *passim*

*Al Shimari v. CACI,*
  No. 09-1335, 2012 WL 1656773 (4th Cir. May 11, 2012)............................................. *passim*

*Amedi v. BAE Sys., Inc.,*
  782 F. Supp. 2d 1350 (N.D. Ga. 2011)........................................................7, 23, 31

*Anderson v. United States,*
  Civil No. CCB-08-3, 2010 WL 1346409 (D. Md. Mar. 30, 2010)..........................................23

*Arnold v. United States,*
  140 F.3d 1037 (5th Cir. 1998)...............................................................36

*Baker v. Carr,*
  369 U.S. 186 (1962)......................................................................24, 25

*Bentzlin v. Hughes Aircraft Co.,*
  833 F. Supp. 1486 (C.D. Cal 1993) ......................................................34

*Boyle v. United Technologies Corp.,*
  487 U.S. 500 (1988)......................................................................33, 34

*Carmichael v. Kellogg Brown & Root Servs., Inc.,*
  572 F.3d 1271 (11th Cir. 2009) .............................................................. *passim*

*Filarsky v. Delia,*
  132 S. Ct. 1657 (2012).................................................................... *passim*

*Getz v. Boeing Co.,*
  No. 07-6396, 2008 WL 2705099 (N.D. Cal. July 8, 2008), *cert. denied,* 132 S. Ct.
  1582 (2012)..............................................................................23

*Gilligan v. Morgan,*
  413 U.S. 1 (1973)........................................................................28

*Hawes v. U.S.,*
  409 F.3d 213 (4th Cir. 2005) ...............................................................22

*Holt v. United States,*
  46 F.3d 1000 (10th Cir. 1995) ..............................................................23

*In re KBR, Inc., Burn Pit Litig.,*
  736 F. Supp. 2d 954 (D. Md. 2010)......................................................... *passim*

*Kim v. United States,*
   609 F. Supp. 2d 499 (D. Md. 2009) ........................................................24

*Lane v. Halliburton,*
   529 F.3d 548 (5th Cir. 2008) .........................................................31, 42

*Lebron v. Rumsfeld*,
   670 F.3d 540 (4th Cir. 2012) ...........................................................5

*Mangold v. Analytic Servs., Inc.*,
   77 F.3d 1442 (4th Cir. 1996) .........................................................41, 42

*Minns v. United States,*
   974 F. Supp. 500 (D. Md. 1997), *aff'd*, 155 F.3d 445 (4th Cir. 1998) ...................36

*Rodriguez v. U.S.,*
   69 Fed. Cl. 487 (2006) ...............................................................32

*Saleh v. Titan Corp.,*
   580 F.3d 1 (D.C. Cir. 2009), *cert. denied,* 131 S. Ct. 3055 (2011) ............... *passim*

*Smith v. Cent. Ariz. Water Conservation Dist.*,
   418 F.3d 1028 (9th Cir. 2005) ........................................................32

*Smith v. Reagan,*
   844 F.2d 195 (4th Cir. 1988) .........................................................22

*Taylor v. Kellogg Brown & Root Servs., Inc.,*
   658 F.3d 402 (4th Cir. 2011) .................................................... *passim*

*Tiffany v. United States,*
   931 F.2d 271 (4th Cir. 1991) ......................................................24, 29

*Tozer v. LTV Corp.*,
   792 F.2d 403 (4th Cir. 1986) ......................................................28, 35

*United States v. Marks,*
   187 F.2d 724 (9th Cir. 1951) .........................................................36

*U.S. ex rel Wilson*, 525 F.3d 370 (4th Cir. 2008) ......................................32

*Velasco v. Gov't of Indon.*,
   370 F.3d 392 (4th Cir. 2004) .........................................................23

*Williams v. U.S.,*
   50 F.3d 299 (4th Cir. 1995) ..........................................................22

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(1) ..................................................................22, 23

Brief for United States as Amicus Curiae, *Al Shimari v. CACI Int'l, Inc.,*
   No. 09-1335 (4th Cir. filed Jan 13, 2012)....................................................... *passim*

Brief for the United States as Amicus Curiae, *Carmichael v. Kellogg*
   *Brown & Root Servs., Inc.*, No. 09-683 (U.S. filed May 28, 2010)................................ *passim*

Brief for the United States as Amicus Curiae, *Saleh v. Titan Corp.*,
   No. 09-1313 (U.S. filed May 27, 2011).................................................................8, 9

Defendants KBR, Inc., Kellogg Brown & Root LLC, Kellogg Brown & Root Services, Inc., and Halliburton Company (hereinafter referred to as "Defendants" or "KBR") hereby file this memorandum in support of their renewed motion to dismiss the underlying complaints pursuant to Rule 12 of the Federal Rules of Civil Procedure (hereinafter "Motion").

## INTRODUCTION

At issue in this Motion is whether the judiciary is constitutionally empowered to scrutinize and second-guess, through the lens of state tort law, military decisions and conduct carried out inside the war theaters of Iraq and Afghanistan.  Since the Court's September 2010 opinion, jurisprudence surrounding battlefield contractor tort suits has evolved considerably.  At the core of this jurisprudence, which includes decisions by the Fourth Circuit and Supreme Court, and likewise central to two significant amicus briefs filed by the United States, is a single unifying principle that reframes the analysis and compels dismissal of Plaintiffs' claims:  In battlefield tort suits, in order to protect the paramount federal interests at stake, courts must look *beyond* narrow allegations of contractor misconduct—e.g., negligence, noncompliance, and unauthorized acts—and focus instead on broader threshold issues—i.e., separation of powers issues implicated by contractor's defenses, the battlefield context in which the claims arose, and the essential public function performed by the contractor.  More specifically:

- Analysis of the political question doctrine requires a court to consider not only a plaintiff's narrowly-tailored claims, but also the liability *defenses* that will be raised.

- Both the political question doctrine and combatant activities preemption can bar tort claims despite a lack of "plenary" or "direct" military control, including where a civilian contractor retained considerable discretion in carrying out the challenged conduct, as well as where plaintiffs allege, and can establish, that defendants actions were negligent, noncompliant, or unauthorized.

- Federal preemption precludes state tort claims against civilian contractors arising out of the U.S. military's wartime combatant activities if similar claims brought against the United States would come within the FTCA's combatant activities exception and if the alleged actions of the contractor occurred within the scope of its contractual relationship with the government.

- The government's immunity from suit should be extended to private contractors who perform public functions.

In addition to these significant legal developments, since the parties last briefed these issues the government released several reports which provide additional proof that the military's wartime decisions are intertwined with the claims and defenses in these suits. For example, the Department of Defense's Report to Congress in April 2010 confirmed that "the decision to use burn pits in deployed operations is *retained at the operational command level.*" A Government Accountability Office ("GAO") Report from October 2010 criticized the U.S. military's handling of waste management in Iraq, citing, among other things, the military's failure to implement alternatives to burn pits, such as incinerators and recycling programs.

These government reports bolster the already substantial record before the Court, which includes, among other things: seven declarations from high-ranking military and government officers; a variety of Army regulations governing contractors on the battlefield, waste management services, and water services; military bulletins and articles regarding burn pit operations; and over a thousand pages of LOGCAP III contractual documents pertinent to waste management and water services, attached as exhibits to this Motion. This record establishes that military decisions lie at the heart of Plaintiffs' claims, that such decisions would need to be evaluated and second-guessed in the resolution of KBR's liability defenses, and that KBR's performance of the challenged waste and water services was within the scope of its contractual obligations.

Importantly, controlling Fourth Circuit precedent confirms that KBR's defenses apply notwithstanding Plaintiffs' narrowly-tailored allegations of negligence and contractual noncompliance. Thus, the merits of Plaintiffs' claims are *not* at issue in this motion. The political question doctrine concerns only whether the Court *could* resolve the merits without offending separation of powers. Similarly, combatant activities preemption and derivative sovereign immunity focus on whether the application of state tort law standards to claims arising out of this battlefield context undermine important federal interests. Plaintiffs must show that trials of these cases will not offend separation of powers and that imposition of state tort law here will not conflict with important federal interests. Plaintiffs can do neither.

These lawsuits violate time-honored separation of powers principles and undermine important federal interests by seeking to regulate decisions and conduct carried out inside overseas war zones through the application of varying state tort law standards. Plaintiffs allege, for example, that KBR "negligently failed to design, manage, and operate burn pits in a safe manner." But what is a "safe" burn pit inside of a hostile war zone? Up until now, the answer to that question was to be determined by trained military commanders, the men and women who are vested by our system of government to make these complex and difficult decisions. Through these lawsuits, however, Plaintiffs seek to take such decisions away from military commanders and place them in the hands of judges and juries. If Plaintiffs prevail, determinations about "safety" inside of overseas war zones will be based upon the vagaries of each state's tort laws rather than the expertise and judgment of military commanders. The federal interest in avoiding such judicial interference with the military's wartime activities is overwhelming, and it underlies each of the defenses raised in this Motion.

# BACKGROUND

## I.   SIGNIFICANT LEGAL DEVELOPMENTS

On September 8, 2010, this Court denied, without prejudice, Defendants' motion to dismiss based on the political question doctrine, derivative sovereign immunity, and combatant activities preemption. *In re KBR, Inc.*, *Burn Pit Litig.*, 736 F. Supp. 2d 954 (D. Md. 2010). Since that time, the legal landscape concerning these three doctrines has evolved markedly. There have been significant case law developments in the Fourth Circuit and Supreme Court regarding the political question doctrine and derivative sovereign immunity, and the United States has clarified the scope of combatant activities preemption that is necessary to protect its important federal interests in wartime operations. All of these developments compel dismissal of this action.

### A.   *Taylor*

In *Taylor v. Kellogg Brown & Root Servs., Inc.,* 658 F.3d 402, 404 (4th Cir. 2011), a Navy Hospital Corpsman alleged that a KBR electrician negligently turned on a generator after being instructed by Marines not to do so, resulting in an electrical shock injury to plaintiff while he was installing an unauthorized backup generator at a Tank Ramp area. The Eastern District of Virginia dismissed the case based on the political question doctrine and combatant activities preemption. *Id.* at 406-07, 408 n.10. On appeal, the Fourth Circuit affirmed the dismissal based on the political question doctrine. *Id.* at 412. Significantly, the court found that "KBR was nearly insulated from direct military control" while performing the allegedly negligent maintenance, *id.* at 411, but the court held that resolution of KBR's defenses, including its defense that military decisions had caused the accident, raised political questions that were "beyond the scope of judicial review." *Id.* at 412. The Fourth Circuit held that its jurisdictional dismissal based on the political question doctrine rendered the issue of combatant activities

preemption moot; nevertheless, two judges wrote separate concurring opinions arguing that combatant activities preemption also barred the claims. *Id.* at 413.[1]

### B.     *Filarsky*

In *Filarsky v. Delia*, 132 S. Ct. 1657 (2012), the Supreme Court held that a private contractor retained by the government to carry out its work is entitled to share the government's immunity from suit.  The Court reasoned that extending governmental immunity to contractors was necessary "to avoid 'unwarranted timidity' in performance of public duties, ensur[e] that talented candidates are not deterred from public service, and prevent[] the harmful distractions from carrying out the work of government that can often accompany damages suits."  *Id.* at 1665.   The Court further explained that "[b]ecause government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity."  *Id.* at 1666.

### C.     *Al Shimari*

In *Al Shimari v. CACI*, No. 09-1335, 2012 WL 1656773 (4th Cir. May 11, 2012), the en banc Fourth Circuit held that it lacked collateral order jurisdiction to entertain appeals filed by military contractors under various theories of immunity and preemption, including derivative official immunity and combatant activities preemption.  Because it lacked jurisdiction over the appeals, the Fourth Circuit did not consider the merits of the contractors' immunity, preemption, or political question doctrine defenses.  *Id.*, at *58 n.3 ("we express no opinion as to the merits of

---

[1] Following a similar line of reasoning, the Fourth Circuit recently affirmed dismissal of a suit brought by an enemy combatant, exercising judicial restraint in the area of military affairs after finding that "judicial review of military decisions would stray from the traditional subjects of judicial competence."  *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012).  Further, the court found that responsibility for military governance was best left "to the branches most capable of addressing them and most accountable to the people for their choices."  *Id.* at 556.

any immunity asserted by the defendants"); *id.,* at *13 ("we are without pendant jurisdiction to further consider the appellants' contentions that plaintiffs' claims present nonjusticiable political questions").   The *Al Shimari* decision, therefore, does not define or limit the application of combatant activities preemption, nor does it contradict or undermine the Fourth Circuit's decision in *Taylor* regarding the merits and applicability of the political question doctrine; in fact, Judge King authored both decisions.

While the majority opinion suggested that the denial of a preemption claim "would not necessarily entail significant scrutiny of sensitive military issues," *id.,* at *9, Judge Wilkinson's extraordinary dissenting opinion sharply criticized the en banc majority's dismissal of the appeals, explaining that postponing review of the contractors' combatant activities preemption, political question, and other pretrial defenses "inflicts significant damage on the separation of powers, allowing civil tort suits to invade theatres of armed conflict heretofore the province of those branches of government constitutionally charged with safeguarding the nation's vital interests." *Id.,* at *14 (Wilkinson, J., dissenting).   Judge Wilkinson embraced the combatant activities exception as grounds for dismissal of the plaintiffs' claims, stating "[t]he exception's use of the term 'combatant activities' does not denote a narrow subset of military operations but a legislative intention to prevent tort from entering the battlefield." *Id.,* at *25.   Judge Niemeyer filed his own strong dissent, expressing his concern that "[t]o entertain the plaintiffs' claims would impose, for the first time, state tort duties onto an active war zone, raising a broad array of interferences by the judiciary into the military functions textually committed by our Constitution to Congress, the President, and the Executive Branch." *Id.,* at *57 (Neimeyer, J., dissenting).   As a result, he would have dismissed the suits under the political question doctrine for lack of subject matter jurisdiction. *Id.,* at *58.

D.      **Significant District Court Cases**

In addition to these controlling precedents, several district courts have recently dismissed battlefield tort claims against wartime contractors under combatant activities preemption and the political question doctrine.  In *Aiello v. Kellogg, Brown & Root Servs., Inc.,* 751 F. Supp. 2d 698, 715 (S.D.N.Y. 2011), a case arising out of KBR's performance of latrine maintenance services on a military base in Iraq under LOGCAP III, the court dismissed all claims based on combatant activities preemption (but found dismissal under the political question doctrine premature). Adopting the D.C. Circuit's test from *Saleh v. Titan Corp.,* 580 F.3d 1 (D.C. Cir. 2009), *cert. denied,* 131 S. Ct. 3055 (2011), the court held that "the design, operation and maintenance of basic life-support facilities at a forward operating base" constituted "combatant activity," and there was "no genuine dispute" that KBR's maintenance services were "integrated into the activities over which the military retained command authority." *Id.* at 713, 715.

In *Amedi v. BAE Sys., Inc.*, 782 F. Supp. 2d 1350 (N.D. Ga. 2011), a product defect and negligence suit arising out of a convoy accident in Iraq, the court followed *Carmichael v. Kellogg Brown & Root Servs., Inc.,* 572 F.3d 1271 (11th Cir. 2009), and held that the suit was barred by the political question doctrine.  The court rejected plaintiff's argument that the court could focus solely on the negligence of the defendant and avoid reviewing any military judgments, finding that political questions would arise because the defendant would "inevitably" question numerous military judgments in its defense and "[t]he fact that Plaintiff desires to assert liability only against the BAE Systems Defendants does not mean that these military decisions would not need to be considered by the court or the jury." *Id.* at 1356-57.

### E.   Briefs Submitted by the United States
###       Clarifying the Broad Scope of Combatant Activities Preemption

In amicus briefs submitted in connection with the *Saleh* petition for writ of certiorari and the *Al Shimari* rehearing en banc in the Fourth Circuit, the United States explained, first, that the scope of combatant activities preemption is broad, and second, why such broad preemption is essential to protect paramount federal interests.[2]

In *Saleh*, the United States opposed certiorari, noting that no circuit conflict existed and that any review by the Supreme Court should await further case law development.  In doing so, the United States agreed that the D.C. Circuit had "reasonably turned to the FTCA's combatant activities exception for guidance" regarding the "unique federal interests at issue," such as "avoiding unwarranted judicial second-guessing of sensitive judgments by military personnel and contractors with which they interact in combat-related activities, and ensuring that there are appropriate limits on private tort suits based on such activities."  Ex. B, Brief for the United States as Amicus Curiae, *Saleh v. Titan Corp.*, No. 09-1313 (U.S. filed May 27, 2011) (hereinafter "U.S. Br. (*Saleh*)") at 11-13.  But the United States went further, refining the framework for the application of combatant activities preemption.  After noting that the *Saleh* decision was in some ways "unclear and potentially problematic," *id*. at 11, the United States

---

[2] The United States also opposed certiorari in *Carmichael* in an amicus brief filed just before this Court heard oral argument on KBR's initial Motion to Dismiss.  *See* Ex. A, Brief for the United States as Amicus Curiae, *Carmichael v. Kellogg Brown & Root Servs., Inc.*, No. 09-683 (U.S. filed May 28, 2010) (hereinafter "U.S. Br. (*Carmichael*)").  In that brief, the United States explained that tort claims against military support contractors "directly implicate the interests of the United States," and the federal government has "significant interests in ensuring that sensitive military judgments are not subject to judicial second-guessing, in protecting soldiers and civilians from wartime injuries, and in making sure contractors are available and willing to provide the military with vital combat-related services."  *Id.* at 9.  Although the United States suggested that *Carmichael* "may have overlooked a narrower way of understanding [the plaintiffs'] claims," *id.* at 16-17, in *Taylor*—subsequently decided—the Fourth Circuit expressly rejected such a narrower way to construe claims.  658 F.3d at 410-11; *see infra* at 25-26.

clarified, first, its view that civilian contractors are not considered "combatants," *id*. at 15, and second, that application of the defense does not hinge on "whether the tortfeasor is himself engaging in a 'combatant activity,'" *id*. at 16.  Instead, the inquiry should focus more broadly—not on the contractor's conduct, but rather on whether the suit involves "claims 'arising out of' the *military's* combatant activities."  *Id*. (emphasis in original).

In *Al Shimari*, after again endorsing the rationale underlying *Saleh,* the United States further clarified the proper scope of preemption.  Ex. C, Brief for United States as Amicus Curiae, *Al Shimari v. CACI Int'l, Inc.,* No. 09-1335 (4th Cir. filed Jan 13, 2012) (hereinafter "U.S. Br. (*Al Shimari*)") at 15.  The United States noted that the FTCA's "reference to claims 'arising out of' the military's combatant activities is *purposefully broad*," and it asserted that the relevant inquiry should be "whether the conduct giving rise to the cause of action has its foundation in combatant activities of the U.S. armed forces."  *Id.* at 19 (emphasis added).  While agreeing with the *Saleh* underpinnings, the United States explained that the preemption test is even broader:

> [S]tate tort law claims against contractors are generally preempted if similar claims brought against the United States would come within the FTCA's combatant activities exception and if the alleged actions of the contractor and its personnel occurred within the scope of their contractual relationship with the government . . .

*Id.* at 2-3.  Under the United States' preemption formulation, the "scope of the contractual relationship" is extremely broad and includes "wrongful" and "negligent" conduct.  *Id.* at 20. State-law tort claims are generally preempted if the alleged conduct "was undertaken within the course of the contractors' work providing the [] services contracted for by the United States . . . even if an employee of a contractor allegedly violated the terms of the contract or took steps not specifically called for in the contract."  *Id.*  The only possible exception to the United States'

preemption rule is alleged torture, and even then the government suggested preemption may still apply. *Id*. at 3.

## II.     STATEMENT OF FACTS[3]

### A.     Waste Management in War Theaters is a Quintessential Military Responsibility Important to the Success of Military Operations

The management and disposal of waste generated in war theaters is a quintessential and longstanding responsibility of the U.S. military that is critically important to the success of military operations.  *See* Ex. D, *Long-Term Health Consequences of Exposure to Burn Pits in Iraq and Afghanistan,* Institute of Medicine (2011) (hereinafter "IOM Study") at 15 ("In past conflicts, poorly managed waste has contributed to the spread of infectious disease . . . [t]hus proper sanitation has been historically and remains today the most important issue driving military waste management practices"); *"One Stop" Waste Disposal* (*See* Ex. 1, Dkt. No. 21-3) at 3 ("Sound environmental management in contingency operations is an important facet of force protection.");     TB     Med     593     §     2-1,     *available     at* http://www.army.mil/usapa/med/DR_pubs/dr_a/pdf/tbmed593.pdf ("improper handling [of waste] can create dangerous working conditions . . . impede mission accomplishment, and cause irreparable harm to training areas").

Despite its importance to operational success, the military often relegates waste management expenditures to a lower priority than other wartime necessities due to the realities of war, including political and financial constraints.  *See* MNC-I Environmental Program SOP, May 24, 2006 (Ex. 12, Dkt. No. 21-14 (hereinafter "MNC-I SOP") at 3 ("During wartime, low

---

[3] KBR incorporates by reference as if fully contained herein the entire "Factual Background" section contained in KBR's original Motion to Dismiss and its exhibits.  References to exhibits previously submitted are identified by both the exhibit numbers and docket numbers.  Of note, exhibits to the original Motion to Dismiss were given number identifiers, whereas exhibits attached to this renewed Motion have letter identifiers.

intensity conflict, or peacemaking operations, environmental considerations *should always be subordinate* to operational requirements and force protection.") (emphasis added)); Declaration of Lieutenant Col. Jennifer Caci (Ex. 11, Dkt. No. 21-13 (hereinafter "Caci Decl.")) ¶¶ 2-3 (explaining that it took the U.S. Army some time to draft guidance for the management of waste in Iraq and Afghanistan because "such issues were not a top priority for the U.S. Army based on operational requirements"); *Solid Waste Generation Rates at Army Base Camps*, U.S. Army Corps of Engineers, Public Works Technical Bulletin 200-1-51 (April 1, 2008) (*See* Ex. 9, Dkt. No. 21-11) at A-1 ("When base camps are established in combat conditions, solid waste management has a very low priority.  Field-expedient measures of open dumping, burying, and limited burning of solid waste are the standard practice of Army units on the move, and these practices continue in the initial base camp phases until the local threat level is low enough to allow units to address solid waste management as a general health and sanitation requirement.").

### B.     The U.S. Military Determined Which Method of Waste Disposal to Use at All Military Bases Across Iraq and Afghanistan

Only the U.S. military has the authority to decide which method of waste disposal to use at military base camps throughout Iraq and Afghanistan, and these decisions are made by military commanders on the ground, *not* by defense contractors such as KBR.   *See* Ex. E, April 28, 2010 DoD Report to Congress on the Use of Open-Air Burn Pits (hereinafter "DoD Report") at 4-5 ("the decision to use burn pits in deployed operations is *retained at operational command level*") (emphasis added); Declaration of Dr. Craig Postlewaite (Ex. 8, Dkt. No. 21-10 (hereinafter "Postlewaite Decl.")) ¶ 4 ("the U.S. military, as a matter of policy and doctrine, decides which method of waste disposal, e.g., burn pits or incinerators, to use at military camps in such war theaters, including Iraq and Afghanistan."); Caci Decl. ¶ 4 ("[T]he U.S. Army decided which methods of waste disposal to use at military base camps."); Declaration of Major

11

Tara Hall (Ex. 6, Dkt. No. 21-8 (hereinafter "Hall Decl.")) ¶ 3 ("[T]he Army decided which method of waste disposal to use at military bases in Iraq.  KBR did not decide which methods of waste disposal were appropriate in the contingency environment of Iraq.").

The military selects the method of waste disposal based on the realities of each war theater, balancing concerns for soldier health and the environment against a variety of strategic, tactical, financial, and political considerations.  *See, e.g.,* Postlewaite Decl. ¶ 4 ("The decision regarding which method of waste disposal to use is made by military commanders, after taking into account the feasibility as well as risks and benefits associated with each option and the particular circumstances at a given base camp.").  Although the military strives to use alternatives to open pit burning, in Iraq and Afghanistan the military concluded that burn pits were the only viable option for waste disposal on many base camps.  *See* Force Health Protection and Readiness, Deployment Health & Family Readiness Library, Burning Trash and Human Waste Exposures, (July 1, 2008) (*See* Ex. 13, Dkt. No. 21-15) at 1 ("While open burning of trash and human waste is the least preferred method of disposal, *it may be necessary*, because other options, such as trash hauling, incineration, sewage disposal and treatment, or use of a landfill are not readily available during deployment operations") (emphasis added); Ex. F, U.S. Gov't Accountability Office, GAO-11-63, Afghanistan and Iraq: DoD Should Improve Adherence on Its Guidance on Open Pit Burning and Solid Waste Management (October 2010) (hereinafter "GAO Report") at 26 ("CENTCOM officials said that it is often easier to burn waste than to implement an efficient recycling program").

For example, incinerators were often not a viable option because of funding constraints, lengthy acquisition and installation processes, and political considerations.  *See* Ex. F, GAO Report at 27 ("DOD officials reported challenges using incinerators in Afghanistan and Iraq,

stating that incinerators were expensive and posed acquisition, logistical, and operational challenges."); Ex. D, IOM Study at 16 ("Incinerators . . . are relatively expensive in terms of both human labor [] and upfront investment in equipment.  As a result, incinerators are often considered impractical for use in rapidly changing combat situations."); Hall Decl. ¶ 5 ("incinerators were not a viable option at many bases in Iraq because of the lengthy lead time and great expense"); Public Works Technical Bulletin 200-1-51 (*See* Ex. 9, Dkt. No. 21-11) ("[I]n many wartime situations, a military unit has no idea whether they will occupy a given base camp for 1 week, 1 month, or 6 months.  This sense of nonpermanence impacts priorities and actions relating to solid waste management").  In fact, in 2005 the Department of Defense suspended construction of incinerators purchased by the military between 2003 and 2005, which "led to incinerators remaining uninstalled at bases in Iraq for approximately 5 years, until March 2010 when the USF-I engineer command ordered the installation of the 11 incinerators by July 2010." Ex. F, GAO Report at 27.

Despite the military's preference for alternative waste disposal methods, burn pits are an inescapable reality of overseas combat operations, and they will remain so for the foreseeable future.  General Petraeus reaffirmed this point in 2008, stating that "[t]here is and will continue to be a need for burn pits during contingency operations."  Letter from David H. Petraeus, General, U.S. Army, to the Honorable Russell D. Feingold, U.S. Senator (Dec. 4, 2008) (Ex. 3, Dkt. No. 21-5 (hereinafter "2008 Petraeus Letter")).  And in April 2010, the Department of Defense explained to Congress that "during military operations, open-air burning will be the safest (from a total threat standpoint), most effective, and expedient manner of solid waste

reduction until current research and development efforts produce efficient, reliable, and deployable technology to support sustainable operations."  Ex. E, DoD Report at 3.[4]

### C.      The U.S. Military Determined the Location of Burn Pits and the Items that Could be Disposed of in Burn Pits

The U.S. military's control over battlefield waste management and disposal did not end at its decision to use burn pits.  The military also decided where to locate burn pits within a base camp and which items could be disposed of in a burn pit.  Declaration of Gerald Vincent (Ex. 7, Dkt. No. 21-9 (hereinafter "Vincent Decl.")) ¶ 9 ("The Garrison Commander or Mayor Cell is in charge of siting burn pits and incinerators, as well as living quarters, dining facilities, etc."); Postlewaite Decl. ¶¶ 5, 6; Caci Decl. ¶ 6.

The military's decision regarding where to locate burn pits was significant because the relative locations, distances, and wind directions between burn pits and living and working facilities dramatically affected the extent of burn pit smoke exposures.  *See* Postlewaite Decl. ¶ 5 ("While the military prefers to locate burn pits downwind and away from living quarters, sometimes the conditions on the ground dictated locating burn pits upwind.").  *Cf. Callue* Am. Compl. ¶ 40 (alleging that smoke from the burn pits disturbed the "*nearby* living quarters of American soldiers and contractors accompanying the force") (emphasis added).  "As base camp populations grew larger, military and contractor personnel may have ended up living closer to

---

[4] In order to comply with Section 317 of the National Defense Authorization Act of 2010, the Department of Defense directed that burn pits throughout Iraq close by December 31, 2010. Fragmentary Order ("FRAGO") 2193 (attached hereto as Exhibit G), relates to this effort and provides further evidence that only the military can choose the method of battlefield waste disposal and direct the construction and installation of landfills and incinerators.  For example, this FRAGO directs the military to, among other things:  designate areas within base camps for landfills and incinerators; to "provide appropriate direction to, support for and oversight of LOGCAP in the design, construction, operation and maintenance of the landfill[s];" and, to accept incinerators moved from other base camps and "direct KBR to prioritize [] incinerator installation as their number one construction project."  *Id.* at 1.

burn pits than was originally intended by the military."  Caci Decl. ¶ 6.  Nonetheless, only the

military could make the decision to re-locate a burn pit; defense contractors like KBR have no

authority to re-locate burn pits.  *Id.* ("Decisions to relocate burn pits were made by the

military…"); *see also* 2008 Petraeus Letter ("much effort has gone into locating/relocating burn

pits in remote areas of the operating bases to minimize exposure").  As an illustration of the

military's authority to locate and re-locate burn pits, Lieutenant Colonel Caci explained in her

sworn declaration:

> For example, the burn pit at Bagram Air Force Base in Afghanistan
> was located at the end of an air strip.  The food waste placed in the
> burn pit attracted rodents, which in turn, and in combination with
> the smoke from this burn pit, attracted a lot of birds.  One time, a
> F-15 military jet lost an engine due to a bird strike.  Even after this
> incident, the military decided not to relocate the burn pit because
> Bagram was a growing base and there were competing priorities
> for land use (e.g., housing for soldiers took priority over garbage
> burning).

Caci Decl. ¶ 7.

The military also directed which substances could or could not be disposed of in a burn

pit, and these military decisions were influenced by the realities of the contingency environment.

Postlewaite Decl. ¶ 6.  The military listed the items that could not be disposed of in burn pits,

i.e., the "prohibited items," in the MNC-I SOP.  Vincent Decl. ¶ 10.  If an item was not

specifically prohibited, then the military allowed it to be burned.  *Id.*  For example, the military

authorized the disposal of plastic water bottles in burn pits because military and contractor

personnel go through enormous quantities of water bottles each day and there are typically no

viable alternatives for disposal, such as recycling.[5]  *Id.*; Postlewaite Decl. ¶ 6; *see also* Caci Decl.

_____

[5] As noted in the GAO Report, the military's guidance regarding prohibited items changed in
2009. Ex. F, GAO Report at Highlights of Report.  As explained by the GAO, however, KBR's
contract with the military was still governed by the prior MNC-I guidance from 2006, which
allowed for burning of plastics.  ("The continued burning of prohibited items has resulted from a

¶ 8 ("Despite concerns about the burn pit smoke and emissions, at bases throughout Iraq and Afghanistan it was necessary to burn plastics in burn pits because of the large volume of plastic bottles used by military and contractor personnel each day and the lack of available alternatives (e.g., recycling).").  "Although disposing of certain substances in burn pits may not be ideal from a health standpoint, on an installation in a hostile environment in wartime, there may not be any other viable options for waste disposal."  Postlewaite Decl. ¶ 6.

In addition to creating a list of prohibited items, the military sometimes directed KBR to burn certain items in burn pits.  *See* Declaration of Master Sergeant Lawrence Werts (Ex. 17, Dkt. No. 21-19 (hereinafter "Werts Decl.")) ¶ 6 ("[T]he Army provided specific instructions to KBR regarding what it could burn.").  These directions to KBR were often memorialized in writing in Letters of Technical Direction ("LOTD") from the Administrative Contracting Officer for the Defense Contract Management Agency.  *See* LOTD L05-89-C5-10, Taji Burn Pit Operations (July 6, 2005) (Ex. 18, Dkt. No. 21-20).  For example, at Camp Taji in Iraq, the Army determined that it was necessary to burn dead animal carcasses in the burn pit rather than bury them, so the Army required KBR to accept and burn animal carcasses in the burn pit.  *Id.* at Attach. 1, Dep't of the Army Memo for KBR, Burn Pit (June 23, 2005).

**D.    The U.S. Military Exercises Exclusive Responsibility Over Environmental, Health, and Safety Practices in Iraq and Afghanistan**

The military is responsible for providing wartime environmental, health, and safety policies and guidance.[6]  The military's policies and decisions about waste management and

---

number of factors, including the constraints of combat operations, resource limitations, and *contracts with burn pit operators that do not reflect current guidance.*") *Id.* (emphasis added).

[6] The GAO was very critical of the military's failure to promulgate comprehensive burn pit guidance until 2009 "despite the military's reliance on burn pits since the beginning of the wars in Iraq and Afghanistan."  Ex. F, GAO Report at Highlights of Report; *see also id.* at 10 ("Although DOD has long recognized the dangers of open pit burning . . . CENTCOM and its

disposal in the war theaters of Iraq and Afghanistan are guided by a variety of regulations, DOD Instructions, Fragmentary Orders ("FRAGOs"), and international laws.  For example, in Iraq, the MNC-I SOP bestows on the MNC-I Commander the following responsibilities:  ensuring that all MNC-I personnel comply with applicable environmental SOPs, Army Regulations, DOD Instructions, FRAGOs, and applicable environmental laws; establishing a theater-wide environmental policy in accordance with US Central Command ("CENTCOM") and Multi-National Force-Iraq ("MNF-I") guidance; and coordinating with the MNC-I Surgeon to conduct health-related environmental surveys, addressing issues such as air quality, solid waste disposal, and hazardous waste management.  MNC-I SOP at 4.

Likewise, the military is responsible for evaluating the effects of workplace and environmental hazards on deployed personnel.  "According to DOD guidance, it is the military's responsibility to document and evaluate occupational and environmental health hazards during deployments, which includes accomplishing specific health surveillance activities before, during, and after deployments."  Ex. F, GAO Report at 40; *see also* Postlewaite Decl. ¶ 2 ("my office oversees air, water, and soil testing at base camps to determine whether there are any exposure issues that need to be addressed from a policy or oversight perspective"); Declaration of Major Sueann O. Ramsey (*See* Ex. 19, Dkt. No. 21-21 (hereinafter "Ramsey Decl.")) ¶ 4 ("I was engaged in the oversight of both water quality operations and effects of burn pit operations in Iraq").  To this end, the military routinely conducted health and environmental assessments at military bases in Iraq and Afghanistan to assess potential environmental hazards and to ensure

---

subordinate commands did not provide comprehensive instructions on managing and operating burn pits or minimizing these dangers until 2009."); Ex. D, IOM Study at 18 ("When military operations began in Afghanistan in 2001 and Iraq in 2003, there were no regulations governing the use of burn pits in overseas combat operations.  An Overseas Environmental Baseline Guidance Document (DOD 2007) did offer guidance . . . but this document excluded "contingency operations" and thus was not enforceable . . .").

the health and safety of military and contractor personnel in theater.  Hall Decl. ¶ 6 ("[I]t is the Army's responsibility to conduct health assessments of Service Members at military bases in Iraq and to assess potential health risks to Army personnel from exposure to smoke from burn pits and other potential environmental hazards.").[7]

### E.      The U.S. Military Controls Water Operations in War Theaters

Like the management and disposal of battlefield waste, the production and distribution of water for dining, medical, and hygienic uses is an essential function of the U.S. military in every contingency operation.  *See* Technical Bulletin Medical 577 ("TB Med 577") § 2-2, *available at* http://www.army.mil/usapa/med/DR_pubs/dr_a/pdf/tbmed577.pdf ("The water support mission is a key component of sustaining forces on the battlefield.").  The military has exclusive oversight and responsibility for water operations in Iraq and Afghanistan, regardless of whether the water is produced and distributed by the military or by a civilian contractor.  *Preventive Medicine*, Army Regulation 40-5 (May 25, 2007), *available at* http://www.army.mil/USAPA/epubs/pdf/r40_5.pdf; *see also Preventive Medicine*, Army Pamphlet 40-11 (July 22, 2005) ("DA PAM 40-11"), *available at* http://www.apd.army.mil/pdffiles/p40_11.pdf.

To this end, the Army provided instructions, regulations, and guidance regarding the

---

[7] USACHPPM and Army Preventive Medicine initiated a comprehensive air monitoring and surveillance program in Iraq and Afghanistan aimed at monitoring exposures to burn pit emissions.  Ramsey Decl. ¶ 8; Hall Decl. ¶ 7; Declaration of Col. Steven Swann (Ex. 20, Dkt. No. 21-22) (hereinafter "Swann Decl.") ¶ 7.  For instance, "[i]n 2008, the military initiated a comprehensive health risk assessment regarding the burn pit at Joint Base Balad, the largest burn pit in the Iraqi theater."  Postlewaite Decl. ¶ 8.  This health risk assessment, which utilized US EPA guidance and military risk assessment methodology, concluded that "long-term health effects are not expected to occur from breathing the smoke at JBB."   USACHPPM, Readiness thru Health, U.S. Army Center for Health Promotion and Preventive Medicine, "*Just the Facts… Balad Burn Pit*," 47-002-1208 (*see* Ex. 21, Dkt. No. 21-23); *see also* Postlewaite Decl. ¶ 8.  These conclusions "were validated by the Defense Health Board (DHB)."  *Id.*

production, testing, distribution, and surveillance of potable and nonpotable water in Iraq and Afghanistan. *See* TB Med 577; Ramsey Decl. ¶ 5 ("MNC-I policies provided detailed specifications for military and contractor personnel who were authorized to provide water services in Iraq."). Army regulations, including TB Med 577, set forth the standards and testing methodologies that governed water operations in war theaters. *See id.* In addition, the Army provided interpretive guidance in theater regarding what the governing regulations required in particular circumstances. *See id.*; Swann Decl., Attach. 1, Clarification of Specifications for Water Production and Testing in Iraq.

As detailed in TB Med 577, Army Preventive Medicine personnel directly supervised the production, testing, and distribution of potable and nonpotable water in Iraq and Afghanistan. *See also* Ramsey Decl. ¶ 5 ("The military had oversight over the provision of water services at base camps within Iraq."); Hall Decl. ¶ 11 (same). In this supervisory role, Army Preventive Medicine personnel required, and regularly conducted, routine surveillance of the water at base camps to ensure the health and safety of base camp populations. Hall Decl. ¶ 11. This surveillance included frequent sampling and testing of water "to ensure the water was safe for human uses." *Id.* The only water that the Army did not test was water designated as "nonpotable for non-human uses." *Id*. The Army was also responsible for certifying the safety and effectiveness of Reverse Osmosis Water Purification Units ("ROWPUs"). *Id.* ¶ 12. ROWPUs were used by the Army and civilian contractors to produce potable water by filtering and treating a variety of raw water sources, e.g., rivers and wells. *Id.* The Army routinely certified and inspected ROWPUs to ensure safety and sanitation. *Id.*

F.      **The U.S. Military Directed KBR to Implement the Military's Waste Management and Water Decisions at Certain Bases in Iraq and Afghanistan**

In 1985, the United States Army issued regulations that authorize the use of civilian contractors to provide selected services in wartime to "release military units for other missions or [to] fill shortfalls."  *See* "Logistics Civil Augmentation Program (LOGCAP)," Army Regulation 700-137 (16 December 1985) ("AR 700-137"), § 1.1 (Ex. 4, Dkt. No. 21-6).  As a result, contractors provide mission-critical services, such as battlefield waste disposal, that were previously provided by military engineering and combat units.  *Id.*  "This force-multiplier effect permits the combatant commander to have sufficient support in the theater, while strengthening the joint force's fighting capability." Army Field Manual FM 3-100.21 "Contractors on the Battlefield," (January 2003) (Ex. 5, Dkt. No. 21-7 (hereinafter "Contractors on the Battlefield")) at 1-3.

In December 2001, KBR competitively bid for and was awarded Contract No. DAAA09-02-D-0007; *see* Ex. H, December 2001 LOGCAP III Basic Contract, No. DAAA09-02-D-0007 (hereinafter "LOGCAP III contract").  Under LOGCAP III, KBR performs numerous essential services to support the U.S. military's missions in Iraq, Afghanistan, and other countries throughout the world.  The LOGCAP III contract is an indefinite-delivery, indefinite-quantity umbrella contract, and the military assigns specific work requirements under this contract through the issuance of Task Orders ("TOs").  In addition, the military issues ACLs and LOTDs to provide further direction and detailed instructions about the performance of work under each Task Order.  *See*, *e.g.*, ACL KBR 08-139Y-C5-1042 Ton Incinerator Project (Ex. 16, Dkt. No. 21-18).  The Task Orders each contain a detailed Statement of Work ("SOW") in which the military specifies the services that KBR is to provide, including, for example, transportation

(e.g., military convoys), site preparation, construction, dining facilities operation, non-drinking water, showers, laundry, warehousing, and waste disposal.

Attached as exhibits to this Motion are Task Orders and associated SOWs in which the U.S. military delineates, among other things, requirements related to burn pit and water services that are the subject of Plaintiffs' allegations.  *See* Exs. I – T, Iraq Task Orders 59, 89, 139, 159, and Afghanistan Task Orders 13, 14, 97, 98, 113, 116, 118, and 145.  These SOWs define the scope of the relevant KBR services in Iraq and Afghanistan.[8]

The military utilized KBR to provide these essential support services *only* at certain bases; at other bases, the military utilized other contractors or its own personnel to provide these services.  *See* Ex. E, DoD Report at 5 ("*the majority of burn pits are operated by troops*, detailed to the task, as LOGCAP does not service all bases.") (emphasis added); Ex. F, GAO Report at 1 ("According to DOD, the oversight and operation of burn pits varies substantially across installations, with waste management decisions made largely by base commanders and carried out by military personnel, contractors, or a combination.").[9]

---

[8] The attached contract materials include the base LOGCAP III contract (Ex. H) followed by separate Task Orders with associated SOWs (Exhibits I through T).  The SOWs are quite voluminous and largely address services that are not at issue in these lawsuits.  In order to facilitate the Court's review of these substantial contract materials, attached are two summary charts that include excerpts of SOW provisions pertaining to burn pit services (attached hereto as Exhibit U) and water services (attached hereto as Exhibit V).  The military periodically amended the SOWs associated with each Task Order.  The SOWs attached are the most recent versions, through June 2009, for sites identified in one or more complaints at which KBR performed the relevant services.

[9] For example, at Joint Base Balad, the U.S. military chose to utilize burn pits for waste disposal, but the military never tasked KBR to manage those burn pit operations.  *See* Defs.' Offer of Proof Regarding the Design and Operation of the Burn Pit at Joint Base Balad, Dkt. No. 148; Hall Decl. ¶ 9; Vincent Decl. ¶ 11.  The fact that KBR did not operate the burn pit at Joint Base Balad is significant because over 50% of Plaintiffs allege exposure to the burn pit at that base.

Accordingly, at bases throughout the war theaters, decisions on whether to use burn pits and then whether to task KBR, another defense contractor, or its own personnel with managing those burn pits were made solely by U.S. military personnel.  Where the military tasked KBR to provide waste management and water services, KBR performed these functions according to Army regulations, DOD instructions, and specific guidance from the U.S. Military (e.g., LOTDs, ACLs, etc.).[10]

## STANDARD OF REVIEW

KBR's Motion to Dismiss is a factual challenge to subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and Plaintiffs bear the burden of establishing jurisdiction.  *See In re KBR, Inc., Burn Pit Litig.,* 736 F. Supp. 2d at 957*; Taylor,* 658 F.3d at 404; *Smith v. Reagan*, 844 F.2d 195, 196 (4th Cir. 1988) (noting defendant's motion to dismiss based on the political question doctrine was "for lack of subject matter jurisdiction" and holding case was non-justiciable); *Hawes v. U.S.*, 409 F.3d 213 (4th Cir. 2005) (affirming 12(b)(1) dismissal of claim against U.S. where conduct at issue fell within discretionary function exception to FTCA); *Williams v. U.S.*, 50 F.3d 299, 305 (4th Cir. 1995) ("The federal courts

---

[10] *See generally Contractors Accompanying the Force,* Army Regulation 715-9, (Oct. 29, 1999) (Ex. 23, Dkt. No. 21-25) (hereinafter "AR 715-9") § 1-1 at 4 (establishing "Department of the Army policies, responsibilities, and procedures for using contractors on the battlefield, and specifically addresses planning for acquiring and administering commercial support services on the battlefield").  The military regulations make clear that KBR answered to the military and was expected to abide by military orders, policies, and requirements.  *See id.* § 3-2(f) at 14.  In the event that military orders are violated, Army Regulation 715-9 gives the military the authority to "limit access to facilities and/or revoke any special status a contractor employee has as an individual accompanying the force," and to "demand that the contractor replace the individual." *Id*. *Cf. Al Shimari*, 2012 WL 1656773, at *31 (Wilkinson, dissenting) ("it is silly to think that without tort suits, military contractors will simply be wandering around war zones unsupervised").

have held consistently that they lack subject matter jurisdiction if the discretionary function exception bars the suit.").[11]

In a factual challenge to subject matter jurisdiction, unlike a motion under Rule 12(b)(6), Plaintiffs' bare factual allegations are not entitled to deference and courts may look beyond the pleadings and consider affidavits, declarations, and other outside materials.  *See Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004) ("Generally, when a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."); *see also Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) ("When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. . . . In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion."); *Amedi*, 782 F. Supp. 2d at 1351 ("Because Defendants make a factual attack on the subject-matter jurisdiction of the court, the court is permitted to review facts outside of the complaint and need not view those facts in the light most favorable to Plaintiff."); *accord Getz v. Boeing Co.*, No. 07-6396, 2008 WL 2705099, at *4 (N.D. Cal. July 8, 2008), *cert. denied,* 132 S. Ct. 1582 (2012) ("Plaintiffs argue that the Court should dismiss their claims only if Defendants establish that there are no material facts in dispute. This standard, however, cannot be applied to a political question dispute. . . .  Because Plaintiffs' proposed procedure would require the Court to evaluate any disputed evidence at trial, its adoption could result in the Court reviewing nonjusticiable claims.").  In fact, a court "is free

---

[11] Although the Court suggested that KBR's motion was a facial attack on subject matter jurisdiction, *In re KBR, Inc., Burn Pit Litig.,* 736 F. Supp. 2d at 957, it is a factual attack because KBR has introduced evidence outside the complaint challenging the factual predicate for the Court's subject matter jurisdiction.

to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Anderson v. United States*, Civil No. CCB-08-3, 2010 WL 1346409, at *2 (D. Md. Mar. 30, 2010) (quoting *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995)) (granting motion to dismiss complaint under the FTCA); *see also Kim v. United States*, 609 F. Supp. 2d 499, 504 (D. Md. 2009) (same).

In practical terms, this means that Plaintiffs cannot defeat this Motion simply by disputing facts and arguing that KBR acted negligently, improperly, or in violation of its contract. Any such disputed facts and allegations are immaterial. Instead, this Court must weigh the jurisdictional evidence necessary to resolve the following question: Can this case can be fully resolved without offending separation of powers or intruding upon the strong federal interest in letting military commanders control conduct on a battlefield?

## ARGUMENT

## I.    THESE SUITS ARE BARRED BY THE POLITICAL QUESTION DOCTRINE

The political question doctrine recognizes both the constitutional separation of powers among the branches of the federal government as well as the inherent limitations of the judiciary. *See Tiffany v. United States*, 931 F.2d 271, 276 (4th Cir. 1991). In *Baker v. Carr*, the Supreme Court set forth six independent guidelines for the existence of a political question outside the proper scope of review of the federal judiciary: (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing a lack of the respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from

multifarious pronouncements by various departments on one question.   369 U.S. 186, 217

(1962).  Here, the first, second, and fourth factors are most applicable.  *See Taylor*, 658 F.3d at

408.

A.      *Taylor* **Confirms that Dismissal is Required**
           **Where a Contractor's Liability Defenses Would Raise Political Questions**

In *Taylor*, the Fourth Circuit confirmed that the analysis of the political question doctrine

requires a court to consider not only a plaintiff's claims but also the liability *defenses* that a

defendant will raise.   The plaintiff in *Taylor* alleged that KBR negligently performed its duties

under the LOGCAP III contract in Iraq.  658 F.3d at 404.  In considering the political question

doctrine, the *Taylor* court *assumed* that a KBR employee acted contrary to military orders not to

turn on a generator.    *Id.*    Notwithstanding the assumption of contractor negligence and

noncompliance, the Fourth Circuit held that the suit was barred by the political question doctrine

because *KBR's liability defenses—i.e., that wartime military decisions caused the accident—*

*would require the court to evaluate the reasonableness of military decisions, and under*

*separation of power principles the court lacks the authority and competence to do so.  Id.* at 411-

12; *see also id.* at 409 (finding that it was "obliged" to look beyond the complaint and consider

how KBR would defend itself at trial) (citing *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir.

2008) and *Carmichael*, 572 F.3d at 1292).  *Taylor* thus clarifies that the critical inquiry under the

political question doctrine is not whether a contractor acted negligently or performed an

unauthorized act; it is whether courts would be required to conduct impermissible evaluations of

wartime military decisions in the *resolution of the case*, including consideration of a contractor's

liability defenses.

In addition, the Fourth Circuit emphasized that military decisions regarding how to

configure and maintain a military base inside a war zone are plainly committed to the political

branches and therefore non-justiciable.   In particular, the court noted that there were "no discoverable and manageable standards for evaluating how electric power is supplied to a military base in a combat theatre or who should be authorized to work on the generators supplying that power," and that "any such judicial assessment thereof would show a lack of respect for the executive branch."   *Id.* at 412 n.13.

  **B.**  **These Cases Must be Dismissed Under *Taylor***

    1.  The Court Could Not Resolve KBR's Liability Defenses
       Without Encountering Non-Justiciable Political Questions

  The Fourth Circuit's decision in *Taylor* compels dismissal of these cases.   Here, as in *Taylor*, KBR will defend itself by asserting that military decisions and conduct *caused* Plaintiffs' injuries.[12]   In fact, by virtue of Plaintiffs' allegations, military decisions are even more directly implicated in this case.   For example, Plaintiffs allege that the decisions to use burn pits and locate such burn pits in close proximity to living facilities were negligent and caused their injuries.   *See, e.g.*, Metzgar Compl. ¶ 36, Jobes Compl. ¶ 39.   In its defense KBR will assert that these allegedly negligent decisions—decisions that form the backbone of Plaintiffs' entire case— were made by the military, not KBR.   *See supra* at 11-15; *cf. In re: KBR Inc,. Burn Pit Litig.*, 736 F. Supp. 2d at 960 (finding that "the first *Baker* factor may preclude a plaintiff from suing for injuries in a war zone where the alleged wrongs stemmed from the military's strategic and tactical decisions…").   Accordingly, in assessing KBR's liability defense, the Court would be

---

[12] KBR actually has two causation defenses in this suit:  (1) proximate causation and (2) medical causation.   For purposes of this motion, however, the Court need only consider KBR's defense on proximate, i.e., factual causation because that is the defense that runs afoul of the political question doctrine.   Nonetheless, it is worth noting that Plaintiffs' will have a very hard time proving that their injuries were caused by exposure to burn pits as opposed to other environmental exposures in Iraq and Afghanistan.   *See, e.g.,* Ex. D, IOM Study at 7 (IOM committee was unable to determine whether long term health effects were likely to result from exposure to burn pit emissions at Balad and noted that environments in Iraq and Afghanistan are full of particulate matter unrelated to burn pits).

"obliged to evaluate military decisions" and determine whether such decisions caused or contributed to Plaintiffs' alleged injuries.  Under *Taylor*, such evaluations and determinations are plainly beyond the scope of judicial review.[13]  *Taylor*, 658 F.3d at 412.

The substantial record before this Court is replete with evidence, including military declarations and government documents, that supports KBR's liability defense that Plaintiffs' alleged injuries were caused by military decisions and conduct, not by KBR.  For example, the record supports KBR's assertions that:  (1) the military directed KBR to use burn pits; (2) the military determined the locations of the burn pits; and (3) the military determined which items could and could not be disposed of inside of burn pits.  *See supra* at 11-15; *see also Carmichael*, 572 F.3d at 1286 ("in litigating the suit, KBR would inevitably (and not without substantial evidential foundation) try to show that unsound military judgments and policies . . . were either supervening or concurrent causes . . .").

The military decisions and policies that KBR will argue caused Plaintiffs' injuries relate to the military's management of battlefield waste and water on bases located in hostile war zones.  These decisions are inherently non-justiciable political questions constitutionally committed to the political branches, thus implicating the first *Baker* factor.  *See Carmichael*, 572 F.3d at 1281 ("There can be little doubt that military judgments generally fall into this category").  Judicial review of such matters would supplant the authority of the Executive Branch to oversee military operations by applying varying state tort standards of care to govern

---

[13] The fact that KBR *implemented* these military decisions at certain bases and, therefore, exercised some degree of "control" over the burn pits is immaterial and does not preclude KBR from asserting that military decisions caused plaintiffs' injuries.  *See Carmichael*, 572 F.3d at 1284-85 (noting that the fact the KBR driver "had physical control over his tanker does not change the fact that he was operating at all times under orders and determinations made by the military . . .  [i]ndeed, any defense mounted by KBR or Irvine would undoubtedly cite the military's orders as the reason why Irvine did not reduce his speed.").

conduct inside of overseas war zones—a clear violation of separation of powers principles.  *See Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).

In addition to the first *Baker* factor, *Taylor* also requires dismissal of these claims under the second *Baker* factor because these military decisions cannot be measured against any judicially discoverable or manageable standards of care.  *Taylor*, 658 F.3d at 412 n.13; *see also Gilligan,* 413 U.S. at 10  ("it is difficult to conceive of an area of governmental activity in which the courts have less competence.  The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments . . . ."); *Tozer v. LTV Corp.*, 792 F.2d 403, 406 (4th Cir. 1986) ("Difficult choices, trade-offs, and compromises inhere in military planning that simply find no analogue in civilian life.").  The military decisions at issue here involved judgments about security threats, budgetary and resource limitations, time constraints, base longevity, and political considerations, among others.  *See supra* at 11-15; *see also* Vincent decl. ¶ 7.  This Court lacks standards with which to judge whether the military acted reasonably in formulating and executing these policies and decisions, and, further, "any such judicial assessment thereof would show a lack of respect for the executive branch."  *Taylor*, 658 F.3d at 412 n.13; *cf.* Postlewaite Decl. ¶ 10 ("Military commanders are often asked to assume some risk to prevent a greater risk, and the continued use of burn pits reflects a policy determination by military commanders, after weighing the available options and considering conditions on the ground, that exposure to burn pit smoke is less risky than alternatives…").

Likewise, the Court lacks standards with which to judge whether KBR acted reasonably in responding to the military's directions on such issues in the midst of the ongoing wars.  *See Carmichael*, 572 F.3d at 1289 ("The question here is not just what a reasonable [contractor]

would do—it is what a reasonable [contractor] in a combat zone, subject to military regulations and orders, would do.") (quoting *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277, 1282 (M.D. Ga. 2006)).  For example, Plaintiffs allege that KBR "negligently failed to design, manage, and operate the burn pits in a safe manner," *see, e.g.*, Jobes Compl. ¶ 77, which could require 55 different trial judges, relying on the varying tort standards of 42 different states,[14] to determine exactly how the military and its contractors should operate burn pits inside of an active war zone in order to make them "safe."  But what does "safe" mean inside of a war zone?  Such determinations are properly left to military commanders—highly trained men and women who are vested by our system of government to make these complex and difficult decisions.  *See Tiffany*, 931 F.2d at 278 ("Not only do courts lack the expertise to evaluate military tactics, but they will often be without knowledge of the facts or standards upon which military decisions have been based."); *Al Shimari*, 2012 WL 1656773, at *15 (Wilkinson, dissenting) ("caution that may be well-advised in a civilian context may not translate neatly to a military setting, where the calculus is different, and stakes run high").

        2.        Under *Taylor*, Plaintiffs Cannot Circumvent
                      Political Questions Through Allegations of Negligence or Noncompliance

Plaintiffs will argue that this case does not raise political questions because the Court can focus solely on the allegedly negligent and/or noncompliant actions of KBR without passing judgment on the actions or decisions of the military.  The plaintiff in *Taylor* made the same exact argument, and it was soundly rejected by the Fourth Circuit.  *Taylor*, 658 F.3d at 410-11 (finding that the district court "correctly recognized that Taylor's negligence claim could not be viewed in isolation"); *see also Carmichael*, 572 F.3d at 1285-86 (same argument rejected by Eleventh Circuit).

---

[14] By KBR's count, there are currently 55 cases in this MDL, originating in 42 states.

Based on new controlling precedent, it is irrelevant to resolving this motion whether or not Plaintiffs could establish that KBR acted negligently, performed in an unauthorized manner, or otherwise breached its contract.  In *Taylor*, the Fourth Circuit held that evidence of contractor negligence and noncompliance was immaterial to the determination of whether resolution of the case would raise political questions.  658 F.3d at 411-12.  In fact, the Fourth Circuit assumed that a KBR electrician turned on a generator after being told by the Marines not to do so.  *Id.* at 404.  Similarly, in *Carmichael*, the Eleventh Circuit noted that an internal KBR post-accident review faulted the KBR truck driver for "traveling at an excessive speed while negotiating a curve" and "not paying attention to surroundings."   572 F.3d at 1278 n.8; *cf. Saleh*, 580 F.3d at 2-3, 5 (holding claims were barred by battlefield preemption after assuming that the contractor tortured prisoners).  Thus, for purposes of deciding this Motion, the Court can *assume* that KBR acted negligently in the performance of its contractual duties.

Likewise, it is irrelevant whether KBR exercised some discretion in its performance under LOGCAP III.  In *Taylor*, the Fourth Circuit considered many of the same LOGCAP contract provisions cited by Plaintiffs as evidence of KBR's discretion in this case, *e.g.*, that KBR "shall be responsible for the safety of employees and base camp residents" and that KBR "shall have exclusive supervisory authority and responsibility over employees," and found that "KBR was nearly insulated from direct military control."  658 F.3d at 411.  Notwithstanding its finding of substantial contractor discretion, the court affirmed dismissal under the political question doctrine.  In doing so, the Fourth Circuit confirmed that the political question doctrine applies in situations where the contractor retains discretion and the military does not exercise direct control over the contractor's actions.   *Id.*

Again, *Taylor* clarifies that the relevant inquiry is whether the *resolution of this case* will raise political questions, which necessarily includes consideration of KBR's liability defenses. *Id.*; *see also Amedi*, 782 F. Supp. 2d at 1356-57 ("the issue is whether in reaching a determination on the merits the court or the jury would need to evaluate military decisions"). For example, KBR will assert, with substantial supporting evidence (including military testimony and documents), that the military specifically approved the burning of items such as plastics and that the military failed to provide or authorize alternative means of waste disposal, e.g., incinerators. Accordingly, regardless of whether Plaintiffs could prove that KBR burned a prohibited item or engaged in other "unauthorized" acts, the defenses KBR will raise would require the Court to evaluate wartime military decisions. *Taylor*, 658 F.3d at 412; *see also Carmichael*, 572 F.3d at 1295 (explaining "it would be impossible to determine that [KBR's conduct] alone was the sole cause of the accident or to possibly apportion blame without ruling out the potential causal role played by pivotal military judgments"); *Lane*, 529 F.3d at 561 ("If we must examine the Army's contribution to causation, 'political question' will loom large.").

Further, a judicial inquiry into "unauthorized acts" of a military contractor violates separation of powers by usurping the role of the Executive Branch in controlling contractor conduct on the battlefield. *See Al Shimari*, 2012 WL 1656773, at *29 (Wilkinson, J., dissenting) ("In the absence of some contrary expression by the Congress, the most basic precepts of separation of powers require that the alleged abuses of military contractors must be addressed through the medium of contract, not through tort."). Because these are private tort suits, not breach of contract actions brought by the federal government, it is inappropriate for this Court to apply varying state tort standards of care to the performance of a federal government contract

inside of a war zone. [15]  *See id.,* at *32 (Wilkinson, J., dissenting) ("Tort law, however, conflicts with rather than complements these contractual mechanisms of control by 'interfer[ing] with the federal government's authority to punish and deter misconduct by its own contractors.'") (citing *Saleh,* 580 F.3d at 8).

The Court must dismiss this action for lack of jurisdiction under *Taylor* because KBR's causation defense, supported by abundant evidence in the record, would inevitably but inappropriately require the Court to evaluate a variety of military decisions and judge whether such decisions caused or contributed to Plaintiffs' alleged injuries.  *Taylor*, 658 F.3d at 411-12.

## II.   PLAINTIFFS' TORT CLAIMS ARE PREEMPTED[16]

Acting to protect its critical interests in wartime conduct and decision-making, the United States concluded that tort claims brought against government contractors are preempted if: (1) "similar claims brought against the United States would come within the FTCA's combatant activities exception"; and (2) "the alleged actions of the contractor and its personnel occurred within the scope of their contractual relationship with the government."  Ex. C, U.S. Br. (*Al*

---

[15] Plaintiffs' more recent complaints include a claim for breach of contract (although Plaintiffs only seek tort damages).  *See* Jobes Compl. ¶ 136.  This claim is frivolous as Plaintiffs have absolutely no standing to sue for breach of a government contract.  *U.S. ex rel Wilson*, 525 F.3d 370, 376 (4th Cir. 2008) (dismissing qui tam suit against KBR because suit was really a breach of contract action "that only the government may bring"); *Smith v. Cent. Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1035 (9th Cir. 2005) ("Parties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary"); *Rodriguez v. U.S.*, 69 Fed. Cl. 487, 493 (2006) ("[w]hen a member of the public alleges standing to sue as an intended third-party beneficiary of a government contract, the purpose of which is to render a public service, the public citizen is 'considered to be [an] incidental beneficiary unless [he] can show a direct right to compensation.'"); *see also* Ex. H, LOGCAP III contract (LOGCAP III neither names any intended beneficiaries nor provides a direct right of compensation to third parties).

[16] In *Taylor*, the Fourth Circuit vacated the district court's dismissal under combatant activities preemption, finding that "[b]ecause the political question doctrine deprives the federal courts of jurisdiction to resolve Taylor's negligence claim, a ruling on the FTCA issue would be little more than an advisory opinion on a constitutional question…"  658 F.3d at 412.

*Shimari)* at 2-3.   This broad preemption test applies "even if an employee of a contractor allegedly violated the terms of the contract or took steps not specifically called for in the contract" because "wrongful" and "negligent" conduct falls "within the scope of their contractual relationship."  *Id.* at 3, 20.

Further, the United States explained that the need for preemption "does not turn on whether a challenged act is itself a 'combatant activity,' or whether the alleged tortfeasor is himself engaging in a 'combatant activity.'"  *Id.* at 17.   Instead, because the statute bars all claims that "*aris[e] out of* the combatant activities *of the military*," the proper focus of the preemption analysis is on neither the actor nor the act, but rather the context in which the claim arises.  *Id.* (emphasis in original); *see also Al Shimari*, 2012 WL 1656773, at *25 (Wilkinson, J., dissenting) (explaining that the combatant activities exception "has a considerable sweep" and that "[m]ultiple textual clues in this exception indicate that Congress wanted to keep tort law out of the battlefield regardless of a defendant's status as a soldier or a contractor.").

A.    **The Court Should Adopt the
United States' Test for Combatant Activities Preemption**

In developing its test for combatant activities preemption, the United States concluded, consistent with recent contractor-on-the-battlefield jurisprudence, that a broad preemption rule is essential to protect a number of well settled, and critically important, federal policies and interests.  *See* Ex. C, U.S. Br. (*Al Shimari*) at 14-16.   Specifically, the United States explained that the combatant activities exception embodies the "federal interest in protecting the conduct of the military's combat operations from interference by litigation based on state tort law."  *Id.* at 2.

In reaching this conclusion, the United States, as well as the D.C. Circuit, relied on the Supreme Court's analysis in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) as the starting point for the preemption analysis.  *Id.* at 14-15; *Saleh*, 580 F.3d at 6.  *Boyle* rests on the

premise that potential tort liability of government contractors is an area of "uniquely federal concern," and therefore state tort claims are precluded insofar as they present a "significant conflict" with federal policy.  487 U.S. at 507-08; *see also Al Shimari*, 2012 WL 1656773, at *50-51 (Niemeyer, J., dissenting) (explaining that the "methodology" of *Boyle* requires displacement of state law, through preemption, with federal common law immunity).  Whereas in *Boyle* the Supreme Court looked to the FTCA's discretionary function exception to identify the relevant federal immunity, the United States and the D.C. Circuit, applying the same methodology, looked to the FTCA's "combatant activities" exception, which is "even broader" than the discretionary function exception because it employs a broad "arising-out of test" to "cast an immunity net over any claim that *arises* out of combat activities."  *Saleh,* 580 F.3d at 6.  Thus, courts have characterized combatant activities preemption as a type of 'field preemption' in that "the federal government occupies the field when it comes to warfare, and its interest in combat is always 'precisely contrary' to the imposition of a non-federal tort duty."  *Id.* at 7 (quoting *Boyle*, 487 U.S. at 500); *Aiello*, 751 F. Supp. 2d at 710.  As the United States observed, there is no "presumption against preemption" in this context, as there would be in an ordinary case, because inside a war theater the States have *never* exercised "historic police powers."  Ex. B, U.S. Br. (*Saleh*) at 12-13.

Combatant activities preemption therefore rests in large part on the well-settled principle that the U.S. military must retain supremacy and command flexibility in controlling conduct inside a war zone, including in the assessment and acceptance of risk inherent in any battlefield operation.  *See, e.g.*, *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1494 (C.D. Cal 1993) ("Where a deliberate choice has been made to tolerate tragedy for some higher purpose, civilian state law standards cannot be applied to those who suffer the tragedies contemplated in war.").

The net result of battlefield tort suits—even suits against private contractors—is that conduct inside the warzone becomes subject to, and therefore effectively (and inappropriately) regulated by, state tort standards of care.  *See Saleh*, 580 F.3d at 11 ("The federal government's interest in preventing military policy from being subjected to fifty-one separate sovereigns (and that is only counting the *American* sovereigns) is not only broad—it is also obvious.").

The harm to federal interests when state tort law standards are applied to conduct inside a warzone is "obvious," primarily because "all of the traditional rationales for *tort* law—deterrence of risk-taking behavior, compensation for victims, and punishment of tortfeasors—are singularly out of place in combat situations, where risk taking is the rule."  *Id*. at 7 ("these cases are really indirect challenges to the actions of the U.S. military (direct challenges obviously are precluded by sovereign immunity)").  The threat of tort suits would "hamper military flexibility and cost-effectiveness, as contractors may prove reluctant to expose their employees to litigation-prone combat situations."  *Id*. at 8; *accord Aiello*, 751 F. Supp. 2d at 708; *Cf. Filarsky v. Delia,* 132 S. Ct. 1657 (2012).

In addition, a broad preemption rule is consistent with the federal interest in avoiding "extensive judicial probing of the government's wartime policies."  *Saleh*, 580 F.3d at 8 ("whether the defendant is the military itself or its contractor, the prospect of military personnel being haled into lengthy and distracting court or deposition proceedings is the same . . . requiring extensive judicial probing of the government's wartime policies"); Ex. C, U.S. Br. (*Al Shimari*) at 16 (quoting same); *see also Tozer,* 792 F.2d at 406 (dismissing litigation against government contractor in part because trial of the case would "require members of the Armed Services to

testify in court as to each other's decisions and actions") (quoting *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 673 (1977)).[17]

**B.      The United States' Preemption Test Compels Dismissal of Plaintiffs' Claims**

Plaintiffs' claims satisfy both elements of the United States' two-part preemption test and, therefore, must be dismissed.  First, identical claims asserted against the United States, e.g., claims arising out of *the military's* performance of battlefield waste management and water services, would be barred by the FTCA's combatant activities exception.  This exception is "purposefully broad," Ex. C, U.S. Br. (*Al Shimari*) at 19, and courts have applied it in a wide variety of circumstances to bar claims far removed from active combat.  For example, the Fifth Circuit held that claims arising out of the vaccination of a civilian contractor during the Gulf War were barred by the combatant activities exception, even where the vaccination was administered in Saudi Arabia, well outside the combat theater.  *See Arnold v. United States*, 140 F.3d 1037 (5th Cir. 1998) (attached hereto as Exhibit W).  Similarly,  *United States v. Marks* arose out of the military's destruction of private property in Hawaii, carried out after Pearl Harbor, in preparation for an invasion by Japan that never occurred.  187 F.2d 724 (9th Cir. 1951). Emphasizing that the challenged activities were outside of the war zone but not "remote in time or place from a zone of actual combat," the Ninth Circuit held that they constituted combatant activities.  *Id.* at 728; *cf. Minns v. United States*, 974 F. Supp. 500, 506 (D. Md. 1997), *aff'd*, 155 F.3d 445 (4th Cir. 1998) (dismissing for lack of subject matter jurisdiction and noting, without reaching the issue, the United States' position that claims arising from pre-war inoculations were

---

[17] The declarations filed in this case preview the type of military testimony that would be introduced at trial by both KBR and Plaintiffs, forcing members of the military to explain and justify wartime decisions and, even worse, placing members of the military in the awkward position of testifying against each other and/or implicating decisions of their superiors as the cause of Plaintiffs' injuries. *Compare* Ex. 8, Dkt. No. 21-10 ("the U.S. military decides where to locate burn pits.") *with* Ex. B to Pls.' Opp'n. ("KBR . . . decid[ed] where to locate a burn pit.").

barred by the combatant activities exception).   Both of these courts broadly construed "combatant activities" to include wartime conduct that took place far away from actual combat— unlike the conduct here, which took place at active operating bases *inside* a war zone during the United States' most recent war campaigns in Iraq and Afghanistan.   Thus, Plaintiffs' claims clearly arise from combatant activities of the U.S. military.  *See* Ex. C, U.S. Br. (*Al Shimari*) at 17.

Second, as this Court has already found, KBR was acting within the scope of its contractual relationship with the federal government in its performance of waste management and water services.  *See In re: KBR Inc.*, *Burn Pit Litig.*, 736 F. Supp. 2d at 970 ("waste disposal and water treatment were generally within the scope of the government contractor's duties as set forth in LOGCAP III").   The scope of KBR's work under LOGCAP III is established by the relevant Task Order provisions.  *See supra* at 20-21.  For example, Task Order 139, § 8.8 "Non-Hazardous Solid Waste Management and Disposal," provides that KBR "shall provide, install, operate and maintain waste management systems and programs" and that these activities shall be conducted in accordance with the "order of precedence," which includes Recycling, Incineration, Landfills and Surface Burning.  Ex. K.  The inclusion of surface burning (i.e., burn pits) in the Task Order confirms that KBR's performance of such services is within the scope of the contract.  *See also id.* § 8.11 (confirming water services are within scope).   In addition, the allegations in Plaintiffs' complaints are premised on KBR acting within the scope of LOGCAP III.  *See, e.g.,* Jobes Compl. ¶ 24 (alleging KBR was paid by the federal government to perform waste disposal services under the LOGCAP contract); *id.* ¶ 14 ("The LOGCAP Materials constitute the contract, and set forth the parameters within which [Defendants] needed to perform.").

37

Moreover, as the United States explained, the "scope of the contractual relationship" standard broadly encompasses claims "even if an employee of a contractor allegedly violated the terms of the contract or took steps not specifically called for in the contract." Ex. C, U.S. Br. (*Al Shimari*) at 20. Thus, Plaintiffs' allegations that KBR engaged in conduct that was negligent and/or noncompliant—*see, e.g.*, Jobes Compl. ¶ 24 (alleging that KBR "ignore[d] [its] contractual obligations, and instead burn[ed] vast quantities of unsorted waste in enormous open air burn pits with no safety or engineering controls")—are immaterial under the United States' combatant activities preemption test.

As a result, the Court should dismiss this action because it falls well within the test determined by the United States as necessary to protect the unique federal interests in controlling battlefield operations.

### C.   Dismissal Under Combatant Activities Preemption Is Also Supported By Recent Jurisprudence

Even before the United States clarified the contours of preemption under the combatant activities exception, several courts recently concluded that contractor-on-the-battlefield suits conflicted with unique federal interests and therefore dismissed the plaintiffs' claims under the combatant activities exception. *See Saleh,* 580 F.3d at 9*; Aiello,* 751 F. Supp. 2d at 715; *Taylor,* 658 F.3d at 413. Although these courts—acting without the benefit of the United States' analysis—applied a slightly different formulation for preemption, they reached the same conclusion as the United States based on the same rationale underlying the United States' test: protecting the significant federal interest in controlling battlefield operations.

In *Saleh*, the D.C. Circuit applied the following formulation for combatant activities preemption:

> During wartime, where a private service contractor is integrated into combatant activities over which the military retains command

> authority, a tort claim arising out of the contractor's engagement in
> such activities shall be preempted.

580 F.3d at 9.  This 'battlefield preemption' test, which was adopted by the district courts in

*Aiello* and *Taylor,* also compels dismissal of Plaintiffs' claims here.  *Aiello,* 751 F. Supp. 2d at

715; *Taylor,* 658 F.3d at 413.

The management of battlefield waste and the production and distribution of water inside

an active war zone are "combatant activities."  *Cf. Aiello*, 751 F. Supp. 2d at 713 (holding that

combatant activities include "the design, operation and maintenance of basic life-support

facilities at a forward operating base").  Just as the maintenance of latrines "is integral to

sustaining combat operations," *id.* at 714, managing battlefield waste and providing water are

crucial to sustaining the health and welfare of combat troops.  *See supra* at 10-11; *see also*

*Taylor*, 658 F.3d at 413 (concurring opinions agreeing with district court that generator

maintenance was a combatant activity).  In fact, at many bases in Iraq and Afghanistan these

activities were performed exclusively by military personnel.  *See supra* at 21.

KBR's performance of waste management and water services was integrated with

combatant activities of the U.S. military over which the military retained command authority.[18]

In *Aiello*, addressing KBR's LOGCAP III maintenance services, the court held that "there is no

genuine dispute whether [KBR's] services were integrated into the activities over which the

military retained command authority."  *Aiello*, 751 F. Supp. 2d at 715; *see also Taylor*, 658 F.3d

at 413 (concurring opinions agreeing that KBR's electrical generator maintenance met *Saleh*

formulation).  It is indisputable that the U.S. military exercises authority, responsibility, and

control over the activities and operations inside of a combat theater.  Contractors, including

---

[18] Of course, as clarified by the United States, preemption does not hinge on "integration" with
military personnel. Ex. C, U.S. Br. (*Al Shimari*) at 17-18.

KBR, are subject at all times to military orders, regulations, and supervision by military contracting officers.  *See* AR 715-9.  Here, KBR performed waste management and water services at the direction of, and in close coordination with, U.S. military personnel—e.g., the military directed which method of waste disposal KBR was to use, the location of burn pits, and items that could / could not be disposed of in burn pits.  *See supra* at 11-15, 21-22.

That KBR retained some level of discretion in performing waste management and water services does not alter the fact that KBR was integrated into the military's combatant activities. In fact, *Saleh* expressly rejected the notion that lack of contractor discretion was necessary, citing the Supreme Court's admonishment in *Boyle* that so narrowly restricting preemption would create a "perverse incentive" for contractors.  *See Saleh*, 580 F.3d at 9 (quoting *Boyle, 487 U.S.* at 512-13); *see also Taylor*, 658 F.3d at 411, 413 (majority opinion noting "KBR was nearly insulated from direct military control," and two concurring opinions arguing that claims were preempted); *see also In re KBR Inc.*, *Burn Pit Litig.,* 736 F. Supp. 2d at 969 (finding that claims arising out of the "exercise of [KBR's] discretion validly conferred by LOGCAP III or otherwise by the military" would "likely be barred" by derivative sovereign immunity and/or federal preemption).

In sum, Plaintiffs' claims must be preempted because they seek to displace military judgments on how to conduct essential combat support functions inside an active war zone with state tort law-based standards of conduct.  Injecting such standards into the battlefield—where the military routinely makes decisions based on war-time risks that are unique both to its expertise and to that environment—would harm paramount federal interests.  For example, allowing these claims to proceed would permit *the states* (using varying tort standards) to decide whether and how burn pits can be used in a war zone, notwithstanding that *the U.S. military* has

determined that burn pits are *essential to the military's mission*.  *See* 2008 Petraeus letter; Ex. E, DoD Report at 3.  This is precisely the type of blatant interference with military prerogatives that combatant activities preemption seeks to eliminate.

## III.   KBR IS ENTITLED TO DERIVATIVE SOVEREIGN IMMUNITY

The rationale underlying a recent unanimous Supreme Court decision strongly supports dismissal of the claims against KBR based on derivative sovereign immunity.  In *Filarsky v. Delia*, 132 S. Ct. 1657 (2012), the Supreme Court held that a private lawyer temporarily retained by a city government to conduct an internal affairs investigation was entitled to share the government's qualified immunity from suit.  In determining whether to extend immunity to the private actor, the Court found that "examples of individuals receiving immunity for actions taken while engaged in public service on a temporary or occasional basis are as varied as the reach of government itself."  *Id.* at 1658 (citing cases); *see also Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1447-48 (4th Cir. 1996) (finding that "[e]xtending immunity to private contractors to protect an important government interest is not novel.").  The Court explained that extending the government's immunity to private actors "protect[s] government's ability to perform its traditional functions" by "helping to avoid 'unwarranted timidity' in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits."  *Filarsky,* 132 S. Ct. at 1665 (citations omitted).

In addition, the Court reasoned that "[b]ecause government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity."  *Id.* at 1666.  Under this scenario, the Court expressed concern that "any private individual with a choice might think twice before

accepting a government assignment." *Id.*  And the distraction of lawsuits against private actors would also "affect any public employees with whom they work by embroiling those employees in litigation" and requiring such employees to provide testimony, thus "undermin[ing] an important reason immunity is accorded public employees in the first place."  *Id.*; *see also Mangold*, 77 F.3d at 1447 ("Even though private persons under contract with the government act only partly in the public sphere, the public interest may demand that immunity protect them to the same extent that it protects government employees."); *Saleh*, 580 F.3d at 8.

The Court's broad holding and rationale in *Filarsky* is even more compelling when the private actors seeking immunity are military contractors.  *See Al Shimari*, 2012 WL 1656773, at *13 (Duncan, J., concurring) (asking the district courts to "give due consideration to the appellant's immunity and preemption arguments—especially in light of the Supreme Court's recent opinion in *Filarsky v. Delia*"); *Id.,* at *53 (Niemeyer, J., dissenting) ("The Supreme Court has made clear that  immunity attaches to the *function* that is being performed, and private actors who are hired by the government to perform public functions are entitled to the same immunities to which public officials performing those duties would be entitled.") (citing *Filarsky*, 132 S. Ct. at 1661-66).  There is "ample evidence that the military finds the use of civilian contractors in support roles to be an essential component of a successful war-time mission."  *Lane v. Halliburton*, 529 F.3d 548, 554 (5th Cir. 2008); *see also Al Shimari*, 2012 WL 1656773, at *29 (Wilkinson, J., dissenting).

By necessity, the U.S. military relies on an ever-increasing number of contractors to provide critical battlefield services that were historically performed by military personnel. Contractors on the Battlefield (in order "to reach a minimum of required levels of support, deployed military forces will often have to be significantly augmented with contractor support

. . . the future battlefield will require ever increasing numbers of often critically important contractor employees"). *Id.* at Preface. The use of contractors in military theaters permits the combat "commander the flexibility of increasing his combat power by substituting combat units for military support units. This force-multiplier effect permits the combat commander to have sufficient support in the theater, while strengthening the joint force's fighting capability." *Id.* § 1-3. Extending immunity to military contractors, therefore, will protect the government's ability to perform among its most important "traditional functions": protecting our nation and waging war.

Here, the United States hired KBR to perform critical government services on the battlefields in Iraq and Afghanistan, services which were necessary to sustain the health and welfare of our combat troops. *See supra* at 10-11. Further, military personnel performed these same exact services at bases throughout Iraq and Afghanistan. *See supra* at 21. It is undeniable that these military personnel are immune from suit for their performance of waste and water services. Allowing these actions to proceed against KBR raises precisely the same concerns expressed by the Court in *Filarsky*: that a private contractor will be left "holding the bag— facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." 132 S. Ct. at 1666. Moreover, these lawsuits are certain to engage military personnel in protracted discovery, compelled depositions, and, if necessary, live trial testimony. *See id.*; *In re KBR Inc.*, *Burn Pit Litig.,* 736 F. Supp. 2d at 971 ("Permitting the Plaintiffs' lawsuit to proceed could subject military personnel and contractors to lengthy and distracting court or deposition proceedings and cause government contractors to refuse to bid on government contracts or raise the amount of their bids."). Thus, for reasons even more compelling than those in *Filarsky*, the Court should extend the government's immunity to KBR.

## IV.    JURISDICTIONAL DISCOVERY IS NOT NECESSARY

Plaintiffs recently argued that "targeted discovery regarding the facts relevant to Defendants' immunity and preemptions defenses" is necessary and that "these defenses cannot be resolved absent discovery." *See* Emer. Correspondence, Dkt. No. 214.  Plaintiffs are incorrect.

First, Plaintiffs' argument for discovery ignores controlling precedent under *Taylor*, where the Fourth Circuit affirmed dismissal under the political question doctrine based on consideration of KBR's liability defenses.  The court did not require evidence establishing the contractor's compliance with military directives; in fact, the court assumed that a KBR electrician acted contrary to military orders not to turn on a generator.  Although "limited jurisdictional discovery" occurred in *Taylor*, it produced 303 pages of contract documents—the LOGCAP III base contract, a single Task Order 139 SOW, and 2 work orders—as well as a single deposition of the base camp Mayor.  In addition to this "discovery," the court also had before it three declarations from military personnel, various Army regulations, an accident report, and a Marine Corps Safety Bulletin.

By contrast, the record already before this Court is far more comprehensive than the record before the district court in *Taylor*.  It includes, among other things:  more than one-thousand pages of contract documents (the LOGCAP III base contract, Iraq Task Orders 59, 89, 139, and 159, Afghanistan Task Orders 13, 14, 97, 98, 113, 116, 118, and 145, various LOTDs and ACLs, and an award fee letter); seven declarations from high-ranking military and government officials, which were fully vetted by the Department of Defense before being released to use in this litigation; multiple government reports regarding the use of burn pits; a variety of Army regulations regarding contractors on the battlefield, waste management, and water operations; and various military bulletins and articles regarding the use of burn pits.  Most

importantly, the record already establishes that political questions will arise when KBR asserts its liability defenses, which will require the Court to conduct an impermissible inquiry into military judgments and decisions. *See supra* at 11-15, 26-27.

In addition, the record is more than sufficient for the Court to resolve KBR's preemption and immunity defenses.   KBR's contracts—and Plaintiffs' own complaints—establish that battlefield waste management and water services were within the scope of KBR's contractual duties.  *See supra* at 37.   Although Plaintiffs would like discovery into any and all acts of "noncompliance" on the part of KBR, preemption applies even where a contractor engaged in "wrongful or negligent" conduct or "violated the terms of the contract."  *See* Ex. C, U.S. Br. (*Al Shimari*) at 20.   Accordingly, it is not necessary to determine, for example, whether or not KBR ever burned a prohibited item in order to find that Plaintiffs' claims are preempted.

Further, contrary to Plaintiffs' assertion, the en banc decision in *Al Shimari* does not *require* this Court to engage in any additional discovery prior to ruling on KBR's renewed motion to dismiss.   In fact, the court deferred to district courts' determinations regarding the need for discovery, acknowledging that district courts are in the best position to determine whether the record is sufficient to warrant dismissal.   *Al Shimari v. CACI Int'l*, 2012 WL 1656773, at *11 (noting that "the need for additional development of the record [is] among those 'matters more within a district court's ken'") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009)).   Nonetheless, to the extent the Fourth Circuit suggested in dicta that consideration of the pertinent contract documents was a useful prerequisite to ruling on preemption and immunity defenses, *see id.,* at *30, this Court now has before it pertinent contracts covering waste management and water services under LOGCAP III.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that Plaintiffs' Complaints be dismissed with prejudice.


Dated:  June 1, 2012                                    Respectfully submitted,


                                                        /s/ Daniel L. Russell Jr.
                                                        Raymond B. Biagini (Bar ID No. 03540)
                                                            rbiagini@mckennalong.com
                                                        Robert A. Matthews (*pro hac vice*)
                                                            rmatthews@mckennalong.com
                                                        Daniel L. Russell Jr. (Bar ID No. 16855)
                                                            drussell@mckennalong.com
                                                        Shannon G. Konn (*pro hac vice*)
                                                            skonn@mckennalong.com
                                                        MCKENNA LONG & ALDRIDGE LLP
                                                        1900 K Street, N.W.
                                                        Washington, DC  20006
                                                        (202) 496-7500
                                                        Fax: (202) 496-7756

                                                        Counsel for Defendants KBR, Inc.,
                                                        Kellogg Brown & Root LLC,
                                                        Kellogg Brown & Root Services, Inc.,
                                                        and Halliburton Company

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 1, 2012, a copy of the foregoing document was electronically filed in this case via the CM/ECF system, which will provide notice to Susan L. Burke, lead and liaison counsel for Plaintiffs.

/s/ Daniel L. Russell Jr.
Daniel L. Russell Jr. (Bar ID No. 16855)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, DC  20006
(202) 496-7500
Fax: (202) 496-7756