# Exhibit A

No. 09-683

# In the Supreme Court of the United States

ANNETTE CARMICHAEL, INDIVIDUALLY AND AS
GUARDIAN FOR KEITH CARMICHAEL, PETITIONER

*v.*

KELLOGG, BROWN & ROOT SERVICE, INC., ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

NEAL KUMAR KATYAL
  *Acting Solicitor General
    Counsel of Record*
TONY WEST
  *Assistant Attorney General*
EDWIN S. KNEEDLER
  *Deputy Solicitor General*
MELISSA ARBUS SHERRY
  *Assistant to the Solicitor
    General*
MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

### QUESTION PRESENTED

Whether the political question doctrine bars the adjudication of state law negligence claims brought on behalf of a United States service member against a civilian contractor arising from the crash of a contractor-operated vehicle during a military fuel convoy in Iraq.

**TABLE OF CONTENTS**

                                                                    Page
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**TABLE OF AUTHORITIES**

Cases:

*Aktepe* v. *United States*, 105 F.3d 1400 (11th Cir.
    1997), cert. denied, 522 U.S. 1045 (1998) . . . . . . . . . . . . 16

*Askir* v. *Brown & Root Servs. Corp.*, No. 95 Civ.
    11008, 1997 WL 598587 (S.D.N.Y. Sept. 23, 1997) . . . . 13

*Baker* v. *Carr*, 369 U.S. 186 (1962) . . . . . . . . . . . . . . 5, 14, 15

*Boyle* v. *United Techs. Corp.*, 487 U.S. 500 (1988) . . 4, 12, 15

*Chappell* v. *Wallace*, 462 U.S. 296 (1983) . . . . . . . . . . . . . 10

*Corrie* v. *Caterpillar, Inc.*, 503 F.3d 974 (9th Cir.
    2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21

*Feres* v. *United States*, 340 U.S. 135 (1950) . . . . . . . . . 10, 21

*Fisher* v. *Halliburton*, No. H-05-1731, 2010 WL
    519690 (S.D. Tex. Feb. 8, 2010) . . . . . . . . . . . . . . . . . 13, 20

*Gilligan* v. *Morgan*, 413 U.S. 1 (1973) . . . . . . . . . . . . 7, 15, 16

*Japan Whaling Ass'n* v. *American Cetacean Soc'y*,
    478 U.S. 221 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Lane* v. *Halliburton*, 529 F.3d 548 (5th Cir. 2008) . 7, 19, 20

*Lessin* v. *Kellogg Brown & Root*, No. CIVA
    H-05-01853, 2006 WL 3940556 (S.D. Tex. June 12,
    2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*McMahon* v. *Presidential Airways, Inc.*, 502 F.3d
    1331 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 19

IV

Cases—Continued:                                                    Page

*Saleh* v. *Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009),
    petition for cert. pending, No. 09-1313 (filed Apr.
    26, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21

*Taylor* v. *Kellogg Brown & Root Servs., Inc.*, No.
    2:09cv341, 2010 WL 1707530 (E.D. Va. Apr. 16,
    2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Tiffany* v. *United States*, 931 F.2d 271 (4th Cir. 1991),
    cert. denied, 502 U.S. 1030 (1992) . . . . . . . . . . . . . . . . 16

*United States* v. *Johnson*, 481 U.S. 681 (1987) . . . . . . . . 10

*United States* v. *Munoz-Flores*, 495 U.S. 385 (1990) . . . . 14

*United States* v. *Stanley*, 483 U.S. 669 (1987) . . . . . . . . . 21

*Vasquez* v. *United States*, 454 U.S. 975 (1981) . . . . . . . . 22

Constitution, statutes and regulations:

U.S. Const.:
    Art. I, § 8, Cls. 11-16 . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Art. II, § 2, Cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Defense Base Act, 42 U.S.C. 1651 *et seq.* . . . . . . . . . . . . . 11
    42 U.S.C. 1651(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Federal Employees Liability Reform and Tort
    Compensation Act of 1988, 28 U.S.C. 2679(d)(1) . . . . . 11

Federal Tort Claims Act:
    28 U.S.C. 2680(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    28 U.S.C. 2680(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11, 21
    28 U.S.C. 2680(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Longshore and Harbor Workers' Compensation Act,
    33 U.S.C. 901 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    33 U.S.C. 905(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V

Regulations—Continued:                                    Page

Army Reg.:

Reg. 700-137 (Dec. 16, 1985) . . . . . . . . . . . . . . . . . . . . . . . 1

Reg. 715-9 (Oct. 29, 1999) . . . . . . . . . . . . . . . . . . . . . . . . 6

48 C.F.R. 252.225-7040(b)(2) . . . . . . . . . . . . . . . . . . . . . . . 12

Miscellaneous:

73 Fed. Reg. 16,768 (2008) . . . . . . . . . . . . . . . . . . . . . . . 12

# In the Supreme Court of the United States

-------

No. 09-683

ANNETTE CARMICHAEL, INDIVIDUALLY AND AS
GUARDIAN FOR KEITH CARMICHAEL, PETITIONER

*v.*

KELLOGG, BROWN & ROOT SERVICE, INC., ET AL.

-------

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT*

-------

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

-------

This brief is submitted in response to the order of
this Court inviting the Solicitor General to express the
views of the United States. In the view of the United
States, the petition for a writ of certiorari should be de-
nied.

## STATEMENT

The Logistics Civil Augmentation Program
(LOGCAP) permits private companies to enter into con-
tracts with the United States Army to provide logistical
support services in connection with ongoing combat and
other operations. The program allows "civilian contrac-
tors to perform selected services in wartime to augment
Army forces," to "fill shortfalls," and to relieve military
units so they can focus on "other missions." Army Reg.
700-137, at 1-1 (Dec. 16, 1985). The question presented

(1)

in this case arises from a vehicle crash that occurred while Kellogg, Brown & Root Services, Inc. (KBR) was providing fuel convoy transportation services to the Army in Iraq through a LOGCAP contract. Petitioner is the wife of United States Army Sergeant Keith Carmichael, who was seriously injured in the crash; respondents are the driver of the fuel tanker truck, Richard Irvine, and his employer, KBR.[1]

1. On May 22, 2004, Sergeant Carmichael was assigned as a military escort, or "shooter," to ride in a tanker truck driven by Irvine as part of a fuel supply convoy in Iraq. Pet. App. 7a-8a. The military established the basic parameters for the convoy and the mission was led by the military convoy commander. *Id.* at 5a. Among other things, the military decided the route the convoy would take, the amount of fuel and other supplies to be transported, the overall speed at which the vehicles would travel, the number of vehicles to be included, the spacing to be maintained between vehicles, and the security measures to be employed. *Id.* at 5a-6a & n.5; Pet. 3. KBR's drivers were responsible for safely operating their vehicles. Pet. App. 70a-71a ("Of course the driver is responsible for keeping his truck on the road" and for "apply[ing] his truck's brakes."); Pet. 3-4.

Irvine's truck was the sixth tanker in a convoy of roughly 15 vehicles, and approximately seven military gun trucks were positioned between the tankers. Pet. App. 7a-8a. The military convoy commander had directed the convoy to travel a roadway known as "ASR Phoenix" at a speed of between 50 and 60 miles per hour, to maintain a distance of 100 meters between vehicles,

---

[1]  Halliburton Energy Services, Inc., which was the parent company of KBR until 2007, is also a respondent.  Pet. App. 3a n.1.

3

and to follow the tire tracks of the preceding vehicle. *Id.* at 6a. After several hours, the military gun truck at the head of the convoy alerted the others to a series of approaching "S-curves." Although each vehicle traveling ahead of Irvine successfully negotiated the turns, Irvine lost control of his vehicle on the second curve. His truck slid off the road, rolled over, and pinned Sergeant Carmichael beneath it. Rescuers were eventually able to dislodge him, but Sergeant Carmichael suffered severe brain injuries due to a lack of oxygen and has remained in a persistent vegetative state. *Id.* at 8a-9a.

After the incident, KBR conducted an internal investigation and concluded that the crash occurred because Irvine was traveling at an "excessive speed while negotiating a curve [and] not paying attention to surroundings." Pet. App. 9a n.8; Pet. 5 (finding that the "root cause * * * was speed in excess and failure to control the vehicle") (citation omitted). Irvine had been hired by KBR as a driver at age 66, after initially being rejected for failing a medical exam, and had submitted time cards for more than 75 hours of work in the six days preceding the accident. Pet. App. 8a n.7, 50a-53a & nn.2, 4. After the investigation, KBR permanently barred Irvine from driving tanker trucks. Pet. App. 9a n.8.

2. Petitioner filed suit in Georgia state court, alleging that Irvine was negligent because, *inter alia*, he drove at an excessive speed "under the circumstances," did not keep a proper lookout, and failed to inspect his vehicle before operating it. Pet. App. 10a. Petitioner sought to hold KBR vicariously liable for Irvine's negligence and directly liable for negligently hiring, training, supervising, and retaining Irvine. *Ibid.*

4

Respondents removed the case to federal court and moved to dismiss, arguing that petitioner's claims were nonjusticiable under the political question doctrine and preempted under the "combatant activities" exception to the Federal Tort Claims Act (FTCA), 28 U.S.C. 2680(j). Br. in Opp. App. 2a. The district court denied the motion. *Id.* at 1a-17a. On the political question doctrine, the court recognized that petitioner's claims would be barred if "military decisionmaking or policy would be a necessary inquiry, inseparable from the claims asserted," *id.* at 5a (citation omitted), but concluded that "at this stage of the proceedings it is not yet certain whether inquiries into military decision-making would be necessitated by [petitioner's] claims," *id.* at 7a. "For example," the court explained, Irvine could have been "driving the truck within the speed limit set by the military yet in a manner that was negligent in some other respect." *Ibid.* As for preemption, the court questioned whether *Boyle* v. *United Technologies Corp.*, 487 U.S. 500 (1988), should be extended beyond the scope of the FTCA's discretionary function exception and determined that petitioner's claims were not preempted under the combatant activities exception in any event because they did not involve the procurement of complex military equipment, nor did they involve use of weapons by the military against enemies in combat. Br. in Opp. App. 14a-16a. The court invited respondents to renew their motion to dismiss if discovery revealed additional evidence supporting either defense. *Id.* at 7a, 17a.

After completing discovery, which involved Department of Army documents and personnel, respondents filed a renewed motion to dismiss on political question

5

grounds.[2]  Br. in Opp. 6-7.  This time the district court granted the motion, relying on new evidence uncovered in discovery.  The court found that the first and second *Baker* v. *Carr*, 369 U.S. 186 (1962), factors—*i.e.*, a textually demonstrable commitment to another branch of government and the absence of judicially manageable standards—were satisfied.  Pet. App. 57a-77a.

3.  A divided panel of the court of appeals affirmed. Pet. App. 1a-56a.

a.  On the first *Baker* factor, the court concluded that adjudicating petitioner's negligent driving claim "would require reexamination of many sensitive judgments and decisions entrusted to the military in a time of war" because "military judgments governed the planning and execution of virtually every aspect of the convoy in which Sergeant Carmichael was injured."  Pet. App. 16a.  "At the broadest level," the court noted, these judgments included, *inter alia*, "the military's decision to utilize civilian contractors in conducting the war in Iraq" because the rollover "never would have taken place" if such decisions had not been made.  *Ibid.*  More specifically, the court continued, the military controlled the timing of the convoy's departure, the speed of the vehicles, the route to be taken, the spacing between vehicles, and the measures needed to ensure the convoy's security.  *Ibid.*  The court found it "impossible" to make any judgment regarding Irvine's or KBR's negligence "without bringing those essential military judgments and decisions under" the type of "searching judicial scrutiny * * * that the political question doctrine forbids."  *Id.* at 18a-19a.

---

[2]  Respondents did not renew their motion to dismiss based on the combatant activities exception.  Pet. App. 59a n.1.

6

The court then rejected each of petitioner's arguments. Pet. App. 19a-30a. First, the court found that neither KBR nor Irvine retained control of the convoy in any relevant sense. The court reasoned that although contractor employees were "not under the direct supervision of military personnel in the chain of command," *id.* at 20a (citing Army Reg. 715-9, at 3-2(f) (Oct. 29, 1999)), the military gave orders to the KBR convoy commander, who relayed them to employees, and, if violated, the military could demand that the employee be replaced, *id.* at 19a-21a. And, the court explained, even though "Irvine had physical control over his tanker," "he was operating at all times under orders and determinations made by the military" and would "undoubtedly cite the military's orders as the reason why [he] did not reduce his speed." *Id.* at 22a-23a.

Second, the court was "unpersuaded" that it would not have "to *review* any of those military judgments" to adjudicate the case because petitioner had "not come close to showing" that "Irvine *alone* was responsible for the accident." Pet. App. 23a-25a. Instead, the court thought it "perfectly plausible" that military decisions may have "contributed to the rollover," "that Irvine's fault for the accident was negligible or nonexistent," and that "KBR would inevitably (and not without substantial evidential foundation) try to show that unsound military judgments and policies surrounding every aspect of the May 22 convoy were either supervening or concurrent causes of the accident." *Id.* at 25a-27a.

Finally, the court rejected petitioner's argument that litigating this case would not involve scrutiny of military judgments "traditionally insulated from judicial review," because, the court determined, decisions "concerning how to safely deliver vital military supplies through hos-

7

tile territory in war time" are "'professional military judgments' * * * properly insulated from judicial review." Pet. App. 29a-30a (quoting *Gilligan* v. *Morgan*, 413 U.S. 1, 10 (1973)).

b. On the second *Baker* factor, the court found no judicially manageable standards to resolve petitioner's negligent driving claim. Pet. App. 30a-40a. Although sounding in negligence, the court determined that "the question of whether Irvine acted reasonably or breached the standard of care cannot be answered by reference to the standards used in ordinary tort cases." *Id.* at 31a. Instead, the court would have to ask "what a reasonable driver subject to military control over his exact speed and path would have done," and would have to take into account the fact that "any decision to slow down could well have jeopardized the entire military mission and could have made Irvine and other vehicles in the convoy more vulnerable to an insurgent attack." *Id.* at 31a-33a.

The court acknowledged that its earlier opinion in *McMahon* v. *Presidential Airways, Inc.*, 502 F.3d 1331, 1364 (2007), had found the negligence standard adaptable to a crash (in that case, of a contractor plane carrying troops in Afghanistan) occurring "in a less than hospitable environment," but found that case distinguishable because, among other things, the decision was based on a limited factual record. Pet. App. 35a-37a. The court distinguished the Fifth Circuit's decision in *Lane* v. *Halliburton*, 529 F.3d 548 (2008), also involving a fuel convoy in Iraq, "[f]or largely the same reasons." Pet. App. 37a (noting that, like *McMahon*, the decision in *Lane* was preliminary). Finding "no readily ascertainable and judicially manageable standards to * * * determin[e] or apportion[] Irvine's, KBR's, and the military's respective degrees of liability," the court affirmed

8

the dismissal of petitioner's negligent driving claim. *Id.* at 40a.

c. On direct liability, the court held that only the negligent training and supervision claims had been preserved, but that those claims were also barred by the political question doctrine. Pet. App. 41a-47a. Adjudicating the negligent training claim, the court explained, would raise questions about "military training" because even if the military did not directly provide any of Irvine's training, "KBR's drivers received instruction regarding some techniques directly from the military," because "KBR employees were trained according to military standards," and because courts have no readily available standards upon which to judge the adequacy of such training. *Id.* at 41a-44a. The court found that the negligent supervision claim could not proceed for similar reasons—namely, because "[t]his claim would undeniably require [petitioner] to show that Irvine's driving was *the* sole cause of the accident, that Irvine's poor driving was due to fatigue, and that Irvine's fatigue was the result of KBR's supervisory practices." *Id.* at 44a-46a.

d. Judge Kravitch issued a separate opinion, concurring in part and dissenting in part. Pet. App. 48a-56a. She agreed that the negligent driving claim was nonjusticiable, but dissented from the dismissal of petitioner's negligent supervision claim. *Id.* at 48a. Because "the district court made no factual finding as to whether the military was involved in setting the drivers' work schedules or was responsible for selecting specific drivers for its missions," Judge Kravitch found the record inadequate "to determine whether consideration of the negligent supervision claim would require the reexamination of a military decision." *Ibid.*

9

## DISCUSSION

This case concerns only one of several defenses potentially available to private contractors facing tort suits arising from their actions in Iraq and Afghanistan. The court of appeals appropriately recognized the need to ensure that courts do not second-guess sensitive military judgments. And although it may have reached the wrong conclusion under the political question doctrine, review by this Court is not warranted. There is no conflict among the courts of appeals on this issue, other legal doctrines may be available to bar a suit or limit liability in circumstances such as these, and further percolation is needed to consider the full array of defenses implicated by this complex and developing area.

1. The United States has significant interests in ensuring that sensitive military judgments are not subject to judicial second-guessing, in protecting soldiers and civilians from wartime injuries, and in making sure contractors are available and willing to provide the military with vital combat-related services. At the same time, the United States also has significant interests in ensuring that its contractors exercise proper care in minimizing risks to service members and civilians and do not avoid appropriate sanctions for misconduct. Contractor misconduct resulting in harm to local nationals abroad also in some circumstances can have significant negative foreign policy implications for the United States. In recent years, an increasing number of lawsuits have been filed against private contractors asserting tort claims arising out of logistical support services provided in Iraq and Afghanistan. These cases directly implicate the interests of the United States.

10

The development of the body of law applicable in such cases, however, is in its infancy. The courts have just begun to flesh out how a variety of statutory, common law, and constitutional defenses should be applied in these novel and challenging circumstances. And while there are a number of such cases currently pending before the district courts, only a handful have undergone appellate scrutiny and only then on limited issues.

Injuries suffered in combat zones by service members, contractor employees, and other civilians are some of the most severe tragedies to befall the individuals concerned and the United States. Nonetheless, such injuries are often not compensable with monetary damages under the ordinary tort system. Service members injured or killed in service to this country are entitled to statutory disability and death benefits that "compare extremely favorably with those provided by most workmen's compensation statutes." See *United States* v. *Johnson*, 481 U.S. 681, 690 (1987) (quoting *Feres* v. *United States*, 340 U.S. 135, 145 (1950)). But service members cannot recover in tort against the United States. The *Feres* doctrine bars suits by service members for injuries incurred "incident to service." See 340 U.S. at 146. As the Court explained in *Johnson*, the *Feres* doctrine is grounded on, *inter alia*, "the existence of * * * generous statutory disability and death benefits" and the concern that such cases "would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." 481 U.S. at 689-690.[3]

---

[3] Cf. *Chappell* v. *Wallace*, 462 U.S. 296, 299, 304 (1983) (holding that service members have no *Bivens* remedy against superior officers, and noting, *inter alia*, the harmful effects on military effectiveness of litigation against the government concerning injuries sustained in the course of duty).

11

A number of exceptions to the FTCA's waiver of sovereign immunity would equally bar tort recovery against the United States for injuries suffered by a civilian in a combat zone. For example, the combatant activities exception provides that sovereign immunity remains intact as to "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. 2680(j); see also 28 U.S.C. 2680(k) (no waiver for "[a]ny claim arising in a foreign country"); 28 U.S.C. 2680(a) (discretionary function exception). And should the injured party sue a government employee instead, the Federal Employees Liability Reform and Tort Compensation Act of 1988 (Westfall Act), 28 U.S.C. 2679(d)(1), provides for substitution of the United States in any common law tort suit arising within the scope of employment.

Contractor employees—in addition to being precluded from suing the United States and its personnel—are also precluded by statute from pursuing a negligence claim against their employer for injuries incurred while performing a government contract outside the United States. The Defense Base Act (DBA), 42 U.S.C. 1651 *et seq.*, which incorporates the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. 901 *et seq.*, establishes a system of worker's compensation for contractor employees that provides an exclusive remedy. 42 U.S.C. 1651(c) ("liability of an employer * * * under this chapter shall be exclusive and in place of all other liability of such employer * * * to his employees (and their dependents) coming within the purview of this chapter"); see 33 U.S.C. 905(a).

Of course not every tort suit arising from an injury incurred in a combat zone is covered by the aforementioned statutes and doctrines. Thus, in some suits

12

against private contractors not barred by the DBA, contractor defendants have raised other defenses.[4]   For example, some contractors have argued that courts should apply the government contractor defense recognized by this Court in *Boyle* v. *United Technologies Corp.*, with modifications to take into account differences between service and procurement contracts.   487 U.S. 500, 511-512 (1988) (grounding the defense, in part, on the need to prevent courts from "second-guessing" military judgments, the concern that the "financial burden of judgments against the contractors would ultimately be passed through" to the government, and the belief that "[i]t makes little sense to insulate the Government against financial liability" for certain judgments

---

[4]   An amendment to the Defense Federal Acquisition Regulation Supplement Rule provides that "[c]ontract performance in support of U.S. Armed Forces deployed outside the United States may require work in dangerous or austere conditions.   Except as otherwise provided in the contract, the Contractor accepts the risks associated with required contract performance in such operations."   48 C.F.R. 252.225-7040(b)(2). In responding to public comments, the Department of Defense (DoD) affirmed that "the clause retains the current rule of law," as expressed in recent court cases, "holding contractors accountable for the negligent or willful actions of their employees, officers, and subcontractors." 73 Fed. Reg. 16,768 (2008).   The response also suggested that *Boyle* "does not apply when a performance-based statement of work is used in a services contract," and that the amended rule should not "invite courts to shift the risk of loss to innocent third parties" through "defenses based on the sovereignty of the United States" for the contractor's "own actions." *Ibid.*   DoD, however, made clear that "it makes no changes to existing rules regarding liability," and that "[c]ontractors will still be able to defend themselves when injuries to third parties are caused by the actions or decisions of the Government." *Ibid.*   To the extent there is ambiguity, this response was not intended to opine on the state of the law.

13

when it is the manufacturer, "but not when it contracts for the production").[5]  Other defendants have argued for a federal preemption defense drawn from the combatant activities exception to the FTCA.  See, *e.g.*, *Saleh* v. *Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009) (*Titan*), petition for cert. pending, No. 09-1313 (filed Apr. 26, 2010).[6]  And, of course, some have asserted the political question doctrine as a bar.

Whatever the defense asserted, the decisions addressing them—and the various statutes and doctrines in this area more generally—reflect an understandable discomfort with readily subjecting the actions of government contractors who provide services to the U.S. military in war zones to private civil suits under state tort law.  The decisions also evince genuine concerns about second-guessing military judgments, burdening the military and its personnel with onerous and intrusive discovery requests, and otherwise interfering with and detracting from the war effort.  As a general matter, these concerns are well-founded.  What is less clear, particularly absent further percolation in the lower courts, is the appropriate doctrinal framework under which to

---

[5]  See, *e.g.*, *Fisher* v. *Halliburton*, No. H-05-1731, 2010 WL 519690, at **7-8 (S.D. Tex. Feb. 8, 2010) (questioning whether *Boyle* applies to service contracts); *Askir* v. *Brown & Root Servs. Corp.*, No. 95 Civ. 11008, 1997 WL 598587, at *5 (S.D.N.Y. Sept. 23, 1997) (government contractor defense applicable to performance contracts).

[6]  See also, *e.g.*, *Taylor* v. *Kellogg Brown & Root Servs., Inc.*, No. 2:09cv341, 2010 WL 1707530, at **7-12 (E.D. Va. Apr. 16, 2010) (recognizing preemption under combatant activities exception); Br. in Opp. App. 7a-17a (declining to adopt combatant activities exception); *Lessin* v. *Kellogg Brown & Root*, No. CIVA H-05-01853, 2006 WL 3940556, at **4-5 (S.D. Tex. June 12, 2006) (same).

14

determine whether a particular claim may proceed and, if so, to what extent.[7]

2. The court of appeals in this case was confronted with only one of the several defenses potentially available to private contractors operating in a combat zone—the political question doctrine. Prompted by the sorts of concerns discussed above, the court ultimately concluded, after discovery and extensive analysis, that petitioner's negligence claims presented nonjusticiable political questions. In so holding, the court sought to avoid adjudication of a case that it feared would require judicial second-guessing of sensitive military judgments. Although the court may have reached the wrong conclusion under the political question doctrine, review by this Court is unwarranted. There is no conflict among the courts of appeals on this legal issue, and there are obvious benefits to deferring consideration of cases arising in this context until lower courts have more fully considered this and other legal doctrines that may bar a suit or otherwise limit liability in circumstances such as these.

a. The political question doctrine is "primarily a function of separation of powers," *Baker* v. *Carr*, 369 U.S. 186, 210 (1962), and "is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government," *United States* v. *Munoz-Flores*, 495 U.S. 385, 394 (1990). It thus "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed to the halls of Congress or the confines of the Executive Branch." *Japan*

---

[7]   Irrespective of the availability of private tort remedies, contractors remain subject to applicable federal criminal law and contractual remedies, the enforcement of which is under the purview of the United States Government.

15

*Whaling Ass'n* v. *American Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

In *Baker*, this Court identified six characteristics "[p]rominent on the surface of any case held to involve a political question" including, as relevant here (see pp. 5-8, *supra*), "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." 369 U.S. at 217. To determine whether "one of these formulations" is applicable, the court must engage in a "discriminating inquiry into the precise facts and posture of the particular case." *Ibid.*

The Constitution confers on the Executive and Legislative Branches authority over the military. See U.S. Const. Art. I, § 8, Cls. 11-16; Art. II, § 2, Cl. 1. Although not "every case or controversy which touches foreign relations lies beyond judicial cognizance," *Baker*, 369 U.S. at 211, military affairs feature prominently among the areas in which the political question doctrine traditionally has been implicated. In *Gilligan* v. *Morgan*, 413 U.S. 1 (1973), for example, this Court held that the political question doctrine barred a suit seeking injunctive relief based on allegations that the National Guard used excessive force in responding to Vietnam war protesters at Kent State University, because "[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments." *Id.* at 5, 10. Indeed, the Court found it "difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches," and "difficult to conceive of an area of

16

governmental activity in which the courts have less competence." *Id.* at 10.

Likewise, in *Aktepe* v. *United States*, 105 F.3d 1400, 1403-1404 (1997), cert. denied, 522 U.S. 1045 (1998), the Eleventh Circuit held that the political question doctrine barred claims against the United States after the Navy fired live missiles at a Turkish ship during a joint training exercise, because deciding the negligence claims would inevitably require a court to determine whether members of the military exercised reasonable care during the training exercise and because the court lacked judicially manageable standards to judge "how a reasonable military force would have conducted the drill." And in *Tiffany* v. *United States*, 931 F.2d 271, 275, 277-278 (1991), cert. denied, 502 U.S. 1030 (1992), the Fourth Circuit held that the political question doctrine barred tort claims against the United States arising from a collision between a private plane and an Air Force jet sent to intercept that plane, because adjudicating such claims would require the court to "second-guess[] judgments with respect to potentially hostile aircraft." See also *Corrie* v. *Caterpillar, Inc.*, 503 F.3d 974, 982, 984 (9th Cir. 2007) (holding suit against private corporation barred by the political question doctrine where claims challenged U.S. military assistance to another country).

b. The court of appeals relied on the legal principles developed under the political question doctrine in these cases, but may have ultimately erred in applying them to the particular facts of this case. Its conclusion that adjudication of petitioner's negligence claims would necessarily call for a review of the propriety of sensitive military judgments and policies, and that it lacked judicially manageable standards to do so, may have over-

17

looked a narrower way of understanding petitioner's claims.

Petitioner does not assert that respondents were negligent for engaging in conduct ordered or approved by the military; she argues that within the general parameters set by the military, Irvine and KBR acted negligently with respect to driving and supervision. Pet. 13. Thus, the court identified "the question before the [district c]ourt" as "what a reasonable driver subject to military control over his exact speed and path would have done." Pet. App. 32a (internal quotation marks and citation omitted). It may be possible for the trial court to factor military standards and orders into the inquiry as external facts to be taken as a given, such that the trier of fact would not be required to question the wisdom of military judgments.

Under such an approach, the jury could conclude that Irvine failed to behave in a reasonable manner *within* the parameters established by the military. For example, one could envision such a result if petitioner was able to prove that Irvine was not paying attention when he took the second curve. See Br. in Opp. App. 7a (Irvine could have been "driving the truck within the speed limit set by the military yet in a manner that was negligent in some other respect."). Or the jury could conclude that Irvine failed to comply with military orders if petitioner could prove that Irvine exceeded the speed limit set by the military. Or the jury could decide, conversely, that given the military parameters and the circumstances present in Iraq at the time, Irvine acted in a reasonably prudent manner. In short, if the parameters set by the military were not followed, then there would be no cause to second-guess military judgments as such. If they were followed, then such constraints

18

presumably could be taken into account in assessing whether Irvine acted reasonably under the circumstances. Either way, adjudication of petitioner's claims might not require searching judicial inquiry into the soundness of a distinct military judgment, or the considerations underlying it, in the manner that lower courts have regarded as barred by the political question doctrine.

The court may also have erred in finding "no readily available judicial standard with which to answer this question." Pet. App. 32a. To be sure, jurors may be less able to rely on their "common sense and everyday experience," *id.* at 33a, to determine what a reasonably prudent person would do in these challenging circumstances, but that does not mean that the issue is always nonjusticiable under the political question doctrine. A juror may not be readily familiar with the intricacies of a complicated malpractice or products liability claim, but the introduction of documentary and testimonial evidence, including expert testimony, permits courts to resolve such claims. Even so, the need for certain evidence in a suit against a private contractor may itself give rise to serious concerns (*e.g.*, classified information in certain circumstances, burdens on the military), rendering such evidence unavailable—and perhaps independently precluding the adjudication of some combat-related tort claims, greatly complicating the adjudication of others, and raising broader concerns about such litigation.

c. In any event, there is no circuit conflict on the question presented. Only three court of appeals decisions have addressed the political question doctrine in this context, and two (including this case) are from the Eleventh Circuit. Petitioner does not claim an intra- or

19

inter-circuit conflict. Accordingly, this Court's review is unwarranted.

In *McMahon* v. *Presidential Airways, Inc.*, 502 F.3d 1331 (2007), the Eleventh Circuit affirmed the district court on interlocutory appeal, holding that the political question doctrine did not preclude tort claims brought by service members against a civilian contractor arising from the crash of a contractor-operated plane carrying troops in Afghanistan. While recognizing that "military activities often give rise to political questions," *id.* at 1358, the court concluded that "at least on the limited record now before" it, the contractor "has not shown that the military retained control or responsibility over the aspects of [its] operations that [plaintiff] is challenging," *id.* at 1360, 1362. The court also determined that manageable standards existed to adjudicate those claims, even though the standards would have to be modified to take account of the "less than hospitable environment." *Id.* at 1364 ("We readily acknowledge that flying over Afghanistan during wartime is different from flying over Kansas on a sunny day. But this does not render the suit inherently non-justiciable."). In the end, the court made clear that it did "not (and could not) hold that this litigation will not at some point present a political question." *Id.* at 1365. The case has since settled. See 05-01002 Docket entry No. 335 (M.D. Fla. Apr. 1, 2010).

In *Lane* v. *Halliburton*, 529 F.3d 548 (2008), the Fifth Circuit held that the political question doctrine did not preclude claims brought by contractor employees injured or killed when insurgents attacked their fuel convoy in Iraq. The employees alleged that the contractor authorized the convoys despite knowing the routes were vulnerable to insurgent attacks, and that the con-

20

tractor made fraudulent promises in recruiting employ-
ees regarding the level of protection drivers would re-
ceive. *Id.* at 555. The court concluded that it appeared
such claims could be resolved "without second-guessing
the acts and decisions of the Army," but acknowledged
that the "negligence allegations move precariously close
to implicating the political question doctrine, and fur-
ther factual development very well may demonstrate
that the claims are barred." *Id.* at 567. The case was
remanded to the district court and, after discovery, the
defendant contractors renewed their motion to dismiss
on political question grounds. The district court denied
that motion, *Fisher* v. *Halliburton*, No. H-05-1731, 2010
WL 519690, at *10 (S.D. Tex. Feb. 8, 2010), and the de-
fendants have filed an interlocutory appeal, *id.* No. 10-
20202 (5th Cir. filed Mar. 31, 2010).

The Fifth and Eleventh Circuits thus agree that
state law tort suits against private contractors are
barred by the political question doctrine if adjudication
would require reexamination of sensitive military poli-
cies or judgments. And they agree that determining
whether such reexamination is required will often neces-
sitate a developed factual record. The differing out-
comes in this case, on the one hand, and *McMahon* and
*Lane*, on the other, are based not on divergent under-
standings of the applicable legal principles, but on the
fact that "different cases involving different claims re-
quire their own discriminating inquiry under *Baker*."
*Lane*, 529 F.3d at 568. There is no conflict among the
courts of appeals.

d. As developed and applied in this context by the
lower courts, the political question doctrine involves an
inherently factbound inquiry that can itself be unduly
burdensome, intrusive, and unpredictable. One of the

21

government's primary concerns is that the increasing litigation-related demands on the military and its personnel will disrupt and detract from the military's paramount duty to provide for the national defense. Cf. *United States* v. *Stanley*, 483 U.S. 669, 682 (1987) (recognizing that the government's interests are also threatened by the prospect of "compelled depositions and trial testimony by military officers concerning the details of their military commands"). Yet the applicability of the political question doctrine in this context tends to be resolved only after extensive discovery—discovery that very well may involve military personnel and documents, thereby raising these very concerns. A suit by or on behalf of an injured service member against a contractor may also effectively implicate the service member's relationship with his commander or other military officials, especially when the contractor's operations are integrally related with military operations Cf. *Feres*, 340 U.S. at 146.

For reasons such as these, the D.C. Circuit's recent decision in *Titan*, *supra*, drawing on the combatant activities exception in the FTCA, 28 U.S.C. 2680(j), found common law damage actions preempted "where a private service contractor is integrated into combatant activities over which the military retains command authority." 580 F.3d at 9. In that court's view, the military's interests are "equally implicated whether the alleged tortfeasor is a soldier or a contractor engaging in combat[-related] activities at the behest of the military and under the military's control," "the prospect of military personnel being haled into lengthy and distracting court or deposition proceedings" is just as likely, and "finger-pointing" would inevitably lead to "extensive judicial probing of the government's wartime policies." *Id.* at

22

7-8.  These concerns do not necessarily render a case nonjusticiable under the political question doctrine.  But whether or not they do—and regardless of the merits of the court's particular approach in the circumstances of *Titan* and whether other courts of appeals will agree with it—the courts have begun to grapple with these issues and have identified significant concerns when state tort law is used to address private claims against government contractors that arise out of services they provide to the U.S. military in war zones.

In the end, consideration of the applicability of various defenses in suits against contractors supporting military operations in war zones would benefit greatly from further percolation.  See *Vasquez* v. *United States*, 454 U.S. 975, 976 (1981) (Stevens, J., respecting the denial of certiorari) ("Often the law develops in a more satisfactory fashion if this Court withholds review of novel issues until differing views have been expressed by other federal courts.") (footnote omitted).  The lower courts are able to examine the full array of relevant defenses—in conjunction with one another and in light of the relative benefits and burdens of each.  This case presents only one of several such defenses, and it does so in the absence of a circuit conflict and at a time when the courts of appeals are only beginning to consider the broader issues involved in litigation in this area.  The Court should deny the petition for a writ of certiorari.

23

**CONCLUSION**

The petition for a writ of certiorari should be denied.

Respectfully submitted.

NEAL KUMAR KATYAL
*Acting Solicitor General*

TONY WEST
*Assistant Attorney General*

EDWIN S. KNEEDLER
*Deputy Solicitor General*

MELISSA ARBUS SHERRY
*Assistant to the Solicitor
General*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
*Attorneys*

MAY 2010