1                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND

2                      SOUTHERN DIVISION

3  IN RE:  KBR, INC.,           Civil No.  RWT-09-md-2083

4  BURN PIT LITIGATION         Greenbelt, Maryland

5                     March 10, 2017

6                     9:00 a.m.

7  -------------------------/

8               TRANSCRIPT OF MOTIONS HEARING
          BEFORE THE HONORABLE ROGER W. TITUS

9             UNITED STATES DISTRICT JUDGE

10  APPEARANCES:

11  For the Plaintiffs:    FRED BAKER, ESQUIRE
                    JAMES LEDLIE, ESQUIRE

12                   LISA SALZBERG, ESQUIRE
                    ELIZABETH SMITH, ESQUIRE

13

14

15  For the Defendant:     ROBERT MATTHEWS, ESQUIRE
                    BENJAMIN RAZI, ESQUIRE

16                   DANIEL RUSSELL, ESQUIRE
                    CHASE JOHNSON, ESQUIRE

17                   MARIANNE KIES, ESQUIRE

18

19  Court Reporter         Lisa K. Bankins RMR FCRR
                    United States District Court

20                   6500 Cherrywood Lane
                   Greenbelt, Maryland 20770

21

22  Proceedings recorded by mechanical stenography,
  transcript produced by notereading.

23

24

25

1

1          TABLE OF CONTENTS

2              TRIAL

3             WITNESSES

4    On behalf of the Plaintiffs:

5    KEVIN ROBBINS

6    Direct examination by Ms. Smith.......... 47
     Cross-examination by Mr. Johnson......... 62
7    Redirect examination by Ms. Smith........ 82

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1   THE COURT:  Ready to proceed?

All right.  Before we begin, I just wanted to --
if you notice the bags under my eyes, I wanted to certify
to you that I personally read last night the designations
of the transcript of Brad Lockhart and you don't need to
do anything further in connection with that in support of
your case.  I would expect you to in your closings to
address what's significant or insignificant as the case
may be about this transcript, but I want to tell you I did
read it.  But I'm awake.  You may proceed.

MR. LEDLIE:  Thank you, Your Honor.

THE COURT:  You may proceed.

MR. LEDLIE:  Thank you, Your Honor.  May it
please the court.  Ready?

THE COURT:  You may proceed.

MR. LEDLIE:  Okay.  Thank you.

Your Honor, this is a two-day hearing and today
is the plaintiffs' day to put on their evidence in support
of the case.  And as we do that, Your Honor, it is
important for us to take a few moments to summarize the
evidence that has been presented to date and set in
context how we will -- we will not be calling six
witnesses -- six live witnesses, Your Honor.  We're going
to be calling two live witnesses and going through some

3

1    demonstrative slides summarizing the evidence in the

2    briefing and the evidence in the case through the page and

3    line designations.  So I just want to do a little bit of

4    housekeeping first, Your Honor.

5              I believe at the end of the day yesterday,

6    Mr. Baker moved into evidence the exhibits from our

7    briefing.  But we have provided to the deputy clerk a

8    exhibit list showing those exhibits and we would ask that

9    they be formally received into evidence at this time.

10             THE COURT:  Do I have physical copies of all of

11   them?

12             MR. LEDLIE:  We have provided the clerk a disc

13   Your Honor.  We have hard copies here as well that we will

14   provide to the court.

15             THE COURT:  We've got large materials with the

16   briefings.  You're talking about additional things beyond

17   what was in the briefing.  Correct?

18             MR. LEDLIE:  At this time, Your Honor, we have

19   the briefing exhibits, the hard copy and we have

20   everything in the briefing and everything that we will

21   cover today on a hard drive that we've given to --

22             THE COURT:  Was I correct when Mr. Matthews

23   began when he stated that there had been no additional

24   submissions with respect to the disputed declarations that

25   were the subject of the motion that we heard last week

1      that you're not going to rely upon those?

2              MR. LEDLIE:  Your Honor, they are in the -- we

3      did not submit any additional briefing.  You heard our

4      argument, Your Honor, and we believe that because there

5      has not been any discovery in this case, substantive

6      discovery on violations, that at this juncture, those

7      allegations must be accepted as true.  However, if your

8      court needs any question about that in addition to the

9      other evidence that we'll be putting on with respect to

10     control and integration that relate to that --

11             THE COURT:  Well, what I asked you to do when we

12     had the conference was that -- the samples of the

13     declarations that were attached to the moving papers had

14     serious problems in terms of personal knowledge, in terms

15     of relevance and so forth and I asked you that if you

16     wanted to rely upon any particular declaration for

17     purposes of this hearing, that I would expect you to give

18     me a submission that would say which affidavit you're

19     relying upon and what specific paragraphs so I can go

20     right to the chase and see if there's something there that

21     would be appropriate for me to consider.  You didn't do

22     that.  So I'm assuming you're not relying upon those

23     declarations for the purposes of this hearing which is on

24     the pure jurisdictional questions.  Is that right?

25             MR. LEDLIE:  Your Honor, we understood Your

1    Honor's request.  We did not submit any specific

2    paragraphs.  We don't believe that they are relevant, Your

3    Honor, because we believe that the allegations because

4    discovery hasn't been permitted on them must be accepted

5    as true at this time.

6              THE COURT:  All right.  You may proceed.

7              MR. LEDLIE:  Thank you, Your Honor.

8              The two questions which the evidence will

9    address today, Your Honor, are, of course, control and

10   integration.  And in discussing the evidence, Your Honor,

11   we need to make sure that the court is -- that based on

12   some questioning yesterday, we want to make sure the court

13   is conducting the necessary discriminating analysis as to

14   the questions at issue.  And so, Your Honor, at this time

15   we will discuss what control -- the evidence that relates

16   to control which has come up yesterday.

17             The test, Your Honor, the parties have differing

18   beliefs on what control means in this case or what is

19   required in order for the parties to successfully assert

20   the political question doctrine.  The case law, Your

21   Honor, is clear though that it has to be direct and

22   plenary control and based on the evidence from all the

23   witnesses yesterday, the independent contractor status of

24   KBR was scrupulously maintained with respect to waste

25   disposal.  And so we would ask that as Your Honor does

1    consider the evidence throughout today and as you look at

2    the evidence from yesterday, you consider whether the

3    control at issue is so pervasive, so overwhelming that

4    there really was nothing else that KBR could do at any

5    point with respect to waste disposal because that is the

6    proper test for this court to consider.

7              Similarly with respect to integration, there

8    will be -- there was testimony yesterday that KBR was

9    integrated into certain meetings and that their movements

10   across theater were heavily integrated with the military.

11   But the operative test, Your Honor, is whether they were

12   integrated for the specific combatant activity of waste

13   disposal and water services inside of the bases.  That is

14   the activity at issue and we want to make sure in

15   considering the evidence that Your Honor is guided by the

16   case law which says that not only do you need integration,

17   but the integration needs to be such that the military

18   chain of command exercises command authority.

19             And you heard testimony yesterday and you'll

20   hear testimony today, Your Honor, that that test of

21   integration as to waste disposal, what was actually going

22   on at the burn pit, you read Mr. Lockhart's deposition,

23   you'll hear from Mr. Robbins live today, you'll hear from

24   an ACO, one of these contract officers we've heard so much

25   about you'll hear from in the form of Augusta Fehn today,

1    Your Honor, and it will be clear to Your Honor that both

2    the combatant command and the contracting command

3    understood that KBR employees and KBR as an entity was not

4    under their command authority, but rather subject to the

5    contractual controls, the contractual authority that

6    relate to all government contracts.

7            With that said, Your Honor, we'll move on to the

8    specific task, the specific combatant activity, as Your

9    Honor has determined, of waste disposal.  But it's

10   important for Your Honor to understand that there are two

11   core components to plaintiffs' allegations with respect to

12   waste disposal.  The first is that at many bases, KBR was

13   never authorized or directed as required by the contract

14   to operate or use a burn pit at all.  But secondly, Your

15   Honor, and I think what we've not -- Your Honor's

16   questioning yesterday did not seem to capture is that we

17   do allege as we always have that if the military did issue

18   any directive or authorization to KBR, which they did at

19   certain bases to use burn pits, the question is still were

20   they directed to burn anything and everything.

21           And General Vines could not have been clearer on

22   that subject, Your Honor, that HAZMAT materials -- yes,

23   burn pits he thought were okay.  But HAZMAT materials were

24   not okay.  We heard testimony from numerous other

25   witnesses yesterday concerning the fact that they are

1    prohibited items.  So violations are very much a part of

2    this case, Your Honor, and there's no way that you can

3    grapple with the Combatant Activities Exception or for

4    that matter jurisdiction without considering the full

5    panoply of plaintiffs' claims.

6            In that regard, in our brief, Your Honor, there

7    are a number of paragraph headings which summarize our

8    evidence on the operative points at issue here and the

9    first one that I'd like to go over -- do we have a copy of

10   the slides?

11           THE COURT:  That would help because I haven't

12   got the best eyesight in the world looking across the

13   room --

14           MR. LEDLIE:  Nor do I.

15           THE COURT:  -- and there's a thing over here,

16   but it's hard to read.  That will be great if you give me

17   the slides.  Thank you.  Do you have another one by any

18   chance?

19           MR. LEDLIE:  I do, Your Honor.

20           So, Your Honor, when you're looking at the two

21   questions of whether or not KBR was authorized or directed

22   to use a burn pit at a base or whether or not they were

23   authorized and directed to burn everything and anything at

24   that burn pit, you need to look at how would the

25   government pursuant to military doctrine tell KBR that

1          they had authority or direction.  And it is critically

2    important to understand that while there was one mission

3    in -- one global mission in Iraq, Your Honor, that the

4    military understood and respected a desire and a reality

5    that contracting functions would be handled through the

6    contracting command and that operational war fighting

7    functions would be handled through the operational army or

8    the war fighting army, Your Honor, and there are very

9    drastic differences between these two commands and there

10   are very drastic differences between their authority and

11   responsibilities with respect to interacting with

12   contractors.

13          For instance, Your Honor, the operational arm,

14   this would include everybody from General Vines, General

15   Sanchez, the base commanders down to the squad level, Your

16   Honor, are distinct from the contracting arm.  We would

17   cite, Your Honor, to paragraphs 20 and 24 from our brief

18   where there is additional information to back up this

19   statement, Your Honor, but it's critically important to

20   understand that the person using the service, the war

21   fighter, certainly has an input.  They state their

22   requirement of what they need done, but it's not up to

23   them.  They don't have the authority.  They said that they

24   respected -- every witness that took the stand, KBR and

25   the military and everyone that you will hear from today

1    says, Your Honor, that the contracting process even in the

2    time of war, even under fire as much as possible, whenever

3    possible must be respected.

4          That the war fighter does have a role in the

5    contracting process, but that once he's stated what he

6    needs, it's up to the folks on the contracting arm, the

7    Rock Island and DCMA folks to determine whether or not in

8    their judgment, that is something that they can convert

9    into an enforceable contract and what the terms and

10   conditions the contracting officer in their judgment and

11   discretion determine are in the government's best

12   interest.  That's the way the military worked even in the

13   combat arena.

14         For that reason, the operational arm does not

15   handle contracting issues.  We'd cite Your Honor

16   specifically to paragraphs 20 and 21 of our brief.  We'd

17   also cite Your Honor to General Vines' testimony, General

18   Sanchez's testimony, Mr. Mayo's testimony, Mr. Singleton's

19   testimony.  Every witness who took the stand said that the

20   operational arm of the military are not the people that

21   contract or determine the terms and conditions.  And the

22   terms and conditions of the contract, Your Honor, is what

23   this case is about as administered in the field by the

24   contracting arm.  It's not that the military doesn't have

25   the ability to control contractors.  It's not that the war

1    fighters don't have the ability to be heard.  But at the

2    end of the day, the United States government has made a

3    determination that the contracting process shall be

4    followed on the battlefield for very important reasons

5    because there's a need for an independence.  There's a

6    need for a person that is aware of how to properly manage

7    an independent contractor on a military installation and

8    the people that are the most knowledgeable about that are

9    the contracting professionals and the contracting arm.

10   They do get some feedback, Your Honor, from the CORs which

11   we've heard about.  But it's actually the contracting arm

12   that gives the COR a very limited delegation.

13          For that reason, as we cited in paragraph 23 of

14   our brief, Your Honor, the operational arm did not manage

15   the LOGCAP contract.  They couldn't modify the terms.

16   They couldn't put any different performance standards in

17   there that the contracting arm hadn't already placed in

18   there.  If they needed something done, they had a line of

19   communication, not a direct command, but they had a line

20   of communication to the contracting folks and they used

21   that.

22          We saw -- Mr. Baker, how many contracting

23   documents -- 600,000 contracting documents, Your Honor.

24   The contracting process happened.  Terms and conditions of

25   contractors were modified.  But when the language says if

1    you're going to use a burn pit, you have to do it at the

2    direction of the ACO and everybody that took the stand and

3    everybody that will take the stand and every piece of

4    evidence will show that that wasn't happening with respect

5    to burn pits.  You have to enforce the contract, Your

6    Honor, because the operational arm cannot give direction

7    to contractors as a matter of army policy and procedure.

8    Paragraphs 2, 27 and 28.

9           The operational arm respected the process and

10   followed the established contracting channels.  Paragraphs

11   30, 31 and 59, Your Honor, more specifically of our brief

12   speak directly to this point.

13          So let's talk about the contracting arm, Your

14   Honor, and the evidence in our brief to this point as well

15   as Your Honor will be familiar with the evidence that

16   you've heard.  But as I mentioned, you will be hearing

17   from an actual ACO today, Ms. Augusta Fehn, and I would

18   ask that Your Honor consider these points when considering

19   that testimony.

20          The contracting arm is distinct from the

21   operational army.  They are the ones that handle all

22   contracting issues concerning what a contractor is

23   required to do in theater with respect to defining the

24   scope of work, the terms and conditions, the performance

25   standards, the reference documents that apply.  And one of

1    those reference documents that apply, Your Honor -- and

2    Mr. Baker will go into the contract in greater detail --

3    is the contractors on the battlefield, which we'll go

4    through in greater detail, but that's a document which

5    both the United States military and KBR as an entity

6    agreed applied to the LOGCAP III contract and agreed to

7    honor in the process.  So we ask that Your Honor also

8    respect that decision by the United States military to

9    determine how a contractor can be managed on the

10   battlefield.

11            Paragraph 21 speaks to how Rock Island and DCMA

12   will decide what goes in a contract.  This includes a

13   discussion of the fact that there's no doubt that the war

14   fighter has input.  But the ultimate decision, the final

15   decision, the binding decision can only be executed

16   through the contracting arm with the rare exception, Your

17   Honor, of limited force protection efforts because the

18   contract itself recognized that when it comes to things

19   like convoy movements in theater, that's not something

20   that civilian contractors know how to protect themselves

21   against nor can they under the Geneva Convention.  So in

22   that limited instance, absolutely the military does put

23   themselves in front, behind and in the middle of KBR and

24   control them from point A to point B and there's really

25   nothing KBR can do when they're boxed in on all sides and

1    they're under the direction, the personal and precise

2    direction of the convoy commander.  In that situation,

3    they are under the direct and plenary control of the

4    military.  But with respect to the contract documents, it

5    will be clear that within the confines of their work area,

6    KBR maintained operational control, full operational

7    control.

8              You've heard the evidence, Your Honor, that the

9    contracting professionals did not directly supervise KBR's

10   personnel.  They're an independent contractor and they

11   were managed and controlled consistent with the

12   contracting framework that applies to all government

13   contractors.  There were some exceptions made for the

14   military realities in the field without a doubt, Your

15   Honor.  But when it comes to day to day, what was going on

16   on a base, it's the contracting arm that manages, that

17   defines and that is in charge of the contractor and they

18   do so respecting the contractual independence and the

19   functional independence of the contractor as an entity and

20   their personnel as not being soldiers and not being in the

21   military chain of command or command authority.

22             ACOs, any directions they did provide would be

23   in writing.  You heard the testimony on that, Your Honor.

24   We have additional cites to paragraphs 30 and 31, Your

25   Honor, of our brief.

1          The contracting process was followed
2    specifically in the case of the LOGCAP III contract at
3    issue here, Your Honor.  And additional citations and
4    additional testimony that you heard from the witnesses
5    yesterday and the ones that you'll hear today which would
6    include Colonel Coponis, Augusta Fehn will be found in our
7    brief at -- and for that matter Commander Walsh, who
8    you'll hear from shortly in terms of a summary board, Your
9    Honor, but we would refer you to paragraphs 19, 26, 30 and
10   59.
11         We have two theaters of war, dozens of bases.
12   To be most efficient with the court's time, we're trying
13   to go through the evidence so you know when you get back
14   into chambers and you're asking yourself how do you
15   conduct the discriminating analysis, where is the best way
16   for you to go, that's what we're going to be doing today,
17   Your Honor, is helping walk you through what the evidence
18   is.
19         And including the fact that contract management,
20   Your Honor, that's not a political question.  There's
21   discernible standards in a contract.  They are written.
22   They are in writing and they are easily discernible like
23   any other contract and they are what they are.  But what
24   they're not is an exercise of command authority or direct
25   supervision of the personnel that you would need in order

1    to invoke the political question doctrine.  In support of

2    that, Your Honor, the entirety of our brief, but in

3    particular, paragraphs 27 and 29, Your Honor.

4           So I spoke briefly about Colonel Damon Walsh,

5    Your Honor, and to set him in context briefly, he was the

6    DCMA commander.  The contracting arm, the contracting

7    command in Iraq from 2003 to 2004.  So this was the lead

8    contract officer in theater for DCMA at the time of

9    General Sanchez's tenure in theater.  He came in I believe

10   a little bit after General Sanchez in September and stayed

11   until 2004.

12          And we asked Colonel Walsh, DCMA commander in

13   Iraq, "is General Sanchez a member of the contracting

14   force of the army and he said no.  We said does he have

15   the authority to modify a contract and he said no, Your

16   Honor.  Would it be appropriate for General Sanchez to

17   tell KBR how to technically carry out the term of the

18   contract?  Would that be appropriate?  And his answer was

19   it would be inappropriate for General Sanchez or for any

20   non-acquisition official to give direct directions to any

21   contractor.  His or her mechanism for doing that is

22   through the acquisition work force."  The contracting

23   command, Your Honor.

24          And he was further asked by KBR "would I agree

25   or would I accept that General Sanchez would have

1    authority to direct KBR on doing burn pits?  My answer

2    would be no.  General Sanchez didn't have any authority to

3    direct KBR to do anything."  Testimony of Commander Walsh.

4    And as referenced in the paragraph above, that same logic

5    applies to any of the operational commanders who are not

6    part of the acquisitional workforce.  Anybody at a base,

7    any base commander, any mayor cell, they are not part of

8    the acquisitional work force, Your Honor.  They are a

9    separate command.

10         I mentioned Colonel Walsh because he's one of

11   the witnesses that KBR has relied upon for the premise

12   that burn pits were the de facto default mechanism for

13   KBR.  But when you do a discriminating analysis, Your

14   Honor, this slide will show you that his testimony makes

15   clear, first of all, he doesn't have any background or

16   experience.  He describes himself as a pig looking at a

17   wristwatch when it comes to waste management, Your Honor.

18   Pages 66, 15, 19.  Do we have the Walsh testimony?

19         But, Your Honor, we did the slide we handed you.

20   It breaks down the testimony, Your Honor, into these

21   concrete points that KBR -- he doesn't recall whether KBR

22   ever received authorization or instruction to use burn

23   pits as a default method of waste disposal.  He never

24   discussed the topic of burn pits with KBR management.

25   He's the DCMA commander.  He was involved in all the base

1    planning operations, the statements of work and the ROM

2    discussions that led up to the contracts being issued.  He

3    said burn pits were not discussed.

4         He agrees that any regulations or limitations on

5    burn pits included in the contract apply to KBR.  He

6    doesn't know what they specifically were, but he agrees

7    that if they were in, they're binding.

8         The LOGCAP contract was managed using the same

9    tools as other government contracts, Your Honor.  Pages

10   46, 47, 48 and 202-203, Your Honor.

11        Battlefield commanders -- that would be the

12   operational military -- and DCMA commanders don't have

13   command authority over KBR or its employees.  104 to 106.

14   107 to 108, Your Honor.  That is in and of itself enough

15   to defeat the Combatant Activities Exception, Your Honor,

16   because the reality is contractors were independent in

17   their management and in their organization and in the way

18   that they were treated by the military.  They were

19   controlled exclusively through the contracting process.

20        Finally, Your Honor, on the issue of assignment

21   of land, Colonel Walsh did speak to that and he made it

22   clear that once KBR was assigned land on a base, it was

23   still expected to do its job in the assigned area and

24   bring to the command's attention any health hazards posed

25   by its operations.  And he does not recall KBR ever being

1    asked or ever asking to have a burn pit operation moved

2    and having that request denied.  That's in the record,

3    Your Honor.  Pages 111 to 112.

4            He's not the only contracting official that

5    we've heard from in this case.  Mr. James Loerhl, who was

6    actually at Rock Island, the other contracting command.

7    Division Chief for LOGCAP III from 2004 to 2009.  So we

8    have to look at timeframes here, Your Honor.  And from

9    2004 to 2009 and then Director of Contracting at Rock

10   Island again in 2009 and 2010.

11           Mr. Loehrl said -- say -- "let's say, General

12   Sanchez, he comes along and he actually wants to direct --

13   issue a direct order to a KBR employee.  Is General

14   Sanchez allowed to do that?  No."

15           And General Sanchez explained that he handed his

16   command down to the military chain of command.  Doesn't

17   even know if KBR was doing any waste disposal at that

18   time.  But why would he not be allowed to do that?

19   Because he's not a contracting officer.  That's the

20   question that Your Honor needs to be looking at.  And he

21   did not have the authority to change, modify or direct the

22   contractor in any of those fashions.  KBR was not over

23   there as a direct employee of the army and so we needed to

24   maintain that independence.  And so, no, he was not

25   allowed to do that.

1          Moreover, General Robert Radin, the commander,

2    two-star general, Army Sustainment Command, Rock Island,

3    the contracting authority for the LOGCAP III contract was

4    asked, "if something isn't included in the terms and

5    conditions of the contract, can a soldier or officer in

6    the field" -- can a -- I'm sorry.  You can see it, Your

7    Honor.  "Can an officer or soldier in the field supplement

8    or change that contract?  His answer is no.  The

9    contracting command as a matter of military doctrine

10   policy and chain of command has determined that a

11   contractor has to be managed by the contracting command

12   and that their management must be done in keeping with the

13   independent contractor status.  They can be controlled

14   through contractual means.  They can be provided force

15   protection when necessary.  But in terms of their

16   day-to-day work, the only person that directs a contractor

17   is the contract document or the contract officer.  That's

18   the law."

19          MR. MATTHEWS:  Your Honor, before Mr. Ledlie

20   goes any further, we would like to interpose an objection.

21   This sounds to me like a surreply.  This is legal

22   argument.  This is citing chapter and verse, page and line

23   from testimony.  Mr. Walsh could have been brought here.

24   Mr. Loehrl could have been brought here.  I'm not sure I

25   understand the value of it.

1          We did agree to interim argument, but we thought

2     that meant, you know, you're going to summarize evidence

3     that the court has heard.  This is pure additional

4     argument.  It's almost as if Mr. Ledlie himself is

5     testifying and we would ask the Court to at least set some

6     limitations on whether this is --

7          THE COURT:  He's got the day.  He's in charge of

8     this day.  I'll permit him to present to me what amounts

9     to references to snippets in the record that we're here on

10    a motions hearing.  So I'll permit him to do it.  It's

11    almost like a closing argument.  But that's not going to

12    happen until Monday.

13         And when the day is finished, I want to make

14    sure I tell counsel I want you to be ready for a pesky

15    judge in closing argument on Monday because I'm holding

16    off in asking any questions or challenging any statements

17    until Monday.  But on Monday, it's going to be an oral

18    argument.  I want to ask pesky questions to both sides and

19    I'll try to give you some idea of areas I'm interested in

20    that you need to emphasize and address on Monday.  But no,

21    I'll permit him to do this.

22         MR. MATTHEWS:  Thank you, Your Honor.

23         THE COURT:  The objection is overruled.

24         MR. LEDLIE:  Thank you, Your Honor.

25         One of the exhibits to our brief and it was also

covered with General Sanchez yesterday was the Contractors

on the Battlefield Field Manual dated January the 3rd,

2003, Your Honor.  And because it is a voluminous

document, Your Honor, I have chosen to direct you to some

specific passages that we think are most germane to the

case.  The first one is plaintiffs' -- this is Plaintiffs'

Exhibit 6023.  And page 5, Your Honor, there's a

description of -- is there a way to get this up on my

screen?

It discusses -- and I should preface this by

saying, Your Honor, that this is one of the documents,

reference documents which once again was actually included

as part of the contracting process.  It was issued months

before the ground evasion in Iraq and it specifically is

intended to address the use of contractors on the

battlefield as an added resource for the commander.

It's important to note that it was -- its

purpose and this is handed out to all military commands

through the chain of command as army doctrine is to define

the role of contractors, describe their relationship to

the combatant commanders -- that's the war fighters, the

operational military -- and the army service component

commanders.  That includes the Rock Island division.  DCMA

as Your Honor is probably aware by this point is actually

a D.O.D. organization, but they were operating as

1    delegated through Rock Island and present their mission of

2    augmenting these sources.  But this manual was intended as

3    a guide to both army contracting professionals and

4    contractors in implementing planning decisions and

5    understanding how contractors will be managed and

6    supported by the military forces they augment.  That's

7    significant, Your Honor, because KBR agreed that this was

8    a reference document that applied in theater.

9         It makes clear that the duties of a contractor

10   are established solely by the terms of the contract.  An

11   authority over contractors is exercised through the

12   contracting officer.  Page 11.

13        The whole foundation of the duties in this case,

14   the responsibilities of KBR, are easily discernible.  "It

15   is important to understand that the terms and conditions

16   of the contract establish the relationship between the

17   military, U.S. government and the contractor.  This

18   relationship does not extend through the contractor

19   supervisor to its employees.  Only the contractor can

20   directly supervise its employees.

21        The military chain of command, the operational

22   military chain of command exercises management control --

23   well, actually it's any military command.  The military

24   command chain of command exercises management control

25   through the contract."  That's what it says.

1        And when it comes to the terms and conditions of
2   the contract, it's made clear that "the contractor is
3   expected to be self-sufficient, handling all actions
4   necessary to perform under the terms and conditions of the
5   contract without significant assistance from the
6   government."  This was not a situation of the military
7   commingling assets in burn pits or at water stations, Your
8   Honor.  KBR had those contractual obligations.  They were
9   the ones that were required under the contract to perform
10  those functions.

11       "Management of contractor activities is
12  accomplished through the responsible contracting
13  organization and not the chain of command."  Got to do it
14  through the contracting arm, not the military operational
15  chain of command.

16       "Commanders do not have direct control over
17  contractors or their employees."  Tests for political
18  question, direct control, commanders don't have that.
19  Only the contractors manage, supervise and give directions
20  to their employees.

21       "Commanders must manage contractors through the
22  contracting officer or ACO," Your Honor.  That's because
23  as 5.8 states "the contractor's responsibility regarding
24  support provided by the government is to ensure that it
25  complies with the terms and conditions of the contract

1   concerning government provided support.

2          The role and responsibilities of the COR, the

3   contract officer representative, are a matter of military

4   doctrine and policy.  They are laid out on page 14 of this

5   exhibit, Your Honor, which states that "it should be noted

6   that the COR represents the contracting officer only to

7   the extent delegated in the written appointment," Your

8   Honor.  It's not an unlimited obligation.  And he does not

9   have the authority to change the terms and conditions of

10  the contract.  Only a PCO or ACO if appointed may make

11  changes to an existing contract.  This point is driven

12  home on the following page that says that "the contracting

13  officer, not the COR is the only government official with

14  the authority to direct the contractor or modify the

15  contract."

16         Lastly, in Appendix A on page 91, we direct Your

17  Honor specifically to paragraph A(3).  It makes clear that

18  "although a COR provides a vital link between the military

19  operational" -- is what they're discussing there -- "and

20  the contractor, there are certain limits to his authority.

21  A COR is prohibited from making any commitments or changes

22  that affect the price, quality, quantity, delivery or

23  other terms and conditions of the contract."  That's army

24  policy.  Military decision set forth.

25         Interfering with the contractor's management

1   prerogative by supervising contractor employees or

2   otherwise directing their work efforts is something that a

3   COR is not authorized to do.  He doesn't have the

4   authority.  He's not supposed to do it.  There's not

5   evidence that they were doing it.

6          It wasn't only the military that understood this

7   fact, Your Honor.  Mary Wade, senior contract manager for

8   the LOGCAP III contract.  The highest person at KBR when

9   it came to that function was asked the question, "and so

10  regardless of what a mayor cell may want on the military

11  side, they had to get it through the contract process at

12  Rock Island?"  And her answer was yes.

13         The operational military can ask, but what they

14  get is defined by the contract officer in the terms and

15  conditions of the contract.  If they need to modify it,

16  they need to go back to the contract officer and get

17  modifications.  Certainly, in the theater of war, you can

18  get verbal direction, but it would always be followed up

19  in writing, especially when something is fundamental as

20  the basic way in which waste is going to be managed at a

21  given base on a day-to-day basis.

22         I will at this point let Mr. Baker walk you

23  through what these terms and conditions of the contract

24  that we've been discussing actually say.

25         MR. BAKER:  May it please the court.  Fred Baker

1    for the plaintiffs.  First, I will hand up some excerpts

2    of the contracts that I'm going to be discussing.  These

3    are cited in our brief and part of the items that Mr.

4    Ledlie moved in earlier this morning.  But rather than

5    giving Your Honor six inches of paper, I've tried to boil

6    it down to the ones that I'm actually going to talk about.

7                THE COURT:  God bless you.

8                MR. BAKER:  So the first document we're going to

9    be looking at is Exhibit 1070 and this is the umbrella

10   LOGCAP contract.  If we could first turn to Section 1.11.

11   This is a cor provision of the umbrella contract that

12   applies across the board throughout the entire LOGCAP III

13   process and here's what it says.  "The relationship of the

14   contractor and the U.S. Army shall at all times be that of

15   independent contractor.  The contractor shall have

16   exclusive supervisory authority and responsibility over

17   employees.  The government shall manage the contract, but

18   will not exert control or supervision over contractor

19   employees."

20                So as Your Honor looks at the political question

21   doctrine and the plenary control, the direct control, this

22   is a very informative paragraph that overhangs the entire

23   analysis.  What is also significant, Your Honor -- and I

24   mentioned this briefly in my opening statement -- if you

25   look back at the Taylor case, you'll see that the Taylor

1   court relied on this paragraph as one of the basis for not

2   finding the first Taylor factor having been satisfied.  So

3   we think it's a very significant paragraph that should be

4   considered.

5           If we could go next to paragraph 1.14?  Now

6   we've discussed about the issue of quality control.  KBR

7   was the initial entity that was responsible for ensuring

8   that its performance complied with the terms of the

9   contract.  It says "the contractor will be responsible for

10  the quality, technical, logistical and financial accuracy

11  and the coordination of all aspects of performance."

12          Let's look at 1.16.1.  Here we have one of the

13  umbrella performance standards that is in the contract and

14  it says "any contractor personnel working on this contract

15  are required to adhere to sound environmental practices

16  and all applicable environmental protection and

17  enhancement laws and regulations.  Environment protection

18  matters shall be coordinated with the PCO or designated

19  representative and commander responsible for the AO, area

20  of operation."

21          So those were the high points that I think of

22  the umbrella contract that I wanted to touch upon.

23          If next, we could go to the first task order

24  that I'm going to discuss, which is Task Order 59 and

25  that's Exhibit 1102.  Try to walk through this.  If first

1    we could go to -- and I touched on some of this briefly

2    yesterday.  So I'm not going to dwell on it too much.  But

3    if we could first go to Section 8.9?  And here's the

4    tasking.  Here's what the government tasks KBR with and

5    this is from 2004.  Like I said, Your Honor, there are

6    many of these task orders.  We've attached them to our

7    brief.  I don't have time to go obviously through all 50

8    or 60 that we have.  But this will give you a sampling I

9    believe.

10           This paragraph has no reference to using a burn

11   pit.  It simply says in general terms handle the waste for

12   us.  Engage in waste management and disposal.  It

13   certainly has if you read through towards the bottom, it

14   says "the contractor is responsible for collecting,

15   storing HAZMAT, HAZ waste generated by internal operations

16   and utilizing DRMS to transport and dispose."  So

17   obviously, those aren't considered to be burnable items,

18   it says treat these separately and the military units are

19   responsible for establishing their own hazardous waste

20   storage areas.

21           If we could next look at 8.9.1?  In this

22   paragraph, it says "the contractor shall incinerate using

23   a contractor-acquired incinerator all solid wastes to

24   include medical wastes, but including recyclables.  So

25   here we have the concept very early on in the process of

1    recycling as well as incineration.  And the contractor --

2    that next line I don't need.

3            If next, we could go to Section 1.1.  So again

4    here is the overarching principle that applies to waste

5    management by KBR.  "Notwithstanding any other provisions

6    of this SOW, statement of work, the contractor shall

7    comply with all U.S. laws."  And, of course, one of the

8    U.S. laws that we've pointed out to Your Honor is RCRA and

9    RCRA does not allow for surface burning.

10           And again we pointed out yesterday "in the case

11   of inconsistencies, the contractor shall contact the

12   administrative contracting officer, identify the

13   inconsistency and seek guidance."  So if there's a problem

14   and the contractor says I can't meet this term, there's a

15   mechanism for dealing with that.  It's to go to the ACO

16   and get a directive.

17           Next if we could look at paragraph 1.5.  And 1.5

18   says that "the contractor shall adhere to the OEBGD unless

19   otherwise directed by the ACO."  The OEBGD -- and I'm not

20   going to put it up here today, but yesterday we went

21   through it -- it underscores that "surface burning is not

22   to be used as the regular method of solid waste disposal."

23   So it underscores that earlier paragraph that says you

24   must comply with all U.S. laws.  Those are the points that

25   I wanted to make on Task Order 59.  Let's next turn to

1    Task Order -- I'm sorry.

2            Let's go to another provision in Task Order 59,

3    which is 1.2.  While she's pulling it up, I can simply

4    read it to Your Honor.  It's again another performance

5    standard.  And it says "the contractor shall be

6    responsible for the safety of employees and base camp

7    residents during all operations in accordance with the

8    army and OSHA safety regulations and guidance."  So

9    there's another performance standard that even if they

10   were allowed, assuming arguendo that they were allowed to

11   use a burn pit, they were still responsible under a

12   performance standard to be responsible for the safety of

13   base camp residents.

14           This again is a very significant paragraph and

15   it applies in multiple task orders and this is the second

16   paragraph that the Taylor court relied upon in finding

17   that the first Taylor factor had not been found for the

18   purposes of a political question doctrine analysis.  So

19   again we'd ask Your Honor to focus in on this paragraph as

20   well when it considers that and look back at Taylor.

21           The next paragraph I'd like to look at in this

22   document is 1.4.  This is a familiar theme, but I'd like

23   to highlight it.  "Unless otherwise specified in the

24   statement of work, all increases, decreases or

25   modifications to requirements specified in this SOW are

1    directed by the ACO."  Again, here we have the ACO being

2    the person who can make the changes to the contract terms.

3         We heard from witnesses yesterday on a repeated

4    basis that changes have to be in writing.  So we've looked

5    through these 600,000 documents that KBR told us about in

6    its opening that were contract directives were other

7    writings from the ACOs directing KBR to use a burn pit.

8         If we could go next to 6.0 of this document?

9    And here I'd like to draw Your Honor's attention to the

10   next to the last line where it says "the contractor shall

11   have exclusive supervisory authority and responsibility

12   over employees."  Again, this is very relevant for the

13   political question doctrine analysis and the Combatant

14   Activities Exception preemption analysis states that they

15   have -- this is not the language that you'd find if you

16   were looking for plenary control, Your Honor.

17        Finally, let's look at 1.9 and as Mr. Ledlie

18   mentioned earlier, there is a provision regarding

19   contractor force protection and that is the sole area that

20   is reserved back to the government.  And I haven't cited

21   it in the materials here that I gave Your Honor, but as

22   you look through the fuller document, if you look at

23   Section 2.7, that is the provision that integrates as a

24   reference document the contractors on the battlefield, a

25   document that Mr. Ledlie just described to you.

1           Now we can turn to Task Order 89.  And the

2    first, section I'd like to highlight for Your Honor is

3    Section 8.9.  This, by the way, Your Honor is not a task

4    order that we went through yesterday.  So again here's the

5    tasking on waste management disposal and it speaks in

6    similar terms as the previous document that we looked at

7    except if you look down to paragraph 8.9.1. and here it

8    says again "the contractor shall incinerate using a

9    contractor-acquired incinerator all solid waste to include

10   medical waste."  And here's the part that pertains to burn

11   pits.  "As a last resort and as specified by the ACO" --

12   again we have directive by the ACO -- "the contractor

13   shall operate burn pits while minimizing their

14   environmental effects on the base camp."

15           So first of all, to underscore it again, they

16   can only use a burn pit if it's specified by the ACO.  We

17   haven't seen those documents.  There's 600,000 contractual

18   documents out there.  We just don't see them in there.

19   And "the contractor shall operate the burn pits while

20   minimizing their environmental effects on the base camp."

21   So there's a performance standard written into the

22   contract as well.

23           Next if we could look at -- and of course, it's

24   as a last resort.  If we could look at 8.9.2?  Again, part

25   of our claim is that even in those instances where KBR

1    might have been authorized to use a burn pit, they were

2    not authorized to burn anything and everything in it and

3    this simply underscores that point.  It says "this task

4    order is not intended for the disposal of hazardous waste.

5    If hazardous waste is discovered mixed with any scrap

6    item, it shall be removed and disposed of under

7    appropriate DRMS contract."  And so not only do we have

8    from this paragraph, the take-away is that hazardous waste

9    certainly should not be included in any burn pit if it

10   were allowed.  The second take-away is is that there's the

11   concept of sorting introduced into the contract, another

12   performance standard.

13          And indeed if you look at 8.9.2.2, "the

14   contractor is responsible for operating and maintaining a

15   hazardous waste storage area to collect and store" -- not

16   burn -- "HAZMAT, HAZ waste generated by internal and

17   military operations."

18          Next if we could go to paragraph 1.1?  The

19   language is a little bit different, but it's the same

20   concept.  "Except as otherwise provided, the contractor

21   shall comply with all host nation, local laws and again

22   U.S. laws."  All U.S. laws it's required to comply with.

23   And again we have the same language or very similar

24   language regarding inconsistencies.  If there's a problem,

25   go to the ACO and get directive.  Again, however, we

1    haven't seen those directives.

2          If we could go to paragraph 1.4?

3          THE COURT:  Counsel, I don't have that page you

4    just referred to.  Oh, yes, I do.  It's in the end.  Okay.

5    It's out of order.  Okay.  I got it.  Thank you.

6          MR. BAKER:  So 1.4 incorporates both the -- I'll

7    read it.  "The contractor shall adhere to the overseas

8    environmental baseline guidance document, the OEBDG, and

9    MNC-I Environmental Standard Operating Procedure (SOP) in

10   the performance of this SOW."  Again we've gone through

11   the OEBGD.  It says that surface burning is not to be the

12   regular method of disposal.  We looked a little bit at the

13   MNC-I.  I'm going to look at it in greater detail now

14   because this really goes to some very important points on

15   the performance standards.

16         So next, if we could turn to the MNC-I, which is

17   Exhibit 2028?  And hopefully, Your Honor, that's the next

18   item in your --

19         THE COURT:  That is.

20         MR. BAKER:  So first, let's look at Section

21   B(2).  Okay.  It says down here in B(2), "Burn pits are

22   strongly discouraged because it can generate potentially

23   toxic air emissions, can result in fire hazards and should

24   only be authorized as a last resort by the base camp

25   commander."  And of course, this document was written for

1    the military.  But when it is incorporated into contracts,

2    then you go and look at the ACO for that last resort

3    language.  Even so, even if KBR were to argue that's the

4    base camp commander, we haven't seen those documents

5    either from the base camp commander saying go forth and

6    use a burn pit.

7            And then there's another performance standard in

8    here, "tires are usually recycled through the military's

9    direct exchange program and should not be burned."  So

10   again tires can't be burned.

11           Next, if we could look at section -- the scope

12   section on page 74.  Okay.  So here is where the SOP not

13   only because of the task order, but by the SOP's own

14   application makes it applicable to contractors.  It says

15   "this SOP is applicable to all military units and

16   contractor operations related to burn pits or burning of

17   wastes with the exception of incinerator use.  All MNC-I

18   units will ensure this SOP is incorporated by reference

19   into all contracts calling for any type of burning of

20   wastes."

21           So if we look then down to Section 5.0(a) and

22   again I'm going to quickly run through a number of the

23   performance standards for -- if you were in fact allowed

24   to use a burn pit, there's lots of performance standards

25   with which you must comply.  One is that you have to

1    control the access.  You have to have a chain or a gate

2    capable of being locked and it will be used to control

3    access to the burn pit.

4            Next, if we could look at 5.1(a).  A list of all

5    prohibited items must be posted as well.  This paragraph

6    is key, Your Honor.  I read through it yesterday and I

7    want to reemphasize it today.  So even where you're

8    allowed to use a burn pit, there's very, very severe

9    limitations on what you can burn under the MNC-I.  "Only

10   wood, wooden products and paper, paper products, or

11   canvas, i.e., uniforms will be accepted."  If you want to

12   try to burn anything else in that burn pit, you need

13   written permission.  "Requests for incineration of any

14   other type of material must be approved by the Garrison

15   DPW or the FOB ECO.  Approval must be in writing."  Again

16   when you translate this into the contractual term, you

17   look to the ACO.

18           So then let's look down at 5.1(b).  Organics

19   can't be burned.  Okay.  It says that "there shall be a

20   separate designated area within the dump for organic

21   biodegradable decomposing food waste from dining

22   facilities."

23           If we could look at paragraph 5.1(c).  This

24   paragraph tells us that "rubber, scrap metal and usable

25   wood should not be burned.  They should be dropped off for

1    re-use and recycling."

2           Paragraph 5.1(d).  This paragraph highlights

3    that hazardous waste, POL, which is petroleum, oil and

4    lubricants, should be separately dealt with.  Not in the

5    burn pit.

6           Next if we could look at 5.2(b)?  So here again

7    another performance standard with which a burn pit

8    operator must comply, which is "burning operations will be

9    supervised by authorized until supervision decides there's

10   no potential danger and there's guidelines.  You have to

11   make sure the weather conditions are stable and the flames

12   can't be higher than two feet."

13          And then let's turn to Section 5.3(b).  So again

14   we have prohibited items.  And again we've looked at the

15   earlier section, which is 5.1(a) and that says you can

16   only burn wood, paper and canvas.  Prohibited items we

17   believe are items that can never be burned even with ACO

18   directives.  So that would be propane cylinders, fuel

19   cans, aerosol cans, paints, fuel oils, chemicals.

20          And if you'd go to the next page, please?

21   Ammunition, explosives, combustibles, medical waste,

22   metal, batteries, tires, lubricants, appliances,

23   electronics, any other hazardous material, coolant, any

24   hazardous waste, any serviceable military items.  These

25   are prohibited items.  Can't be burned.  Ever.

1            So again these performance standards are very

2     important in considering particularly the second prong of

3     the plaintiffs' claim.

4            If we could turn back to the Task Order 89

5     again?  And if we go to paragraph 1.2, please?  Again here

6     we have the work site safety paragraph.  And again this is

7     the paragraph upon which the Taylor court relied in

8     finding that the Taylor prong 1 had not been satisfied.

9     So here we have it again.

10           If we look then at Section 1.3?  And here we

11    have all the direction.  "Unless otherwise specified in

12    this SOW, all increases, decreases or modifications to

13    requirements specified in this SOW are at the direction of

14    the PCO ACO.  It's where the directives come from.

15           Next if we could turn to Section 6.0?  The

16    language will start becoming familiar to Your Honor

17    because it appears in virtually all these task orders.

18    "The contractor shall have exclusive supervisory authority

19    and responsibility over employees."  The language of

20    plenary control.

21           If we could go to paragraph 1.7?  Again, here is

22    the familiar contractor force protection reservation for

23    convoys and that sort of thing.  And then also in this

24    document and I haven't cited it to Your Honor in the

25    papers that you have, but paragraph 2.7 contains the

1    reference document that Mr. Ledlie spoke about,

2    contractors on the battlefield.  That's incorporated into

3    this.  So those are my comments on paragraph or Task Order

4    89.  That's what I would like to highlight there.

5           If we could now turn to Task Order 139?  And I

6    did run this very briefly with Your Honor yesterday.  So

7    I'll try to be a little bit faster on this one.

8           Again, paragraph 8.8.  8.8 is the tasking

9    paragraph.  And again it tasks KBR with handling

10   non-hazardous solid waste, management and disposal.  And

11   again let's emphasize non-hazardous solid waste.  It

12   doesn't include hazardous waste for purposes of this

13   paragraph.  And it says at the end, that "the contractor

14   shall conduct non-hazardous solid waste management

15   activities in accordance with the order of precedence as

16   listed below."  So let's look at the order of precedence

17   and you will see that the fourth and final least preferred

18   method is solid waste or is surface burning.

19          If we could go to that paragraph?  So we have

20   the order of precedence and surface burning is included in

21   there.  Again though it says "surface burning in

22   coordination with the LSO" and familiar language "at the

23   direction of the ACO."  And we've heard people say time

24   and time again, these witnesses, it would have to be in

25   writing.  "The contractor shall provide new or operate

1    uncontaminated existing burn site while minimizing the

2    environmental effects on the base camp."  So there's a

3    performance standard embedded in there, too.  Minimizing

4    environmental effects on the base camp.  "The contractor

5    shall ensure that products of combustion are reduced to

6    become ash and non-combustible components."  And then here

7    we have another performance standard.  "The contractor

8    shall minimize any type of smoke exposures to the camp

9    population."  Discernible standard does not raise a

10   political question.

11          If we could then go to that chart that you just

12   showed, Ms. Veldman?  And again just to show the

13   nomenclature that they're using.  They call them

14   performance objectives and performance standards.  That's

15   why I'm calling them performance standards.  And again you

16   have the language that you saw above.  And you have

17   reference here to the MNC-I guidance.

18          So let's then look back at Section 1.1.1.  And

19   here is reference again to the OEBDG, which we've gone

20   through many times, and the contractor shall adhere to the

21   MNC-I, Environmental Standard Operating Procedure, the

22   document we just went through.

23          Next if we were to look at Section 1.1.2, the

24   worksite safety paragraph, the Taylor language.  Let's

25   then look at 1.1.3.  Inconsistencies.  "In the case of

1    inconsistencies" -- that is if the contractor believes it

2    can't comply -- "the contractor shall contact the

3    administrative contracting officer, identify the

4    inconsistency and seek guidance."

5         Next, if we could look at 1.2?  Contractor

6    Direction.  "All increases, decreases or modification to

7    requirements specified in this SOW are at the written

8    direction of the ACO in coordination with the procuring

9    contracting officer.  The PCO.  Again it has to be in

10   writing.

11        1.9, please.  So again if you look at the last

12   sentence of that paragraph?  "The contractor shall

13   maintain supervisory control over all contractor employees

14   and ensure its subcontractors maintain supervisory control

15   over its subcontract employees."  Familiar language.

16   Again very relevant to the plenary control inquiry.

17        Let's look at Section 1.10.  Another paragraph

18   that's very, very relevant to the plenary control and

19   Combat Activities Exception preemption analysis.

20   "Operational Control (OPCON) is the context of this SOW --

21   in the context of this SOW is defined as the contractor

22   being fully responsible for performing the function,

23   service or capability specified by the government.  The

24   contractor shall report performance outcomes to the

25   responsible or accountable government official in charge.

1    The contractor shall maintain supervisory control over all

2    contractor employees."  That's paragraph 1.10.

3              Let's look at paragraph 6.0.  We focus in on the

4    last line here.  Again underscores the independence of the

5    contractor.  "The contractor shall have exclusive

6    supervisory authority and responsibility over employees."

7              Finally, paragraph 1.5.  And here, we have the

8    familiar force protection language that talks about

9    convoys and that sort of thing, reserving that to the

10   government.

11             So that was my walk-thru, Your Honor, of the

12   contracts and I hope this helps you navigate these as you

13   go back in chambers and you have to pinpoint the points

14   where we believe --

15             THE COURT:  No.  It's very helpful.  It's

16   exciting as paint drying, but it's easier for me to find

17   it when you walk me through it this way.

18             MR. BAKER:  Thank you, Your Honor.

19             THE COURT:  So I appreciate it.

20             MR. LEDLIE:  And, Your Honor, while the

21   contracts are fresh in your mind, I would like to go

22   through the General Petraeus letter.  So the first one,

23   Your Honor, we'll go through -- I want to make sure that

24   we have the right one here -- is the --

25             THE COURT:  Now what are you reading from now?

1          MR. LEDLIE:  This is the 4th of December 2008

2     letter from General David Petraeus, Your Honor.

3          THE COURT:  Okay.  Do you have copies of that?

4          MR. LEDLIE:  Yes, Your Honor.  Exhibit 122 to

5     our -- it's defendant's brief.  122.

6          Your Honor, the first thing I'd like to note is

7     the date, which is significant.  It is a document from

8     2008 in which General Petraeus is commenting on a recent

9     letter from Russell Feingold "regarding the possible

10    exposure of service members and the local population to

11    hazardous waste in Iraq and Afghanistan.  The health of

12    our personnel and environmental management of our forward

13    deployed locations is one of my top priorities."

14         And the next section is the one that Your Honor

15    is familiar with because the defendants have frequently

16    cited which is "there is and will continue to be a need

17    for burn pits during contingency operations."  But it

18    doesn't stop there.  "To this extent, much effort has gone

19    into locating/relocating pits in remote areas of the

20    operating bases to minimize exposures, training personnel

21    on proper operation and developing and circulating

22    operating procedures and assessing burn pit operations to

23    include corrective action."  And I think in context he's

24    discussing military-run burn pits, Your Honor.  But it's

25    significant that whether it's a military burn pit or a

1    contractor-run burn pit, there is clear army direction

2    that you don't just do anything there.  You need to

3    consider location.  More importantly, you need to follow

4    the operating procedures set down.  And so Mr. Baker has

5    just gone through the contractual operating procedures

6    that apply and this letter needs to be considered in that

7    context.

8           More directly and this is discussing KBR's waste

9    management responsibilities and this is a letter -- this

10    is Plaintiffs' Exhibit 5182, the letter from James Loehrl

11    of the -- executive director of Rock Island.  I showed you

12    his deposition testimony earlier.  And the first thing is

13    the date is not the most legible copy, but it clearly says

14    April of 2010, Your Honor.  So when you're placing this

15    letter, place it in the context of when it was written.

16           And Mr. Loehrl does state a number of things.

17    But at the end, he says "the army believes that operating

18    the burn pits in accordance with the contractual

19    requirements, USFI SOPs and the CENTCOM guidance is an

20    acceptable means of waste disposal in a contingency

21    environment and should continue."  But that operation,

22    Your Honor, is specifically premised on the condition that

23    it will be in accordance with the contractual

24    requirements, SOPs and other guidance.  "Accordingly, you

25    are to continue operating the burn pits in accordance with

1    the contract."  2010, the contract still matters as well

2    as existing CENTCOM and USFI guidance.

3              Our next piece of evidence, Your Honor, will be

4    Mr. Robbins, a live witness.  Would it be a good time for

5    a break before we do that or --

6              THE COURT:  No.  Let's take a break until 20

7    minutes of 11 and then you can put your first witness on.

8              MR. LEDLIE:  Thank you, Your Honor.

9              THE COURT:  Thank you.

10             (Recess.)

11             MR. MATTHEWS:  Your Honor, if I may before

12   plaintiffs resume?

13             THE COURT:  Yes.

14             MR. MATTHEWS:  I just want to say for the record

15   that there is so much that just came out from the

16   testimony from counsel, we just want to inform the court

17   it's our intention to provide a thoughtful and thorough

18   response in the closing consistent with whatever direction

19   the court gives us at the end of the day.

20             THE COURT:  You may.

21             MR. MATTHEWS:  Thank you.

22             THE COURT:  All right.  Who is your first

23   witness?

24             MS. SMITH:  Thank you, Your Honor.  The

25   plaintiffs would like to call Kevin Robbins.

1          THE CLERK:  Sir, please come forward.  Please

2     raise your right hand.

3     Thereupon,

4                    KEVIN ROBBINS,

5     Having been called as a witness on behalf of the

6     plaintiffs and having been first duly sworn by the Deputy

7     Clerk, was examined and testified as follows:

8          THE CLERK:  Please have a seat on the witness

9     stand.  Sir, please speak directly into the microphone.

10    State your name.  Please spell your first and last name.

11         THE WITNESS:  Kevin, K-E-V-I-N.  Robbins,

12    R-O-B-B-I-N-S.

13                   DIRECT EXAMINATION

14         BY MS. SMITH:

15    Q     Good morning, Mr. Robbins.

16    A     Good morning.

17    Q     Mr. Robbins, are you a plaintiff in this case?

18    A     Yes, I am.

19    Q     And are you a former KBR employee?

20    A     Yes, I am.

21    Q     Mr. Robbins, when did you first become employed

22    with KBR?

23    A     Best I can remember, late February, early March

24    of '05.

25    Q     And what led you to join KBR?

48

1      A    My youngest brother was killed with the initial

2    invasion in April of '03 and it weighed on me.  So -- I

3    was too old to join.  I'm prior military and I was too old

4    to joined.  So I contacted KBR via the Internet.

5      Q    And you started working for them you said in

6    late February or March of 2005?

7      A    Yes.

8      Q    And how long did you work for KBR?

9      A    Approximately 25 months.

10     Q    When you first started working for KBR, what

11   base were you working at?

12     A    Al Kut.

13     Q    Is that Delta?

14     A    Camp Delta.  Yes.  I'm sorry.

15     Q    And what was your job title at Camp Delta when

16   you arrived?

17     A    Labor foreman.

18     Q    And what were you asked to do in that capacity

19   as labor foreman?

20     A    To run the burn pit.

21     Q    How long did you run the burn pit at Camp Delta?

22     A    Approximately 90 days.

23     Q    Prior to your employment with KBR, had you had

24   any experience with respect to waste management?

25     A    None.

1      Q    What were you doing when you applied for the job

2  at KBR?

3      A    I was an independent drywall contractor.

4      Q    And did KBR provide you with any training

5  related to waste management before you started running the

6  burn pit?

7      A    No.

8      Q    Did you have some sort of training before you

9  left?

10      A    I had two weeks of training in Houston in

11  chemical warfare and about a hour, hour and a half of OSHA

12  regulations.

13      Q    And were you informed that the OSHA regulations

14  were regulations that would apply when you were working

15  for KBR --

16      A    Yes.

17      Q    -- in Iraq?  When you were tasked with running

18  the burn pit, were you given any documents or instructions

19  about how to run the burn pit?

20      A    When I got there, when I asked questions, they

21  said that there was a document inside the burn pit hut?

22      Q    And was there in fact a document inside the burn

23  pit hut?

24      A    There was.

25      Q    And what did that document say?

1      A     Not to burn unspent ammunition and look for

2    explosives.

3      Q     Were you given a list of prohibited items?

4      A     I was not.

5      Q     Did the military provide you with any training

6    with regard to the operation of the burn pit?

7      A     No.

8      Q     And did DCMA provide you with any training with

9    regard to the operation of the burn pit?

10     A     No.

11     Q     Who is your direct supervisor when you were

12   running the burn pit?

13     A     I had a general labor foreman.  I cannot

14   pronounce his name.

15     Q     And he was the KBR general foreman?

16     A     Yes.

17     Q     And who was his boss?

18     A     David Fulgram, our assistant camp manager.

19     Q     KBR as well?

20     A     Yes.

21     Q     And then who was -- had the ultimate -- the

22   highest position I guess you could say there at Camp Delta

23   for KBR?

24     A     That would be our camp manager, Forest Cat

25   Early.

DIRECT EXAMINATION OF ROBBINS

1    Q    Did you report to anyone from the military?

2    A    No, I did not.

3    Q    Did you report to anyone from DCMA?

4    A    Excuse me?

5    Q    Did you report to anyone from DCMA?

6    A    No, I did not.

7    Q    Aside from yourself, were there other

8    individuals who were working in the burn pit with you?

9    A    I had six host country nationals.

10   Q    And did they report to you?

11   A    Yes.

12   Q    And aside from those six host country nationals,

13   were there any other KBR employees or subcontractors that

14   worked in waste disposal or the burn pit operations at

15   Camp Delta?

16   A    We had subcontractors who would drive around

17   camp and pick up their trash and bring it to the pit, the

18   burn pit.

19   Q    Where was the burn pit located at Camp Delta?

20   A    We had -- it was an old air force base and it

21   was located at the end of an air strip approximately three

22   miles from the LSA.

23   Q    And can you just provide us with a physical

24   description of what the pit looked like?

25   A    The pit was a triangle-shaped piece of ground

1    that had a pit about 400 feet wide and maybe 50 feet deep

2    and it sloped into the ground from the top of the burn

3    pit.

4        Q    Were there any structures or facilities there at

5    the burn pit or next to the burn pit?

6        A    The only structures that were there were some

7    bombed-out Iraqi pilot hosing and a guard tower and our

8    hut.

9        Q    And tell me about your hut.  Where was that in

10   relation to the burn pit?

11       A    We had approximately a eighty to a hundred-foot

12   fence and it had a gate in it and it was right beside that

13   gate.

14       Q    The hut was?

15       A    The hut was.  Yes.

16       Q    And the fence and the gate, were those on one

17   side of the burn pit?

18       A    They were on what I call the front side of the

19   pit.  Yes.

20       Q    And what was on the other sides of the burn pit?

21       A    Nothing.

22       Q    Was there a fence or gate or anything?

23       A    No fence.  No gate.

24       Q    So was that gate -- did it have a lock?

25       A    Yes, it did.

1    Q    And did you have the key for that lock?

2    A    I did have the key.

3    Q    In your capacity running the burn pit at Camp

4    Delta, how many days a week were you physically at the

5    burn pit?

6    A    Seven.

7    Q    And did the burn pit burn on a daily basis?

8    A    Every day.

9    Q    What were the hours of operation?

10   A    When I got there, I believe the hours were 7 to

11   7, but I changed them to 6 to 6.

12   Q    You changed them to 6 to 6?

13   A    Yes.

14   Q    And were those generally KBR's hours?

15   A    As a rule, yes.

16   Q    Can you describe what you did from day to day

17   when you were running the burn pit?

18   A    I would get up in the morning, go to DFAC and

19   eat, go to our security gate, pick up my HCNs as they

20   cleared security and I would drive to the burn pit.  We

21   would start work -- change our clothes, start working.

22   Worked 12 hours.  We would wait for the trash truck to

23   come.  Open the gate.  Kind of scan the truck for

24   anything.  Let them in.  Dump the trash.  Look for

25   ammunition and explosives and burn.

1    Q    Let's break some of that down.  So when the

2    trash truck came to the gate, what did you all do?

3    A    Me or my lead HCN, Omar, would scan the cab of

4    the truck for anything that might have got picked up that

5    they shouldn't have in their truck, electronics, anything

6    that could be used against the warrior.

7    Q    Anything that could be used, I'm sorry, against

8    the warriors you said?

9    A    Yes.

10   Q    And so once you did that scan, that was just a

11   visual scan of what was in the truck.  Is that right?

12   A    Just a visual scan.

13   Q    And then what happened next?

14   A    I went and unlocked the gate, let the truck in.

15   They would go down and again when they got to the gate, I

16   would scan to make sure they didn't take nothing out of

17   what they had just dumped that they shouldn't have.

18   Q    That the individuals who were dumping didn't

19   take -- that they didn't take something out?

20   A    Yes.

21   Q    Okay.  And was there any sorting that was done?

22   A    No sorting.  Just look -- kind of kicking around

23   looking for ammunition and explosives.

24   Q    At what point would you all burn the trash that

25   was dropped in the burn pit?

1        A     Just when I felt that there was enough that the

2   flames wouldn't be too high and the smoke wouldn't be too

3   bad.

4        Q     And how did you decide what that was, the flames

5   weren't too high and the smoke wasn't too bad?

6        A     It depends on what the material was.  Paper and

7   wood would burn much hotter, less smoke.  But we burn a

8   lot of plastic and stuff and we would try to spread it out

9   to minimize the smoke.

10       Q     Did anyone ever tell you that the flames should

11  only reach a certain height?

12       A     I heard that today.

13       Q     You hadn't heard that before today?

14       A     Never.

15       Q     Did any members of the military work shoulder to

16  shoulder with you in the burn pit?

17       A     No.

18       Q     Was your supervisor stationed at the burn pit?

19       A     No.

20       Q     Did the military ever direct your day-to-day

21  duties with respect to the operation of the burn pit?

22       A     Not to me.

23       Q     Did anyone from the military ever give you

24  instructions regarding your duties at the burn pit?

25       A     No.

1  Q Did the hours for burning ever vary based on the

2 weather?

3  A No.  Not at Camp Delta.

4  Q What sort of items did you observe being burned

5 in the burn pit?

6  A Canvas, plywood, paper, plastic, truck parts,

7 tires, PVC pipe.  Just numerous things.

8  Q Everything except for ammunition and explosives.

9 Is that right?  Those were the things that you all tried

10 to take out of the burn pit.

11  A Yes.  We tried, but I know ammunition got

12 through because we had sporadic rounds going off.

13  Q Let me ask you about some specific items and you

14 can tell me if you saw any of these things in the burn pit

15 at Camp Delta.  Okay?

16  A Okay.

17  Q Aerosol cans?

18  A I seen them and burn them.

19  Q Paints?

20  A I seen it and burn it.

21  Q Fuel?

22  A I used fuel to start the fire.

23  Q Chemicals?

24  A Yes.

25  Q Ammunition we just talked about?

1    A    Yes.  Not purposely.

2    Q    Medical waste?

3    A    Yes.

4    Q    Metal?

5    A    Yes.

6    Q    Batteries?

7    A    Yes.

8    Q    I think you mentioned tires?

9    A    Tires.

10    Q    Coolant?

11    A    Anti-freeze?

12    Q    Yes.

13    A    Yes.

14    Q    Was there a list of prohibited items posted

15    outside of the burn pit at Delta?

16    A    There was after I left the pit.  Not while I was

17    there.

18    Q    Not while you were working during those 90 days

19    running the burn pit?

20    A    No.

21    Q    Eventually, did you start sorting items that

22    were coming into the burn pit?

23    A    Yes.  I tried.

24    Q    And what did you try to sort?

25    A    PVC, batteries, tires.  We had a lot of -- I

1    don't know the name of it.  It was gray pipe, like

2    plumbing pipe, but it was really black smoke and as well

3    as plastic bottles.

4         Q    And what happened to the items that you sorted?

5         A    We would put them in different areas until the

6    piles got too high.

7         Q    And then what happened?

8         A    Everything other than the metal.  We had a

9    contractor from outside the wire come in and take the

10   scrap metal.  But everything else, we would -- if it got

11   too high, we would burn it.

12        Q    During the 90 days that you were running the

13   burn pit at Camp Delta, did the burn pit get inspected?

14        A    I recall once of a true inspection.  Yes.

15        Q    What do you mean by a true inspection?

16        A    Where somebody actually asked me questions about

17   the operation of the pit.

18        Q    Okay.  And who was it that came to the burn pit

19   on that occasion?

20        A    It was -- I believe he was a second lieutenant

21   and a specialist.

22        Q    What did they ask you?

23        A    They asked me for permission to enter the gate,

24   told me who they were and said that -- about five minutes

25   later, they come back and said it looked pretty good.

1      Q      And that was it?

2      A      Well, they asked me about the piles of items we

3   had that I had started sorting.

4      Q      And what did they ask you about that?

5      A      They said what do we do with it when it's too

6   high, what do you do with it when your piles are too big.

7      Q      Before that inspection, was there an occasion

8   that you remember that inspectors came to the burn pit

9   before that time?

10     A      I do now.  I did not know they were inspectors

11  then.

12     Q      And who was it that came then?

13     A      It was an army officer and a specialist.

14     Q      What did they do at that time?

15     A      They just kind of looked around a little bit.

16  Went through the gate and looked around and asked me if I

17  sorted anything.

18     Q      And what did you tell them?

19     A      I told them then that I didn't because -- the

20  only thing I sorted was ammunition and explosives.

21     Q      And about how long were they there?

22     A      Five to ten minutes.

23     Q      Are those the only two occasions that you recall

24  anyone coming out to the burn pit?

25     A      That's all I can recall.

DIRECT EXAMINATION OF ROBBINS

1    Q    You started at Camp Delta in March of 2005.  Is

2    that right?

3    A    Approximately.  I stayed in Camp Liberty a long

4    time because of Ramadan and security concerns and right

5    now, I just can't remember how long I was at Liberty.  It

6    was a long time.

7    Q    And but do you think that you had started

8    working at the burn pit by sometime in March?

9    A    I believe I did.  Yes.

10    Q    And so you were there for 90 days after that

11    point.  Let's say mid to late March?

12    A    Yes, because I was there I know at least 90 days

13    and I left in mid June.

14    Q    Okay.  And for the 90 days, you were running the

15    burn pit?

16    A    Yes.

17    Q    Did a time come when you had to -- where you

18    needed a new burn pit at Camp Delta?

19    A    Yes.

20    Q    And what happened?  How did the creation of a

21    new burn pit come about?

22    A    I put in a work order to put a burn pit beside

23    the old one because the first one needed dirt over it and

24    they came out.  It was either the next day or the day

25    after that.  They come and buried my first pit and dug a

1    second one and made a new burn with that dirt.

2        Q    Who did you put the work order into?

3        A    My general foreman.

4        Q    And on the work order, did you identify where

5    you wanted the additional pit to go?

6        A    Yes.  I thought the best place was right beside

7    the old one.

8        Q    And were there general parameters that you would

9    follow as to where the new burn pit could go?

10        A    Did I know the parameters?

11        Q    Right.

12        A    No.  I mean I told them where I thought the pit

13    would go, but I -- nobody told me where to put it.

14        Q    Okay.  Were there roads that were around the

15    burn pit area?

16        A    Yes.

17        Q    And did those service kind of general kind of

18    points within which you could put the new burn pit?

19        A    Yes.

20        Q    But other than that, there was no additional

21    direction in terms of where the new burn pit could go?

22        A    No.

23        Q    And you said that they would -- someone came and

24    dug a new pit.  Who was that?

25        A    Our M.A.G. folks, equipment operators.  And I

1    also believe that there was a subcontractor there because

2    we didn't have a loader and they did.

3        Q    And what did they do?

4        A    They buried the pit that was full and dug

5    another one and made a burn out of that soil.

6        Q    And was that new burn pit operated in the same

7    way that you ran the old burn pit?

8        A    Exactly.

9        Q    Were you allowed to run the burn pit according

10   to your own discretion?

11       A    Yes.

12       Q    Were you required to keep track of what was

13   burned in the burn pit at Delta?

14       A    Not what was burned.  I had to keep track if I

15   found any ammunition or explosives and how many loads came

16   into the burn pit that day.

17       Q    And how did you keep track of that?

18       A    We had a piece of paper with a load count and

19   any ammunition that we found or explosives.

20       Q    Now at some point did you go to another camp?

21       A    Yes, I did.

22       Q    And what camp was that?

23       A    Camp Echo at Diwaniya.

24       Q    I'm sorry?

25       A    Diwaniya.

1    Q    Did you run the burn pit at Camp Echo?

2    A    I did not.

3    Q    Were you asked to go to the burn pit on any

4    occasions?

5    A    Yes.

6    Q    How often did you go to the actual burn pit?

7    A    I went there twice.  I drove by it every day,

8    but I went there twice.

9    Q    Did you observe the materials that were in the

10   burn pit there at Camp Echo?

11   A    Yes, I did.

12   Q    And what did you see being burned at Camp Echo?

13   A    The same things I seen at Delta.

14   Q    Batteries?

15   A    Tires.

16   Q    Paint?

17   A    Paper, plywood, paint.  Everything.

18        MS. SMITH:  I think that's it, Mr. Robbins.

19   Thank you.

20        THE WITNESS:  Thank you.

21        THE COURT:  Cross?

22        MR. JOHNSON:  Yes, Your Honor.  Thank you.

23                    CROSS-EXAMINATION

24        BY MR. JOHNSON:

25   Q    Good morning, Mr. Robbins.  How are you?

1      A    Good.  How are you?

2      Q    Mr. Robbins, I'm just going to clarify as we did

3    during your deposition some of the questions that you were

4    just asked.  I'd like to start just to make sure I have

5    the timeline right.  So you spent 90 days working at the

6    Al Kut or Camp Delta burn pit.  Is that right?

7      A    I did.

8      Q    Okay.  And that was in 2005?

9      A    2005.

10     Q    And then when you went to FOB Echo, your next

11   base, a year later, you saw the burn pit, but you did not

12   work there.  Is that right?

13     A    I did not work there.

14     Q    Okay.  So let's focus first then on Al Kut and

15   the time that you operated the burn pit for 90 days.

16   Okay?

17     A    Okay.

18     Q    All right.  So first, as a general description,

19   the burn pit at Al Kut was about six miles away from the

20   main camp.  Correct?

21     A    It may have not been that far, but it was a long

22   distance.  To say miles, I guess I shouldn't have said

23   that.  I don't know the mileage.

24     Q    So you do remember that you testified that it

25   was six miles --

CROSS-EXAMINATION OF ROBBINS

1      A     Yes, I do.

2      Q     Okay.  And you don't -- nothing has happened

3  between your deposition and today to make you think that

4  that's incorrect.  Right?

5      A     Nothing has happened.

6      Q     No one lived out in that part of Al Kut where

7  the burn pit was.  Right?  It was sort of an empty old

8  part of the base?

9      A     It was an empty part.  Yes.

10     Q     Old bombed-out Iraqi buildings I believe.

11     A     And a guard tower.

12     Q     And besides the guard tower, there were no other

13  facilities in that part of the base where the burn pit

14  was.  Right?

15     A     None.

16     Q     Now you mentioned the location of the new burn

17  pit.  I want to talk about that.  I believe you said that

18  nobody told you where to put the new burn pit at Al Kut;

19  is that correct, just now during your testimony?

20     A     I did say that.

21     Q     Okay.  But in fact, it was your KBR supervisor,

22  the camp manager who came to you and talked to you about

23  locating the new burn pit.  Isn't that right?

24     A     My general foreman when I told him where I

25  wanted it, my camp manager then said it was okay through a

1    work order.

2        Q    Well, in fact, he told you that he wanted the

3    burn pit to be as far away from the camp as possible.

4    Right?

5        A    I couldn't move it because of the shape of

6    the -- where the roads were in relation to the property

7    where the burn pit was.  I mean I couldn't move it across

8    the road.  No.

9        Q    Right.  Let me just take a step back and make

10   sure I understand the process.  So it was your general

11   foreman who approached you about expanding or building a

12   new burn pit.  Right?

13       A    I told him I needed a new one.

14       Q    And he told you that it needed to be built as

15   far from the camp as possible.  Right?

16       A    I don't recall ever being told -- I mean I

17   couldn't -- the physical location was right beside the old

18   one.  I couldn't move it three miles.  No.

19       Q    Okay.  So maybe you're just answering my

20   question another way.  So you had to build this new burn

21   pit next to the existing burn pit?

22       A    Yes.

23       Q    You couldn't put it somewhere else on the base?

24       A    No.

25       Q    You said, for example, you couldn't move it

1    three miles somewhere else and put it next to the DFAC?

2        A    No.

3        Q    So the new burn pit you built was immediately

4    adjacent to the old burn pit?

5        A    Yes.

6        Q    At a constrained area I believe you testified a

7    half mile by half mile area next to the old burn pit where

8    you're going to build the new burn pit.  Right?

9        A    That's close.

10       Q    There was a road that was there and you weren't

11   allowed to build the new burn pit on the other side of

12   that road.  Right?

13       A    Exactly.  There was two existing roads.

14       Q    So you had this area, this area adjacent to the

15   old burn pit where you had authorization to construct a

16   new or adjacent burn pit.  Right?

17       A    Yes.

18       Q    Now this new burn pit, this came towards the end

19   of your time at Al Kut.  Right?  It was about 90 days sort

20   of as you were wrapping up your time there?

21       A    I would say every bit of 80.  Yes.

22       Q    Other than the discussion we just mentioned

23   where you had a conversation with your general foreman

24   about the burn pit, you didn't have any other discussions

25   with KBR personnel about locating this new burn pit.

1    Correct?

2         A    I did.

3         Q    Okay.  Who did you have those conversations

4    with?

5         A    With our M.A.G. people who were the operators

6    and the subcontractor who operated the loader.  And the

7    camp manager and assistant manager knew because they

8    signed the work order.

9         Q    So let's break that down.  So the M.A.G. folks,

10   those are the heavy mechanical people who actually came

11   out and built the burn pit.  Correct?

12        A    Yes.

13        Q    And you had conversations with them.  Right?

14        A    Yes.

15        Q    Your assistant camp manager and your camp

16   manager were your KBR supervisors.  Is that right?

17        A    They were.  Above my immediate supervisor.

18        Q    So in the course of building this adjacent burn

19   pit, did you ever have any conversations with DCMA about

20   where that burn pit would be located?

21        A    At that point in time, I didn't even know what a

22   DCMA was.

23        Q    So no?

24        A    No.

25        Q    And you did not have any conversations with the

1    military about where they wanted you to locate this

2    adjacent burn pit?

3         A    None.

4         Q    And you didn't see any contract documents that

5    discussed where this new burn pit should be located.

6    Right?

7         A    None.

8         Q    For example, an administrative change letter?

9         A    No.

10        Q    Or a letter of technical direction?

11        A    No.

12        Q    Okay.  You're smiling a little bit?

13        A    I didn't even know what that stuff meant then.

14        Q    Okay.  Fair enough.  Are you aware of who in

15   your KBR chain of command might have been having

16   conversations with DCMA and the military about this burn

17   pit?

18        A    I have no idea.

19        Q    Okay.  So you don't know one way or the other?

20        A    I don't know.

21        Q    Now you recall making the general statement in

22   one of your declarations that KBR had the authority to

23   locate a burn pit.  Do you remember that?

24        A    Yes.

25        Q    Okay.  Just to be clear about what you said when

1   you meant that, your only reference point for that is the

2   location of its adjacent burn pit that we've just

3   discussed.  Right?

4       A   Yes.  That area between the roads and the wire.

5       Q   Right.  You don't have any contract expertise or

6   other experiences that support that conclusion?

7       A   Absolutely none.

8       Q   Right.  So when you say KBR had the authority,

9   it's based on everything you and I have just discussed

10  here in this courtroom?

11      A   Yes.

12      Q   Okay.  Now, Mr. Robbins, I'm going to move on a

13  little bit, but stay at Al Kut at the burn pit.  All

14  right?  So we're going to talk a little bit about some of

15  the prohibited items and things that were burning in the

16  burn pit.  Some of the things that you mentioned were

17  plastic, car parts and medical waste.  Is that right?

18      A   Yes.

19      Q   Okay.  Now I don't believe you've stated it

20  today, but you've stated it in the past that you believe

21  that those were violations.  Do you remember using that

22  word?

23      A   Yes.

24      Q   But you've never read the contract or a contract

25  document that tells you what KBR is or is not allowed to

1    burn in burn pits.  Right?

2        A    I'm not sure that I meant violations.  I knew it

3    was wrong what we were doing.  I'm not a law guy.  So to

4    say that we were committing a violation, I couldn't say

5    that.

6        Q    Okay.  That's absolutely a fair distinction.  So

7    you don't mean a violation of contract.  You just mean you

8    felt it was wrong?

9        A    I knew it was wrong.

10       Q    Right.  And will drill down on that a little

11   bit, but I appreciate that distinction.

12            Now one of the things that you talked about was

13   medical waste being burned in the burn pit.  Do you

14   remember talking about that?

15       A    Yes, I do.

16       Q    Now there were military medics who were bringing

17   that medical waste to the burn pit.  Right?

18       A    Yes.

19       Q    KBR was not bringing the military's medical

20   waste to the burn pit at Al Kut?

21       A    They were not.

22       Q    And in fact at a point in time I believe about

23   sixty days after you had been operating the Al Kut burn

24   pit, you instructed the military medics not to bring their

25   waste to your burn pit anymore.  Do you remember that?

1       A       There was an incident.

2       Q       But despite you telling the military not to

3   bring waste to your burn pit, they kept bringing it

4   because they brought it at night.  Is that right?

5       A       Yes.

6       Q       And again, so that was the military bringing

7   their waste to the burn pit you were operating at Al Kut?

8       A       Yes.

9       Q       And you base that conclusion not on actually

10  seeing the military medics dropping that waste off in the

11  burn pit, but it's based on the fact that you saw bags in

12  the burn pit when you showed up in the morning.  Right?

13      A       Yes.

14      Q       And you didn't know where those -- you didn't

15  see those bags get dropped off?

16      A       I've never physically seen it.  No.

17      Q       Right.  You assumed that they were medical waste

18  bags because you saw medical trucks.  Right?

19      A       When I got done working in the evening, I would

20  run and I would run towards the burn pit, not all the way,

21  but that's the way my route was and I seen medical

22  vehicles coming from that direction.

23      Q       Military medical vehicles?

24      A       Military.

25      Q       Those trash bags that you saw in the morning,

1    you didn't go and open them to confirm what they were --

2         A    I did not.

3         Q    Now you also testified about water bottles.  Do

4    you remember that?

5         A    Yes.  Yes.

6         Q    And you said that the smoke from burning water

7    bottles was darker and different than burning other items.

8    Is that right?

9         A    Burning plastic was a much nastier smoke.  Yes.

10        Q    So plastic more generally.  Not just bottles,

11   but plastic --

12        A    Plastic.

13        Q    Okay.  Now for the first sixty of the ninety

14   days you were operating the Al Kut burn pit, you were

15   burning water bottles within the burn pit with everything

16   else.  Right?

17        A    Yes.

18        Q    And then it was at that 60-day mark when you

19   decided that you shouldn't be burning water bottles

20   anymore?

21        A    I probably decided before that, but that's when

22   I tried to make a stand.

23        Q    That's when you started to actually sort or

24   segregate?

25        A    Yes.

1      Q    So during your first sixty days, the military

2  came to the burn pit.  Right?

3      A    The military came?

4      Q    During that first sixty days when you were

5  operating the burn pit, the military came out to your burn

6  pit?

7      A    I'm not sure I know what you mean.

8      Q    Let's talk about how the different instances

9  were that happened.

10     A    Okay.

11     Q    All right.  I know you said that DCMA only came

12  out to inspect you once and I believe the phrase you used

13  was only one true inspection.  But you testified

14  previously that DCMA actually came to observe the burn pit

15  three to four times during your ninety days of operating

16  the burn pit.  Right?

17     A    I didn't know what a DCMA was then.

18     Q    Right.  Do you recall testifying that they came

19  to visit the burn pit three or four times?

20     A    Military inspectors.  I didn't know if they were

21  DCMA or who they were.

22     Q    Okay.  So some form of inspector came to your

23  burn pit to inspect it three or four times during the

24  ninety days you were operating the Al Kut burn pit.

25  Right?

1      A    I may have said that.  But right now, all I can

2    remember is three in -- very vividly.

3      Q    Okay.  So you remember three distinctly?

4      A    I think so.  Yes.

5      Q    And then the one that you called the true

6    inspection when you actually spoke with the inspectors as

7    opposed to them just doing whatever else they were doing.

8    Is that right?

9      A    I spoke with them.  Yes.

10     Q    And in addition to the inspectors who came to

11   the burn pit, you also just testified that the military,

12   the medics, for example, were actually coming and dumping

13   their own waste in the burn pit.  Right?

14     A    Yes.

15     Q    And during the first sixty days they were doing

16   that during the day.  Right?  They didn't do it at night

17   until you told them they couldn't come back?

18     A    Right.

19     Q    Okay.  So there's at least two reference points

20   for the military being at your burn pit during the first

21   sixty days and seeing what you were doing.  Right?

22     A    Yes.

23     Q    And in addition to the military observing or

24   DCMA observing what you were doing, your KBR supervisors

25   came out occasionally and saw what you were doing as well.

1    Right?

2         A    No.

3         Q    During that first sixty days, did anybody tell

4    you to stop burning plastic?

5         A    I was told by upper management through my

6    general labor foreman not to burn plastic on a certain day

7    and to go out at night and burn it.

8         Q    We'll talk about that night bit.  Other than

9    what you just described, nobody told you to stop burning

10   plastic.  Right?

11        A    No.

12        Q    DCMA never approached you and told you to stop

13   burning plastic?

14        A    No.

15        Q    The military never approached you and told you

16   to stop burning plastic?

17        A    No.

18        Q    You didn't read a contract document that told

19   you you shouldn't be burning it.  Right?

20        A    I did not.

21        Q    And as you just testified and as you testified

22   previously, you believed it was a violation because you

23   knew it in your head.  Right?

24        A    Yes.  And I had an incidence where a guard come

25   out of the guard tower and threatened because the smoke

1    was going towards the tower.

2         Q    Right.  There was some Ukrainian guards who work

3    next to the burn pit and they didn't like the smoke.

4    Right?

5         A    Yes.

6         Q    And that's what you're referring to?

7         A    Yes.

8         Q    So based on the nature of the smoke after the

9    first 60 days, you decided you want to segregate and you

10   started segregating out the water bottles among some other

11   items.  Right?

12        A    I asked.  I did not decide.  I asked.

13        Q    But then you started doing it?

14        A    Yes.

15        Q    Okay.

16        A    I was granted permission.

17        Q    From KBR?

18        A    From KBR.

19        Q    Right.  You don't know if the military or DCMA

20   was involved in this?

21        A    No clue.

22        Q    But of course, there was no where for that trash

23   to go.  Right?  There was no where for the water bottles

24   to go.  There was no recycling, for example, at Al Kut?

25        A    No.

1    Q    There were no incinerators at Al Kut?

2    A    None.

3    Q    There were no landfills at Al Kut?

4    A    Not that I was aware of.

5    Q    So after a while, you've been stacking up these

6    bottles and something has to happen with them.  Right?

7    A    You say landfill.  I actually seen dirt being

8    put into an old burn pit.  So if that's a landfill, then I

9    guess I did know there was a landfill there.

10   Q    Okay.  The sorting you were doing, right, taking

11   all these water bottles and other things that shouldn't be

12   burned, those didn't go to a landfill.  Right?

13   A    No.

14   Q    Right.  Because ultimately, what happened once

15   they built up is you burned them?

16   A    Yes.

17   Q    And you burned them at night?

18   A    I had on a couple of occasions.  Yes.

19   Q    And burned them at night because you thought

20   that burning those items was some sort of -- not a

21   contract violation, but something that shouldn't be done?

22   A    No.  Somebody above me told me when to do it at

23   night.  Not me.

24   Q    Somebody in KBR?

25   A    Somebody in KBR.

1      Q      But again, for those first sixty days when you

2    were burning those same items, those same bottles during

3    the day and they were producing smoke, nobody from the

4    military, nobody from DCMA ever told you to stop burning

5    water bottles.  Right?

6      A      Right.

7      Q      And you were the one who approached your KBR

8    bosses and told them you thought it was a problem to burn

9    water bottles?

10     A      Yes.

11     Q      Now even once you started burning water bottles

12   at night, did DCMA or the military ever tell you to stop

13   doing what you were doing?

14     A      No.

15     Q      And as you sit here, you actually don't know if

16   burning water bottles at night is a violation of any

17   contract document.  Right?

18     A      I do not know.

19     Q      You just did it at night because you were

20   worried about the smoke?

21     A      I was told to do it at night on a couple of

22   occasions.

23     Q      Now we hit on this a little bit, but let's shift

24   and let's talk about DCMA.  So your testimony today is

25   that DCMA inspected you three times in ninety days.

1    Right?

2        A    That is not my testimony.  I didn't know what a

3    DCMA was.  So I don't know if they inspected me or not.

4        Q    Okay.  Who were the people that came to the burn

5    pit to inspect you three times?

6        A    A lieutenant and a specialist.

7        Q    Okay.  So people in military uniforms?

8        A    Yes.

9        Q    You don't know who they were?

10       A    No clue.

11       Q    But you do know they were conducting an

12   inspection.  They were looking at the burn pit.  They were

13   asking questions.

14       A    Yes.

15       Q    Now on one of the three occasions, they spoke to

16   you?

17       A    Yes.

18       Q    Right.  Okay.  You also observed some civilians

19   come and observe the burn pit, but you don't know who they

20   were.  Right?

21       A    I do not know who they were.

22       Q    And those civilians came out to the burn pit and

23   observed what was happening four or five different times?

24       A    Yeah.  Probably.

25       Q    And as we've already talked about, the military

1    was also coming out to the burn pit to dump waste.  Right?

2        A    The military was what?

3        Q    Coming out to the burn pit to dump waste?

4        A    Yes.

5        Q    Sometimes when you were there, sometimes when

6    you weren't there.

7        A    Right.  Exactly.

8        Q    And you never saw any documents from DCMA about

9    your performance at the burn pit.  Right?

10       A    No.

11       Q    You didn't sit on award fee evaluation boards?

12       A    I did not.

13       Q    Did you sit on any performance evaluation

14   boards?

15       A    I did not.

16       Q    Okay.  So do you know how DCMA evaluated your

17   operation of the burn pit for your ninety days at Al Kut?

18       A    I have absolutely no way of knowing.

19       Q    Now as far as the process -- taking a step back

20   to think about how you located the burn pit.  If you

21   wanted to do something, you testified about this earlier,

22   like if you wanted to build a hut, you had to submit a

23   work order.  Right?

24       A    Yes.

25       Q    So certain projects required authorization that

1    you passed up your chain of command.  Right?

2        A    Yes.

3        Q    And KBR could approve certain things or DCMA and

4    the military could approve certain things?

5        A    I don't know about -- we didn't have a DCMA in

6    our camp.

7        Q    Okay.  So you don't know how the process worked

8    when you requested --

9        A    Exactly.

10       Q    Fair enough.

11            MR. JOHNSON:  Okay.  Thank you, Mr. Robbins.  I

12   don't have any further questions.

13            THE WITNESS:  You're welcome.

14            THE COURT:  Redirect?

15            MS. SMITH:  Just a couple.

16                    REDIRECT EXAMINATION

17            BY MS. SMITH:

18       Q    You just discussed with counsel for KBR the

19   military coming to the burn pit to dump waste?

20       A    Yes.

21       Q    What military was coming to the burn pit to dump

22   waste?  Where were they from?

23       A    The Ukrainian Hospital.

24       Q    They were Ukrainian military?

25       A    Yes.

1    Q    And was that the only military that you ever saw

2    to come to the burn pit to dump waste?

3    A    Yes.

4    Q    And counsel for KBR made a point that KBR didn't

5    bring the medical waste to the burn pit.  But KBR did burn

6    it at the burn pit.  Correct?

7    A    Yes, I did burn medical waste.

8         MS. SMITH:  That's all I've got.  Thank you.

9         THE WITNESS:  You're welcome.

10        THE COURT:  You may step down, sir.  Thank you

11   very much.

12        MS. SALZBERG:  Your Honor, you heard from Mr.

13   Baker and Mr. Ledlie about how KBR agreed to abide by a

14   contract requirement that required written permission from

15   an ACO to a contracting officer to use a burn pit at all

16   and even then impose standards that restricted what could

17   be burned.  And one thing we wanted to draw your attention

18   to was testimony from David Palmer who was a contracts

19   manager, a theater contracts manager for KBR during the

20   2004 to 2009 timeframe.  We have a slide about that.

21        THE COURT:  Are you going to call him as a

22   witness?

23        MS. SALZBERG:  No.  We have a demonstrative

24   slide and also a copy of the deposition transcript pages

25   for you.

1              THE COURT:  All right.

2              MS. SALZBERG:  Can I hand those out?

3              THE COURT:  You have to speak up.  I can't hear

4     you, ma'am.

5              MS. SALZBERG:  Your Honor, could I hand up

6     copies of a slide and the deposition transcript pages

7     behind it?

8              THE COURT:  Yes.

9              MS. SALZBERG:  One of the things that Mr. Palmer

10    was asked was "when you were KBR's theater contract

11    administrator, did you ever receive any letter of

12    technical direction or other form of written permission

13    for KBR to surface burn paint?"

14              He said, "paint?  Well, no."

15              "Question:  Well, if the military wanted to give

16    permission to KBR to depart from the terms of the contract

17    that prohibited burning items, what form of contract

18    direction would that come through?

19              Answer:  It would be an LOTD.

20              Question:  Did KBR ever receive a letter of

21    technical direction or any other form of contract

22    direction allowing KBR to surface burn batteries?

23              Answer:  No."

24              And we heard yesterday from Commander Hersh that

25    no, batteries were not something that could be burned.

1    That should have gone to the HAZMAT area.

2           Similarly, "did KBR ever receive a letter of

3    technical direction or any other form of contract

4    modification that permitted KBR to burn solvents?"

5           He says "no, that's another thing that would go

6    to the hazardous waste."

7           "Question:  Did KBR ever receive any letter of

8    technical direction or other contract direction that gave

9    KBR permission to burn chemicals in surface burn pits?

10          Answer:  No."

11          We have two more.

12          "Question:  Did KBR ever receive a letter of

13   technical direction or any other form of contract

14   direction that permitted KBR to burn hydraulic fluids in

15   surface burn pits?"

16          Once again, "no, that would have been a

17   hazardous waste collection point."

18          "Question:  Did KBR ever receive a letter of

19   technical direction or any other form of contract

20   direction giving KBR permission to surface burn petroleum

21   products?

22          Answer:  No.  Again, hazardous waste collection

23   point."

24          Then just two more examples for Your Honor.

25          "Question:  Did KBR ever get a letter of

1    direction or any other form of government direction that

2    allowed KBR to surface burn pesticides?

3              Answer:  No.

4              "Did KBR ever receive a letter of technical

5    direction or any other form of government directive that

6    gave KBR permission to surpass burn rubber?

7              He says "rubber, no."

8              And you heard from Mr. Baker earlier about tires

9    being one of the things.

10             MR. RAZI:  Your Honor, could we be heard briefly

11   in response to that?

12             THE COURT:  Let me ask you a question.  You've

13   given me an excerpt from the deposition that begins on

14   page 127.  So you're assuming I know who he is.  Who is

15   he?

16             MS. SALZBERG:  Mr. Palmer was a theater

17   contracts manager for KBR.  I apologize.

18             THE COURT:  All right.

19             MR. RAZI:  Your Honor, may I -- can I just make

20   a brief comment about that?

21             THE COURT:  Yes, you may.

22             MR. RAZI:  We weren't aware until just now that

23   plaintiffs intended to call Mr. Palmer by deposition, but,

24   you know, what's done is done.

25             THE COURT:  Didn't they give a list of

1    deposition excerpts they were intending to rely on?

2           MR. RAZI:  They gave us a list of the witnesses

3    last night that they intended to present today and I don't

4    think he was on it.

5           THE COURT:  No.  My question was from the

6    pretrial.  Did we not have a list of deposition excerpts?

7           MR. RAZI:  There may well have been.  My only

8    point is we've briefed and submitted to the court other

9    excerpts from Mr. Palmer's testimony and Mr. Palmer's

10   testimony supports KBR's position that there's no

11   jurisdiction, that these cases are preempt and we would

12   just commend to the court --

13          THE COURT:  Is that attached to your memo?

14          MR. RAZI:  Yes, Your Honor.  We'll just commend

15   the full --

16          THE COURT:  I'll make sure we cross-check that.

17          MR. RAZI:  Thank you.

18          THE COURT:  Thank you.  All right.  Next?

19          MR. BAKER:  Good morning again, Your Honor.  I

20   mentioned in the opening that we would discuss KBR's

21   paragraph 23, facts in some more detail.  And, of course,

22   paragraph 23 of the defendant's facts is the paragraph on

23   which KBR principally relies upon for the proposition that

24   the military directed KBR to use burn pits.

25          Now the witnesses that we've heard over the past

1    day and a half have repeatedly said the contract documents

2    control.  And yet, the government witnesses on which KBR

3    relies upon for this paragraph 23 have little to no

4    knowledge of KBR's contractual tasking with respect to

5    waste.  So we've already discussed a number of these

6    already.  So I'm not going to repeat those, but I'd like

7    to go through a couple of the ones that we have not

8    addressed yet.

9                THE COURT:  Do I have this slide yet?

10               MR. BAKER:  I'm going to bring it up.

11               THE COURT:  Okay.  Thank you.

12               MR. BAKER:  So you've heard from General Vines.

13   Of course, General Sanchez.  Dr. Postlewaite was here

14   yesterday.  Colonel -- Mr. Vincent.  Lieutenant Colonel

15   Hall I discussed in the opening yesterday.  So I won't

16   repeat that one.  And the Loehrl letter at the bottom, Mr.

17   Ledlie already discussed.

18               Let's turn first to Damon Walsh.  And Colonel

19   Walsh was the commander of DCMA, Northern Iraq and deputy

20   commander for DCMA, Iraq, 2003-2004.  And here's what he

21   has to say about his knowledge of the contractual tasking

22   to KBR.

23               "Question:  I have a corollary question.  Do you

24   recall any specific instance in which you were informed

25   that KBR was authorized to use a burn pit as the default

1    method of waste disposal at a site in Iraq?

2              Answer:  No.

3              Question:  Did you ever see written authority

4    expressly authorizing KBR to use burn pits in Iraq?

5              Answer:  No."

6              Later he's asked, "you are not a technical

7    expert in waste management?

8              Answer:  I'm a pig looking at a wrist watch when

9    it comes to any technical issues concerning waste

10   management.

11             Question:  Okay.  You don't have any knowledge

12   as to what the army regulations are about the steps you

13   need to take before you employee" -- actually, in the

14   transcript it says employee, but I believe it should be

15   employ -- "open surface burning on?

16             Answer:  That is correct.  I do not have any

17   knowledge about that."

18             So that's Mr. Colonel Walsh.  That's what he has

19   to say about the contractual documents.

20             Next, you have Mr. James Loehrl.  He's the

21   division -- he's the division chief for LOGCAP III from

22   2004 to 2009 and was the Director of Contracting at Rock

23   Island from 2009 to 2010.  Let's see what he knows about

24   the contractual documents vis-a-vis waste management.

25             "Question:  Do you know who made the decision to

1    utilize burn pits as a method of waste disposal in Iraq

2    and Afghanistan?

3              Answer:  No, I do not.

4              Question:  Do you know whether that's a decision

5    made by a government person versus a contractor like KBR?

6              Answer:  No, I don't know.  No."

7              Yet, KBR relies upon this witness for the

8    proposition that the government directed KBR to use a burn

9    pit across the board, no less.

10             The next witness is David Bennett and he was an

11   ACO, an Administrative Contracting Officer at the H-sites

12   in Iraq in 2006.

13             He's asked:  "Do you remember any specific terms

14   of the task orders or statements of work that dealt with

15   waste management at the H-sites?

16             Answer:  No.  I don't remember any specific

17   terms.

18             Question:  And would you have any knowledge for

19   waste management services under LOGCAP outside of the

20   H-sites?

21             Answer:  No, I wouldn't."

22             Thank you, Your Honor.

23             MR. LEDLIE:  Similarly, Your Honor, in paragraph

24   page 31 of defendant's memorandum, they cite to

25   Mr. Loehrl, who we just discussed, for the proposition --

1    they quote him for the proposition that "is your testimony

2    that KBR was in fact integrated with the military in

3    performing this contract?  Answer was yes."

4            And, Your Honor, we'd like to pass up to the

5    court additional designations for Mr. Loehrl.

6            "Once again, I am defining integrated as they

7    were there, they were sharing the installations, they were

8    part of the process -- they were part that, with it and

9    they had -- in order to properly perform the services that

10   they were being required, they had to be aware of what was

11   going on situationally around them, what they had to help

12   with -- foresee or help or interpret what the government

13   was necessarily going to need and how to execute the

14   mission that they had been assigned to.  By integrated,

15   I've never said that they were part of the military.  I

16   mean they were still a succinct organization, succinct

17   structure in there, but they had to be connected and

18   integrated in with them so that they were both -- so all

19   were moving in the same direction."

20           It goes on to say:  "I want to draw your

21   attention specifically to the operation of burn pits.

22   When KBR operated a burn pit, who did the operation?  Was

23   it KBR or was it the military?

24           Answer:  It was KBR.

25           Question:  Was there anybody in the military

1  that was working shoulder to shoulder with KBR in these

2  pits?

3          Answer:  Best of my knowledge, no.  There

4  shouldn't have been.  There should not have been."  That's

5  Mr. Loehrl.

6          Finally, Your Honor, in page 157 of his

7  deposition, Mr. Loehrl said "I mean they were not

8  integrated from the standpoint -- I mean it depends on how

9  you define integrated.  If you define integrated as KBR as

10 you had KBR in the military down there operating burn pits

11 together, the answer is no.  If KBR is responsible for

12 operating the burn pits and this month, there's going to

13 be a population of 3,000 people and next month 5,000

14 people integrated from the standpoint that KBR had to be

15 aware that they were to have two-fifths more waste to be

16 dealt with, from that standpoint, if that's how you're

17 defining integration, then my answer is yes."

18         So integration to Mr. Loehrl is defined by his

19 definition, Your Honor.  And I do have a copy of the

20 deposition transcript to go along with it.

21         THE COURT:  All right.

22         MR. JOHNSON:  And, Your Honor, just by way of

23 brief rebuttal to that, the citation provided by

24 plaintiff's counsel, which is the same exhibit we provided

25 the court, not lines 92, 23 to 93, 1 where Mr. Loehrl does

1    testify that the continuing operation of burn pits was an

2    army decision that was made after his recollection was

3    refreshed with a document which post-ceded what Mr.

4    Ledlie --

5             THE COURT:  And that's in your

6    counter-designations?

7             MR. JOHNSON:  It is, Your Honor.

8             THE COURT:  Okay.  I'll make sure we look at it.

9             Yes, sir.  What's next?

10            MR. BAKER:  Next, Your Honor, we're going to

11   speak briefly about water.  Your Honor, there are water

12   claims in our case and again, when you're evaluating the

13   plenary control issue, one of the points that we've made

14   in our brief repeatedly is that this was a what not how

15   contract.  And as we go through the terms of the water

16   tasking, I think that will be readily apparent.

17            First, if you look at Task Order 59 and the

18   relevant passage is in or the tasking is in 8.11.  Here's

19   what the task order says.  "In accordance with, IAW, in

20   accordance with applicable army regulations, the

21   contractor shall provide install, operate and maintain

22   potable and non-potable water systems to include plumbing,

23   sewage, gray/black water separation and gray/black water

24   disposal to facilitate the operation of facilities

25   provided or operated by the contractor previously

1    designated by the government or as directed by the ACO for

2    new requirements."  Very clear what not how directive.

3           Next, if you'll look at an exemplar from Task

4    Order 89 and there the relevant provision will be again in

5    8.11 and I'm not going to read it again, but it's a very

6    short paragraph and it basically tells what the army

7    expects.  It doesn't say how to do it.

8           Let's look next at Task Order 139 and here

9    there's a little bit more detail, but not much.  It's

10   still of the what not how variety.  Tells that "the

11   contractor shall provide, install, operate and maintain

12   potable and non-potable water systems.  These systems

13   shall include plumbing, sewage, gray/black water

14   separation, gray/black water disposal.  All water

15   production and storage will be in accordance with

16   applicable regulations and TB Med 577, which is a water

17   quality standard."  So there's a performance standard

18   incorporated now.

19          Again if you look further down into it, it says

20   the contractor shall ensure potable water standards comply

21   with TB Med 577, again in the contract.

22          And if you look at Section 8.115, here's where

23   "the contractor shall ensure that the water they produce,

24   store and distribute is purified and tested in accordance

25   with all applicable D.O.D. and U.S. water purification and

1    preventive medicine regulations and technical manuals."

2    So KBR is being the one that is required to ensure the

3    water quality, not Prev Med in the first instance.

4             Next you go to Task Order 159, our next

5    exemplar.  And the tasking again reads very, very

6    similarly and it says that "all water production and

7    storage will be in accordance with applicable regulations

8    and TB Med 577, Tab H."  Again a water quality standard.

9             And again we see that the contractor in the

10   first instance is the party that is responsible for

11   ensuring that the water is appropriately tested, not the

12   military.  It says "the contractor shall ensure that the

13   water they produce, store and distribute is purified and

14   tested in accordance with all applicable D.O.D. and U.S.

15   Army water purification and preventive medicine

16   regulations and technical manuals.  The contractor shall

17   be responsible for testing delivered water that they do

18   not produce or water commingled with municipal water

19   sources at the water storage and final distribution

20   sites."  Again this is KBR who is being tasked with what

21   not how.  Those are our points on water.  Thank you, Your

22   Honor.

23             THE COURT:  All right.

24             MR. LEDLIE:  Very briefly, Your Honor.  We have

25   one ACO that we mentioned, Augusta Fehn, that we'll be

1    calling by video.

2         There was a second administrative contract

3    officer who was deposed in this case, included in our

4    brief, but we will just give Your Honor a flavor of the

5    deposition of former ACO David West Bennett.  One second,

6    Your Honor.  I will get copies.  Apparently, we didn't

7    have them ready for this particular one.

8         THE COURT:  All right.  What's the name of the

9    witness again?

10        MR. LEDLIE:  Yes.  This is -- his name is David

11   Bennett, but he went by West.  So West Bennett, Your

12   Honor.  He was an Administrative Contract Officer.  It's

13   Exhibit 43 to our brief.  And I will be publishing lines

14   15 through 17 and 19 through 21, Your Honor.

15        Mr. Bennett is being asked about responsibility

16   for supervising -- I'm just waiting, Your Honor, while we

17   get it up.  But he's been asked about whether as an

18   Administrative Contract Officer, so part of the

19   contracting command, "Did you also provide oversight to

20   the KBR employees to the extent that you were providing a

21   service that you authorized?

22        His answer was "I don't think my oversight was

23   specific to employees.  It was more general to the

24   performance of the contract."

25        "Question:  Within that structure, did you

1    provide supervision or guidance to KBR as an entity, which

2    necessarily includes KBR employees?

3            His answer was "I wouldn't call anything I did

4    supervision.  I wouldn't call it -- I wouldn't

5    characterize it that way.  No."  Because as an

6    Administrative Contract Officer, he understood that KBR

7    was to be -- he was not to manage or supervise or directly

8    do anything with KBR's personnel.  He would coordinate on

9    performance standards.  What not how, Your Honor.  West

10   Bennett.

11           MR. RUSSELL:  Your Honor, if I could briefly be

12   heard in response to that?  Mr. Bennett is one in a list

13   of witnesses that the plaintiffs did not tell us they

14   would be calling by deposition today.

15           MR. LEDLIE:  I need to respond to that, Your

16   Honor.  We had an agreement -- a letter agreement with the

17   court that you endorsed that said that anything that we

18   included in our brief, we could use demonstrate exhibits

19   so long as we restricted ourselves to the page and lines

20   in our brief.

21           MR. RUSSELL:  Mr. Ledlie, let me finish and let

22   me just cut to the chase, Your Honor.  We had

23   counter-designations that we had prepared if we were told

24   that they were going to be presented by deposition.  We're

25   happy to provide the Court with those

1  counter-designations.

2          THE COURT:  Provide me with the

3  counter-designations.

4          MR. RUSSELL:  We will do that.

5          THE COURT:  And then when we hear closing

6  argument, you can give your position on the significance

7  or lack thereof of the witness.

8          MR. RUSSELL:  We will do that, Your Honor.

9  Thank you.

10          THE COURT:  You were going to play this

11  testimony?

12          MR. LEDLIE:  Of Augusta Fehn.  Yes, Your Honor.

13          THE COURT:  I'm talking about Bennett.

14          MR. LEDLIE:  Oh, no, Your Honor.  That was just

15  that one snippet.  But we do have the other ACO that was

16  deposed in this case, Augusta Fehn's videotape, shortened

17  videotape deposition which we are ready to begin playing

18  at this time, Your Honor.

19          THE COURT:  Does that include

20  counter-designations?

21          MR. LEDLIE:  At the request of KBR, we had it

22  cut that way.  They requested that they hand theirs up.

23          MR. RUSSELL:  Your Honor, we'll have a brief

24  response after this.  We didn't think it was an efficient

25  use of the time to play more video.

1          THE COURT:  All I'm saying is I want to make

2    sure that for the sake of completeness, whatever you're

3    playing has enough for the KBR position to come out.  If

4    it doesn't, we need to edit it.  That's all.

5          MR. LEDLIE:  Okay.

6          THE COURT:  Okay.  This is another ACO?

7          MR. LEDLIE:  Yes, Your Honor.  This is Augusta

8    Fehn.  She was a DCMA ACO and the time of her tenure will

9    be covered in her testimony, Your Honor.  For Your Honor's

10   information, it is a 52-minute video.

11         THE COURT:  You're going to play 52 minutes?

12         MR. LEDLIE:  Your Honor, as an Administrative

13   Contract Officer, yes, Your Honor.  We think that you need

14   to see not just the written word, but the answers to the

15   questions posed.

16         THE COURT:  Well, what's the pleasure of the

17   parties?  Do you want to take lunch now or 52 minutes from

18   now?

19         MR. LEDLIE:  We don't have a preference, Your

20   Honor.

21         MR. JOHNSON:  We'll proceed with Augusta Fehn,

22   Your Honor.  Thank you.

23         THE COURT:  How do you spell her last name?

24         MR. LEDLIE:  Your Honor, it is F-E-H-N.  There

25   are a couple of exhibits that are referenced in the

1    deposition which -- and if it would assist the Court, we

2    have a copy of the clip sheets of the video, Your Honor.

3              (Video deposition played.)

4              MR. LEDLIE:  That concludes the deposition of

5    ACO Augusta Fehn, Your Honor.

6              THE COURT:  All right.  What is on tap for the

7    rest of the day from the plaintiffs?

8              MR. LEDLIE:  Your Honor, our original plan was

9    to call General Volmecke who had a health situation.  So

10   we're not calling him.  We have learned that Colonel

11   Coponis who was our other will call live witness is also

12   ill.  I'm going to be checking on him over the lunch

13   break.

14             THE COURT:  Okay.

15             MR. LEDLIE:  If we don't have any

16   more witnesses, Your Honor, we do have our brief

17   submissions and I don't know that we'll need to publish

18   much this afternoon, Your Honor.  Thank you.

19             THE COURT:  Well, let's recess for an hour and

20   see how you're doing at -- and we'll resume at quarter of

21   2.

22             (Luncheon Recess.)

23                      AFTERNOON SESSION

24             THE COURT:  Okay.  What's on tap from the

25   plaintiffs?

 1          MR. LEDLIE:  Your Honor, we do have two handouts

 2   that I went over earlier that I didn't have copies of.  So

 3   it's an administrative matter.

 4          THE COURT:  Okay.  That will be helpful.

 5          MR. LEDLIE:  First, this is the slide from David

 6   Bennett and I also have the deposition backup for the

 7   slide that we published for Damon Walsh.

 8          THE COURT:  Okay.  Thank you.

 9          MR. LEDLIE:  And that concludes the evidence

10   that the plaintiffs will submit at this hearing, Your

11   Honor.  We are interested in what you have to say.

12          THE COURT:  All right.  Does the defense want to

13   offer any rebuttal either through argument on Monday or

14   through any witnesses or documents today?

15          MR. MATTHEWS:  No, Your Honor.  You have our

16   counter-designations and we will wait for closing to

17   submit arguments.

18          THE COURT:  All right.  Well, we'll have a nice

19   robust closing.  I wanted to make sure that -- you know,

20   we got half the Bar Association in this courtroom and

21   they're all tired and it's Friday.  So I'm not going to

22   try to have you do argument today as I said yesterday.

23          I wanted to get educated more on Monday about

24   why national defense interests are not closely intertwined

25   with the military's decisions as to KBR's conduct of its

1    contractual duties.  If I understand the testimony and you

2    all can straighten me out on this on Monday, when KBR was

3    tasked with waste management services at a particular

4    location, these contracts which have wonderful language in

5    them which would be probably only possible to comply with

6    in California, but it has a lot of wonderful language in

7    it about complying with various environmental things.

8              The military contracts with these people in most

9    instances at least as I saw to provide waste management

10   services.  I remember one of the witnesses said that.  He

11   said, well, if I'm going to be tasked to operate the burn

12   pit at Balad or whatever it is, I'm going to get a

13   contract that says waste management; it doesn't say burn

14   pit.

15             And the question I have is while you -- there's

16   the language that's been given in the arguments about

17   what, not how.  But don't I have to discredit the

18   testimony of General Sanchez that he arrives in Iraq and

19   assesses the situation and makes the determination based

20   upon battlefield exigencies that the only way to dispose

21   of waste and other materials is either to bury them or

22   burn them.  And that decision that he made was carried out

23   by his successors and not changed.  And in fact it was

24   defended in communications with Congress.  It's not a nice

25   way to get rid of trash.  There's no question about that.

1          But I need to be educated by the plaintiffs as

2     to why the use of burn pits was not a military judgment.

3     I need to be helped by the plaintiffs in educating me on

4     if -- as with the convoy case, you've got a person driving

5     a truck negligently causing harm, but unless you can say

6     that it was exclusively and only that person and not a

7     military involvement, they couldn't recover.

8          So in this case, you've got KBR with these

9     wonderful agreements that talk about waste management

10    services that if you read them on their face, clearly even

11    in California, it would be hard to do all the things that

12    those contracts say.  And I admire the government lawyers

13    that drew up those agreements.  But one size fits all is

14    not necessarily going to work in assessing liability under

15    battlefield conditions and so I need a little help on that

16    type of an issue.

17         The question of integration, I need a little

18    help on whether that means literally into the strictly

19    speaking chain of command of the military or does it mean

20    integrated into the mission of the military.  And the

21    military carries out its mission in a variety of ways.  It

22    can do it with its own personnel or it can do it with its

23    own personnel joined by contractual personnel.

24         And under the military control factor, there has

25    been a lot of testimony presented to me as to whether the

1    battlefield commanders have KBR in its chain of command.

2    So you can go up to somebody and say -- you should say,

3    sir, yes, sir and how high do I jump, sir, and so forth

4    doesn't apply to military contract.  I understand that.

5    But for purposes of "control" under the cases, does it

6    strictly mean only the battlefield commander's control or

7    does it mean "the military's control" and why would that

8    not include contracting officers who "control" the conduct

9    and the contracting and the performance of the contract of

10   the contractors?

11           If you apply the Al Shimari test, which deals

12   with being either under actual control or involving

13   sensitive military judgments I need to be helped as to why

14   it doesn't satisfy both of those prongs in this case.

15           I do need some more education from both parties

16   on the -- not as exciting aspect of this case as burn

17   pits -- but the water question.  So I need to make sure

18   that both sides focus a little more on giving me record

19   and legal arguments with respect to the water services

20   that are also at issue in this case.

21           And I need help from the plaintiffs as to why

22   the language of all these contract documents is at least

23   in the battlefield context of this case elevating form

24   over substance because the most important aspect of this

25   case, the one causing more -- at least from my

1    observation -- more harm and involving more sensitive

2    questions of ruining people's lungs and causing all kinds

3    of injuries and damages, I need to have a better

4    understanding from the plaintiffs as well as from the

5    defense as to how and why the operation of these burn pits

6    does not reflect a quintessential military judgment and

7    whether it conforms with the language of the contracts or

8    not.

9            It is clear that in the battlefield environment

10   of this case, there were burn pits all over the place and

11   that the decision to have burn pits and where to locate

12   them except under miniscule circumstances was made by the

13   military.  They made the decision on where in the real

14   estate of that base you could put that burn pit.  They

15   made the decision to use them at least from the record

16   I've got in front of me.  So I need some help from both

17   sides on going into greater detail on that.

18           If you look at the Saleh case which the Fourth

19   Circuit embraced, the D.C. Circuit said "during wartime

20   where a private service contractor is integrated into

21   combatant activities over which the military retains

22   command authority, a tort claim arising out of the

23   contractor's engagement in such activity shall be

24   preempted."

25           Now the question I have for both sides to look

1    at is, well, what does it mean "integrated into combatant

2    activities"?  Does it literally mean what appears to be

3    the thrust of the testimony from the plaintiffs' witnesses

4    that it has to be somebody in the strict chain of military

5    command of the battlefield commander or does it mean

6    military authority, which would include contracting

7    authority?  And what does it mean for the Saleh test that

8    the military retains command authority?  I doubt in any

9    sense of the way that the military did not retain command

10   authority over all these forward operating bases and so I

11   need some argument and help on that question.

12           And referring again to Carmichael, one of the

13   observations of the Eleventh Circuit was that the

14   plaintiff had not come close to showing that the KBR

15   employee was the only party to blame and that other

16   military decisions could have been implicated as well.

17           And the question I would have is you've got a

18   very clear record demonstrating the military made the

19   decision to use burn pits and you've also got record

20   evidence indicating that not all of the operations of all

21   of the burn pits may have been perfect.  That some things

22   may have been burned that shouldn't have been in some

23   places on some occasions.  One observation I would make is

24   that's one of the risks you take when you operate burn

25   pits.  That you may have a big truck roll up of a load of

1      trash and unless you get in there and go through every

2      piece of trash in there, you may not be able to completely

3      assure people that there's not one or two things going in

4      that are impure or not proper for being burned.

5              But with the decision of the military being made

6      to use burn pits, knowing that that carries with it some

7      risks that things are going to be burned, even the proper

8      things to be burned that may cause health risks and that

9      occasionally, somebody may not operate it perfectly

10     correct, that's a military judgment.

11             Now let's assume that somebody did dump a

12     Sherman tank into a burn pit on a given day, which may or

13     may not have caused anybody any harm on that day or some

14     other day.  The question is whether you could say that the

15     harm being caused to the plaintiffs is only caused by KBR

16     or is there some joint responsibility, co-responsibility

17     of the military and KBR for the operation of the burn pit?

18     I'm not sure how to answer that question at this point.

19             I mean the overall question from the Fourth

20     Circuit in one aspect of this case is their observation in

21     which it concluded that "although the evidence shows that

22     the military exercised some level of oversight over KBR's

23     burn pit and water treatment activities, we simply need

24     more evidence to determine whether KBR or the military

25     chose how to carry out these tasks."

1          And so I need argument based on the factual

2    record as to what the answer is there.  I believe at this

3    point that the position of the plaintiffs is that it was

4    KBR's duty under the contract to choose how to carry out

5    its tasks and the principal task that's challenged is the

6    decision under a waste management contract to use burn

7    pits.  I wonder out loud whether the language of a

8    contract can on this record be determinative of that issue

9    when the factual record indicates, quite clearly, that the

10   decision at least insofar as carrying out the waste

11   management duty was made by the military to use burn pits.

12         And that takes me back to the Al Shimari which

13   made clear that the first Taylor factor requires an

14   evaluation of whether the military retained actual control

15   as opposed to merely formal control over the contractor's

16   performance.  Clearly, under the record as developed in

17   this case before me, if the control issue is directed at

18   the use of burn pits, why is that not established by the

19   record in this case as opposed to saying that it was KBR's

20   decision and it violated its contract?

21         I need some help from the plaintiffs on their

22   contention that KBR should have been using incinerators as

23   to how in the record developed before me that would be

24   feasible when they couldn't get them transported there,

25   there were fiscal constraints on getting them there.  How

 1     they could be expected to engage in incineration when

 2     incineration was not an available option under the

 3     battlefield conditions of this case?

 4              There are a number of examples that the defense

 5     gives of specific directives given to KBR as to how to

 6     carry out its water services.  And I think the question

 7     that needs to be addressed is whether that -- those number

 8     and type of directives that were given would be sufficient

 9     to constitute them controlling the fulfillment of its

10     contract by KBR.

11              And as I said, that brings me back to the

12     question I raised before.  Does control mean it has to be

13     control of a strictly speaking military battlefield chain

14     of command or does control also include command by the

15     contracting authorities within the military?  Is that a

16     distinction with a difference or without a difference?

17              Those are just some random observations that may

18     help you focus yourself a little bit for Monday.  And as I

19     said, some things have fallen off my calendar for Monday.

20     So I can be pretty generous with you in terms of how much

21     time you take to go forward on Monday.  And so in the

22     absence of anything else, we'll --

23              MR. MATTHEWS:  Your Honor, if I may?

24              THE COURT:  Go ahead.

25              MR. MATTHEWS:  I actually was going to ask that

1    very question.  I think we had originally talked about

2    being done by noon.  Are you suggesting it would go beyond

3    that as needed?

4              THE COURT:  It's possible.  I said I want to get

5    this case well argued and I don't want to be just running

6    a clock.  I want to give you all a chance to develop your

7    record and make your arguments --

8              MR. MATTHEWS:  Much appreciated.

9              THE COURT:  -- clearer.  And that's why -- I

10   mean I got you down all the way to noon.  But if worse

11   comes to worst, I can go after noon.  I've got a 1:00

12   hearing in a criminal case in which the defendant has

13   scheduled his guilty plea.  So that's going to go away.

14   So other than being parched with hunger and thirst, I can

15   give you more than three hours to get this down.

16             MR. MATTHEWS:  Your Honor, the only other thing

17   was to clarify.  I think I said that all the counters were

18   in and what I really meant to say was we would -- whatever

19   counter-designations are not already in will be in by

20   Monday.

21             THE COURT:  That's right.  And you can do the

22   same thing they did and tell me what they are so I'm fully

23   aware that we get the full picture.

24             All right.  Well, you've been working very hard

25   for a long, long time in this case.  It's time to have a

```
 1    nice weekend of relaxation --

 2              (Laughter.)

 3              THE COURT:  -- preparation for Monday.  All

 4    right.  We'll see you Monday at 9:00.

 5              MR. LEDLIE:  The exchange as a part of the

 6    pretrial conference and in this case, page and line

 7    designations.  Both sides, affirmatives and counters.

 8    Whatever you're submitting is going to be in response to

 9    the already exchanged page and lines?

10              MR. MATTHEWS:  Yes.

11              MR. LEDLIE:  That's fine.

12              THE COURT:  All right.

13              (Proceedings concluded.)

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>CERTIFICATE OF REPORTER</u>

I, Lisa K. Bankins, an Official Court Reporter for the United States District Court for the District of Maryland, do hereby certify that I reported, by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the hearing in the case of the In Re: KBR, Inc., Burn Pit Litigation, Civil Action Number RWT-09-md-2083, in said court on the 10th day of March, 2017.

I further certify that the foregoing 110 pages constitute the official transcript of said proceedings, as taken from my machine shorthand notes, together with the backup tape of said proceedings to the best of my ability.

In witness whereof, I have hereto subscribed my name, this 11th day of March, 2017.


Lisa K. Bankins

Lisa K. Bankins
Official Court Reporter

**MR. BAKER: [9]**  27/24 28/7 36/5 36/19 44/17 88/18 89/9 89/11 94/9

**MR. JOHNSON: [5]**  64/21 83/10 93/21 94/6 100/20

**MR. LEDLIE: [35]**  3/11 3/13 3/16 4/11 4/17 5/1 5/24 6/6 9/13 9/18 22/23 44/19 44/25 45/3 47/7 91/22 96/23 97/9 98/14 99/11 99/13 99/20 100/4 100/6 100/11 100/18 100/23 101/3 101/7 101/14 101/25 102/4 102/8 112/4 112/10

**MR. MATTHEWS: [11]**  21/18 22/21 47/10 47/13 47/20 102/14 110/22 110/24 111/7 111/15 112/9

**MR. RAZI: [7]**  87/9 87/18 87/21 88/1 88/6 88/13 88/16

**MR. RUSSELL: [5]**  98/10 98/20 99/3 99/7 99/22

**MS. SALZBERG: [6]**  84/11 84/22 85/1 85/4 85/8 87/15

**MS. SMITH: [4]**  47/23 64/17 83/14 84/7

**THE CLERK: [2]**  47/25 48/7

**THE COURT: [70]**  3/1 3/12 3/15 4/9 4/14 4/21 5/10 6/5 9/10 9/14 22/6 22/22 28/6 36/2 36/18 44/14 44/18 44/24 45/2 47/5 47/8 47/12 47/19 47/21 64/20 83/13 84/9 84/20 84/25 85/2 85/7 87/11 87/17 87/20 87/24 88/4 88/12 88/15 88/17 89/8 89/10 93/20 94/4 94/7 96/22 97/7 99/1 99/4 99/9 99/12 99/18 99/25 100/5 100/10 100/15 100/22 101/5 101/13 101/18 101/23 102/3 102/7 102/11 102/17 110/23 111/3 111/8 111/20 112/2 112/11

**THE WITNESS: [4]**  48/10 64/19 83/12 84/8

**'**

**'03 [1]**  49/2

**'05 [1]**  48/24

**1**

**1.1 [2]**  31/3 35/18

**1.1.1 [1]**  42/18

**1.1.2 [1]**  42/23

**1.1.3 [1]**  42/25

**1.10 [2]**  43/17 44/2

**1.11 [1]**  28/10

**1.16 [1]**  29/5

**1.16.1 [1]**  29/12

**1.2 [3]**  32/3 40/5 43/5

**1.3 [1]**  40/10

**1.4 [3]**  32/22 36/2 36/6

**1.5 [3]**  31/17 31/17 44/7

**1.7 [1]**  40/21

**1.9 [2]**  33/17 43/11

**10 [1]**  1/5

**104 [1]**  19/13

**106 [1]**  19/13

**107 [1]**  19/14

**1070 [1]**  28/9

**108 [1]**  19/14

**10th [1]**  113/9

**11 [2]**  24/12 47/7

**110 [1]**  113/11

**1102 [1]**  29/25

**111 [1]**  20/3

**112 [1]**  20/3

**11th [1]**  113/16

**12 [1]**  54/22

**122 [2]**  45/4 45/5

**127 [1]**  87/14

**139 [2]**  41/5 95/8

**14 [1]**  26/4

**15 [2]**  18/18 97/14

**157 [1]**  93/6

**159 [1]**  96/4

**17 [1]**  97/14

**19 [3]**  16/9 18/18 97/14

**1:00 [1]**  111/11

**2**

**2.7 [2]**  33/23 40/25

**20 [3]**  10/17 11/16 47/6

**2003 [2]**  17/7 23/3

**2003-2004 [1]**  89/20

**2004 [8]**  17/7 17/11 20/7 20/9 30/5 84/20 89/20 90/22

**2005 [4]**  49/6 61/1 65/8 65/9

**2006 [1]**  91/12

**2008 [2]**  45/1 45/8

**2009 [6]**  20/7 20/9 20/10 84/20 90/22 90/23

**2010 [4]**  20/10 46/14 47/1 90/23

**2017 [3]**  1/5 113/10 113/16

**202-203 [1]**  19/10

**2028 [1]**  36/17

**203 [1]**  19/10

**20770 [1]**  1/20

**2083 [2]**  1/3 113/9

**21 [3]**  11/16 14/11 97/14

**23 [5]**  12/13 88/21 88/22 89/3

**93/25

**24 [1]**  90/17

**25 [1]**  49/9

**26 [1]**  16/9

**27 [2]**  13/8 17/3

**28 [1]**  13/8

**29 [1]**  17/3

**3**

**3,000 [1]**  93/13

**30 [3]**  13/11 15/24 16/9

**31 [3]**  13/11 15/24 91/24

**3rd [1]**  23/2

**4**

**400 feet [1]**  53/1

**43 [1]**  97/13

**46 [1]**  19/10

**47 [2]**  2/6 19/10

**48 [1]**  19/10

**4th [1]**  45/1

**5**

**5,000 [1]**  93/13

**5.0 [1]**  37/21

**5.1 [5]**  38/4 38/18 38/23 39/2 39/15

**5.2 [1]**  39/6

**5.3 [1]**  39/13

**5.8 [1]**  25/23

**50 [1]**  30/7

**50 feet [1]**  53/1

**5182 [1]**  46/10

**52 [2]**  100/11 100/17

**52-minute [1]**  100/10

**577 [3]**  95/16 95/21 96/8

**59 [6]**  13/11 16/10 29/24 31/25 32/2 94/17

**6**

**6.0 [3]**  33/8 40/15 44/3

**60 [2]**  30/8 78/9

**60-day [1]**  74/18

**600,000 [3]**  12/23 33/5 34/17

**6023 [1]**  23/7

**62 [1]**  2/6

**6500 [1]**  1/20

**66 [1]**  18/18

**7**

**74 [1]**  37/12

**8**

**8.11 [2]**  94/18 95/5

**8.115 [1]**  95/22

**8.8 [2]**  41/8 41/8

**8**

**8.9 [2]** 30/5 34/5
**8.9.1 [2]** 30/21 34/7
**8.9.2 [1]** 34/24
**8.9.2.2 [1]** 35/13
**80 [1]** 68/21
**82 [1]** 2/7
**89 [4]** 34/1 40/4 41/4 95/4

**9**

**90 [9]** 49/22 58/18 59/12 61/10 61/12 61/14 65/5 65/15 68/19
**91 [1]** 26/16
**92 [1]** 93/25
**93 [1]** 93/25
**9:00 [2]** 1/6 112/4

**A**

**a.m [1]** 1/6
**abide [1]** 84/13
**ability [3]** 11/25 12/1 113/14
**above [4]** 18/4 42/16 69/17 79/22
**absence [1]** 110/22
**absolutely [4]** 14/22 71/7 72/6 82/18
**accept [1]** 17/25
**acceptable [1]** 46/20
**accepted [3]** 5/7 6/4 38/11
**access [2]** 38/1 38/3
**accomplished [1]** 25/12
**accordance [11]** 32/7 41/15 46/18 46/23 46/25 94/19 94/20 95/15 95/24 96/7 96/14
**according [1]** 63/9
**Accordingly [1]** 46/24
**accountable [1]** 43/25
**accuracy [1]** 29/10
**ACO [28]** 7/24 13/2 13/17 25/22 26/10 31/5 31/19 33/1 33/1 34/11 34/12 34/16 35/25 37/2 38/17 39/17 40/14 41/23 43/8 84/15 91/11 95/1 96/25 97/5 99/15 100/6 100/8 101/5
**ACOs [2]** 15/22 33/7
**acquired [2]** 30/23 34/9
**acquisition [2]** 17/20 17/22
**acquisitional [2]** 18/6 18/8
**across [5]** 7/10 9/12 28/12 67/7 91/9
**action [2]** 45/23 113/8
**actions [1]** 25/3
**activities [9]** 9/3 19/15 25/11 33/14 41/15 43/19 106/21 107/2 108/23

**activity [4]** 7/12 7/14 8/8 106/23
**added [1]** 33/16
**adding [1]** 91/9
**addition [3]** 5/8 76/10 76/23
**address [4]** 3/9 6/9 22/20 23/15
**adduced [1]** 113/7
**adhere [4]** 29/15 31/18 36/7 42/20
**adjacent [6]** 68/4 68/14 68/16 69/18 70/2 71/2
**administered [1]** 11/23
**administrative [10]** 31/12 43/3 70/8 91/11 97/2 97/12 97/18 98/6 100/12 102/3
**administrator [1]** 85/11
**admire [1]** 104/12
**aerosol [2]** 39/19 57/17
**affidavit [1]** 5/18
**affirmatives [1]** 112/7
**Afghanistan [2]** 45/11 91/2
**afternoon [2]** 101/18 101/23
**agreement [2]** 98/16 98/16
**agreements [2]** 104/9 104/13
**air [3]** 36/23 52/20 52/21
**AI [19]** 49/12 65/6 65/14 65/19 66/6 66/18 68/19 71/13 72/20 72/23 73/7 74/14 75/24 78/24 79/1 79/3 82/17 105/11 109/12
**allegations [3]** 5/7 6/3 8/11
**allege [1]** 8/17
**allow [1]** 31/9
**allowed [12]** 20/14 20/18 20/25 32/10 32/10 35/10 37/23 38/8 63/9 68/11 71/25 87/2
**allowing [1]** 85/22
**almost [2]** 22/4 22/11
**although [2]** 26/18 108/21
**ammunition [10]** 39/21 51/1 54/25 55/23 57/8 57/11 57/25 60/20 63/15 63/19
**amounts [1]** 22/8
**analysis [8]** 6/13 16/15 18/13 28/23 32/18 33/13 33/14 43/19
**answer [26]** 17/18 18/1 21/8 27/12 85/19 85/23 86/10 86/22 87/3 90/2 90/5 90/8 90/16 91/3 91/6 91/16 91/21 92/3 92/24 93/3 93/11 93/17 97/22 98/3 108/18 109/2
**answers [1]** 100/14
**Anti [1]** 58/11
**Anti-freeze [1]** 58/11
**anymore [2]** 72/25 74/20
**AO [1]** 29/19
**apologize [1]** 87/17
**apparent [1]** 94/16

**APPEARANCES [1]** 1/10
**appendix [1]** 46/15
**appliances [1]** 39/22
**applicable [8]** 29/16 37/14 37/15 94/20 95/16 95/25 96/7 96/14
**application [1]** 37/14
**applied [3]** 14/6 24/8 50/1
**applies [5]** 15/12 18/5 28/12 31/4 32/15
**apply [7]** 13/25 14/1 19/5 46/6 50/14 105/4 105/11
**appointed [1]** 26/10
**appointment [1]** 26/7
**appreciate [2]** 44/19 72/11
**appreciated [1]** 111/8
**approached [4]** 67/11 77/12 77/15 80/7
**appropriately [1]** 96/11
**Approval [1]** 38/15
**approve [2]** 83/3 83/4
**approved [1]** 38/14
**April [2]** 46/14 49/2
**area [13]** 15/5 19/23 29/19 33/19 35/15 38/20 62/15 68/6 68/7 68/14 68/14 71/4 86/1
**areas [4]** 22/19 30/20 45/19 59/5
**aren't [1]** 30/17
**arena [1]** 11/13
**argue [1]** 37/3
**argued [1]** 111/5
**arguendo [1]** 32/10
**argument [12]** 5/4 21/22 22/1 22/4 22/11 22/15 22/18 99/6 102/13 102/22 107/11 109/1
**arguments [4]** 102/17 103/16 105/19 111/7
**arising [1]** 106/22
**arm [18]** 10/13 10/16 11/6 11/14 11/20 11/24 12/9 12/11 12/14 12/17 13/6 13/9 13/13 13/20 14/16 15/16 17/6 25/14
**army [21]** 10/7 10/8 13/7 13/21 17/14 20/23 21/2 23/19 23/22 24/3 26/23 28/14 32/8 46/1 46/17 60/13 90/12 94/2 94/20 95/6 96/15
**arrived [1]** 49/16
**arrives [1]** 103/18
**ash [1]** 42/6
**aspect [3]** 105/16 105/24 108/20
**aspects [1]** 29/11
**assert [1]** 6/19

## A

assesses [1] 103/19
assessing [2] 45/22 104/14
assets [1] 25/7
assigned [3] 19/22 19/23 92/14
assignment [1] 19/20
assist [1] 101/1
assistance [1] 25/5
assistant [3] 51/18 69/7 69/15
Association [1] 102/20
assume [1] 108/11
assumed [1] 73/17
assuming [3] 5/22 32/10 87/14
assure [1] 108/3
attached [3] 5/13 30/6 88/13
augment [1] 24/6
augmenting [1] 24/2
Augusta [9] 7/25 13/17 16/6 96/25 99/12 99/16 100/7 100/21 101/5
authorities [1] 110/15
authority [31] 7/18 8/4 8/5 10/1 10/10 10/23 15/21 16/24 17/15 18/1 18/2 19/13 20/21 21/3 24/11 26/9 26/14 26/20 27/4 28/16 33/11 40/18 44/6 70/22 71/8 90/3 106/22 107/6 107/7 107/8 107/10
authorization [4] 8/18 18/22 68/15 82/25
authorized [10] 8/13 9/21 9/23 27/3 35/1 35/2 36/24 39/9 89/25 97/21
authorizing [1] 90/4
awake [1] 3/11
award [1] 82/11

## B

background [1] 18/15
backup [2] 102/6 113/14
bags [5] 3/4 73/11 73/15 73/18 73/25
BAKER [9] 1/11 4/6 12/22 14/2 27/22 27/25 46/4 84/13 87/8
Balad [1] 103/12
Bankins [4] 1/19 113/3 113/19 113/20
Bar [1] 102/20
base [25] 9/22 10/15 15/16 18/6 18/7 18/25 19/22 27/21 32/6 32/13 34/14 34/20 36/24 37/4 37/5 42/2 42/4 49/11 52/20 65/11 66/8 66/13 67/23 73/9 106/14

baseline [1] 36/8
bases [6] 9/23 12/8 16/23 40/16 45/20 107/10
basic [1] 27/20
basis [4] 27/21 29/1 33/4 54/7
batteries [6] 39/22 58/6 58/25 64/14 85/22 85/25
battlefield [17] 12/4 14/3 14/10 19/11 23/2 23/16 33/24 41/2 103/20 104/15 105/1 105/6 105/23 106/9 107/5 110/3 110/13
becoming [1] 40/16
behind [2] 14/23 85/7
beliefs [1] 6/18
below [1] 41/16
BENJAMIN [1] 1/15
Bennett [9] 91/10 97/5 97/11 97/11 97/15 98/10 98/12 99/13 102/6
besides [1] 66/12
beyond [2] 4/16 111/2
binding [2] 14/15 19/7
biodegradable [1] 38/21
black [5] 59/2 94/23 94/23 95/13 95/14
blame [1] 107/15
bless [1] 28/7
board [3] 16/8 28/12 91/9
boards [2] 82/11 82/14
boil [1] 28/5
bombed [2] 53/7 66/10
bombed-out [2] 53/7 66/10
boss [1] 51/17
bosses [1] 80/8
bottles [15] 59/3 74/3 74/7 74/10 74/15 74/19 78/10 78/23 79/6 79/11 80/2 80/5 80/9 80/11 80/16
bottom [2] 30/13 89/16
boxed [1] 14/25
Brad [1] 3/6
brief [22] 9/6 10/17 11/16 12/14 13/11 13/14 15/25 16/7 17/2 22/25 28/3 30/7 45/5 87/20 93/23 94/14 97/4 97/13 98/18 98/20 99/23 101/16
briefed [1] 88/8
briefing [6] 4/2 4/7 4/17 4/19 4/20 5/3
briefings [1] 4/16
brother [1] 49/1
build [4] 67/20 68/8 68/11 82/22
building [2] 67/11 69/18

buildings [1] 66/10
built [4] 67/64 68/3 69/11 79/15
buried [2] 61/25 63/4
burn [241]
burnable [1] 30/17
burned [21] 37/9 37/10 38/19 38/25 39/17 39/25 57/4 63/13 63/14 64/12 72/13 79/12 79/15 79/17 79/19 84/17 85/25 107/22 108/4 108/7 108/8
burning [28] 31/9 31/21 36/11 37/16 37/19 39/8 41/18 41/20 41/21 57/1 71/15 74/6 74/7 74/9 74/15 74/19 77/4 77/9 77/13 77/16 77/19 79/20 80/2 80/4 80/11 80/16 85/17 90/15
bury [1] 103/21

## C

cab [1] 55/3
calendar [1] 110/19
California [2] 103/6 104/11
camp [42] 32/6 32/13 34/14 34/20 36/24 37/4 37/5 42/2 42/4 42/8 49/14 49/15 49/21 51/18 51/22 51/24 52/15 52/17 52/19 54/3 57/3 57/15 59/13 61/1 61/3 61/18 63/20 63/22 63/23 64/1 64/10 64/12 65/6 65/20 66/22 66/25 67/3 67/15 69/7 69/15 69/15 83/6
canvas [3] 38/11 39/16 57/6
capability [1] 43/23
capable [1] 38/2
capacity [3] 49/18 54/3 113/6
capture [1] 8/16
car [1] 71/17
Carmichael [1] 107/12
carried [1] 103/22
carries [2] 104/21 108/6
carry [4] 17/17 108/25 109/4 110/6
carrying [1] 109/10
Cat [1] 51/24
ceded [1] 94/3
cell [2] 18/7 27/10
CENTCOM [2] 46/19 47/2
CERTIFICATE [1] 113/1
certify [3] 3/4 113/5 113/11
chain [17] 7/18 15/21 20/16 21/10 23/19 24/21 24/22 24/24 25/13 25/15 38/1 70/15 83/1 104/19 105/1 107/4 110/13
challenged [1] 109/5
challenging [1] 22/16

# C

**chambers [2]** 16/14 44/13
**chance [2]** 9/18 111/6
**channels [1]** 13/10
**chapter [1]** 21/22
**characterize [1]** 98/5
**charge [3]** 15/17 22/7 43/25
**chart [1]** 42/11
**chase [3]** 1/16 5/20 98/22
**chemical [1]** 50/11
**chemicals [3]** 39/19 57/23 86/9
**Cherrywood [1]** 1/20
**chief [2]** 20/7 90/1
**choose [1]** 109/4
**chose [1]** 108/25
**chosen [1]** 23/4
**Circuit [4]** 106/19 106/19 107/13 108/20
**circulating [1]** 45/21
**circumstances [1]** 106/12
**citation [1]** 93/23
**citations [1]** 16/3
**cite [4]** 10/17 11/15 11/17 91/24
**cited [5]** 12/13 28/3 33/20 40/24 45/16
**cites [1]** 15/24
**citing [1]** 21/22
**Civil [2]** 1/3 113/8
**civilian [1]** 14/20
**civilians [2]** 81/18 81/22
**claim [3]** 34/25 40/3 106/22
**claims [2]** 9/5 94/12
**clarify [2]** 65/2 111/17
**clear [14]** 6/21 8/1 15/5 18/15 19/22 24/9 25/2 26/17 46/1 70/25 95/2 106/9 107/18 109/13
**cleared [1]** 54/20
**clearer [2]** 8/21 111/9
**clerk [3]** 4/7 4/12 48/7
**clip [1]** 101/2
**clock [1]** 111/6
**close [2]** 68/9 107/14
**closely [1]** 102/24
**closing [6]** 22/11 22/15 47/18 99/5 102/16 102/19
**closings [1]** 3/8
**clothes [1]** 54/21
**clue [2]** 78/21 81/10
**co [1]** 108/16
**co-responsibility [1]** 108/16
**collect [1]** 35/15
**collection [2]** 86/17 86/22
**Colonel [10]** 16/6 17/4 17/12 18/10 19/21 89/14 89/14 89/18

90/18 101/10
**combat [2]** 14/9 43/11
**combatant [9]** 7/12 8/2 8/8 9/3 19/15 23/21 33/13 106/21 107/1
**combustible [1]** 42/6
**combustibles [1]** 39/21
**combustion [1]** 42/5
**command [40]** 7/18 7/18 8/2 8/2 8/4 10/6 12/19 15/21 15/21 16/24 17/7 17/23 18/9 19/13 20/6 20/16 20/16 21/2 21/9 21/10 21/11 23/19 24/21 24/22 24/23 24/24 24/24 25/13 25/15 70/15 83/1 97/19 104/19 105/1 106/22 107/5 107/8 107/9 110/14 110/14
**command's [1]** 19/24
**commander [17]** 15/2 16/7 17/6 17/12 18/3 18/7 18/25 21/1 23/16 29/19 36/25 37/4 37/5 85/24 89/19 89/20 107/5
**commander's [1]** 105/6
**commanders [10]** 10/15 18/5 19/11 19/12 23/21 23/23 25/16 25/18 25/21 105/1
**commands [2]** 10/9 23/18
**commend [2]** 88/12 88/14
**comment [1]** 87/20
**commenting [1]** 45/8
**comments [1]** 41/3
**commingled [1]** 96/18
**commingling [1]** 25/7
**commitments [1]** 26/21
**committing [1]** 72/4
**communication [1]** 12/19 12/20
**communications [1]** 103/24
**completeness [1]** 100/2
**complied [1]** 29/8
**complies [1]** 25/25
**comply [9]** 31/7 31/24 35/21 35/22 37/25 39/8 43/2 95/20 103/5
**complying [1]** 103/7
**component [1]** 23/22
**components [2]** 8/11 42/6
**concept [3]** 30/25 35/11 35/20
**concerns [1]** 61/4
**concluded [2]** 108/21 112/13
**concludes [2]** 101/4 102/9
**conclusion [2]** 71/6 73/9
**concrete [1]** 18/21
**condition [1]** 46/22
**conditions [17]** 11/10 11/21 11/22 12/24 13/24 21/5 24/15

25/1 25/4 25/25 26/9 26/23 27/1 27/23 78/11 104/15 110/3
**conduct [4]** 16/15 41/14 102/25 105/8
**conducting [2]** 6/13 81/11
**conference [2]** 5/12 112/6
**confines [1]** 15/5
**confirm [1]** 74/1
**conforms [1]** 106/7
**Congress [1]** 103/24
**connected [1]** 92/17
**connection [1]** 3/7
**consistent [2]** 15/11 47/18
**constitute [2]** 110/9 113/12
**constrained [1]** 68/6
**constraints [1]** 109/25
**construct [1]** 68/15
**contains [1]** 40/25
**contention [1]** 109/22
**CONTENTS [1]** 2/1
**context [8]** 3/23 17/5 43/20 43/21 45/23 46/7 46/15 105/23
**contingency [2]** 45/17 46/20
**continuing [1]** 94/1
**contract [95]** 7/24 8/13 11/9 11/21 11/22 12/15 13/5 14/2 14/6 14/12 14/18 15/4 16/2 16/19 16/21 16/23 17/8 17/15 17/18 19/5 19/8 21/3 21/5 21/8 21/17 21/17 24/10 24/16 24/25 25/2 25/5 25/9 25/25 26/3 26/10 26/11 26/15 26/23 27/7 27/8 27/11 27/14 27/15 27/16 27/23 28/10 28/11 28/17 29/9 29/13 29/14 29/22 33/2 33/6 34/22 35/7 35/11 47/1 47/1 70/4 71/5 71/24 71/24 72/7 77/18 79/21 80/17 84/14 85/10 85/16 85/17 85/21 86/3 86/8 86/13 86/19 89/1 92/3 94/15 95/21 97/2 97/12 97/18 97/24 98/6 100/13 103/13 105/4 105/9 105/22 109/4 109/6 109/8 109/20 110/10
**contracting [59]** 8/2 10/5 10/6 10/16 11/1 11/5 11/6 11/10 11/15 11/24 12/3 12/9 12/9 12/11 12/17 12/20 12/22 12/23 12/24 13/10 13/13 13/20 13/22 14/16 15/9 15/12 15/16 16/1 17/6 17/6 17/13 17/22 19/19 20/4 20/6 20/9 20/19 21/3 21/9 21/11 23/13 24/3 24/12 25/12 25/14 25/22 26/6 26/12 31/12 43/3 43/9 84/15 90/22 91/11

## C

contracting... [5] 97/15 105/8
105/9 107/6 110/15
contractor [77] 6/23 12/7 13/22
14/9 15/10 15/17 15/19 17/21
20/22 21/11 21/13 21/16 24/9
24/17 24/18 24/19 25/2 25/11
26/14 26/20 27/1 28/14 28/15
28/15 28/18 29/9 29/14 30/14
30/22 30/23 31/1 31/6 31/11
31/14 31/18 32/5 33/10 33/19
34/8 34/9 34/12 34/19 35/14
35/20 36/7 37/16 40/18 40/22
41/13 41/25 42/4 42/7 42/20
43/1 43/2 43/5 43/12 43/13
43/21 43/24 44/1 44/2 44/5
46/1 50/3 59/9 91/5 94/21 94/25
95/11 95/20 95/23 96/9 96/12
96/16 106/20
contractor's [4] 25/23 26/25
106/23 109/15
contractor-acquired [2] 30/23
34/9
contractor-run [1] 46/1
contractors [21] 10/12 11/25
12/25 13/7 14/3 14/20 15/13
19/16 23/1 23/15 23/20 24/4
24/5 24/11 25/17 25/19 25/21
33/24 37/14 41/2 105/10
contracts [15] 8/6 19/2 19/9
28/2 37/1 37/19 44/12 44/21
84/18 84/19 87/17 103/4 103/8
104/12 106/7
contractual [16] 8/5 8/5 15/18
21/14 25/8 34/17 38/15 46/5
46/18 46/23 89/4 89/21 90/19
90/24 103/1 104/23
control [44] 5/10 6/9 6/15 6/16
6/18 6/22 7/3 11/25 14/24 15/3
15/6 15/7 24/22 24/24 25/16
25/18 28/18 28/21 28/21 29/6
33/16 38/1 38/2 40/20 43/13
43/14 43/16 43/18 43/20 44/1
89/2 94/13 104/24 105/5 105/6
105/7 105/8 105/12 109/14
109/15 109/17 110/12 110/13
110/14
controlled [3] 15/11 19/19
21/13
controlling [1] 110/9
controls [1] 8/5
Convention [1] 14/21
convert [1] 11/8
convoy [3] 14/19 15/2 104/4

convoys [2] 40/23 44/9
cool... [3] 19/23 58/10
coordinate [1] 98/8
coordinated [1] 29/18
coordination [3] 29/11 41/22
43/8
Coponis [2] 16/6 101/11
cor [8] 12/12 26/2 26/6 26/13
26/18 26/21 27/3 28/11
core [1] 8/11
corollary [1] 89/23
corrective [1] 45/23
CORs [1] 12/10
count [1] 63/18
counter [7] 94/6 98/23 99/1
99/3 99/20 102/16 111/19
counter-designations [7] 94/6
98/23 99/1 99/3 99/20 102/16
111/19
counters [2] 111/17 112/7
country [2] 52/9 52/12
court [28] 1/1 1/19 1/19 3/15
4/14 5/8 6/11 6/12 7/6 22/3 22/5
27/25 29/1 32/16 40/7 47/16
47/19 88/8 88/12 92/5 93/25
98/17 98/25 101/1 113/3 113/4
113/9 113/20
court's [1] 16/12
courtroom [2] 71/10 102/20
cover [1] 4/21
covered [2] 23/1 100/9
creation [1] 61/20
criminal [1] 111/12
critically [1] 10/1 10/19
cross [4] 2/6 64/21 64/23 88/16
cross-check [1] 88/16
Cross-examination [2] 2/6
64/23
cut [2] 98/22 99/22
cylinders [1] 39/18

## D

D.C [1] 106/19
D.O.D [3] 23/25 95/25 96/14
daily [1] 54/7
damages [1] 106/3
Damon [3] 17/4 89/18 102/7
danger [1] 39/10
DANIEL [1] 1/16
darker [1] 74/7
David [7] 45/2 51/18 84/18
91/10 97/5 97/10 102/5
day-to-day [3] 21/16 27/21
56/20
DCMA [33] 11/7 14/11 17/6

17/8 17/12 18/25 19/12 23/23
51/8 52/6 53/25 69/10 69/22
70/16 75/10 75/11 75/17 75/21
76/24 77/12 78/19 80/4 80/12
80/24 80/25 81/3 82/8 82/16
83/3 83/5 89/19 89/20 100/8
de [1] 18/12
dealt [3] 39/4 91/14 93/16
December [1] 45/1
decide [3] 14/12 56/4 78/12
decided [3] 74/19 74/21 78/9
decides [1] 39/9
decision [17] 14/8 14/14 14/15
14/15 26/24 90/25 91/4 94/2
103/22 106/11 106/13 106/15
107/19 108/5 109/6 109/10
109/20
decisions [2] 24/4 102/25
107/16
declaration [1] 5/16
declarations [4] 4/24 5/13 5/23
70/22
decomposing [1] 38/21
decreases [3] 32/24 40/12 43/6
deep [1] 53/1
default [3] 18/12 18/24 89/25
defeat [1] 19/15
defendant [2] 1/15 111/12
defendant's [3] 45/5 88/22
91/24
defendants [1] 45/15
defended [1] 103/24
defense [4] 102/12 102/24
106/5 110/4
defined [3] 27/14 43/21 93/18
definition [1] 93/19
delegated [2] 24/1 26/7
delegation [1] 12/12
delivered [1] 96/17
delivery [1] 26/22
Delta [17] 49/13 49/14 49/15
49/21 51/22 52/15 52/19 54/4
57/3 57/15 58/15 59/13 61/1
61/18 63/13 64/13 65/6
demonstrate [1] 98/18
demonstrating [1] 107/18
demonstrative [2] 4/1 84/23
denied [1] 20/2
depart [1] 85/16
depends [2] 56/6 93/8
deployed [1] 45/13
deposed [2] 97/3 99/16
deposition [20] 7/22 46/12 65/3
66/3 84/24 85/6 87/13 87/23
88/1 88/6 93/7 93/20 97/5 98/14

## D

deposition... [6] 98/24 99/17
101/1 101/3 101/4 102/6
deputy [3] 4/7 48/6 89/19
description [3] 23/8 52/24
65/18
designated [3] 29/18 38/20
95/1
designations [11] 3/5 4/3 92/5
94/6 98/23 99/1 99/3 99/20
102/16 111/19 112/7
desire [1] 10/4
despite [1] 73/2
detail [6] 14/2 14/4 36/13 88/21
95/9 106/17
determination [2] 12/3 103/19
determinative [1] 109/8
determined [2] 8/9 21/10
develop [1] 111/6
developed [2] 109/16 109/23
developing [1] 45/21
DFAC [2] 54/18 68/1
difference [2] 110/16 110/16
differences [2] 10/9 10/10
dining [1] 38/21
direct [22] 2/6 6/21 12/19 15/3
16/24 17/20 18/1 18/3 20/12
20/13 20/21 20/23 23/4 25/16
25/18 26/14 26/16 28/21 37/9
48/13 51/11 56/20
directed [10] 8/13 8/20 9/21
9/23 31/19 33/1 88/24 91/8 95/1
109/17
direction [31] 10/1 13/2 13/6
15/1 15/2 27/18 40/11 40/13
41/23 43/6 43/8 46/1 47/18
62/21 70/10 73/22 85/12 85/18
85/21 85/22 86/3 86/8 86/8
86/13 86/14 86/19 86/20 87/1
87/1 87/5 92/19
directions [3] 15/22 17/20
25/19
directive [6] 8/18 31/16 34/12
35/25 87/5 95/2
directives [6] 33/6 36/1 39/18
40/14 110/5 110/8
director [3] 20/9 46/11 90/22
dirt [3] 61/23 62/1 79/7
disc [1] 4/12
discernible [4] 16/21 16/22
24/14 42/9
discouraged [1] 36/22
discovered [1] 35/5
discovery [3] 5/5 5/6 6/4

discredit [1] 103/17
discretion [2] 47/11 63/10
discriminating [3] 6/13 16/15
18/13
discussion [2] 14/13 68/22
discussions [2] 19/2 68/24
disposal [20] 6/25 7/5 7/13
7/21 8/9 8/12 18/23 20/17 30/12
31/22 34/5 35/4 36/12 41/10
46/20 52/14 90/1 91/1 94/24
95/14
dispose [2] 30/16 103/20
disposed [1] 35/6
disputed [1] 4/24
distance [1] 65/22
distinct [2] 10/16 13/20
distinction [3] 72/6 72/11
110/16
distinctly [1] 76/3
distribute [2] 95/24 96/13
distribution [1] 96/19
DISTRICT [6] 1/1 1/1 1/9 1/19
113/4 113/4
division [5] 1/2 20/7 23/23
90/21 90/21
Diwaniya [2] 63/23 63/25
doctrine [9] 6/20 9/25 17/1 21/9
23/19 26/4 28/21 32/18 33/13
document [24] 14/4 21/17 23/4
24/8 28/8 32/22 33/8 33/22
33/24 33/25 34/6 36/8 36/25
40/24 41/1 42/22 45/7 50/21
50/22 50/25 71/25 77/18 80/17
94/3
documents [19] 12/23 12/23
13/25 14/1 15/4 23/11 23/12
33/5 34/17 34/18 37/4 50/18
70/4 82/8 89/1 90/19 90/24
102/14 105/22
doubt [3] 14/13 15/14 107/8
dozens [1] 16/11
DPW [1] 38/15
Dr [1] 89/13
drastic [2] 10/9 10/10
draw [3] 33/9 84/17 92/20
drew [1] 104/13
drill [1] 72/10
DRMS [2] 30/16 35/7
dropped [3] 38/25 55/25 73/15
dropping [1] 73/10
drove [1] 64/7
drying [1] 44/16
drywall [1] 50/3
dug [3] 61/25 62/24 63/4
duly [1] 48/6

dump [8] 38/20 54/24 82/1 82/3
83/19 83/21 84/1 108/11
dumped [1] 55/17
dumping [2] 55/18 76/12
duties [5] 24/9 24/13 56/21
56/24 103/1
duty [2] 109/4 109/11
dwell [1] 30/2

## E

early [3] 30/25 48/23 51/25
easier [1] 44/16
easily [2] 16/22 24/14
eat [1] 54/19
Echo [5] 63/23 64/1 64/10
64/12 65/10
ECO [1] 38/15
edit [1] 100/4
educated [2] 102/23 104/1
educating [1] 104/3
education [1] 105/15
effects [4] 34/14 34/20 42/2
42/4
efficient [2] 16/12 99/24
effort [1] 45/18
efforts [2] 14/17 27/2
eighty [1] 53/11
electronics [2] 39/23 55/5
elevating [1] 105/23
Eleventh [1] 107/13
ELIZABETH [1] 1/12
embedded [1] 42/3
embraced [1] 106/19
emissions [1] 36/23
emphasize [2] 22/20 41/11
employ [1] 90/15
employee [6] 20/13 20/23
48/19 90/13 90/14 107/15
employees [20] 8/3 19/13
24/19 24/20 25/17 25/20 27/1
28/17 28/19 32/6 33/12 40/19
43/13 43/15 44/2 44/6 52/13
97/20 97/23 98/2
employment [1] 49/23
empty [2] 66/7 66/9
endorsed [1] 98/17
enforce [1] 13/5
enforceable [1] 11/9
engage [2] 30/12 110/1
engagement [1] 106/23
enhancement [1] 29/17
ensure [8] 25/24 37/18 42/5
43/14 95/20 95/23 96/2 96/12
ensuring [1] 29/7 96/11
enter [1] 59/23

## E

entirety [1] 47/2
entity [5] 8/3 14/5 15/19 29/7 98/1
environment [3] 29/17 46/21 106/9
environmental [11] 29/15 29/16 34/14 34/20 36/8 36/9 42/2 42/4 42/21 45/12 103/7
equipment [1] 62/25
especially [1] 27/19
ESQUIRE [9] 1/11 1/11 1/12 1/12 1/15 1/15 1/16 1/16 1/17
establish [1] 24/16
established [3] 13/10 24/10 109/18
establishing [1] 30/19
estate [1] 106/14
evaluated [1] 82/16
evaluating [1] 94/12
evaluation [3] 82/11 82/13 109/14
evasion [1] 23/14
evening [1] 73/19
everybody [3] 10/14 13/2 13/3
everyone [1] 10/25
evidence [28] 3/19 3/22 4/1 4/2 4/6 4/9 5/9 6/8 6/10 6/15 6/22 7/1 7/2 7/15 9/8 13/4 13/14 13/15 15/8 16/13 16/17 22/2 27/5 47/3 102/9 107/20 108/21 108/24
examination [6] 2/6 2/6 2/7 48/13 64/23 83/16
examined [1] 48/7
examples [2] 86/24 110/4
exception [6] 9/3 14/16 19/15 33/14 37/17 43/19
exceptions [1] 15/13
excerpt [1] 87/13
excerpts [4] 28/1 88/1 88/6 88/9
exchange [2] 37/9 112/5
exchanged [1] 112/9
exciting [2] 44/16 105/16
exclusive [4] 28/16 33/11 40/18 44/5
exclusively [2] 19/19 104/6
Excuse [1] 52/4
execute [1] 92/13
executed [1] 14/15
executive [1] 46/11
exemplar [2] 95/3 96/5
exercise [1] 16/24

exercised [2] 24/11 108/22
exercises [3] 47/8 24/22 24/22/17
exert [1] 28/18
exigencies [1] 103/20
existing [5] 26/11 42/1 47/2 67/21 68/13
expanding [1] 67/11
experience [2] 18/16 49/24
experiences [1] 71/6
expert [1] 90/7
expertise [1] 71/5
explosives [8] 39/21 51/2 54/25 55/23 57/8 60/20 63/15 63/19
exposure [1] 45/10
exposures [2] 42/8 45/20
expressly [1] 90/4
extend [1] 24/18
extent [3] 26/7 45/18 97/20
eyes [1] 3/4
eyesight [1] 9/12

## F

F-E-H-N [1] 100/24
face [1] 104/10
facilitate [1] 94/24
facilities [4] 38/22 53/4 66/13 94/24
fact [12] 8/25 14/13 16/19 27/7 37/23 50/22 66/21 67/2 72/22 73/11 92/2 103/23
facto [1] 18/12
factor [4] 29/2 32/17 104/24 109/13
facts [2] 88/21 88/22
factual [2] 109/1 109/9
fallen [1] 110/19
fashions [1] 20/22
faster [1] 41/7
FCRR [1] 1/19
feasible [1] 109/24
February [2] 48/23 49/6
fee [1] 82/11
feedback [1] 12/10
Fehn [8] 7/25 13/17 16/6 96/25 99/12 100/8 100/21 101/5
Fehn's [1] 99/16
Feingold [1] 45/9
fence [4] 53/12 53/16 53/22 53/23
field [5] 11/23 15/14 21/6 21/7 23/2
fifths [1] 93/15
fighter [3] 10/21 11/4 14/14
fighters [2] 12/1 23/21
fighting [2] 10/6 10/8

final [3] 14/14 41/17 96/19
Finally [4] 12/9 30/17 44/7 93/6
financial [1] 29/10
finish [1] 98/21
finished [1] 22/13
fiscal [1] 109/25
fits [1] 104/13
flames [4] 39/11 56/2 56/4 56/10
flavor [1] 97/4
fluids [1] 86/14
FOB [2] 38/15 65/10
focus [5] 32/19 44/3 65/14 105/18 110/18
folks [5] 11/6 11/7 12/20 62/25 69/9
food [1] 38/21
foot [1] 53/11
force [9] 14/17 17/14 17/22 18/8 21/14 33/19 40/22 44/8 52/20
forces [1] 24/6
foregoing [1] 113/11
foreman [9] 49/17 49/19 51/13 51/15 62/3 66/24 67/11 68/23 77/6
foresee [1] 92/12
Forest [1] 51/24
form [11] 7/25 75/22 85/12 85/17 85/21 86/3 86/13 86/19 87/1 87/5 105/23
formal [1] 109/15
formally [1] 4/9
former [2] 48/19 97/5
foundation [1] 24/13
fourth [3] 41/17 106/18 108/19
framework [1] 15/12
FRED [2] 1/11 27/25
freeze [1] 58/11
frequently [1] 45/15
fresh [1] 44/21
Friday [1] 102/21
front [3] 14/23 53/18 106/16
fuel [4] 39/18 39/19 57/21 57/22
fulfillment [1] 110/9
Fulgram [1] 51/18
fuller [1] 33/22
function [2] 27/9 43/22
functional [1] 15/19
functions [3] 10/5 10/7 25/10
fundamental [1] 27/19

## G

Garrison [1] 38/14

# G

**gate [14]** 58/1 53/12 53/13 53/16 53/22 53/23 53/24 54/19 54/23 55/2 55/14 55/15 59/23 60/16

**general [38]** 8/21 10/14 10/14 11/17 11/17 17/9 17/10 17/13 17/16 17/19 17/25 18/2 20/11 20/13 20/15 21/1 21/2 23/1 30/11 44/22 45/2 45/8 51/13 51/15 62/3 62/8 62/17 65/18 66/24 67/10 68/23 70/21 77/6 89/12 89/13 97/23 101/9 103/18

**generate [1]** 36/22

**generated [2]** 30/15 35/16

**generous [1]** 110/20

**Geneva [1]** 14/21

**germane [1]** 23/5

**given to [1]** 4/21

**gives [3]** 12/12 47/19 110/5

**global [1]** 10/3

**God [1]** 28/7

**government [24]** 8/6 9/25 12/2 15/12 19/9 24/17 25/6 25/24 26/1 26/13 28/17 30/4 33/20 43/23 43/25 44/10 87/1 87/5 89/2 91/5 91/8 92/12 95/1 104/12

**government's [1]** 11/11

**granted [1]** 78/16

**grapple [1]** 9/3

**gray [5]** 59/1 94/23 94/23 95/13 95/14

**gray/black [4]** 94/23 94/23 95/13 95/14

**great [1]** 9/16

**greater [4]** 14/2 14/4 36/13 106/17

**Greenbelt [2]** 1/4 1/20

**ground [3]** 23/14 52/25 53/2

**guard [5]** 53/7 66/11 66/12 77/24 77/25

**guards [1]** 78/2

**guidance [9]** 31/13 32/8 36/8 42/17 43/4 46/19 46/24 47/2 98/1

**guide [1]** 24/3

**guided [1]** 7/15

**guidelines [1]** 39/10

**guilty [1]** 111/13

# H

**H-sites [3]** 91/11 91/15 91/20

**Hall [1]** 89/15

**handle [3]** 11/15 13/21 30/11

**handled [1]** 4/5

**handling [2]** 25/3 41/9

**handouts [1]** 102/1

**happy [1]** 98/25

**harm [4]** 104/5 106/1 108/13 108/15

**HAZ [2]** 30/15 35/16

**hazardous [16]** 30/19 35/4 35/5 35/8 35/15 39/3 39/23 39/24 41/10 41/11 41/12 41/14 45/11 86/6 86/17 86/22

**hazards [2]** 19/24 36/23

**HAZMAT [5]** 8/22 8/23 30/15 35/16 86/1

**HCN [1]** 55/3

**HCNs [1]** 54/19

**headings [1]** 9/7

**health [4]** 19/24 45/11 101/9 108/8

**hearing [9]** 1/8 3/18 5/17 5/23 13/16 22/10 102/10 111/12 113/7

**heavily [1]** 7/10

**heavy [1]** 69/10

**height [1]** 56/11

**helpful [2]** 44/15 102/4

**here's [8]** 28/13 30/3 30/4 34/4 34/10 89/20 94/18 95/22

**hereby [1]** 113/5

**hereto [1]** 113/15

**Hersh [1]** 85/24

**higher [1]** 39/12

**highest [2]** 27/8 51/22

**highlight [3]** 32/23 34/2 41/4

**highlights [1]** 39/2

**hit [1]** 80/23

**holding [1]** 22/15

**home [1]** 26/12

**honor [178]**

**Honor's [4]** 6/1 8/15 33/9 100/9

**HONORABLE [1]** 1/8

**hope [1]** 44/12

**hopefully [1]** 36/17

**hosing [1]** 53/7

**Hospital [1]** 83/23

**host [3]** 35/21 52/9 52/12

**hotter [1]** 56/7

**hour [3]** 50/11 50/11 101/19

**hours [6]** 54/9 54/10 54/14 54/22 57/1 111/15

**housekeeping [1]** 4/4

**Houston [1]** 50/10

**hundred [1]** 53/11

**hundred-foot [1]** 53/11

**hunger [1]** 111/14

**hurt [3]** 50/21 50/23 53/8 53/9 53/14 53/15 82/22

**hydraulic [1]** 86/14

# I

**I'd [8]** 9/9 32/21 32/22 33/9 34/2 45/6 65/4 89/6

**I'll [8]** 22/8 22/10 22/19 22/21 36/6 41/7 88/16 94/8

**I'm [37]** 3/11 5/22 21/6 21/24 22/15 22/19 28/2 28/6 29/24 30/2 31/19 32/1 36/13 37/22 42/15 49/3 49/14 55/7 63/24 65/2 71/12 72/2 72/3 75/7 89/6 89/10 90/8 95/5 97/16 99/13 100/1 101/12 102/21 103/11 103/12 108/18 111/22

**I've [6]** 28/5 73/16 84/8 92/15 106/16 111/11

**i.e [1]** 38/11

**IAW [1]** 94/19

**III [7]** 14/6 16/2 20/7 21/3 27/8 28/12 90/21

**ill [1]** 101/12

**immediate [1]** 69/17

**immediately [1]** 68/3

**implementing [1]** 24/4

**implicated [1]** 107/16

**impose [1]** 84/16

**impure [1]** 108/4

**inappropriate [1]** 17/19

**INC [2]** 1/3 113/8

**inches [1]** 28/5

**incidence [1]** 77/24

**incident [1]** 73/1

**incinerate [2]** 30/22 34/8

**incineration [4]** 31/1 38/13 110/1 110/2

**incinerator [3]** 30/23 34/9 37/17

**incinerators [2]** 79/1 109/22

**inconsistencies [4]** 31/11 35/24 42/25 43/1

**inconsistency [2]** 31/13 43/4

**incorporated [4]** 37/1 37/18 41/2 95/18

**incorporates [1]** 36/6

**incorrect [1]** 66/4

**increases [3]** 32/24 40/12 43/6

**indeed [1]** 35/13

**independence [5]** 12/5 15/18 15/19 20/24 44/4

**independent [7]** 6/23 12/7 15/10 19/16 21/13 28/15 50/3

## I

**individuals [2]** 52/6 55/18
**information [2]** 10/18 100/10
**informative [1]** 28/22
**informed [2]** 50/13 89/24
**initial [2]** 29/7 49/1
**injuries [1]** 106/3
**input [2]** 10/21 14/14
**inquiry [1]** 43/16
**insignificant [1]** 3/9
**insofar [1]** 109/10
**inspect [3]** 75/12 75/23 81/5
**inspected [3]** 59/13 80/25 81/3
**inspection [6]** 59/14 59/15 60/7 75/13 76/6 81/12
**inspector [1]** 75/22
**inspectors [5]** 60/8 60/10 75/20 76/6 76/10
**install [2]** 94/21 95/11
**installation [1]** 12/7
**installations [1]** 92/7
**instance [5]** 10/13 14/22 89/24 96/3 96/10
**instances [3]** 34/25 75/8 103/9
**instructed [1]** 72/24
**instruction [1]** 18/22
**instructions [2]** 50/18 56/24
**integrated [14]** 7/9 7/10 7/12 92/2 92/6 92/14 92/18 93/8 93/9 93/9 93/14 104/20 106/20 107/1
**integrates [1]** 33/23
**integration [9]** 5/10 6/10 7/7 7/16 7/17 7/21 93/17 93/18 104/17
**intended [5]** 23/15 24/2 35/4 87/23 88/3
**intending [1]** 88/1
**intention [1]** 47/17
**interacting [1]** 10/11
**interest [1]** 11/12
**interested [2]** 22/19 102/11
**interests [1]** 102/24
**Interfering [1]** 26/25
**interim [1]** 22/1
**internal [2]** 30/15 35/16
**Internet [1]** 49/4
**interpose [1]** 21/20
**intertwined [1]** 102/24
**introduced [1]** 35/11
**invasion [1]** 49/2
**invoke [1]** 17/1
**involvement [1]** 104/7
**Iraq [13]** 10/3 17/7 17/13 23/14 45/11 50/17 89/19 89/20 90/1
90/4 91/1 91/12 103/18
**Iraqi [2]** 53/7 66/10
**Island [10]** 11/7 14/11 20/6 20/10 21/2 23/23 24/1 27/12 46/11 90/23
**issue [14]** 6/14 7/3 7/14 8/17 9/8 16/3 19/20 20/13 29/6 94/13 104/16 105/20 109/8 109/17
**issued [2]** 19/2 23/13
**issues [3]** 11/15 13/22 90/9
**item [2]** 35/6 36/18
**items [22]** 9/1 28/3 30/17 38/5 39/14 39/16 39/17 39/24 39/25 51/3 57/4 57/13 58/14 58/21 59/4 60/2 71/15 74/7 78/11 79/20 80/2 85/17

## J

**JAMES [4]** 1/11 20/5 46/10 90/20
**January [1]** 23/2
**job [3]** 19/23 49/15 50/1
**JOHNSON [3]** 1/16 2/6 64/24
**join [2]** 48/25 49/3
**joined [2]** 49/4 104/23
**joint [1]** 108/16
**judge [2]** 1/9 22/15
**judgment [5]** 11/8 11/10 104/2 106/6 108/10
**judgments [1]** 105/13
**jump [1]** 105/3
**juncture [1]** 5/6
**June [1]** 61/13
**jurisdiction [2]** 9/4 88/11
**jurisdictional [1]** 5/24

## K

**K-E-V-I-N [1]** 48/11
**KBR [132]**
**KBR's [12]** 15/9 46/8 54/14 85/10 88/10 88/20 89/4 98/8 102/25 108/22 109/4 109/19
**KEVIN [4]** 2/5 47/25 48/4 48/11
**key [3]** 38/6 54/1 54/2
**kicking [1]** 55/22
**KIES [1]** 1/17
**kinds [1]** 106/2
**knowing [2]** 82/18 108/6
**knowledgeable [1]** 12/8
**knows [1]** 90/23
**Kut [17]** 49/12 65/6 65/14 65/19 66/6 66/18 68/19 71/13 72/20 72/23 73/7 74/14 75/24 78/24 79/1 79/3 82/17

## L

**labor [4]** 49/1 49/19 51/13 77/6
**lack [1]** 99/7
**laid [1]** 26/4
**land [2]** 19/21 19/22
**landfill [4]** 79/7 79/8 79/9 79/12
**landfills [1]** 79/3
**Lane [1]** 1/20
**language [19]** 12/25 33/15 35/19 35/23 35/24 37/3 40/16 40/19 41/22 42/16 42/24 43/15 44/8 103/4 103/6 103/16 105/22 106/7 109/7
**large [1]** 4/15
**Lastly [1]** 26/16
**late [3]** 48/23 49/6 61/11
**Laughter [1]** 112/2
**law [4]** 6/20 7/16 21/18 72/3
**laws [7]** 29/17 31/7 31/8 31/24 35/21 35/22 35/22
**lead [2]** 17/7 55/3
**learned [1]** 101/10
**led [2]** 19/2 48/25
**LEDLIE [11]** 1/11 21/19 22/4 28/4 33/17 33/25 41/1 84/13 89/17 94/4 98/21
**legal [2]** 21/21 105/19
**legible [1]** 46/13
**letter [19]** 44/22 45/2 45/9 46/6 46/9 46/10 46/15 70/8 70/10 85/11 85/20 86/2 86/7 86/12 86/18 86/25 87/4 89/16 98/16
**liability [1]** 104/14
**Liberty [2]** 61/3 61/5
**lieutenant [3]** 59/20 81/6 89/14
**limitations [3]** 19/4 22/6 38/9
**limited [3]** 12/12 14/17 14/22
**limits [1]** 26/20
**lines [4]** 93/25 97/13 98/19 112/9
**link [1]** 26/18
**LISA [4]** 1/12 1/19 113/3 113/19 113/20
**list [8]** 4/8 38/4 51/3 58/14 87/25 88/2 88/6 98/12
**literally [2]** 104/18 107/2
**LITIGATION [2]** 1/4 113/8
**load [2]** 63/18 107/25
**loader [2]** 63/2 69/6
**loads [1]** 63/15
**local [2]** 35/21 45/10
**locating/relocating [1]** 45/19
**location [5]** 46/3 66/16 67/17

## L

**location... [2]** 71/2 103/4
**locations [1]** 45/13
**lock [2]** 53/24 54/1
**locked [1]** 38/2
**Lockhart [1]** 3/6
**Lockhart's [1]** 7/22
**Loehrl [12]** 20/11 21/24 46/10 46/16 89/16 90/20 91/25 92/5 93/5 93/7 93/18 93/25
**Loerhl [1]** 20/5
**LOGCAP [11]** 12/15 14/6 16/2 19/8 20/7 21/3 27/8 28/10 28/12 90/21 91/19
**logic [1]** 18/4
**logistical [1]** 29/10
**LOTD [1]** 85/19
**loud [1]** 109/7
**LSA [1]** 52/22
**LSO [1]** 41/22
**lubricants [2]** 39/4 39/22
**lunch [2]** 100/17 101/12
**Luncheon [1]** 101/22
**lungs [1]** 106/2

## M

**M.A.G [3]** 62/25 69/5 69/9
**machine [2]** 113/5 113/13
**main [1]** 65/20
**maintain [6]** 20/24 43/13 43/14 44/1 94/21 95/11
**maintained [2]** 6/24 15/6
**maintaining [1]** 35/14
**manage [6]** 12/6 12/14 25/19 25/21 28/17 98/7
**managed [6]** 14/9 15/11 19/8 21/11 24/5 27/20
**management [30]** 16/19 18/17 18/24 19/17 21/12 24/22 24/24 25/11 26/25 30/12 31/5 34/5 41/10 41/14 45/12 46/9 49/24 50/5 77/5 90/7 90/10 90/24 91/15 91/19 103/3 103/9 103/3 104/9 109/6 109/11
**manager [12]** 27/7 51/18 51/24 66/22 66/25 69/7 69/7 69/15 69/16 84/19 84/19 87/17
**manages [1]** 15/16
**manual [2]** 23/2 24/2
**manuals [2]** 96/1 96/16
**March [8]** 1/5 48/23 49/6 61/1 61/8 61/11 113/9 113/16
**MARIANNE [1]** 1/17
**Mary [1]** 27/7

**MARYLAND [4]** 1/1 1/4 1/20 113/5
**material [3]** 38/14 39/23 56/6
**materials [6]** 4/15 8/22 8/23 33/21 64/9 103/21
**matter [6]** 9/4 13/7 16/7 21/9 26/3 102/3
**matters [2]** 29/18 47/1
**MATTHEWS [2]** 1/15 4/22
**Mayo's [1]** 11/18
**mayor [2]** 18/7 27/10
**md [2]** 1/3 113/9
**mechanical [2]** 1/22 69/10
**mechanism [3]** 17/21 18/12 31/15
**Med [4]** 95/16 95/21 96/3 96/8
**medical [14]** 30/24 34/10 39/21 58/2 71/17 72/13 72/17 72/19 73/17 73/18 73/21 73/23 84/5 84/7
**medicine [2]** 96/1 96/15
**medics [4]** 72/16 72/24 73/10 76/12
**meetings [1]** 7/9
**member [1]** 17/13
**members [2]** 45/10 56/15
**memo [1]** 88/13
**memorandum [1]** 91/24
**merely [1]** 109/15
**metal [5]** 38/24 39/22 58/4 59/8 59/10
**method [6]** 18/23 31/22 36/12 41/18 90/1 91/1
**microphone [1]** 48/9
**mid [2]** 61/11 61/13
**middle [1]** 14/23
**mile [2]** 68/7 68/7
**mileage [1]** 65/23
**miles [6]** 52/22 65/19 65/22 65/25 67/18 68/1
**military [112]** 7/10 7/17 8/17 9/25 10/4 10/25 11/12 11/20 11/24 12/7 14/5 14/8 14/22 15/4 15/14 15/21 19/12 19/18 20/16 21/9 23/18 23/22 24/6 24/17 24/21 24/22 24/23 24/23 25/6 25/14 26/3 26/18 26/24 27/6 27/10 27/13 30/18 35/17 37/1 37/15 39/24 45/24 45/25 49/3 51/5 52/1 56/15 56/20 56/23 70/1 70/16 72/16 72/24 73/2 73/6 73/10 73/23 73/24 75/1 75/3 75/5 75/20 76/11 76/20 76/23 77/15 78/19 80/4 80/12 81/7 81/25 82/2 83/4 83/19

83/21 83/24 84/1 85/15 88/24 92/9 92/15 92/21 92/25 93/10 96/12 103/8 104/2 104/7 104/19 104/20 104/21 104/24 105/4 105/13 106/6 106/13 106/21 107/4 107/6 107/8 107/9 107/16 107/18 108/5 108/10 108/17 108/22 108/24 109/11 109/14 110/13 110/15
**military's [4]** 37/8 72/19 102/25 105/7
**military-run [1]** 45/24
**minimize [3]** 42/8 45/20 56/9
**minimizing [4]** 34/13 34/20 42/1 42/3
**miniscule [1]** 106/12
**mission [6]** 10/2 10/3 24/1 92/14 104/20 104/21
**mixed [1]** 35/5
**MNC [7]** 36/9 36/13 36/16 37/17 38/9 42/17 42/21
**MNC-I [7]** 36/9 36/13 36/16 37/17 38/9 42/17 42/21
**modification [2]** 43/6 86/4
**modifications [3]** 27/17 32/25 40/12
**modified [1]** 12/25
**modify [5]** 12/15 17/15 20/21 26/14 27/15
**moments [1]** 3/21
**Monday [14]** 22/12 22/15 22/17 22/17 22/20 102/13 102/23 103/2 110/18 110/19 110/21 111/20 112/3 112/4
**month [2]** 93/12 93/13
**months [2]** 23/13 49/9
**more witnesses [1]** 101/16
**motion [1]** 4/25
**motions [2]** 1/8 22/10
**movements [2]** 7/9 14/19
**Mr [13]** 2/6 28/3 64/18 64/24 64/25 83/11 84/12 84/13 85/9 87/16 89/16 93/18 94/3
**Mr. [41]** 4/6 4/22 7/22 7/23 11/18 11/18 12/22 14/2 20/5 20/11 21/19 21/23 21/24 22/4 27/22 33/17 33/25 41/1 46/4 46/16 47/4 48/15 48/17 48/21 65/2 71/12 87/8 87/23 88/9 88/9 89/14 90/18 90/20 91/25 92/5 93/5 93/7 93/25 97/15 98/12 98/21
**Mr. Baker [6]** 4/6 12/22 14/2 27/22 46/4 87/8
**Mr. Bennett [2]** 97/15 98/12

## M

**Mr. Colonel [1]** 90/18
**Mr. James [2]** 20/5 90/20
**Mr. Ledlie [6]** 21/19 22/4 33/17 33/25 41/1 98/21
**Mr. Lockhart's [1]** 7/22
**Mr. Loehrl [8]** 20/11 21/24 46/16 91/25 92/5 93/5 93/7 93/25
**Mr. Matthews [1]** 4/22
**Mr. Mayo's [1]** 11/18
**Mr. Palmer [1]** 87/23
**Mr. Palmer's [2]** 88/9 88/9
**Mr. Robbins [7]** 7/23 47/4 48/15 48/17 48/21 65/2 71/12
**Mr. Singleton's [1]** 11/18
**Mr. Vincent [1]** 89/14
**Mr. Walsh [1]** 21/23
**Ms [6]** 2/6 2/7 13/17 42/12 48/14 83/17
**multiple [1]** 32/15
**municipal [1]** 96/18

## N

**nastier [1]** 74/9
**nation [1]** 35/21
**national [1]** 102/24
**nationals [2]** 52/9 52/12
**nature [1]** 78/8
**navigate [1]** 44/12
**necessary [3]** 6/13 21/15 25/4
**negligently [1]** 104/5
**next turn [1]** 31/25
**nice [3]** 102/18 103/24 112/1
**ninety [5]** 74/13 75/15 75/24 80/25 82/17
**nobody [5]** 62/13 66/18 77/9 80/3 80/4
**nomenclature [1]** 42/13
**non [7]** 17/20 41/10 41/11 41/14 42/6 94/22 95/12
**non-acquisition [1]** 17/20
**non-combustible [1]** 42/6
**non-hazardous [3]** 41/10 41/11 41/14
**non-potable [2]** 94/22 95/12
**none [6]** 49/25 66/15 70/3 70/7 71/7 79/2
**noon [3]** 111/2 111/10 111/11
**Northern [1]** 89/19
**notereading [1]** 1/22
**notice [1]** 3/4
**Notwithstanding [1]** 31/5
**number [7]** 9/7 37/22 46/16

89/5 110/4 110/7 113/8
**numerous [2]** 47/24 57/7

## O

**objection [2]** 21/20 22/23
**objectives [1]** 42/14
**obligation [1]** 26/8
**obligations [1]** 25/8
**observation [3]** 106/1 107/23 108/20
**observations [2]** 107/13 110/17
**observe [4]** 57/4 64/9 75/14 81/19
**observed [2]** 81/18 81/23
**observing [2]** 76/23 76/24
**occasion [2]** 59/19 60/7
**occasions [6]** 60/23 64/4 79/18 80/22 81/15 107/23
**OEBDG [2]** 36/8 42/19
**OEBGD [3]** 31/18 31/19 36/11
**offer [1]** 102/13
**officer [24]** 11/10 17/8 20/19 21/5 21/7 21/17 24/12 25/22 26/3 26/6 26/13 27/14 27/16 31/12 43/3 43/9 60/13 84/15 91/11 97/3 97/12 97/18 98/6 100/13
**officers [2]** 7/24 105/8
**official [8]** 17/20 20/4 26/13 43/25 113/3 113/6 113/12 113/20
**Oh [2]** 36/4 99/14
**oil [1]** 39/3
**oils [1]** 39/19
**Omar [1]** 55/3
**OPCON [1]** 43/20
**open [3]** 54/23 74/1 90/15
**opening [4]** 28/24 33/6 88/20 89/15
**operate [9]** 8/14 34/13 34/19 41/25 94/21 95/11 103/11 107/24 108/9
**operated [5]** 63/6 65/15 69/6 92/22 94/25
**operating [19]** 23/25 35/14 36/9 42/21 45/20 45/22 46/4 46/5 46/17 46/25 72/23 73/7 74/14 75/5 75/15 75/24 93/10 93/12 107/10
**operation [16]** 20/1 29/20 45/21 46/21 51/6 51/9 54/9 56/21 59/17 82/17 92/21 92/22 94/1 94/24 106/5 108/17
**operational [19]** 10/6 10/7 10/13 11/14 11/20 12/14 13/6

13/9 13/21 15/6 15/6 18/5 19/12 23/22 24/21 25/1 26/19 27/13 43/20
**operations [11]** 19/1 19/25 30/15 32/7 35/17 37/16 39/8 45/17 45/22 52/14 107/20
**operative [2]** 7/11 9/8
**operator [1]** 39/8
**operators [2]** 62/25 69/5
**opposed [3]** 76/7 109/15 109/19
**option [1]** 110/2
**oral [1]** 22/17
**order [31]** 6/19 16/25 20/13 29/23 29/24 31/25 32/1 32/2 34/1 34/4 35/4 36/5 37/13 40/4 41/3 41/5 41/15 41/16 41/20 61/22 62/2 62/4 67/1 69/8 82/23 92/9 94/17 94/19 95/4 95/8 96/4
**orders [4]** 30/6 32/15 40/17 91/14
**organic [1]** 38/20
**Organics [1]** 38/18
**organization [4]** 19/17 23/25 25/13 92/16
**original [1]** 101/8
**originally [1]** 111/1
**OSHA [3]** 32/8 50/11 50/13
**outcomes [1]** 43/24
**overall [1]** 108/19
**overarching [1]** 31/4
**overhangs [1]** 28/22
**overruled [1]** 22/23
**overseas [1]** 36/7
**oversight [3]** 97/19 97/22 108/22
**overwhelming [1]** 7/3

## P

**page [16]** 4/2 21/22 23/7 24/12 26/4 26/12 26/16 36/3 37/12 39/20 87/14 91/24 93/6 98/19 112/6 112/9
**pages [6]** 18/18 19/9 20/3 84/24 85/6 113/11
**paint [5]** 44/16 64/16 64/17 85/13 85/14
**paints [2]** 39/19 57/19
**Palmer [4]** 84/18 85/9 87/16 87/23
**Palmer's [2]** 88/9 88/9
**panoply [1]** 9/5
**paper [8]** 28/5 38/10 38/10 39/16 56/6 57/6 63/18 64/17
**papers [2]** 5/13 40/25

# P

**paragraph [48]** 9/7 12/13 14/7 18/4 26/17 28/22 29/1 29/3 29/5 30/10 30/22 31/17 31/23 32/14 32/16 32/19 32/21 34/7 35/8 35/18 36/2 38/5 38/23 38/24 39/2 39/2 40/5 40/6 40/7 40/21 40/25 41/3 41/8 41/9 41/13 41/19 42/24 43/12 43/17 44/2 44/3 44/7 88/21 88/22 88/22 89/3 91/23 95/6

**paragraphs [9]** 5/19 6/2 10/17 11/16 13/8 13/10 15/24 16/9 17/3

**parameters [2]** 62/8 62/10

**parched [1]** 111/14

**part [16]** 9/1 18/6 18/7 23/13 28/3 34/10 34/24 66/6 66/8 66/9 66/13 92/8 92/8 92/15 97/18 112/5

**parties [4]** 6/17 6/19 100/17 105/15

**party [2]** 96/10 107/15

**pass [1]** 92/4

**passage [1]** 94/18

**passages [1]** 23/5

**passed [1]** 83/1

**PCO [4]** 26/10 29/18 40/14 43/9

**people [11]** 11/20 12/8 41/23 69/5 69/10 81/4 81/7 93/13 93/14 103/8 108/3

**people's [1]** 106/2

**perfect [1]** 107/21

**perfectly [1]** 108/9

**performance [30]** 12/16 13/24 29/8 29/11 29/13 32/4 32/9 32/12 34/21 35/12 36/10 36/15 37/7 37/23 37/24 39/7 40/1 42/3 42/7 42/14 42/14 42/15 43/24 82/9 82/13 95/17 97/24 98/9 105/9 109/16

**permission [9]** 38/13 59/23 78/16 84/14 85/12 85/16 86/9 86/20 87/6

**permit [3]** 22/8 22/10 22/21

**permitted [3]** 6/4 86/4 86/14

**person [8]** 10/20 12/6 21/16 27/8 33/2 91/5 104/4 104/6

**personal [2]** 5/14 15/1

**personnel [11]** 15/10 15/20 16/25 29/14 45/12 45/20 68/25 98/8 104/22 104/23 104/23

**pertains [1]** 34/10

**pervasive [1]** 7/3

**pesky [2]** 22/14 22/18

**pesticides [1]** 47/2

**Petraeus [3]** 44/22 45/2 45/8

**petroleum [2]** 39/3 86/20

**phrase [1]** 75/12

**pick [2]** 52/17 54/19

**picked [1]** 55/4

**picture [1]** 111/23

**piece [5]** 13/3 47/3 52/25 63/18 108/2

**pig [2]** 18/16 90/8

**piles [3]** 59/6 60/2 60/6

**pilot [1]** 53/7

**pinpoint [1]** 44/13

**pipe [3]** 57/7 59/1 59/2

**pit [178]**

**pits [43]** 8/19 8/23 13/5 18/1 18/12 18/23 18/24 19/3 19/5 25/7 34/11 34/13 34/19 36/21 37/16 45/17 45/19 45/24 46/18 46/25 72/1 86/9 86/15 88/24 90/4 91/1 92/21 93/2 93/10 93/12 94/1 104/2 105/17 106/5 106/10 106/11 107/19 107/21 107/25 108/6 109/7 109/11 109/18

**place [3]** 46/15 62/6 106/10

**plaintiff [2]** 48/17 107/14

**plaintiff's [1]** 93/24

**plaintiffs [18]** 1/11 2/4 28/1 47/12 47/25 48/6 87/23 98/13 101/7 101/25 102/10 104/1 104/3 105/21 106/4 108/15 109/3 109/21

**plaintiffs' [8]** 3/19 8/11 9/5 23/6 23/6 40/3 46/10 107/3

**plan [1]** 101/8

**planning [2]** 19/1 24/4

**plastic [13]** 56/8 57/6 59/3 71/17 74/9 74/10 74/11 74/12 77/4 77/6 77/10 77/13 77/16

**play [3]** 99/10 99/25 100/11

**played [1]** 101/3

**playing [2]** 99/17 100/3

**plea [1]** 111/13

**pleasure [1]** 100/16

**plenary [8]** 6/22 15/3 28/21 33/16 40/20 43/16 43/18 94/13

**plumbing [3]** 59/2 94/22 95/13

**plywood [2]** 57/6 64/17

**point [21]** 7/5 13/12 13/14 14/24 14/24 23/24 26/11 27/22 35/3 55/24 61/11 63/20 69/21 71/1 72/22 84/4 86/17 86/23 88/8 108/18 109/3

**points [11]** 9/8 13/18 18/21 29/1 31/11 34/24 61/4 62/18 76/19 94/13 96/21

**POL [1]** 39/3

**policy [4]** 13/7 21/10 26/4 26/24

**political [8]** 6/20 16/20 17/1 25/17 28/20 32/18 33/13 42/10

**population [3]** 42/9 45/10 93/13

**posed [2]** 19/24 100/15

**position [5]** 51/22 88/10 99/6 100/3 109/3

**post [1]** 94/3

**post-ceded [1]** 94/3

**posted [2]** 38/5 58/14

**Postlewaite [1]** 89/13

**potable [5]** 94/22 94/22 95/12 95/12 95/20

**potential [1]** 39/10

**potentially [1]** 36/22

**practices [1]** 29/15

**precedence [3]** 41/15 41/16 41/20

**precise [1]** 15/1

**preempt [1]** 88/11

**preempted [1]** 106/24

**preemption [2]** 33/14 43/19

**preface [1]** 23/10

**preference [1]** 100/19

**preferred [1]** 41/17

**premise [1]** 18/11

**premised [1]** 46/22

**preparation [1]** 112/3

**prepared [1]** 98/23

**prerogative [1]** 27/1

**present [3]** 22/8 24/1 88/3

**pretrial [2]** 88/6 112/6

**Prev [1]** 96/3

**preventive [2]** 96/1 96/15

**price [1]** 26/22

**principal [1]** 109/5

**principally [1]** 88/23

**principle [1]** 31/4

**priorities [1]** 45/13

**private [1]** 106/20

**problem [3]** 31/13 35/24 80/8

**problems [1]** 5/14

**procedure [3]** 13/7 36/9 42/21

**procedures [3]** 45/22 46/4 46/5

**proceed [6]** 3/2 3/11 3/13 3/16 6/6 100/21

**proceedings [5]** 1/22 112/13 113/6 113/12 113/14

**process [16]** 11/1 11/5 12/3 12/24 13/9 14/7 16/1 19/19

Case 8:09-md-02083-RWT Document 84-7 Filed 03/22/11 Page 126 of 130

## P

process... [8] 23/13 27/1 28/13 30/25 67/10 82/19 83/7 92/8
procuring [1] 43/8
produce [3] 95/23 96/13 96/18
producing [1] 80/3
production [2] 95/15 96/6
products [4] 38/10 38/10 42/5 86/21
professionals [3] 12/9 15/9 24/3
program [1] 37/9
prohibited [10] 9/1 26/21 38/5 39/14 39/16 39/25 51/3 58/14 71/15 85/17
projects [1] 82/25
prong [2] 40/2 40/8
prongs [1] 105/14
pronounce [1] 51/14
propane [1] 39/18
proper [4] 7/6 45/21 108/4 108/7
properly [2] 12/6 92/9
property [1] 67/6
proposition [4] 88/23 91/8 91/25 92/1
protect [1] 14/20
protection [7] 14/17 21/15 29/16 29/17 33/19 40/22 44/8
provision [5] 28/11 32/2 33/18 33/23 95/4
provisions [1] 31/5
publish [1] 101/17
published [1] 102/7
publishing [1] 97/13
pulling [1] 32/3
pure [2] 5/24 22/3
purification [2] 95/25 96/15
purified [2] 95/24 96/13
purposely [1] 58/1
purposes [5] 5/17 5/23 32/18 41/12 105/5
pursuant [1] 9/25
PVC [2] 57/7 58/25

## Q

quality [6] 26/22 29/6 29/10 95/17 96/3 96/8
quantity [1] 26/22
quarter [1] 101/20
question [43] 5/8 6/20 8/19 16/20 17/1 20/20 25/18 27/9 28/20 32/18 33/13 42/10 67/20

85/15 85/20 86/7 86/12 86/18 86/25 87/12 89/7 90/1 90/22 90/3 90/11 90/25 91/4 91/18 92/25 97/25 103/15 103/25 104/17 105/17 106/25 107/11 107/17 108/14 108/18 108/19 110/6 110/12 111/1
questioning [2] 6/12 8/16
questions [13] 5/24 6/8 6/14 9/21 22/16 22/18 50/20 59/16 65/3 81/13 83/12 100/15 106/2
quickly [1] 37/22
quintessential [1] 106/6
quote [1] 92/1

## R

R-O-B-B-I-N-S [1] 48/12
Radin [1] 21/1
raise [2] 42/9 48/2
raised [1] 110/12
Ramadan [1] 61/4
random [1] 110/17
rare [1] 14/16
RAZI [1] 1/15
RCRA [2] 31/8 31/9
re [3] 1/3 39/1 113/8
re-use [1] 39/1
reach [1] 56/11
readily [1] 94/16
ready [5] 3/2 3/15 22/14 97/7 99/17
realities [1] 15/14
reality [1] 10/4 19/16
rebuttal [2] 93/23 102/13
recent [1] 45/8
recess [3] 47/10 101/19 101/22
recognized [1] 14/18
recollection [1] 94/2
record [14] 20/2 22/9 47/14 105/18 106/15 107/18 107/19 109/2 109/8 109/9 109/16 109/19 109/23 111/7
recorded [1] 1/22
recover [1] 104/7
recyclables [1] 30/24
recycled [1] 37/8
recycling [3] 31/1 39/1 78/24
Redirect [3] 2/7 83/14 83/16
reduced [1] 42/5
reemphasize [1] 38/7
reference [12] 13/25 14/1 23/12 24/8 30/10 33/24 37/18 41/1 42/17 42/19 71/1 76/19
referenced [2] 18/4 100/25
references [1] 22/9

reflect [1] 106/6
refreshed [1] 94/13
regular [2] 31/22 36/12
regulations [12] 19/4 29/17 32/8 50/12 50/13 50/14 90/12 94/20 95/16 96/1 96/7 96/16
relation [2] 53/10 67/6
relationship [4] 23/20 24/16 24/18 28/13
relaxation [1] 112/1
relevance [1] 5/15
relied [4] 18/11 29/1 32/16 40/7
relies [3] 88/23 89/3 91/7
relocating [1] 45/19
rely [3] 5/1 5/16 88/1
relying [2] 5/19 5/22
remote [1] 45/19
removed [1] 35/6
repeated [1] 33/3
report [5] 43/24 52/1 52/3 52/5 52/10
Reporter [4] 1/19 113/1 113/3 113/20
representative [2] 26/3 29/19
request [3] 6/1 20/2 99/21
requested [2] 83/8 99/22
Requests [1] 38/13
required [11] 6/19 8/13 13/23 25/9 29/15 35/22 63/12 82/25 84/14 92/10 96/2
requirement [2] 10/22 84/14
requirements [6] 32/25 40/13 43/7 46/19 46/24 95/2
reservation [1] 40/22
reserved [1] 33/20
reserving [1] 44/9
residents [2] 32/7 32/13
resort [4] 34/11 34/24 36/24 37/2
resource [1] 23/16
respected [4] 10/4 10/24 11/3 13/9
response [5] 47/18 87/11 98/12 99/24 112/8
responsibilities [4] 10/11 24/14 26/2 46/9
responsibility [8] 25/23 28/16 33/11 40/19 44/6 97/15 108/16 108/16
rest [1] 101/7
restricted [2] 84/16 98/19
result [1] 36/23
resume [2] 47/12 101/20
retain [1] 107/9
retained [1] 109/14

# R

**retains** [2] 106/2 107/8
**rid** [1] 103/25
**risks** [3] 107/24 108/7 108/8
**RMR** [1] 1/19
**road** [3] 67/8 68/10 68/12
**roads** [4] 62/14 67/6 68/13 71/4
**ROBBINS** [14] 2/5 7/23 47/4 47/25 48/4 48/11 48/15 48/17 48/21 64/18 64/25 65/2 71/12 83/11
**ROBERT** [2] 1/15 21/1
**robust** [1] 102/19
**Rock** [10] 11/7 14/11 20/6 20/9 21/2 23/23 24/1 27/12 46/11 90/22
**ROGER** [1] 1/8
**role** [3] 11/4 23/20 26/2
**roll** [1] 107/25
**ROM** [1] 19/1
**room** [1] 9/13
**rounds** [1] 57/12
**route** [1] 73/21
**rubber** [3] 38/24 87/6 87/7
**ruining** [1] 106/2
**rule** [1] 54/15
**RUSSELL** [2] 1/16 45/9
**RWT** [2] 1/3 113/9
**RWT-09-md-2083** [2] 1/3 113/9

# S

**safety** [5] 32/6 32/8 32/12 40/6 42/24
**sake** [1] 100/2
**Saleh** [2] 106/18 107/7
**SALZBERG** [1] 1/12
**samples** [1] 5/12
**sampling** [1] 30/8
**Sanchez** [13] 10/15 17/10 17/13 17/16 17/19 17/25 18/2 20/12 20/14 20/15 23/1 89/13 103/18
**Sanchez's** [2] 11/18 17/9
**satisfied** [2] 29/2 40/8
**satisfy** [1] 105/14
**scan** [6] 54/23 55/3 55/10 55/11 55/12 55/16
**scheduled** [1] 111/13
**scope** [2] 13/24 37/11
**scrap** [3] 35/5 38/24 59/10
**screen** [1] 23/9
**scrupulously** [1] 6/24
**seat** [1] 48/8
**second** [7] 32/15 35/10 40/2

59/20 62/1 97/2 97/5
**section** [19] 26/10 30/3 30/22 33/23 34/2 34/3 36/20 37/11 37/12 37/21 39/13 39/15 40/10 40/15 42/18 42/23 43/17 45/14 95/22
**security** [3] 54/19 54/20 61/4
**seek** [2] 31/13 43/4
**segregate** [2] 74/24 78/9
**segregating** [1] 78/10
**self** [1] 25/3
**self-sufficient** [1] 25/3
**senior** [1] 27/7
**sense** [1] 107/9
**sensitive** [2] 105/13 106/1
**sentence** [1] 43/12
**separation** [2] 94/23 95/14
**September** [1] 17/10
**serious** [1] 5/14
**service** [7] 10/20 23/22 43/23 45/10 62/17 97/21 106/20
**serviceable** [1] 39/24
**services** [8] 7/13 91/19 92/9 103/3 103/10 104/10 105/19 110/6
**SESSION** [1] 101/23
**Seven** [1] 54/6
**severe** [1] 38/8
**sewage** [2] 94/23 95/13
**shall** [37] 12/3 28/14 28/15 28/17 29/18 30/22 31/6 31/11 31/18 32/5 33/10 34/8 34/13 34/19 35/6 35/21 36/7 38/19 40/18 41/14 41/25 42/8 42/20 43/2 43/12 43/24 44/1 44/5 94/21 95/11 95/13 95/20 95/23 96/12 96/16 106/23
**shape** [1] 67/5
**shaped** [1] 52/25
**sharing** [1] 92/7
**sheets** [1] 101/2
**Sherman** [1] 108/12
**shift** [1] 80/23
**Shimari** [2] 105/11 109/12
**short** [1] 95/6
**shortened** [1] 99/16
**shorthand** [2] 113/6 113/13
**shoulder** [4] 56/15 56/16 93/1 93/1
**side** [4] 27/11 53/17 53/18 68/11
**sides** [7] 14/25 22/18 53/20 105/18 106/17 106/25 112/7
**signed** [1] 69/8
**significance** [1] 99/6

**Singleton's** [1] 11/18
**sister** [1] 49/24 49/24
**sites** [4] 91/11 91/15 91/20 96/20
**situation** [4] 15/2 25/6 101/9 103/19
**situationally** [1] 92/11
**sixty** [8] 72/23 74/13 75/1 75/4 76/15 76/21 77/3 80/1
**size** [1] 104/13
**slide** [8] 18/14 18/19 84/20 84/24 85/6 89/9 102/5 102/7
**slides** [3] 4/1 9/10 9/17
**sloped** [1] 53/2
**smiling** [1] 70/12
**SMITH** [5] 1/12 2/6 2/7 48/14 83/17
**snippet** [1] 99/15
**snippets** [1] 22/9
**soil** [1] 63/5
**soldier** [2] 21/5 21/7
**soldiers** [1] 15/20
**sole** [1] 33/19
**solely** [1] 24/10
**solid** [7] 30/23 31/22 34/9 41/10 41/11 41/14 41/18
**solvents** [1] 86/4
**sometime** [1] 61/8
**SOP** [4] 36/9 37/12 37/15 37/18
**SOP's** [1] 37/13
**SOPs** [2] 46/19 46/24
**sorted** [3] 59/4 60/17 60/20
**sorting** [6] 35/11 55/21 55/22 58/21 60/3 79/10
**sound** [1] 29/15
**sounds** [1] 21/21
**sources** [2] 24/2 96/19
**SOUTHERN** [1] 1/2
**SOW** [8] 31/6 32/25 36/10 40/12 40/13 43/7 43/20 43/21
**specialist** [3] 59/21 61/3 81/6
**specific** [12] 5/19 6/1 7/12 8/8 8/8 23/5 57/13 89/24 91/13 91/16 97/23 110/5
**specified** [8] 32/23 32/25 34/11 34/16 40/11 40/13 43/7 43/23
**spell** [2] 48/10 100/23
**spent** [1] 65/5
**spoke** [5] 17/4 41/1 76/6 76/9 81/15
**sporadic** [1] 57/12
**spread** [1] 56/8
**squad** [1] 10/15
**stable** [1] 39/11
**stacking** [1] 79/5

**S**

**stand [6]** 10/24 11/19 13/2 13/3 48/9 74/22
**standard [15]** 32/5 32/9 32/12 34/21 35/12 36/9 37/7 39/7 42/3 42/7 42/9 42/21 95/17 95/17 96/8
**standards [13]** 12/16 13/25 16/21 29/13 36/15 37/23 37/24 40/1 42/14 42/15 84/16 95/20 98/9
**standpoint [3]** 93/8 93/13 93/16
**star [1]** 21/2
**state [3]** 10/21 46/16 48/10
**stated [4]** 4/23 11/5 71/19 71/20
**statement [5]** 10/19 28/24 31/6 32/24 70/21
**statements [3]** 19/1 22/16 91/14
**states [10]** 1/1 1/9 1/19 12/2 14/5 14/8 25/23 26/5 33/14 113/4
**stationed [1]** 56/18
**stations [1]** 25/7
**status [2]** 6/23 21/13
**stay [1]** 71/13
**stayed [2]** 17/10 61/3
**stenography [1]** 1/22
**step [3]** 67/9 82/19 84/10
**steps [1]** 90/12
**storage [5]** 30/20 35/15 95/15 96/7 96/19
**store [3]** 35/15 95/24 96/13
**straighten [1]** 103/2
**strict [1]** 107/4
**strictly [3]** 104/18 105/6 110/13
**strip [1]** 52/21
**strongly [1]** 36/22
**structure [2]** 92/17 97/25
**structures [2]** 53/4 53/6
**subcontract [1]** 43/15
**subcontractor [2]** 63/1 69/6
**subcontractors [3]** 43/14 52/13 52/16
**submission [1]** 5/18
**submissions [2]** 4/24 101/17
**submit [5]** 5/3 6/1 82/22 102/10 102/17
**submitted [1]** 88/8
**submitting [1]** 112/8
**subscribed [1]** 113/15
**substance [1]** 105/24

**substantive [1]** 5/5
**successfully [1]** 96/19
**successors [1]** 103/23
**succinct [2]** 92/16 92/16
**sufficient [2]** 25/3 110/8
**suggesting [1]** 111/2
**summarize [3]** 3/21 9/7 22/2
**summarizing [1]** 4/1
**summary [1]** 16/8
**supervise [4]** 15/9 24/20 25/19 98/7
**supervised [1]** 39/9
**supervising [2]** 27/1 97/16
**supervision [5]** 16/25 28/18 39/9 98/1 98/4
**supervisor [5]** 24/19 51/11 56/18 66/21 69/17
**supervisors [2]** 69/16 76/24
**supervisory [7]** 28/16 33/11 40/18 43/13 43/14 44/1 44/6
**supplement [1]** 21/7
**support [6]** 3/7 3/19 17/1 25/24 26/1 71/6
**supported [1]** 24/6
**supports [1]** 88/10
**surface [13]** 31/9 31/21 36/11 41/18 41/20 41/21 85/13 85/22 86/9 86/15 86/20 87/2 90/15
**surpass [1]** 87/6
**surreply [1]** 21/21
**Sustainment [1]** 21/2
**sworn [1]** 48/6
**systems [3]** 94/22 95/12 95/12

**T**

**Tab [1]** 96/8
**TABLE [1]** 2/1
**take-away [2]** 35/8 35/10
**tank [1]** 108/12
**tap [2]** 101/6 101/24
**tape [1]** 113/14
**task [23]** 8/8 29/23 29/24 30/6 31/25 32/1 32/2 32/15 34/1 34/3 35/3 37/13 40/4 40/17 41/3 41/5 91/14 94/17 94/19 95/3 95/8 96/4 109/5
**tasked [4]** 50/17 96/20 103/3 103/11
**tasking [8]** 30/4 34/5 41/8 89/4 89/21 94/16 94/18 96/5
**tasks [4]** 30/4 41/9 108/25 109/5
**Taylor [10]** 28/25 28/25 29/2 32/16 32/17 32/20 40/7 40/8 42/24 109/13

**TB [3]** 95/16 95/21 96/8
**technical [23]** 29/10 70/10 85/12 85/21 86/3 86/8 86/13 86/19 87/4 90/6 90/9 96/1 96/16
**technically [1]** 17/17
**tenure [2]** 17/9 100/8
**term [3]** 17/17 31/14 38/16
**terms [30]** 5/14 5/14 11/9 11/21 11/22 12/15 12/24 13/24 16/8 21/4 21/15 24/10 24/15 25/1 25/4 25/25 26/9 26/23 27/14 27/23 29/8 30/11 33/2 34/6 62/21 85/16 91/13 91/17 94/15 110/20
**test [6]** 6/17 7/6 7/11 7/20 105/11 107/7
**tested [3]** 95/24 96/11 96/14
**testimony [32]** 7/8 7/19 7/20 8/24 11/17 11/18 11/18 11/19 13/19 15/23 16/4 18/3 18/14 18/18 18/20 21/23 46/12 47/16 66/19 80/24 81/2 84/18 88/9 88/10 92/1 99/11 100/9 103/1 103/18 104/25 107/3 113/7
**Thank [28]** 3/12 3/14 3/17 6/7 9/17 22/22 22/24 36/5 44/18 47/8 47/9 47/21 47/24 64/19 64/20 64/22 83/11 84/8 84/10 88/17 88/18 89/11 91/22 96/21 99/9 100/22 101/18 102/8
**the right [1]** 44/24
**theater [10]** 7/10 13/23 14/19 17/8 17/9 24/8 27/17 84/19 85/10 87/16
**theaters [1]** 16/11
**theirs [1]** 99/22
**theme [1]** 32/22
**thereof [1]** 99/7
**thirst [1]** 111/14
**thorough [1]** 47/17
**thought [6]** 8/23 22/1 62/6 62/12 79/19 80/8
**thoughtful [1]** 47/17
**threatened [1]** 77/25
**through the [1]** 44/22
**thru [1]** 44/11
**thrust [1]** 107/3
**time [28]** 4/9 4/18 6/5 6/14 11/2 16/12 17/8 20/18 30/7 41/23 41/24 47/4 60/9 60/14 61/4 61/6 61/17 65/15 68/19 68/20 69/21 72/22 99/18 99/25 100/8 110/21 111/25 111/25
**timeframe [1]** 84/20
**timeframes [1]** 20/8

**T**

**timeline [1]** 65/3
**times [8]** 28/14 42/20 75/15 75/19 75/23 80/25 81/5 81/23
**tired [1]** 102/21
**tires [9]** 37/8 37/10 39/22 57/7 58/8 58/9 58/25 64/15 87/8
**title [1]** 49/15
**TITUS [1]** 1/8
**topic [1]** 18/24
**tort [1]** 106/22
**touch [1]** 29/22
**touched [1]** 30/1
**towards [4]** 30/13 68/18 73/20 78/1
**tower [5]** 53/7 66/11 66/12 77/25 78/1
**toxic [1]** 36/23
**track [3]** 63/12 63/14 63/17
**transcript [9]** 1/8 1/22 3/6 3/10 84/24 85/6 90/14 93/20 113/12
**translate [1]** 38/16
**transport [1]** 30/16
**transported [1]** 109/24
**trash [10]** 52/17 54/22 54/24 55/2 55/24 73/25 78/22 103/25 108/1 108/2
**treat [1]** 30/18
**treated [1]** 19/18
**treatment [1]** 108/23
**TRIAL [1]** 2/2
**triangle [1]** 52/25
**triangle-shaped [1]** 52/25
**twice [2]** 64/7 64/8
**two-day [1]** 3/18
**two-fifths [1]** 93/15
**two-star [1]** 21/2

**U**

**U.S [9]** 24/17 28/14 31/7 31/8 31/24 35/22 35/22 95/25 96/14
**Ukrainian [3]** 78/2 83/23 83/24
**ultimate [2]** 14/14 51/21
**ultimately [1]** 79/14
**umbrella [4]** 28/9 28/11 29/13 29/22
**uncontaminated [1]** 42/1
**underscore [1]** 34/15
**underscores [4]** 31/21 31/23 35/3 44/4
**understanding [2]** 24/5 106/4
**uniforms [2]** 38/11 81/7
**UNITED [7]** 1/1 1/9 1/19 12/2 14/5 14/8 113/4

**units [3]** 30/18 37/15 37/18
**unless [5]** 31/4 32/22 40/13 104/5 108/1
**unlimited [1]** 26/8
**unlocked [1]** 55/14
**unspent [1]** 51/1
**upper [1]** 77/5
**us [8]** 3/21 30/12 33/5 38/24 47/19 52/23 88/2 98/13
**usable [1]** 38/24
**USFI [2]** 46/19 47/2
**utilize [1]** 91/1
**utilizing [1]** 30/16

**V**

**value [1]** 21/25
**variety [2]** 95/10 104/21
**vary [1]** 57/1
**vehicles [2]** 73/22 73/23
**Veldman [1]** 42/12
**verbal [1]** 27/18
**verse [1]** 21/22
**versus [1]** 91/5
**via [1]** 49/4
**video [5]** 97/1 99/25 100/10 101/2 101/3
**videotape [2]** 99/16 99/17
**Vincent [1]** 89/14
**Vines [3]** 8/21 10/14 89/12
**Vines' [1]** 11/17
**violated [1]** 109/20
**violation [5]** 72/4 72/7 77/22 79/21 80/16
**violations [4]** 5/6 9/1 71/21 72/2
**virtually [1]** 40/17
**vis [2]** 90/24 90/24
**vis-a-vis [1]** 90/24
**visit [1]** 75/19
**visual [2]** 55/11 55/12
**vital [1]** 26/18
**vividly [1]** 76/2
**Volmecke [1]** 101/9
**voluminous [1]** 23/3

**W**

**Wade [1]** 27/7
**walk [5]** 16/17 27/22 29/25 44/11 44/17
**walk-thru [1]** 44/11
**Walsh [12]** 16/7 17/4 17/12 18/3 18/10 18/18 19/21 21/23 89/18 89/19 90/18 102/7
**war [10]** 10/6 10/8 10/20 11/2 11/4 11/25 14/13 16/11 23/21

27/17
**warfare [1]** 29/1
**warrior [1]** 55/6
**warriors [1]** 55/8
**wartime [1]** 106/19
**waste [76]** 6/24 7/5 7/12 7/21 8/9 8/12 18/17 18/23 20/17 27/20 30/11 30/12 30/15 30/19 31/4 31/22 34/5 34/9 34/10 35/4 35/5 35/8 35/15 35/16 38/21 39/3 39/21 39/24 41/10 41/11 41/12 41/14 41/18 45/11 46/8 46/20 49/24 50/5 52/14 58/2 71/7 72/13 72/17 72/20 72/25 73/3 73/7 73/10 73/17 76/13 82/1 82/3 83/19 83/22 84/2 84/5 84/7 86/6 86/17 86/22 89/5 90/1 90/7 90/9 90/24 91/1 91/15 91/19 93/15 103/3 103/9 103/13 103/21 104/9 109/6 109/10
**wastes [4]** 30/23 30/24 37/17 37/20
**watch [1]** 90/8
**we'd [4]** 11/15 11/16 32/19 92/4
**weather [2]** 39/11 57/2
**weekend [1]** 112/1
**weighed [1]** 49/2
**welcome [2]** 83/13 84/9
**West [4]** 97/5 97/11 97/11 98/9
**whenever [1]** 11/2
**whereof [1]** 113/15
**wide [1]** 53/1
**wire [2]** 59/9 71/4
**witnesses [18]** 2/3 3/24 3/24 3/25 6/23 8/25 16/4 18/11 33/3 41/24 88/2 88/25 89/2 98/13 101/16 102/14 103/10 107/3
**wonder [1]** 109/7
**wonderful [3]** 103/4 103/6 104/9
**wood [4]** 38/10 38/25 39/16 56/7
**wooden [1]** 38/10
**workforce [1]** 18/6
**worksite [1]** 42/24
**world [1]** 9/12
**worried [1]** 80/20
**worse [1]** 111/10
**worst [1]** 111/11
**wrapping [1]** 68/20
**wrist [1]** 90/8
**wristwatch [1]** 18/17
**writings [1]** 33/7

**Y**

**youngest [1]** 49/1